T.C. Memo. 2007-21


UNITED STATES TAX COURT


ESTATE OF BURTON W. KANTER, DECEASED, JOSHUA S. KANTER,
EXECUTOR, AND NAOMI R. KANTER, ET AL.,[1] Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos.    712-86,     1350-87, Filed February 1, 2007.
              31301-87,   33557-87,
               3456-88,   32103-88,
              16421-90,   26251-90,
              20211-91,   21555-91,
              21616-91,    1984-92,
              16164-92,   23743-92,
               7557-93,   22884-93.

---

[1]  Cases of the following petitioners are consolidated
herewith:  Estate of Burton W. Kanter, Deceased, Joshua S.
Kanter, Executor, and Naomi R. Kanter, docket Nos. 1350-87,
31301-87, 33557-87, 3456-88, 32103-88, and 26251-90; Claude M.
and Mary B. Ballard, docket Nos. 16421-90, 20211-91, 21616-91,
1984-92, 23743-92, and 22884-93; and Estate of Robert W. Lisle,
Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-
Executors, and Estate of Donna M. Lisle, Deceased, Thomas W.
Lisle and Amy L. Albrecht, Independent Co-Executors, docket Nos.
21555-91, 16164-92, and 7557-93.

Matthew J. Gries, Randall G. Dick, and N. Jerold Cohen, for petitioner Estate of Burton W. Kanter, Deceased, Joshua S. Kanter, Executor, in docket Nos. 712-86, 1350-87, 31301-87, 33557-87, 3456-88, 32103-88, and 26251-90.

Karen L. Hawkins, for petitioner Naomi R. Kanter in docket Nos. 712-86, 1350-87, 31301-87, 33557-87, 3456-88, 32103-88, and 26251-90.

Steven S. Brown and Royal B. Martin, for petitioners Claude M. and Mary Ballard in docket Nos. 16421-90, 20211-91, 21616-91, 1984-92, 23743-92, and 22884-93, and for petitioners Estate of Robert W. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-Executors, and Estate of Donna M. Lisle, Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-Executors, in docket Nos. 21555-91, 16164-92, and 7557-93.

John J. Comeau, Frederic J. Fernandez, James M. Klein, and Mark J. Miller, for respondent.

## CONTENTS

I.   Procedural History . . . . . . . . . . . . . . . . . . . 12

II.  Amendment to Rule 183 . . . . . . . . . . . . . . . . . 17

III. Notices of Deficiency . . . . . . . . . . . . . . . . . 19

IV.  New Rule 183 and the Court's Review and Adoption
     Procedure . . . . . . . . . . . . . . . . . . . . . . . 26

V.   Standard of Deference Due to General Findings of Fact and
     Credibility Determinations Contained in the STJ Report . 28

VI.   Structure of the Court's Report . . . . . . . . . . . .  35

ISSUE I.   Whether Kanter, Ballard, and Lisle Earned and Are
           Taxable on the Income in Dispute  . . . . . . . . .  37
                      FINDINGS OF FACT
I.   Petitioners . . . . . . . . . . . . . . . . . . . . . . .  38
     A.   Burton W. Kanter  . . . . . . . . . . . . . . . . .  38
     B.   Claude M. Ballard . . . . . . . . . . . . . . . . .  41
     C.   Robert W. Lisle . . . . . . . . . . . . . . . . . .  43
     D.   Additional Findings of Fact Regarding Ballard
          and Lisle . . . . . . . . . . . . . . . . . . . . .  45
          1.   Ballard . . . . . . . . . . . . . . . . . . . .  45
          2.   Lisle . . . . . . . . . . . . . . . . . . . . .  46
     E.   Kanter-Related Entities . . . . . . . . . . . . . .  47
          1.   Investment Research Associates, Ltd.(IRA) . . .  47
               a.   IRA's Shareholders . . . . . . . . . . . .  48
               b.   The Bea Ritch Trusts  . . . . . . . . . .  49
               c.   IRA's Officers and Directors  . . . . . .  50
               d.   IRA's Subsidiaries  . . . . . . . . . . .  52
               e.   IRA's Business Activities . . . . . . . .  53
          2.   Carlco, Inc., TMT, Inc., and BWK, Inc.  . . . .  53
          3.   Additional Findings of Fact Regarding The
               Holding Co. . . . . . . . . . . . . . . . . . .  56
               a.   THC's Shareholders, Officers,
                    and Directors . . . . . . . . . . . . . .  57
               b.   THC's Tax Returns . . . . . . . . . . . .  58
          4.   The Administration Co., Inc., and Principal
               Services Accounting Corp. . . . . . . . . . . .  59
II.  Introductory Statement and Brief Introduction of The
     Five . . . . . . . . . . . . . . . . . . . . . . . . . .  66
     A.   The STJ Report . . . . . . . . . . . . . . . . . .  66
     B.   Comments Regarding the Introductory Statement
          and Brief Introduction of The Five  . . . . . . . .  71
III. Details Regarding The Five . . . . . . . . . . . . . . .  73
     A.   Certain Payments Made by The Five  . . . . . . . .  73
          1.   Hyatt Corp.'s Payment of a Share of Its
               Profits on the Embarcadero Hotel's Management
               Contract to KWJ Corp. . . . . . . . . . . . . .  74
          2.   Bruce Frey's Payments to IRA From 1980 Through
               1985 and to THC in 1981, 1983, 1984, and 1987 .  91
               a.   The Frey/THC Agreement  . . . . . . . . . 100
               b.   The Frey/Zeus Agreement . . . . . . . . . 102
               c.   BJF Partnership . . . . . . . . . . . . . 104
               d.   Summary of Frey Payments to Zeus  . . . . 106
               e.   Summary of Frey Payments to THC . . . . . 107
          3.   Payments From William Schaffel to IRA From
               1979 Through 1983 and to THC From 1984
               Through 1986 . . . . . . . . . . . . . . . . . 107

a. Sale of IBM Building . . . . . . . . . . . 110
b. Torcon Transactions With Prudential . . . . 110
c. Walters's Transactions With Prudential . . 112
d. Walters's Transactions With Travelers . . . 113
e. Schaffel's Payments to IRA and THC . . . . 116
f. Four Ponds, FPC Subventure, and One River
   Partnerships . . . . . . . . . . . . . . 118
   (i). Four Ponds Partnership . . . . . 118
   (ii). FPC Subventure Partnership . . . 119
   (iii). One River Partnership . . . . . . 119
   (iv). Meyers's Memorandum Regarding
         Four Ponds Partnership . . . . . 120
   (v). FPC Subventure's Tax Returns . . 122
4. Schnitzer/PMS Payments From 1979 Through 1989 . 124
5. Payments from Eulich/Essex Partnership to
   IRA and THC From 1982 Through 1989 . . . . . . 131
   a. John Eulich . . . . . . . . . . . . . . . 131
   b. Allen Ostroff . . . . . . . . . . . . . . 133
   c. Hotel Management Industry Trends . . . . . 134
   d. The Gateway Hilton and John Connolly . . . 135
   e. Gateway Hotel Management Co. and Essex
      Corp . . . . . . . . . . . . . . . . . . 138
   f. MHM and GHM Hotel Management Contracts . . 140
   g. Essex Partnership . . . . . . . . . . . . 141
   h. Essex Partnership Operations . . . . . . . 144
   i. GHM's and MHM's Representation and
      Marketing Agreements . . . . . . . . . . 145
   j. Transfer of IRA's Essex Partnership
      Interest . . . . . . . . . . . . . . . . 151
   k. Payments to Essex Partnership and Essex
      Partnership Distributions . . . . . . . . 152
B. Certain Loans, Payments, and Other Benefits That
   Ballard and Lisle and/or Their Family Members
   Received . . . . . . . . . . . . . . . . . . . . 153
IV. Additional Findings of Fact: The Flow of Funds . . . . . 159
A. Payments Made by The Five to IRA and Its
   Subsidiaries From 1977 to 1989 . . . . . . . . . 160
   1. Payments Made During 1977 Through 1983 . . . . 162
   2. Payments Made During 1984 to 1989 . . . . . . 164
B. Distribution of the Funds Paid by The Five in
   Connection With the Various Prudential
   Transactions to Kanter, Ballard, Lisle, and Their
   Respective Family Members . . . . . . . . . . . 166
   1. Additional Details Regarding Management and
      Control of Carlco, TMT and BWK . . . . . . . 166
      a. Carlco . . . . . . . . . . . . . . . . . 166
      b. TMT . . . . . . . . . . . . . . . . . . . 167
      c. BWK . . . . . . . . . . . . . . . . . . . 167

2. IRA's Transfers to Carlco, TMT and BWK of
   Funds Paid by The Five . . . . . . . . . . . . 168
   a. Funds Paid by The Five to IRA During 1977
      Through 1983 Transferred to Carlco, TMT,
      and BWK . . . . . . . . . . . . . . . . . 168
      (i). Transfers From Zeus to IRA . . . 169
      (ii). IRA's Transfer of Its Interest
            in Essex Partnership . . . . . . 170
      (iii). IRA's Transfer of Its Interest
            in Sherwood Partnership . . . . . 171
      (iv). Accounting Treatment . . . . . . 172
      (v). Additional Capital Contributions
            to Sherwood Partnership . . . . . 173
   b. Transfer of Funds Paid by The Five During
      1984 Through 1989 to Carlco, TMT, and BWK   174
      (i). Hyatt Corp. . . . . . . . . . . . 174
      (ii). Frey . . . . . . . . . . . . . . 176
      (iii). Schnitzer/PMS . . . . . . . . . 176
      (iv). Essex Partnership . . . . . . . 176
   c. Carlco, TMT, and BWK Capital Accounts . . 177
3. The Disposition of Funds From Carlco, TMT, and
   BWK for the Benefit of Ballard, Lisle, Kanter,
   and Their Families . . . . . . . . . . . . . . 178
   a. Ballard's Use and Enjoyment of TMT's
      Assets . . . . . . . . . . . . . . . . . . 178
      (i). TMT's Various Accounts . . . . . 178
      (ii). Loans From TMT to Ballard and
            Ballard Entities . . . . . . . . 178
      (iii). TMT's Property Transferred to
            Ballard . . . . . . . . . . . . . 181
      (iv). Investment in Melinda Ballard's
            Company . . . . . . . . . . . . . 184
      (v). Ballard's Disclosures to
            Goldman Sachs . . . . . . . . . . 185
      (vi). TMT's Assets . . . . . . . . . . 187
   b. Lisle's Use and Enjoyment of Carlco's
      Assets . . . . . . . . . . . . . . . . . . 188
      (i). Carlco's Various Accounts . . . . 188
      (ii). Lisle's Personal Use of Carlco's
            Funds . . . . . . . . . . . . . . 189
      (iii). Carlco's Assets . . . . . . . . 189
   c. Kanter's Use and Enjoyment of BWK's
      Assets . . . . . . . . . . . . . . . . . . 190
      (i). Salaries and Officer Compensation
            Paid to Kanter and His Son . . . 190
      (ii). Loans . . . . . . . . . . . . . . 190
      (iii). Gifts . . . . . . . . . . . . . 191

    C.  Other Means Used To Transfer Funds for the
        Benefit of Ballard, Lisle, Kanter, and Their
        Respective Families . . . . . . . . . . . . . . . 191
        1.  Payments From IRA, KWJ Corp., and KWJ
            Partnership . . . . . . . . . . . . . . . . . 191
            a.  IRA Payments to Ballard and
               Lisle in 1982 . . . . . . . . . . . . . 191
            b.  Consulting Fees Paid by KWJ Corp.
               and KWJ Partnership to Ballard's
               and Lisle's Adult Children . . . . . . . 192
        2.  Additional Loans . . . . . . . . . . . . . . 194
            a.   IRA Loans to Kanter . . . . . . . . . . 194
            b.   Loans to Ballard, Lisle, Their Family
               Members, and Their Trusts . . . . . . . 194
               (i).    Ballard's Grantor Trusts . . . . 194
               (ii).   Lisle's Grantor Trusts . . . . . 195
               (iii).  International Films, Inc. . . . . 196
               (iv).   Harbor Exchange Lending Operation 196
               (v).    Loans to Lisle and His Trusts. . 197
               (vi).   Loans to the Ballards and
                     Their Trusts . . . . . . . . . . 197
               (vii).  Writeoff of Loans and Claimed
                     Losses. . . . . . . . . . . . . . 197
               (viii). Loans to Lisle's RWL Cinema
                     Trust During 1988 to 1990 . . . . 205
    D.  Summary of Funds Paid by The Five to IRA and
        Disposition of Those Funds for the Benefit of
        Kanter, Ballard, Lisle, and Their Families . . . . 205
    E.  Payments Made by The Five to THC and Its
        Subsidiaries During 1981 Through 1989 . . . . . . 207
    F.  Distribution of Funds From THC to Kanter . . . . 208
    G.  The Flow of Funds From Four Ponds and One River
        Through FPC Subventure to Kanter and Lisle . . . . 211
V.  Additional Findings of Fact Regarding the Examination
Process and Summons Enforcement Proceedings . . . . . . . 213
    A.  Failure To Cooperate During the Audit . . . . . . 213
    B.  IRS Summonses . . . . . . . . . . . . . . . . . . 214
    C.  Summons Enforcement . . . . . . . . . . . . . . . 215
    D.  Requests for Production of Documents . . . . . . . 219
                     OPINION
    A.  The Parties' Positions . . . . . . . . . . . . . 222
    B.  The Assignment of Income Doctrine . . . . . . . . 224
    C.  Errors in the STJ Report . . . . . . . . . . . . 228
        1.  The STJ Report Reflects a Misunderstanding of
            Respondent's Theory Regarding the Kickback
            Scheme . . . . . . . . . . . . . . . . . . . 229
        2.  Discussion Regarding Assignment of Income . . 231

     3. Failure To Address Respondent's Flow-of-Funds
       Argument . . . . . . . . . . . . . . . . . . 232
     4. Incomplete Discussion Regarding Loan
       Arrangements . . . . . . . . . . . . . . . . 232
     5. Discussion Regarding Consulting Payments to
       Ballard's and Lisle's Adult Children . . . . . 234
     6. Manifestly Unreasonable Credibility
       Determinations . . . . . . . . . . . . . . . 235
       a. Testimony Offered by The Five . . . . . . 235
       b. Ballard's Testimony Regarding the Hyatt
          Transaction . . . . . . . . . . . . . . 235
       c. Kanter's Testimony Regarding
          Deconsolidation . . . . . . . . . . . . 236
       d. Kanter's Testimony Regarding IRA . . . . . 237
       e. Kanter's, Ballard's, and Lisle's Denials 237
D. Summary of Kanter's, Ballard's and Lisle's
  Transactions With The Five . . . . . . . . . . . . 238
     1. An Overview . . . . . . . . . . . . . . . . . 238
     2. The Hyatt Transaction . . . . . . . . . . . . 244
     3. Shaffel . . . . . . . . . . . . . . . . . . . 249
     4. Frey . . . . . . . . . . . . . . . . . . . . 253
     5. Schnitzer/PMS . . . . . . . . . . . . . . . . 257
     6. Eulich/Essex Partnership . . . . . . . . . . 260
E. Flow-of-Funds Analysis . . . . . . . . . . . . . . 267
     1. Payments to IRA: 1977 Through 1983 . . . . . 268
     2. Payments to IRA: 1984 Through 1989 . . . . . 269
     3. IRA Loans to Kanter, Ballard, and Lisle . . . 270
       a. IRA Loans to Ballard and Ballard's Trusts 270
       b. IRA Loans to Lisle and Lisle's Trusts . . 270
       c. Sale of Grantor Trust Notes for $1 . . . . 271
       d. IRA Loans to Kanter . . . . . . . . . . . 271
       e. Additional Loans to Lisle's Grantor Trust 272
       f. Consulting Payments to Ballard's and
          Lisle's Adult Children . . . . . . . . . 272
     4. Payments to THC: 1981 to 1989 . . . . . . . . 273
       a. FPC Subventure Partnership . . . . . . . . 274
       b. THC Transfers to Kanter . . . . . . . . . 276
F. Kanter-Related Entities Were Shams . . . . . . . . 276
     1. IRA and THC . . . . . . . . . . . . . . . . . 276
     2. Carlco, TMT, and BWK . . . . . . . . . . . . 278
       a. Diversification and Deconsolidation . . . 278
       b. Use and Enjoyment of Carlco's, TMT's,
          and BWK's Assets . . . . . . . . . . . . 282
          (i). Carlco . . . . . . . . . . . . . . 282
          (ii). TMT . . . . . . . . . . . . . . . 283
          (iii). BWK . . . . . . . . . . . . . . . 287
G. Cracks in the Kanter Facade . . . . . . . . . . . . 288
     1. The Hyatt Transaction . . . . . . . . . . . . 288

       2.   Frey . . . . . . . . . . . . . . . . . . . . . 289
       3.   Schaffel . . . . . . . . . . . . . . . . . . . 290
       4.   Schnitzer/PMS . . . . . . . . . . . . . . . . . 291
       5.   Loans to Ballard . . . . . . . . . . . . . . . 292
       6.   Ballard's Disclosures to Goldman Sachs . . . . 292
       7.   Kanters's Letters to the Ballard and Lisle
           Children . . . . . . . . . . . . . . . . . . . 293
   H.  Conclusion and Schedule of Income Adjustments . . . 295

ISSUE II.   Whether Kanter and Ballard Are Liable for
        Additions to Tax for Fraud . . . . . . . . . . . . 298
                OPINION
   A.  Failure To Report Substantial Amounts of Income . . 300
   B.  Concealment of the True Nature of the Income and
      the Identity of the Earners of the Income . . . . . 301
   C.  Use of Sham, Conduit, and Nominee Entities . . . . 301
   D.  Reporting Kanter's and Ballard's Income on IRA's
      and THC's Tax Returns . . . . . . . . . . . . . . . 302
   E.  Commingling of Kanter's and Ballard's Income With
      Funds Belonging to Others . . . . . . . . . . . . . 303
   F.  Phony Loans . . . . . . . . . . . . . . . . . . . . 303
   G.  False and Misleading Documents . . . . . . . . . . 304
   H.  Failure to Cooperate During the Examination Process 304
   I.  Conclusion . . . . . . . . . . . . . . . . . . . . 306

ISSUE III.   Whether Commitment Fees Paid to Century
        Industries, Ltd., During 1981 to 1984 and 1986
        are Includable in Kanter's Income . . . . . . . . 307
             FINDINGS OF FACT
                OPINION
   A.  The Parties' Arguments . . . . . . . . . . . . . . 316
   B.  TEFRA Partnership Provisions . . . . . . . . . . . 317
   C.  The STJ Report . . . . . . . . . . . . . . . . . . 318
   D.  Analysis . . . . . . . . . . . . . . . . . . . . . 319

ISSUE IV.   Whether Kanter Received Unreported Income From
        Hi-Chicago Trust During 1981 to 1983 . . . . . . . 324
             FINDINGS OF FACT
                OPINION
   A.  The Assignment of Income Doctrine . . . . . . . . . 326
   B.  The Parties' Arguments . . . . . . . . . . . . . . 327
   C.  Analysis . . . . . . . . . . . . . . . . . . . . . 327

ISSUE V.   Whether Kanter Is Taxable on Income Attributed
        to the Bea Ritch Trusts for 1986 and 1987 . . . . . 330
             FINDINGS OF FACT
   A.  The Bea Ritch Trusts . . . . . . . . . . . . . . . 330
   B.  Oyster Bay Associates Partnership . . . . . . . . . 332

OPINION
A. Grantor Trust Provisions of Sections 671 Through
678 . . . . . . . . . . . . . . . . . . . . . . 341
B. The Parties' Arguments . . . . . . . . . . . . . 343
C. The STJ Report . . . . . . . . . . . . . . . . . 344
D. Analysis . . . . . . . . . . . . . . . . . . . . 345

ISSUE VI. Whether Kanter Received Unreported Income From
CMS Investors Partnership for 1982 to 1984
and 1987 to 1989 . . . . . . . . . . . . . . . . 349
FINDINGS OF FACT
OPINION
A. The Parties' Arguments . . . . . . . . . . . . . 352
B. Analysis . . . . . . . . . . . . . . . . . . . . 354
1. Subject Matter Jurisdiction . . . . . . . . . 354
2. Whether Kanter Improperly Assigned Income to
THC Through CMS Investors . . . . . . . . . . 356

ISSUE VII. Whether Kanter Received Unreported Income From
Equitable Leasing Co., Inc., During 1983 . . . . 357
FINDINGS OF FACT
OPINION

ISSUE VIII. Whether Kanter Received Unreported Income
for 1982 According to the Bank Deposits Method
of Income Reconstruction . . . . . . . . . . . . 361
FINDINGS OF FACT
OPINION
A. The Commissioner's Use of the Bank Deposits
Method of Income Reconstruction . . . . . . . . . 363
B. The Parties' Arguments . . . . . . . . . . . . . 364
C. The STJ Report . . . . . . . . . . . . . . . . . 365
D. Analysis . . . . . . . . . . . . . . . . . . . . 365

ISSUE IX. Whether Kanter Received Barter Income From
Principal Services Accounting Corp. During 1988
and 1989. . . . . . . . . . . . . . . . . . . . . 367

ISSUE X. Whether the Kanters Received Unreported Interest
Income During 1988 . . . . . . . . . . . . . . . 368

ISSUE XI. Whether the Kanters Are Entitled to Certain
Deductions They Claimed on Schedules A and C
for 1986 to 1989 . . . . . . . . . . . . . . . . 368
FINDINGS OF FACT
OPINION
A. The Parties' Arguments . . . . . . . . . . . . . 372
B. Analysis . . . . . . . . . . . . . . . . . . . . 372

ISSUE XII.   Whether Kanter Realized and Must Recognize
             Capital Gains as a Result of Transactions
             Involving Cashmere Investments Associates, Inc.,
             During 1983 and Whether the Kanters May Use
             the Installment Method To Report Gains  . . . . . 374
                         FINDINGS OF FACT
        A.   Transfer of Real Estate Partnership Interests
             to Cashmere . . . . . . . . . . . . . . . . . . . 380
        B.   Sale of Cashmere Stock to Waco  . . . . . . . . . 383
        C.   Sale of Cashmere Stock From Waco to Zell  . . . . 386
                            OPINION
        A.   The Parties' Arguments  . . . . . . . . . . . . . 387
        B.   Analysis . . . . . . . . . . . . . . . . . . . . 389
             1.  Applicability of Section 357(b)(1)  . . . . . 391
             2.  Applicability of Section 357(c) . . . . . . . 392
             3.  Kanter's Use of the Installment Method  . . . 394

ISSUE XIII.   Whether Kanter Is Entitled to Research and
              Development and Business Expense Deductions
              Related to Immunological Research Corp.
              for 1979 . . . . . . . . . . . . . . . . . . . . 396
                         FINDINGS OF FACT
                            OPINION
        A.   Trade or Business Requirement of Section 174  . . 404
        B.   The Parties' Arguments  . . . . . . . . . . . . . 407
        C.   Analysis . . . . . . . . . . . . . . . . . . . . 408

ISSUE XIV.   Whether Kanter Received Unreported Partnership
             Income During 1978  . . . . . . . . . . . . . . . 415
                         FINDINGS OF FACT
                            OPINION

ISSUE XV.   Whether the Kanters Are Entitled to a Loss From
            GLS Associates for 1981  . . . . . . . . . . . . . 417
                            OPINION

ISSUE XVI.   Whether the Kanters Are Entitled to Losses From
             Equitec for 1983 and 1984 . . . . . . . . . . . . 420
                            OPINION
        A.   The Parties' Arguments  . . . . . . . . . . . . . 420
        B.   Analysis . . . . . . . . . . . . . . . . . . . . 421

ISSUE XVII.   Whether the Kanters Are Entitled to an Investment
              Interest Expense Deduction for 1981  . . . . . . 421
                            OPINION
        A.   The Parties' Arguments  . . . . . . . . . . . . . 422
        B.   Analysis . . . . . . . . . . . . . . . . . . . . 422

ISSUE XVIII.   Whether the Kanters Are Entitled to an
               Investment Tax Credit Carryover for 1978  . . .  423
                         OPINION
        A.   The Parties' Arguments  . . . . . . . . . . . . . .  423
        B.   Analysis  . . . . . . . . . . . . . . . . . . . . .  424


ISSUE XIX.    Whether the Kanters Are Entitled to an
               Interest Deduction for 1986  . . . . . . . . . .  426
                         OPINION
        A.   The Parties' Arguments  . . . . . . . . . . . . . .  426
        B.   Analysis  . . . . . . . . . . . . . . . . . . . . .  427


ISSUE XX.     Whether the Kanters Are Entitled to a Business
               Deduction of $104,231 for 1980 . . . . . . . . .  429
                         OPINION
        A.   The STJ Report  . . . . . . . . . . . . . . . . . .  429
        B.   The Parties' Arguments  . . . . . . . . . . . . . .  429


ISSUE XXI.    Whether the Kanters Are Entitled to a Deduction
               for a Charitable Contribution to the Jewish
               United Fund for 1982  . . . . . . . . . . . . . .  430
                     FINDINGS OF FACT
                         OPINION
        A.   The Parties' Arguments  . . . . . . . . . . . . . .  431
        B.   The STJ Report  . . . . . . . . . . . . . . . . . .  432
        C.   Analysis  . . . . . . . . . . . . . . . . . . . . .  432


ISSUE XXII.   Whether Kanter Is Liable for Self-Employment
               Tax for 1982 . . . . . . . . . . . . . . . . . .  434
                         OPINION


ISSUE XXIII.  Whether the Kanters Realized Capital Gains
               and Losses as Reported on Their 1987 Tax
               Return  . . . . . . . . . . . . . . . . . . . . .  434


ISSUE XXIV.   Additions to Tax and Related Matters . . . . . .  435
                         OPINION



                         APPENDIXES

Appendix 1  . . . . . . . . . . . . . . . . . . . . . . . . . . .  437
Appendix 2  . . . . . . . . . . . . . . . . . . . . . . . . . . .  238
Appendix 3  . . . . . . . . . . . . . . . . . . . . . . . . . . .  439
Appendix 4  . . . . . . . . . . . . . . . . . . . . . . . . . . .  440
Appendix 5  . . . . . . . . . . . . . . . . . . . . . . . . . . .  441
Appendix 6  . . . . . . . . . . . . . . . . . . . . . . . . . . .  443
Appendix 7  . . . . . . . . . . . . . . . . . . . . . . . . . . .  444

Appendix 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . 445
Appendix 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . 446
Appendix 10 . . . . . . . . . . . . . . . . . . . . . . . . . . 447
Appendix 11 . . . . . . . . . . . . . . . . . . . . . . . . . . 448
Appendix 12 . . . . . . . . . . . . . . . . . . . . . . . . . . 449
Appendix 13 . . . . . . . . . . . . . . . . . . . . . . . . . . 451
Appendix 14 . . . . . . . . . . . . . . . . . . . . . . . . . . 452
Appendix 15 . . . . . . . . . . . . . . . . . . . . . . . . . . 453
Appendix 16 . . . . . . . . . . . . . . . . . . . . . . . . . . 454
Appendix 17 . . . . . . . . . . . . . . . . . . . . . . . . . . 455

MEMORANDUM FINDINGS OF FACT AND OPINION

HAINES, Judge:  These consolidated cases are before the Court on separate remands from the U.S. Courts of Appeals for the Fifth, Seventh, and Eleventh Circuits[2] for further proceedings consistent with the Supreme Court's opinion in Ballard v. Commissioner, 544 U.S. 40 (2005), revg. 321 F.3d 1037 (11th Cir. 2003) and Estate of Kanter v. Commissioner, 337 F.3d 833 (7th Cir. 2003).

I.  Procedural History

These cases, along with a number of cases instituted by another taxpayer, Investment Research Associates, Ltd., originally were consolidated for trial, briefing, and opinion. Special Trial Judge D. Irvin Couvillion tried the cases but was statutorily prohibited from entering the decisions.  See sec.

---

[2]  See Estate of Kanter v. Commissioner, 406 F.3d 933 (7th Cir. 2005); Ballard v. Commissioner, 429 F.3d 1026 (11th Cir. 2005); Estate of Lisle v. Commissioner, 431 F.3d 439 (5th Cir. 2005).

7443A(c).[3]  Special Trial Judge Couvillion prepared an initial

report that included his recommended findings of fact and opinion

(the STJ report).  The cases were then assigned to Judge Howard

A. Dawson, Jr., for adoption of the STJ report and entry of

decisions.  Under Rule 183 as in effect at the time, the STJ

report was not filed or otherwise entered into the record of the

cases.[4]  Special Trial Judge Couvillion subsequently collaborated

with Judge Dawson in preparing a final report, Inv. Research

Associates, Ltd. v. Commissioner, T.C. Memo. 1999-407, in which

the Court sustained, inter alia, respondent's determinations that

petitioners Burton W. Kanter (Kanter),[5] Claude M. Ballard

(Ballard), and Robert W. Lisle (Lisle)[6] (collectively

petitioners) failed to report income from a kickback scheme and

were liable for additions to tax for fraud.  The Court also

sustained a number of adjustments respondent determined with

---

[3]  Unless otherwise indicated, section references are to
sections of the Internal Revenue Code, as amended, and Rule
references are to the Tax Court Rules of Practice and Procedure.

[4]  As discussed in greater detail below, Rule 183 was
amended effective Sept. 20, 2005.  We shall refer to the amended
Rule as new Rule 183.

[5]  Burton W. Kanter died on Oct. 31, 2001--after he
testified at the trial in the consolidated cases.  Thereafter,
his estate was substituted as a party in each of his dockets.

[6]  Robert W. Lisle died before the trial in the consolidated
cases, and his estate was substituted as a party in each of his
dockets.

regard to Kanter that were unrelated to the alleged kickback scheme.

Following entry of decisions, Kanter, Ballard, and Lisle appealed their cases to separate Courts of Appeals.[7] In Ballard v. Commissioner, 321 F.3d 1037 (11th Cir. 2003), and Estate of Kanter v. Commissioner, 337 F.3d 833 (7th Cir. 2003), the Courts of Appeals for the Eleventh and Seventh Circuits, respectively, affirmed this Court's holdings that (1) Ballard and Kanter failed to report income from the alleged kickback scheme, and (2) each was liable for additions to tax for fraud.[8] The Courts of Appeals also affirmed this Court's earlier ruling that it was not obliged to make the STJ report part of the record. In Estate of Lisle v. Commissioner, 341 F.3d 364 (5th Cir. 2003), the Court of Appeals for the Fifth Circuit affirmed this Court's holding that

---

[7] In Inv. Research Associates, Ltd. v. Commissioner, T.C. Memo. 1999-407, the Court sustained a number of adjustments respondent determined with regard to the tax liability of Investment Research Associates, Ltd. (IRA). The Court entered decisions in all IRA dockets on Sept. 24, 2001. No appeal having been filed, the Court's decisions in the IRA cases are now final. See secs. 7481(a)(1), 7483.

The Kanters did not appeal the decisions entered in their cases at docket Nos. 24002-91 (taxable year 1987), 26918-92 (taxable year 1988), and 25981-93 (taxable year 1989). These decisions were entered on Sept. 24, 2001, and are now final. See secs. 7481(a)(1), 7483.

[8] In Estate of Kanter v. Commissioner, 337 F.3d 833, 854-857 (7th Cir. 2003), the Court of Appeals for the Seventh Circuit also affirmed and reversed this Court's holdings with regard to several issues that related solely to Kanter.

the Estate of Lisle was liable for tax deficiencies related to the alleged kickback scheme for the years 1987 to 1989 but reversed this Court's holding that the Estate of Lisle was liable for additions to tax for fraud.

Ballard and Kanter filed petitions for certiorari with the Supreme Court. The Estate of Lisle did not file a petition for certiorari.

In Ballard v. Commissioner, 544 U.S. 40 (2005), the Supreme Court concluded (1) the collaborative process this Court employed in the review of the STJ report and adoption of the Court's Memorandum Opinion in Inv. Research Associates, Ltd. v. Commissioner, supra, was not warranted by or described in the Court's Rules of Practice and Procedure, and (2) the STJ report was required to be included in the record to permit fully informed appellate review regarding the question whether the Special Trial Judge's "credibility and other findings made in that report were accorded '[d]ue regard' and were 'presumed . . . correct'". Ballard v. Commissioner, supra at 60. Thus, the Supreme Court reversed the judgments of the Courts of Appeals for the Seventh and Eleventh Circuits and remanded the cases for further proceedings consistent with its opinion.

In Estate of Kanter v. Commissioner, 406 F.3d 933, 934 (7th Cir. 2005), the Court of Appeals for the Seventh Circuit remanded the Kanter cases to this Court "for further proceedings

consistent with the Supreme Court's decision in <u>Estate of Burton W. Kanter v. Commissioner of Internal Revenue</u>, No. 03-1034."

In <u>Ballard v. Commissioner</u>, 429 F.3d 1026, 1027 (11th Cir. 2005), the Court of Appeals for the Eleventh Circuit remanded the Ballard cases to this Court with the following instructions:

> (1) The "collaborative report and opinion" of the Tax Court is ordered stricken; (2) The original report of the special trial judge is ordered reinstated; (3) The Chief Judge of the Tax Court is instructed to assign this matter to a regular Tax Court Judge who had no involvement in the preparation of the aforementioned "collaborative report;" (4) The Tax Court shall proceed to review this matter in accordance with the dictates of the Supreme Court, and with the Tax Court's newly revised Rules 182 and 183, giving "due regard" to the credibility determinations of the special trial judge and presuming correct fact findings of the trial judge.
> * * *

The Court of Appeals also stated that Special Trial Judge Couvillion's findings of fact are to be presumed correct "unless manifestly unreasonable". <u>Id.</u> at 1032.

In <u>Estate of Lisle v. Commissioner</u>, 431 F.3d 439 (5th Cir. 2005), the Court of Appeals for the Fifth Circuit recalled its earlier mandate and directed this Court to reexamine the question whether the Estate of Lisle is liable for tax deficiencies consistent with the instructions handed down by the Court of Appeals for the Eleventh Circuit in <u>Ballard v. Commissioner</u>, 429 F.3d at 1027.[9]

---

[9] The Court of Appeals for the Fifth Circuit's mandate in the Lisle cases includes a reference to the case filed with this Court at docket No. 20219-91. However, the Court's decision in
(continued...)

Following the remands, these cases were assigned to Judge Harry A. Haines, a Judge who was not involved in the prior proceedings in these cases.[10]

II.  Amendment to Rule 183

In response to the Supreme Court's holding in Ballard v. Commissioner, 544 U.S. 40 (2005), the Court amended Rule 183 to provide a procedure for service on the parties of a Special Trial Judge's recommended findings of fact and conclusions of law and the filing of objections and responses.  The pertinent portions of new Rule 183 state as follows:

> **(c) Objections**:  Within 45 days after the service of the recommended findings of fact and conclusions of law, a party may serve and file specific, written objections to the recommended findings of fact and conclusions of law.  A party may respond to another party's objections within 30 days after being served with a copy thereof.  The above time periods may be extended by the Special Trial Judge.  After the time for objections and responses has passed, the Chief Judge shall assign the case to a Judge for preparation of a report in accordance with Code section 7460.

---

[9](...continued)
that case, i.e., that there is no deficiency and no addition to tax due from the Lisles for the taxable year 1984, was entered Nov. 20, 2003, and is otherwise final.  See secs. 7481(a)(1), 7483.  Although the Clerk of the Court notified the Court of Appeals for the Fifth Circuit of this discrepancy, the Court has received no further instruction from the Court of Appeals on this point.  Under the circumstances, the Court will assume that docket No. 20219-91 was included in the Court of Appeals' mandate as the result of an inadvertent clerical error and docket No. 20219-91 shall remain closed.

[10]  Judges Mary Ann Cohen and Howard A. Dawson, Jr., and Special Trial Judge D. Irvin Couvillion have taken no part in the review of these cases on remand.  See Ballard v. Commissioner, 429 F.3d at 1032 n.7.

*Unless a party shall have proposed a particular finding of fact, or unless the party shall have objected to another party's proposed finding of fact, the Judge may refuse to consider the party's objection to the Special Trial Judge's recommended findings of fact and conclusions of law for failure to make such a finding or for inclusion of such finding proposed by the other party, as the case may be*. [Emphasis added.]

**(d) Action on the Recommendations**: The Judge to whom the case is assigned may adopt the Special Trial Judge's recommended findings of fact and conclusions of law, or may modify or reject them in whole or in part, or may direct the filing of additional briefs, or may receive further evidence, or may direct oral argument, or may recommit the recommended findings of fact and conclusions of law with instructions. The Judge's action on the Special Trial Judge's recommended findings of fact and conclusions of law shall be reflected in the record by an appropriate order or report. Due regard shall be given to the circumstance that the Special Trial Judge had the opportunity to evaluate the credibility of witnesses, and the findings of fact recommended by the Special Trial Judge shall be presumed to be correct.

Consistent with new Rule 183(c), the parties were served with copies of the STJ report. In view of the recent amendment to Rule 183, and the unique procedural posture of these cases, the Court extended the dates within which the parties were directed to file the objections and responses referred to in new Rule 183(c). Respondent and Kanter filed objections to the STJ report. Ballard and Lisle filed notices of no objection to the STJ report. Kanter, Ballard, and Lisle filed responses to respondent's objection to the STJ report, and respondent filed a response to Kanter's objection to the STJ report.

III.  Notices of Deficiency

Respondent issued notices of deficiency to petitioners as summarized below:

Burton W. and Naomi R. Kanter

| Year | Deficiency | Additions to Tax | | | Penalty |
| | | Sec. 6653 | Sec. 6659 | Sec. 6661 | Sec. 6662 |
|------|-----------|-----------|-----------|-----------|-----------|
| 1978 | $476,999.00 | -- | -- | -- | -- |
| 1979 | 183,909.37 | $9,190.47 | -- | -- | -- |
| 1980 | 454,396.00 | 22,720.00 | -- | -- | -- |
| 1981 | 340,578.00 | 17,029.00 | $42,682 | -- | -- |
| 1982 | 2,086,913.00 | 104,346.00 | -- | $208,691.00 | -- |
| 1983 | 1,150,652.00 | 57,532.60 | -- | 287,663.00 | -- |
| 1984 | 3,825,078.00 | 191,254.00 | -- | 949,211.00 | -- |
| 1986 | 897,224.00 | 44,861.60 | -- | 223,666.00 | -- |
| 1987 | 1,434,529.00 | 71,726.45 | -- | 358,632.25 | -- |
| 1988 | 523,234.00 | 26,162.00 | -- | 130,809.00 | -- |
| 1989 | 835,847.00 | -- | -- | -- | $167,169 |

Claude M. and Mary B. Ballard

| Year | Deficiency | Additions to Tax--Secs. | | | | Penalty |
| | | 6651(a)(1) | 6653 | 6659 | 6661 | Sec. 6662 |
|------|-----------|-----------|-----------|-----------|-----------|-----------|
| 1975 | $23,453 | -- | $1,173.00 | -- | -- | -- |
| 1976 | 34,024 | -- | 1,701.00 | -- | -- | -- |
| 1977 | 11,502 | -- | -- | -- | -- | -- |
| 1978 | 3,923 | -- | -- | -- | -- | -- |
| 1979 | 21,630 | -- | -- | -- | -- | -- |
| 1980 | 92,481 | -- | -- | -- | -- | -- |
| 1981 | 193,743 | -- | 9,687.00 | $17,138 | -- | -- |
| 1982 | 55,338 | -- | 2,766.90 | -- | $8,744.00 | -- |
| 1984 | 981,072 | [1]$51,331 | 88,788.05 | -- | 245,268.00 | -- |
| 1987 | 208,449 | -- | 10,442.45 | -- | 52,112.25 | -- |
| 1988 | 125,136 | -- | 6,257.00 | -- | -- | -- |
| 1989 | 179,924 | -- | -- | -- | -- | $35,985 |

[1]  Respondent conceded the addition to tax under sec. 6651(a)(1) for the taxable year 1984.

Estate of Robert W. Lisle, Deceased, Thomas W. Lisle and Amy L.
Albrecht, Independent Co-executors, and Estate of Donna M. Lisle,
Deceased, Thomas W. Lisle and Amy L. Albrecht, Independent Co-
Executors

| | | Additions to Tax | | Penalty |
|---|---|---|---|---|
| Year | Deficiency | Sec. 6653 | Sec. 6661 | Sec. 6662 |
| 1984 | $827,955 | $41,397.75 | $206,988.75 | -- |
| 1987 | 195,498 | 9,774.90 | 48,874.50 | -- |
| 1988 | 109,048 | 5,452.00 | 27,262.00 | -- |
| 1989 | 109,049 | -- | -- | $21,810 |

Respondent determined in the notices of deficiency or asserted in amended pleadings that the underpayments in tax were subject to increased interest under section 6621(c), formerly section 6621(d),[11] as follows: Burton W. and Naomi R. Kanter for the taxable years 1979,[12] 1980, 1982 to 1984, 1986, and 1987; Claude M. and Mary B. Ballard for the taxable years 1975 to 1982, 1984, 1987, and 1988; and the Estates of Robert W. Lisle,

---

[11] Sec. 6621(d)(1) was added by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 144(a), 98 Stat. 682, and provides for interest of 120 percent of the adjusted interest rate due on any substantial underpayment of tax attributable to tax-motivated transactions. The increased interest is effective for interest accruing after Dec. 31, 1984. In the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c), 100 Stat. 2744, sec. 6621(d)(1) was redesignated sec. 6621(c)(1).

[12] With respect to the Kanter case at docket No. 3456-88, the applicability of sec. 6621(c) was asserted by respondent in an amendment to answer and applies only to an underpayment in tax of $206,239.63 attributable to a loss of $311,478 claimed by petitioners from Immunological Research Corp., an S corporation, which respondent disallowed. In a second amendment to answer, respondent asserted the entire underpayment in tax for 1979 was subject to increased interest under sec. 6621(c). On brief, respondent concedes the underpayment attributable to the disallowed loss from Immunological Research Corp. is not subject to increased interest under sec. 6621(c) on the basis of Estate of Cook v. Commissioner, T.C. Memo. 1993-581.

Deceased, and Donna M. Lisle, Deceased, for the taxable years 1984, 1987, and 1988.

In amended pleadings, respondent asserted increases in the deficiencies in tax and additions to tax for the taxpayers and years as follows:  Burton W. and Naomi R. Kanter for the taxable years 1978 to 1984 and 1986 to 1989; Claude M. and Mary B. Ballard for the taxable years 1975 to 1982, 1984, and 1987 to 1989; and Estates of Robert W. Lisle, Deceased, and Donna M. Lisle, Deceased, for the taxable years 1984 and 1987 to 1989. In the amended pleadings referred to above, respondent asserted that (1) the underpayments of tax with respect to all or substantial portions of the increased deficiencies in tax are subject to the addition to tax for fraud pursuant to section 6653(b);[13] and (2) in the alternative, if the Court holds that petitioners are not liable for additions to tax for fraud, then petitioners are liable for additions to tax under sections 6653(a)(1) and (2) and 6659(a) and increased interest under

---

[13]  For 1976 through 1981, the addition to tax for fraud is set forth in sec. 6653(b).  For 1982 through 1985, the addition to tax for fraud is set forth in sec. 6653(b)(1) and (2).  For 1986 and 1987, the addition to tax for fraud is set forth in sec. 6653(b)(1)(A) and (B).  For 1988, the addition to tax for fraud is set forth in sec. 6653(b)(1).  For 1989, the penalty for fraud is set forth in sec. 6663(a).  By prior agreement among the parties at a pretrial conference with the Court, respondent's amended pleadings and petitioners' replies thereto were not filed of record until the commencement of trial; however, the parties exchanged these filings with each other well before the trial date that was set by the Court.

section 6621(c), or if the underpayment was for 1989, subject to a penalty under section 6662.[14]

In the amended pleadings referred to above, respondent did not calculate or assert the amounts of the increased tax deficiencies or the amounts of the additions to tax or penalties. Respondent generally asserted the amounts of increased income or the amounts of disallowed expenses that would result in increased deficiencies in tax and additions to tax. As a result of these amended pleadings, and as a result of numerous concessions and stipulations of settlement which were effected by the parties before, during, and after the trial, as well as concessions of

---

[14] As previously discussed, in Estate of Lisle v. Commissioner, 341 F.3d 364 (5th Cir. 2003), the Court of Appeals for the Fifth Circuit affirmed this Court's holding that the Estate of Lisle was liable for the deficiencies in dispute for 1987 to 1989 but reversed this Court's holding that the Estate of Lisle was liable for additions to tax for fraud (and therefore assessment for the taxable year 1984 was barred by the period of limitations). After the Lisle cases were first remanded to this Court for entry of revised decisions (but before the Court of Appeals recalled its mandate on Nov. 22, 2005), respondent asserted the Court should sustain respondent's alternative determinations that the Estate of Lisle was liable for additions to tax under secs. 6653(a)(1) and (2) and 6659(a), increased interest under sec. 6621(c), and accuracy-related penalties under sec. 6662. Petitioners disagreed and filed with the Court of Appeals a document that was treated as a petition for writ of mandamus. Although the Court of Appeals issued an order denying the petition for writ of mandamus, the Court of Appeals intimated that issues concerning alternative additions to tax were beyond the scope of the remand. Consequently, the sole issue remaining to be decided in the Estate of Lisle cases is whether the Estate of Lisle is liable for the tax deficiencies determined in the notices of deficiency for 1987 to 1989.

certain issues by respondent on brief, Rule 155 computations will be necessary in these cases.[15]

The parties settled several issues in these cases before and during the trial. In addition, the parties' objections and responses to the STJ report narrowed the issues remaining in dispute. The issues left to be decided are:

(1) Whether payments received by various entities associated with Kanter during the years at issue represent income earned by and properly taxable to Kanter, Ballard, and Lisle;

(2) if the Court sustains respondent's determinations that Kanter, Ballard, and Lisle are taxable on the payments in question, whether Kanter and Ballard are liable for additions to tax for fraud;

---

[15] In several of the cases in which respondent filed amended pleadings seeking increased deficiencies in tax and additions to tax, respondent left blank the amounts of additional income as to which increased deficiencies were asserted, with footnotes stating that such "amounts will be provided later". Petitioners filed motions to strike respondent's assertions of increased deficiencies where the amounts of increased income or disallowed expenses were not specifically asserted. The Court denied petitioners' motions but ordered respondent to file amended pleadings by a designated date asserting the amounts of increased income or disallowed expenses. Respondent filed amended pleadings to comply with the Court's order in all pertinent cases except two: Docket Nos. 31301-87 and 33557-87, Burton W. and Naomi R. Kanter. An order will be issued on the Court's own motion in docket No. 31301-87 striking respondent's assertion of increased income to the Kanters from IRA for the 1978 tax year. No such order will be issued in docket No. 33557-87 because the transaction as to which respondent asserted increased income is an issue the parties have identified as Cablevision Programming Investments, which the parties have settled.

(3) whether commitment fees paid to Century Industries, Ltd., during 1981 to 1984 and 1986 represent income earned by and taxable to Kanter;

(4) whether Kanter received unreported income from Hi-Chicago Trust during 1981 to 1983;

(5) whether Kanter is taxable on income attributed to the Bea Ritch Trusts for 1986 and 1987;

(6) whether Kanter received unreported income from CMS Investors Partnership for 1982 to 1984 and 1987 to 1989;

(7) whether Kanter received unreported income from Equitable Leasing Co., Inc., during 1983;

(8) whether Kanter received unreported income for 1982 according to the bank deposits method of income reconstruction;

(9) whether Kanter received barter income from Principal Services Accounting Corp. during 1988 and 1989;

(10) whether the Kanters received unreported interest income during 1988;

(11) whether the Kanters are entitled to certain deductions they claimed on Schedules A and C for 1986 to 1989;

(12) whether Kanter realized and must recognize capital gains as a result of transactions involving Cashmere Investments Associates, Inc., during 1983, and whether Kanter is entitled to use the installment method for reporting purposes;

(13) whether Kanter is entitled to research and development and business expense deductions related to Immunological Research Corp. for 1979;

(14) whether Kanter received unreported partnership income during the taxable year 1978;

(15) whether the Kanters are entitled to a loss from GLS Associates for 1981;

(16) whether the Kanters are entitled to a loss from Equitec for 1983 and 1984;

(17) whether the Kanters are entitled to an investment interest expense deduction for 1981;

(18) whether the Kanters are entitled to an investment credit carryover of $120,566 for 1978;

(19) whether the Kanters are entitled to an interest deduction for 1986;

(20) whether the Kanters are entitled to a business deduction of $104,231 for 1980;

(21) whether the Kanters are entitled to a deduction for a charitable contribution to the Jewish United Fund for 1982;

(22) whether Kanter is liable for self-employment tax for the taxable year 1982;

(23) whether the Kanters realized capital gains and losses as reported on their tax return for 1987; and

(24) whether Kanter is liable for various additions to tax and increased interest for the years at issue.

IV. <u>New Rule 183 and the Court's Review and Adoption Procedure</u>

In their responses to respondent's objection to the STJ report, petitioners assert that the Court should ignore respondent's objections to the extent respondent (1) failed to make "specific, written objections" and merely rehashed proposed findings of fact and legal arguments from respondent's posttrial briefs, and (2) proposed new findings of fact (not contained in respondent's posttrial briefs).  In connection with the foregoing, petitioners assert:

> Also, in many of his objections, respondent block-quotes directly from the now-tainted Stricken Opinion. As this Court is well aware, the published opinion in this case was found by the Supreme Court to be violative of the Tax Court's own rules and was stricken from the record.  Because the published opinion was the result of a process that has been held by the Supreme Court to be legally insufficient, it is manifestly improper for respondent to base his objections upon that opinion.  Incredibly, however, respondent quotes at length from the Stricken Opinion without acknowledging that he is doing so.  Also, in his objections, respondent in many instances incorporates his proposed findings which are extracted from the Stricken Opinion and therefore legally insufficient. As a result, this Court should not consider those objections or proposed findings of fact.  Moreover, many of the findings from the Stricken Opinion have already been directly criticized by the Fifth Circuit in <u>Estate of Lisle v. Commissioner</u>, 341 F.3d 364 (5th Cir. 2003).

We agree that new Rule 183(c) generally does not contemplate that a party may propose new findings of fact in the party's

objection to a Special Trial Judge's recommended findings of fact and conclusions of law.  Nevertheless, Rule 183(c) does not provide a bar to new proposed findings of fact and leaves the matter within the discretion of the reviewing Judge.  Moreover, a Judge who is assigned a case under new Rule 183 is obliged to review a Special Trial Judge's recommendations against the entire record in the case and determine whether the recommended findings of fact and conclusions of law merit adoption.  In this regard, new Rule 183(d) establishes a number of options that the reviewing Judge normally may exercise during the review and adoption process.[16]  Among these options, the reviewing Judge may adopt, modify, or reject the Special Trial Judge's recommendations.  Thus, the Court does not feel constrained from correcting manifestly unreasonable findings of fact or making additional findings of fact, so long as any additional facts find direct support in the case record.  With this understanding in mind, we turn to the standard of deference to apply in reviewing the recommended findings of fact and conclusions of law contained in the STJ report.

---

[16] Some of the options contemplated under new Rule 183(d), such as receiving additional evidence or recommitting the recommended findings of fact and conclusions of law with instructions, are not available to the Court in these cases due to limitations prescribed by the Courts of Appeals for the Eleventh and Fifth Circuits when they remanded these cases.

V.  <u>Standard of Deference Due to General Findings of Fact and
    Credibility Determinations Contained in the STJ Report</u>

It is well settled that findings of fact and credibility determinations made by the judicial officer who presided over the trial of a case are presumed to be correct.  Rule 183(d); <u>Ballard v. Commissioner</u>, 544 U.S. 40 (2005) (and cases cited therein). The axiom that deference must be given to the trial judge's findings of fact is rooted in the view that the trial judge (1) is uniquely positioned to evaluate the credibility of witnesses, (2) brings experience and expertise to the fact-finding process, and (3) is normally the person most familiar with the record in a case.  <u>Anderson v. City of Bessemer, N.C.</u>, 470 U.S. 564, 575, 580 (1985); see Fed. R. Civ. P. 52(a), Advisory Committee Notes (1985 amendment).

As previously discussed, the Courts of Appeals for the Eleventh Circuit and the Fifth Circuit remanded the Ballard and Lisle cases to this Court and directed that the recommended findings of fact in the STJ report are presumed to be correct "unless manifestly unreasonable".  Respondent concedes that, although the Court of Appeals for the Seventh Circuit did not articulate a particular standard for review in its remand of the Kanter cases, the Court should apply the same "manifestly unreasonable" standard in all of the cases consolidated herein. Although respondent disagrees that the "manifestly unreasonable" standard is the appropriate standard to be applied under new Rule

183, we need not address the point in the context of these cases.
We proceed with the review of the STJ report mandated by the
Courts of Appeals and apply the "manifestly unreasonable"
standard of deference as more fully described in the caselaw
discussed below.

In Ballard v. Commissioner, 544 U.S. at 54-55, the Supreme
Court addressed the deference that is due a Special Trial Judge's
recommended findings of fact under Rule 183 as follows:

> Rule 183(c)'s origin confirms the clear
> understanding, from the start, that deference is due to
> factfindings made by the trial judge.  Commenting in
> 1973 on then newly adopted Rule 182(d), the precursor
> to Rule 183(c), the Tax Court observed that the Rule
> was modeled on Rule 147(b) of the former Court of
> Claims.  Tax Ct. Rule 182 note, 60 T.C. 1150, (Tax
> Court review procedures were to be "comparable" to
> those used in the Court of Claims).  Rule 182(d)'s
> "[d]ue regard" and "presumed to be correct"
> formulations were taken directly from that earlier
> Rule, which the Court of Claims interpreted to require
> respectful attention to the trial judge's findings of
> fact.  See Hebah v. United States, 456 F.2d 696, 698
> (Cl. Ct. 1972) (per curiam) (challenger must make a
> "strong affirmative showing" to overcome the
> presumption of correctness that attaches to trial judge
> findings).  The Tax Court's acknowledgment of Court of
> Claims Rule 147(b) as the model for its own Rule,
> indeed the Tax Court's adoption of nearly identical
> language, lead to the conclusion the Tax Court itself
> expressed:  Under the Rule formerly designated Rule
> 182(b), now designated 183(c), special trial judge
> findings carry "special weight insofar as those
> findings are determined by the opportunity to hear and
> observe the witnesses."  Tax Ct. Rule 182 note, 60 T.C.
> 1150 (1973); see Stone v. Commissioner, 865 F.2d 342,
> 345 (CADC 1989).  [Fn. ref. omitted.]

We briefly examine the Hebah and Stone cases cited by the
Supreme Court above.

In <u>Hebah v. United States</u>, 197 Ct. Cl. 729, 456 F.2d 696,
698 (1972), the Court of Claims stated:

> Under our rule, the [trial] commissioner's findings of
> fact are presumed to be correct because of his
> opportunity to hear the witnesses and to determine the
> weight to be accorded to their testimony.  A party who
> undertakes to overcome this presumption must make a
> strong affirmative showing to the contrary.  <u>Wilson v.
> United States</u>, 151 Ct.Cl. 271 (1960) and <u>Davis v.
> United States</u>, 164 Ct.Cl. 612 (1964).
>
> Although the presumption does not extend to the
> conclusions of law made by the trial commissioner, he
> saw and heard the witnesses and had a much better
> opportunity than the court to familiarize himself with
> all of the circumstances involved.  In the light of
> this situation and a consideration of the record, we
> find that under the peculiar facts and circumstances of
> this case, <u>his conclusions are not unreasonable or
> unwarranted by the record</u>.  [Emphasis added.]

In <u>Stone v. Commissioner</u>, 865 F.2d 342 (D.C. Cir. 1989),
revg. <u>Rosenbaum v. Commissioner</u>, T.C. Memo. 1983-113, the Court
of Appeals for the District of Columbia Circuit addressed the
correct standard of deference to be applied by a Tax Court Judge
assigned to review a Special Trial Judge's proposed findings of
fact under former Rule 182(d).[17]  In short, the Court of Appeals
rejected the proposition that a simple "preponderance of the
evidence" standard of review would suffice and instead held that

_____

[17]  Former Rule 182(d), much like new Rule 183(d), provided
that "Due regard shall be given to the circumstance that the
commissioner had the opportunity to evaluate the credibility of
witnesses; and the findings of fact recommended by the
commissioner shall be presumed to be correct."  60 T.C. 1150.

a "clearly erroneous" standard of review should be applied in such cases.  Stone v. Commissioner, supra at 346-347.

Our understanding of the standard of deference to apply to findings of fact and credibility determinations in the STJ report is further informed by the Court of Appeals for the Eleventh Circuit:  "Credibility determinations are entitled to great deference, and must not be disturbed unless manifestly unreasonable."  Ballard v. Commissioner, 429 F.3d at 1031 (citing Anderson v. City of Bessemer, N.C., supra at 575).

In Anderson, the Supreme Court granted certiorari to decide whether a Court of Appeals correctly rejected the trial court's findings of fact in support of a judgment in favor of a plaintiff in a sex discrimination case.  The Supreme Court held the Court of Appeals misapplied the "clearly erroneous" standard of review governing a Court of Appeals' review of a District Court's findings of fact as set forth in rule 52(a) of the Federal Rules of Civil Procedure.[18]  Quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948), the Supreme Court stated that "'[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a

---

[18] Fed. R. Civ. P. 52(a) states in pertinent part: "Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

mistake has been committed.'" <u>Anderson v. City of Bessemer, N.C.</u>, 470 U.S. at 565. The Supreme Court embellished the "clearly erroneous" standard of review as follows:

> If the district court's account of the evidence is <u>plausible in light of the record viewed in its entirety</u>, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. <u>United States v. Yellow Cab Co.</u>, 338 U.S. 338, 342 (1949); see also <u>Inwood Laboratories, Inc. v. Ives Laboratories, Inc.</u>, 456 U.S. 844 (1982).
>
> This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts. * * * [<u>Id.</u> at 573-574; emphasis added.]

Although the phrase "manifestly unreasonable" does not appear in the <u>Anderson</u> opinion, the Supreme Court did discuss the "special deference" to be paid to a trial judge's credibility determinations. On this point, the Supreme Court stated:

> When findings are based on determinations regarding the credibility of witnesses, Rule 52(a) demands even greater deference to the trial court's findings; for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said. See <u>Wainwright v. Witt</u>, 469 U.S. 412, (1985). <u>This is not to suggest that the trial judge may insulate his findings from review by denominating them credibility determinations, for factors other than demeanor and inflection go into the decision whether or not to believe a witness. Documents or objective evidence may contradict the witness' story; or the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it.</u> Where such factors are present,

the court of appeals may well find clear error even in a finding purportedly based on a credibility determination. See, e.g., United States v. United States Gypsum Co., supra, [333 U.S.] at 396. But when a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic evidence, that finding, if not internally inconsistent, can virtually never be clear error. Cf. United States v. Aluminum Co. of America, 148 F.2d 416, 433 (CA2 1945); Orvis v. Higgins, supra, at 539-540. [Id. at 575-576; emphasis added.]

Consistent with the foregoing, and in the light of the Courts of Appeals' directions to this Court on remand, we are obliged to review the recommended findings of fact and credibility determinations set forth in the STJ report under a "manifestly unreasonable" standard of review, and we may reject such findings of fact and credibility determinations only if, after reviewing the record in its entirety, we conclude that the recommended finding of fact or testimony (1) is internally inconsistent or so implausible that a reasonable fact finder would not believe it, or (2) is not credible because it is directly contradicted by documentary or objective evidence. Id. at 574-575; see Boyett v. Commissioner, 204 F.2d 205, 208 (5th Cir. 1953) (a court may reject positive and uncontradicted testimony as to a particular fact if the testimony "is inherently improbable or manifestly unreasonable, even though no contradictory testimony is offered" (emphasis added)), affg. a Memorandum Opinion of this Court; Stone v. Commissioner, 865 F.2d

at 346 (where the Court of Appeals for the D.C. Circuit discussed Montgomery Coca-Cola Bottling Co. v. United States, 222 Ct. Cl. 356, 615 F.2d 1318 (1980), and concluded the case stands for the proposition that "reversal of the initial fact-finder is proper if the objective evidence overwhelms the initial fact-finder's inferences from testimony and demeanor").

A final point on the subject of deference. In Ballard v. Commissioner, 429 F.3d at 1031, the Court of Appeals for the Eleventh Circuit stated that the Tax Court's review and adoption of a Special Trial Judge's recommended findings of fact is analogous to a District Court's review of a magistrate judge's findings of fact, and, citing United States v. Cofield, 272 F.3d 1303, 1306 (11th Cir. 2001), it further stated that a magistrate judge's credibility determinations generally may not be rejected without rehearing the disputed testimony. Kanter's response to respondent's objections, filed under new Rule 183(c), includes an argument that the Court of Appeals for the Eleventh Circuit made it clear that this Court cannot reject the credibility determinations set forth in the STJ report. We disagree. We do not understand the Court of Appeals' statement to mean that we are barred from rejecting credibility determinations set forth in the STJ report without first rehearing the disputed testimony. Instead, the Court of Appeals observed that the deaths of primary witnesses in these cases foreclosed retrial. Ballard v.

<u>Commissioner</u>, 429 F.2d at 1032.  Rather than treating the credibility determinations as established on that account, the Court of Appeals prescribed the standard under which they are to be reviewed.  Thus, we conclude we are not barred in these cases from rejecting credibility determinations recommended in the STJ report under the "manifestly unreasonable" standard of review described above.

VI.  <u>Structure of the Court's Report</u>

After comparing the recommended findings of fact and legal conclusions in the STJ report with the entire record in these cases, and taking into account the parties' posttrial briefs and objections and responses filed pursuant to new Rule 183(c), we have determined to reject some of the recommended findings of fact in the STJ report because they are manifestly unreasonable and to supplement others because they are incomplete.

In constructing the Findings of Fact portions of this report, we have included many findings of fact drawn directly from the STJ report, and we have made additional findings of fact where necessary.  For clarity, the findings of fact drawn directly from the STJ report appear in italics and are accompanied by page references to the STJ report.[19]  Footnotes

---

[19]  Some reordering and minor additions and changes have been inserted in the recommended findings of fact adopted from the STJ report.  These minor changes did not alter the substance of the adopted findings of fact and are not otherwise noted in

(continued...)

taken from the STJ report likewise appear in italics but are renumbered.  In contrast, the Court's additional findings of fact appear in bold type accompanied by supporting citations of the trial transcript, trial exhibit(s), and/or the parties' original posttrial briefs, as appropriate.  Our departures from the recommended findings of fact in the STJ report normally are marked by a comment either in the text or in the margin (including appropriate citations of the record).  See <u>Ballard v. Commissioner</u>, 429 F.3d at 1031.  Any additions we have made in the findings of fact portions of this report that do not constitute findings of fact, such as headings and general commentary, appear in normal type.

The Opinion portions of this report appear in normal type and include (1) a summary of the legal analysis set forth in the STJ report, (2) an evaluation of the credibility determinations in the STJ report as weighed against the objective evidence drawn from the entire record, and (3) a discussion and analysis of each of the issues remaining in dispute.

---

[19](...continued)
the report.

Issue I.   Whether Kanter, Ballard, and Lisle Earned and Are
           Taxable on the Income in Dispute

FINDINGS OF FACT (STJ report at 14)

*With respect to the issues in dispute, the parties filed
several stipulations of facts.[20] The facts reflected in these
stipulations, with the annexed exhibits, are so found and are
incorporated herein by reference.[21]*

*At the time the petitions were filed, the Kanters' legal
residence was in the State of Illinois, the Ballards' legal
residence was in the State of Florida, and the Lisles' legal
residence was in the State of Texas.  The independent coexecutors
of the Estates of Robert W. and Donna M. Lisle, Amy L. and Thomas
W. Lisle, were also legal residents of the State of Texas at the
time they were substituted as representatives of the Estates of
their deceased parents.*

---

[20]   The STJ report does not contain any recommended findings
of fact regarding the examination process and related summons
enforcement proceedings that preceded the trial in these cases.
These matters are relevant to the question of whether Kanter and
Ballard are liable for additions to tax for fraud and are
addressed in detail in additional findings of fact, infra pp.
213-222.

[21]   Unless otherwise clear from the context, the following
words, their derivatives, and related terms are used for
narrative convenience only to describe the forms of the various
transactions in dispute in these cases:  "invest", "purchase",
"borrow", "pay", "distribute", "promise", "loan", "sale", "note",
"agreement", "obligation", "interest", "capital contribution",
"paid-in capital", "officer", "director", "shareholder", and
"partner".  By our use of such terms, we do not mean to suggest
any conclusions concerning the actual substance or
characterization of the transactions for tax purposes.

I. <u>Petitioners</u>[22]

   A.  <u>Burton W. Kanter</u> (STJ report at 18-20)

*Petitioner Burton W. Kanter is an attorney who has continuously been engaged in the practice of law at Chicago, Illinois, since about 1956. He received a J.D. degree from the University of Chicago in 1952. From 1952 to 1954, he was a teaching associate at the University of Indiana Law School. From 1954 to 1956, he was an attorney-adviser with the U.S. Tax Court at Washington, D.C. Since 1956, his law practice has been at Chicago, Illinois. His primary expertise is in Federal income and estate taxation. From 1964 to 1981, Kanter was a name partner in the law firm Levenfeld & Kanter, which later became Levenfeld, Kanter, Baskes & Lippitz. That firm dissolved in 1981, and Kanter thereafter practiced with the firm of Kanter & Eisenberg. As of the time of trial, Kanter was serving in an "of counsel" capacity with the Chicago firm of Neal, Gerber & Eisenberg.*

*At the time of trial and for the past 10 years, Kanter taught courses in estate and gift taxation and estate planning at*

---

[22] The STJ report, at 15, opened with recommended findings of fact concerning Investment Research Associates, Ltd. (IRA). This report begins with findings of fact concerning the backgrounds of Kanter, Ballard, and Lisle, followed by findings of fact concerning IRA and other entities that Kanter employed in the transactions in dispute (hereinafter sometimes referred to as Kanter-related entities).

the University of Chicago Law School. Kanter has lectured and written extensively in the area of Federal tax law. He has also been an active participant in professional bar associations. For a number of years, Kanter has been a writer and contributor to the Journal of Taxation, a national monthly publication devoted exclusively to Federal taxation. One of the popular features of this publication is the Shop Talk section, which was originated and edited by Kanter. At the time of trial, Kanter was a senior editor with the Journal of Taxation. Kanter is generally recognized as renowned in his field. All of this has resulted in a successful and prolific law practice, which has led to Kanter's not only being engaged in the practice of law but also to his being extensively involved in consultation, development, and investments in a number of various business fields and enterprises.

Commensurate with his reputation as a highly successful and skillful tax lawyer, Kanter, over the years, has amassed an impressive array of business and professional clients and contacts in business and industry throughout the United States. For instance, Kanter has performed extensive legal work for the Pritzker family, majority owners of the Hyatt Corp., a major hotel company in the United States. He is and was a good friend of certain of the Pritzker family members, including the late A.N. Pritzker, the head of the Pritzker family, whom Kanter

*personally represented.  Kanter also served as a director on several corporate and charitable organization boards.*

*Kanter has made many investments through numerous entities, including corporations, partnerships, and family trusts.  Some of these family trusts are trusts the income of which is taxable to Kanter pursuant to the grantor trust provisions of sections 671 through 678.  A number of Kanter's family trusts own substantial stock interests in The Holding Co., Inc., a corporation that made extensive investments during the years at issue.*

*Additionally, on occasion, Kanter and/or entities associated with him have entered into certain arrangements with various individuals, pursuant to which Kanter would use his business and professional contacts to assist such individuals either in obtaining potential business opportunities or in raising capital for business ventures.  In exchange for such assistance from* **Kanter***, these individuals agreed to share their profits or fees payable to an entity or entities associated with Kanter.[23]*

---

[23]  The STJ report incorrectly stated that entities Kanter represented provided assistance to various individuals in obtaining business opportunities or in raising capital.  As discussed in detail in the Court's additional findings of fact, <u>infra</u> pp. 51, n. 27 (Weisgal testimony), 91-107 (Frey), 107-124 (Schaffel), 124-131 (Schnitzer), and 131-152 (Eulich), there is no evidence (1) anyone at any Kanter-related entity provided the businessmen involved in the transactions in dispute (sometimes referred to as The Five) with assistance in obtaining business opportunities or in raising capital, or (2) any of these businessmen were relying on anyone other than Kanter, in his

(continued...)

*Petitioner Naomi R. Kanter, Kanter's wife, was not involved in any of the activities giving rise to this litigation. She is a petitioner in these proceedings solely because she filed joint Federal income tax returns with Kanter for the years at issue.*

**After paying a small amount of tax in 1978, Kanter paid no Federal income taxes during 1979 through 1989.[24] Kanter filed Federal income tax returns that reported adjusted gross income and income tax as follows:**

| Year | Adjusted Gross Income (Loss) | Income Tax Paid | Exhibit |
|------|------------------------------|-----------------|---------|
| 1978 | ($44,386) | $1,671 | 120 |
| 1979 | (105,084) | -0- | 121 |
| 1980 | (155,026) | -0- | 123 |
| 1981 | (53,614) | -0- | 125 |
| 1982 | (287,536) | -0- | 127 |
| 1983 | (819,449) | -0- | 128 |
| 1984 | (804,482) | -0- | 130 |
| 1985 | (954,695) | -0- | 130A |
| 1986 | (1,529,213) | -0- | 131 |
| 1987 | (2,004,257) | -0- | 132 |
| 1988 | (1,340,459) | -0- | 133 |
| 1989 | (1,331,576) | -0- | 134 |

B. <u>Claude M. Ballard</u> (STJ report at 20-22)

*Ballard was an employee of Prudential. He began his employment with Prudential in 1948 in its real estate department.*

---

[23](...continued)
individual capacity, to assist them in obtaining business opportunities and/or in raising capital.

[24] **Kanter paid small amounts of self-employment tax. Exh. 120.**

*He worked continuously at Prudential until his retirement in early 1982. During the course of his career at Prudential, Ballard was assigned to several regional offices of Prudential, including Houston and Dallas, Texas, and, beginning in 1966, in the corporate headquarters of Prudential at Newark, New Jersey, and then again, for a short time, at the Houston regional office. In 1973, he was reassigned to Prudential's Newark corporate headquarters, where he remained until his retirement in early 1982. At the time he left Prudential, Ballard was a senior vice-president in charge of equities and worked under an individual named Donald Knab who was in charge of all of Prudential's real estate operations. After leaving Prudential, Ballard became a general partner with Goldman Sachs, a brokerage and/or an investment firm in New York City. Later, he became a limited partner with Goldman Sachs.*

*Essentially, Ballard's work with Prudential, in its real estate equity operations, involved the purchase and sale of existing properties, as well as the development of new properties. It included, additionally, the management of such properties, including the negotiation and sale of properties, where warranted. Ballard supervised the staff of this department at Prudential's headquarters, as well as the real estate department staff at Prudential's regional offices throughout the United States.*

*In his position with Prudential, Ballard met and was in contact with attorneys, developers, businessmen, and contractors involved in or affected by Prudential's acquisition and/or development, maintenance, operation, and financing activities. Ballard first met Kanter sometime in 1972 at Houston, Texas, in connection with the opening of the Houston Hyatt Hotel. As indicated previously, Kanter represented the Pritzker family, the majority shareholder/owners of Hyatt Corp. At the Houston Hyatt Hotel's opening, Ballard was introduced to Kanter by A.N. Pritzker (the head of the Pritzker family), who told Ballard that Kanter was A.N. Pritzker's "everything". In the succeeding years, Kanter and Ballard had numerous business and professional contacts with each other.*

*Petitioner Mary B. Ballard, Ballard's wife, was not involved, except in a very limited way, in any of the activities giving rise to this litigation. She is a petitioner in these proceedings solely because she filed joint Federal income tax returns with Ballard for the years at issue.*

C. <u>Robert W. Lisle</u> (STJ report at 22-23)

*Lisle was also an employee of Prudential from September 1950 to April 1982. He was also employed in the real estate department at Prudential, in real estate development and in*

mortgage financing. The development aspect of his work was conducted under the umbrella of a subsidiary corporation of Prudential, which was known as PIC Realty Corp. (PIC Realty). Lisle was president of PIC Realty. Prudential conducted its real estate equity and joint venture operations in the name of PIC Realty in those States that prohibited insurance corporations from directly engaging in real estate development. To a large extent, the career of Lisle paralleled that of Ballard. Lisle also worked in various regional offices of Prudential and ultimately was promoted to a senior executive position at Prudential's Newark corporate headquarters. The offices of Lisle and Ballard were next door to each other. At the time Lisle left Prudential in 1982, he was a vice president of Prudential. Lisle's supervisor at Prudential was also Donald Knab. After leaving Prudential in April 1982, Lisle worked for The Travelers Insurance Co. (Travelers) until April 1988, doing virtually the same kind of work he had done for Prudential.

Lisle met Kanter sometime between 1968 and 1970. The two had numerous contacts with each other in succeeding years, including the period after Lisle left Prudential and worked for Travelers. The record does not reflect what outside business activity Lisle was involved with that would be relevant to these cases between the time Lisle left Travelers in April 1988 until his death in 1993.

*Donna M. Lisle, Lisle's wife, was not involved in any of the activities giving rise to this litigation, and her estate is a party to these proceedings solely by virtue of Mrs. Lisle's having filed joint Federal income tax returns with Lisle for the years at issue. She died in 1993.*

D. Additional Findings of Fact Regarding Ballard and Lisle

**Donald Knab (Knab) worked with Ballard and Lisle in Prudential's Houston regional office in the late 1960s and, after being reassigned to Prudential's corporate headquarters in Newark in the early 1970s, Knab asked Ballard and Lisle to come to work for him in the real estate investment department. Knab, Transcr. at 602-604. Knab had very high regard for Ballard's and Lisle's abilities. Knab, Transcr. at 608.**

1. Ballard

**Ballard considered it common in the real estate business for intermediaries to introduce brokers to corporate real estate owners and financiers, such as Prudential, and for such intermediaries and brokers to share any fees arising from real estate transactions related to such introductions. Ballard, Transcr. at 215-216.**

**Ballard's high-ranking-executive position at Prudential allowed him to exert significant influence over Prudential's real estate investment decisions, including awards of property**

management contracts, financing transactions, and related business. Ballard, Transcr. at 215; Knab, Transcr. at 606-609; Strum, Transcr. at 511, 521-522. Ballard believed that his power to reject or veto a proposed transaction was the most significant power that he wielded at Prudential. Ballard, Transcr. at 215.

2. Lisle[25]

Lisle became president of PIC Realty in 1970. Exh. 2030, at 2. Lisle was first introduced to Kanter by A.N. Pritzker during the period 1968 to 1970. Id. at 10-11. At that time, PIC Realty was involved in the construction of what would become the Houston Hyatt Hotel, and Kanter was representing the Pritzkers. Ballard, Transcr. at 119-120; Exh. 2030, at 11.

Lisle was authorized at both Prudential and Travelers to commit up to $20 million to real estate financing transactions and development projects. Exh. 2030, at 2, 9-10. Lisle's position at Travelers, senior vice president for the real estate investment department, was higher than his position at Prudential. Id. at 9. Lisle's high-ranking-executive positions at Prudential and Travelers allowed him to exert significant influence over Prudential's and Travelers' real estate investment

---

[25] As previously indicated, Lisle died before the trial was held in these cases. Exh. 2030 is a transcript of an interview that IRS agents conducted with Lisle on Jan. 10, 1990.

decisions, including awards of construction contracts, financing transactions, development projects, and related business. Ballard, Transcr. at 215; Strum, Transcr. at 511, 521-522; Knab, Transcr. at 606-609.

    E.   <u>Kanter-Related Entities</u>

    1.   <u>Investment Research Associates, Ltd. (IRA)</u> (STJ report at 15-17)

*IRA was incorporated as a subchapter C corporation in the State of Delaware on August 26, 1974, originally under the name Cedilla Co.  In the annual franchise tax report for IRA filed with the State of Delaware, dated March 1, 1979, the name of Cedilla Co. was changed to Investment Research Associates, Ltd.* **To avoid confusion, we refer to the corporation at all times as IRA.**

*IRA consistently filed annual franchise tax reports with the State of Delaware.*  **Between 1974 and 1977, IRA was authorized to issue both common stock and several classes of preferred stock. Exhs. 4, 9071.  IRA's annual franchise reports filed with the State of Delaware from 1975 to 1988 often were not accurate in reporting the shares of its stock that were issued and outstanding.  Exhs. 4, 9071.**

*IRA has always had a board of directors and a full slate of officers.  It has consistently filed Federal income tax returns.*

During 1977 through 1989, IRA reported consolidated total income, taxable income/losses, and net operating losses as set forth in the following table:

## Table 1

| Year | Total Income | Taxable Income (Loss) | Net Operating Losses |
|------|-------------|----------------------|---------------------|
| 1977 | $234,790 | ($271,394) | ($7,954) |
| 1978 | 1,004,475 | (18,673) | (271,394) |
| 1979 | 1,944,332 | 406,771 | (18,673) |
| 1980 | 3,557,198 | 65,094 | -- |
| 1981 | 5,158,583 | (615,852) | -- |
| 1982 | 4,536,122 | (121,501) | (143,987) |
| 1983 | 3,849,742 | (425,538) | (121,501) |
| 1984 | 3,606,785 | (175,946) | (89,235) |
| 1985 | 3,118,893 | 96,363 | (175,946) |
| 1986 | 2,345,762 | (327,854) | -- |
| 1987 | 299,794 | (16,942) | (111,843) |
| 1988 | (526,393) | (637,842) | (10,550) |
| 1989 | 1,011,577 | (116,521) | (1,057,468) |

Exhs. 10 to 24, 9668, 9669.  IRA paid tax of $94,618 for the taxable year 1979.  Exh. 10.

a.  IRA's Shareholders

Before October 28, 1975, Delores Keating (Keating), a real estate broker, held 1,000 shares of IRA's common stock.  Exh. 9051.  In 1973 or 1974, Mildred Schott (Schott) began working with Keating.  Schott, Transcr. at 2122-2123.  *Schott previously worked as a legal secretary and had a real estate brokerage license.  She was introduced to Kanter by a mutual acquaintance of theirs.*

On October 28, 1975, Keating's 1,000 shares of IRA common stock were exchanged for 500 shares of class B preferred stock. Exh. 9051. Although she did not recall the fact, Schott held 1,200 shares of IRA class A preferred stock until 1982. Schott, Transcr. at 2113, 2129; Exhs. 10, 12, 14, 17. Schott held IRA stock to enable the company to hold a corporate real estate license. Schott, Transcr. at 2119; Exh. 4022.

On October 28, 1978, IRA issued 1,000 shares of common stock in equal shares to 25 trusts known collectively as the Bea Ritch Trusts. Exh. 9051; Exh. 135, at 23. By 1978, IRA redeemed Keating's 500 shares of class B preferred stock. Exh. 4.

During the examination of IRA's returns, an IRS agent recalled being presented with IRA corporate minutes for 1983 which indicated that IRA's shareholders at the time included the Bea Ritch Trusts, Schott, a Ballard family trust, and a Lisle family trust. Batory, Transcr. at 3151-3152.

b. The Bea Ritch Trusts

*The Bea Ritch Trusts were established in 1969 and were named after Beatrice K. Ritch, Kanter's mother. After 1982, IRA had only common stock outstanding, and the Bea Ritch Trusts were IRA's sole shareholders.*

*Originally, when the 25 Bea Ritch Trusts were established in 1969, the beneficiaries of the Bea Ritch Trusts were Kanter,*

*Kanter's family, and other relatives of Kanter. By about 1977, Kanter had* **purportedly** *renounced all of his interest as a beneficiary in the Bea Ritch Trusts.*[26] *Solomon Weisgal (Weisgal), an accountant and a longtime friend and business associate of Kanter, has been the sole trustee of the Bea Ritch Trusts since 1969. As trustee of the Bea Ritch Trusts, Weisgal has an extremely broad power either to accumulate the Bea Ritch Trusts' income or to distribute (i.e., sprinkle) the trusts' income and assets among all or any of the trusts' beneficiaries in virtually any manner he deemed appropriate.*

c.  IRA's Officers and Directors

**Before October 27, 1975, Keating was IRA's president and secretary. Exh. 9050. On October 27, 1975, Keating resigned as IRA's president. Id.**

**On October 27, 1975, Schott was elected IRA's president, and Sharon Meyers (Meyers) was elected IRA's secretary. Id. Meyers had originally worked as Kanter's secretary. Meyers,**

---

[26] **Whether Kanter's alleged renunciations were shams is a factual question raised infra Issue V. In any event, numerous additional trusts were later added as beneficiaries to the Bea Ritch Trusts. Exhs. 135, 9187, 9269, 9270, 9271. See app. 17 to this report. Additional trusts (and groups of trusts) for the benefit of Kanter's family members included the Everglades Trusts (5), the T.C. Family Trust, the Egandale-Vine Trust, the Beach Trust, the Baroque Trusts (3), the Softy Trusts (10), the Pillpoppers Trusts (3), and the Chamber Trusts (3). Exhs. 9213-9220.**

Transcr. at 2890-2891.  By the 1970s, Meyers's position at Kanter's law firm evolved to that of Kanter's administrative assistant.  Meyers, Transcr. at 2894-2899.  Meyers served as an officer and/or director of IRA at various times.  Exh. 4.

*From 1975 to 1980, Schott remained the president of IRA and Weisgal was vice president.[27]*  *From 1980 to 1989, the president of IRA was Lawrence Freeman (Freeman), an attorney in Miami, Florida, and a friend and business associate of Kanter.  Although Freeman was not paid for serving as IRA's president, Freeman and his law firm received significant legal business by referrals from Kanter.*  **Although Freeman was IRA's president and director for most of the 1980s, he characterized his role as primarily that of a bookkeeper/accountant and administrator.  Freeman, Transcr. at 1819.**

*In 1989, Kanter became IRA's acting president.*  **Until 1989, Kanter had never been an officer or employee of IRA.  Exhs. 4,**

---

[27]  **Solomon Weisgal (Weisgal) had little recall regarding his activities as either an officer or a director of IRA or The Holding Co. (THC).  Weisgal, Transcr. at 434-437, 443, 445, 458-460.  Weisgal believed the Bea Ritch Trusts were IRA's sole shareholders from its original organization through 1989. Weisgal, Transcr. at 440.  Weisgal had no recollection of the person or persons at IRA or THC who would have generated business opportunities for The Five or the persons at IRA or THC who would have performed services for The Five under various agreements that he executed on behalf of IRA or THC during the years at issue.  Weisgal, Transcr. at 444-446 (Schaffel), 462 (Essex).**

9071, 9085.  Kanter and his law firm provided legal services to IRA.  Gallenberger, Transcr. at 1990.

From 1976 through 1980, Schott, Weisgal, and Patricia Grogan (Grogan) served as IRA's directors.  Exh. 4.  Grogan was an accountant who began working at Kanter's law firm in the mid-1970s.  Grogan, Transcr. at 1395-1396.  From 1981 through 1989, Freeman served as IRA's director.  Exhs. 4, 9071.

Ballard and Lisle were never shareholders, officers, directors, or employees of IRA.  Exh. 4.  However, in December 1981, IRA issued a check to Ballard in the amount of $12,500--an amount identified in the memo section of the check as a director's fee.  Exh. 3007.  Ballard cashed the check, and IRA deducted the payment as a director's fee on its 1981 tax return.  Id.; Ballard, Transcr. at 218; Exhs. 14, 9071.

   d.  IRA's Subsidiaries

*IRA owned, from time to time, controlling interests in several subsidiary corporations.  These subsidiary corporations included Brickell Enterprises, Inc., Cedilla Co., Cedilla Investment Co., IRA Florida Apartments, Inc., KWJ Corp., Zeus Ventures (Zeus),[28] Carlco, Inc. (Carlco), TMT, Inc. (TMT), and BWK, Inc. (BWK).*  **Carlco, TMT, and BWK are discussed in**

---

[28]  Zeus Ventures (Zeus), is discussed with regard to the Frey transactions described infra pp. 91-107.

**substantial detail below.**  *IRA also, at one point, owned a majority stock interest in International Films, Inc.*

e. <u>IRA's Business Activities</u>

*IRA's principal activity was making investments, either for itself or through its subsidiaries.  It maintained bank accounts and books and records of its activities.  In connection with its investment activities, IRA utilized the services of its officers, employees, advisers, and consultants, among whom was Kanter.*

**IRA was primarily a vehicle for holding passive investments and generally had no paid employees.  Meyers, Transcr. at 2911-2912; Petitioners' Reply Brief at 66.  During the period 1983 to 1989, IRA did not claim any deductions for salaries, wages, or compensation paid to its officers.  Exhs. 18-24.**

2. <u>Carlco, Inc., TMT, Inc., and BWK, Inc.</u> (STJ report at 17-18)

**Kanter was a beneficiary of a trust called the Morkan Trust No. 1.**[29] **Exh. 56.  On October 17, 1983, Kanter exercised a limited power of appointment under the Morkan Trust No. 1 and directed the trustee, Roger Baskes,**[30] **to transfer $2,500 to each of two newly formed trusts:  Christie Trust and Orient Trust.**

---

[29] **Morkan Trust No. 1 was named after Kanter's father, Morris Kanter.  Exh. 56.**

[30] **Roger Baskes was a lawyer employed at one time at Kanter's law firm.  Baskes, Transcr. at 542-543.**

Exhs. 56, 79. Meyers was named trustee of the Christie and Orient trusts. Id. Members of Lisle's family were named as beneficiaries of the Christie Trust, and members of Ballard's family were named as beneficiaries of the Orient Trust. Id.

*Carlco, TMT, and BWK were so-called shelf corporations that Kanter first incorporated in 1982 but remained dormant until late 1983.* Kanter, Transcr. at 3604-3605. In December 1983, IRA acquired 1,000 shares or 100 percent of the common stock of each of Carlco, TMT, and BWK. Exh. 18, at 7. IRA paid $6,000 to each of the corporations for the shares of stock. Exhs. 68, 92, 113.

In December 1983 and January 1984, *Carlco, TMT, and BWK each issued preferred shares of stock. Carlco preferred shares were issued to the Christie Trust (Lisle's family trust); TMT preferred shares were issued to the Orient Trust (Ballard's family trust); and BWK preferred shares were issued to the BK Children's Trust (one of the Bea Ritch Trusts). As a result of those trusts' ownership of these preferred shares, Carlco, TMT, and BWK no longer qualified to be members of IRA's consolidated group of corporations for tax purposes and were not included in the consolidated returns IRA filed. For 1984 and thereafter, Carlco, TMT, and BWK, each filed separate Federal corporate income tax returns.* The record does not include a complete set

of Carlco's, TMT's, or BWK's corporate minutes books, stock ledgers, or stock registers after 1984.

*During this period, Kanter recommended and proposed to Freeman (IRA's president) and Weisgal (trustee of the Bea Ritch Trusts, which held 100 percent of IRA's common stock) that generally Carlco and TMT should each receive a 45-percent share of IRA's available investment funds and that BWK should receive the remaining 10 percent of IRA's available investment funds.*

**Kanter testified that the distribution of IRA's funds to Carlco, TMT, and BWK in a 45/45/10 percent split represented (1) a "free-cashflow asset allocation" he and Freeman devised, and (2) an effort to diversify IRA's investments. Kanter, Transcr. at 3663-3666, 3690-3691, 3694-3695. The diversification of investments was to be achieved by having Lisle manage Carlco and invest principally in municipal bonds, Ballard manage TMT and invest principally in real estate, and Kanter manage BWK and make miscellaneous investments. Id.; Ballard, Transcr. at 222.[31] Kanter, in fact, did not have time to manage BWK's investments. Kanter, Transcr. at 3695.**

---

[31] As shown in additional findings of fact regarding the flow of funds, see infra pp. 162, 187-188: (1) IRA did not allocate all of its free cashflow to Carlco, TMT, and BWK during the period in question, and (2) in addition to real estate investments, Ballard invested substantial amounts of TMT's funds in cash and municipal bonds.

**Kanter also testified that he recommended Carlco, TMT, and BWK be removed from IRA's consolidated group for tax-reporting purposes because (1) he was concerned that Carlco's earnings from tax-exempt municipal bonds might imperil IRA's interest deductions, and (2) he wanted to shelter Ballard and Lisle from "second-guessing" by Freeman or another IRA officer. Kanter, Transcr. at 3685-3686.**[32] *Pursuant to Kanter's proposal, from 1984 through 1989, IRA transferred substantial funds and other assets to Carlco, TMT, and BWK in the respective 45-percent, 45-percent, 10-percent allocation. From 1984 through 1992, Ballard managed TMT's investments, and Lisle managed Carlco's investments.*

3. <u>Additional Findings of Fact Regarding The Holding Co.</u>

Other than identifying The Holding Co. (THC) as a Kanter-related entity that held investments, the STJ report did not include any detailed findings of fact regarding the organization and operation of THC. Inasmuch as THC and its subsidiaries received some of the disputed payments from The Five, and THC is

---

[32] **Kanter did not explain how removing Carlco and TMT from IRA's consolidated group of corporations for tax reporting purposes would serve to shelter Ballard and Lisle from second-guessing by an officer of IRA, given that IRA purportedly continued to own all of Carlco's and TMT's common stock and Carlco and TMT remained IRA's "legally controlled" subsidiaries. See Petitioners' Reply Brief at 3.**

discussed in the flow-of-funds analysis below, additional findings of fact are warranted.[33]

**THC was incorporated as a subchapter C corporation on December 8, 1976. Exh. 153. THC owned several subsidiary corporations including the Citra Co., Active Business Corp., Zion Ventures, Inc.,[34] Harbor Exchange Lending Operation (HELO),[35] LBG Properties, Inc., The Nominee Corp., Oil Investments, Ltd., and Tanglewood Properties, Inc. Exhs. 153, 154, 156-160. THC held numerous partnership interests during the period in question. Id.**

a. THC's Shareholders, Officers, and Directors

**The shareholders statement on each of THC's tax returns shows that Kanter owned THC's voting stock as follows: 1977--75 percent; 1978--76 percent; 1979--76 percent; 1980--76 percent; 1983 to 1986--not more than 50 percent.[36] Exh. 153, at 25; Exh. 154, at 14, l. 10; Exh. 156, at 13, l. 10; Exhs. 157-160. THC's shareholders between 1981 and 1983 included Kanter, his immediate**

---

[33] Payments THC received from The Five (in this case Schaffel, Frey, and Eulich) are summarized infra pp. 207-208.

[34] Zion Ventures, Inc. (Zion), is discussed with regard to the Frey transactions described infra pp. 91-107.

[35] Harbor Exchange Lending Operation (HELO) is discussed with regard to the flow-of-funds analysis infra pp. 196-205.

[36] **The record does not include a complete set of THC's corporate minutes books, stock ledgers, or stock registers.**

family members, and a large number of Kanter family trusts.  Exh.
152, at  1, 2, 6, 7; Exh. 454.

Kanter did not report on his tax returns any sales of THC
stock during the years at issue.  Exhs. 120-134.

During 1981 to 1983, THC's officers and directors included
Kanter, Weisgal, Meyers, Gallenberger, and Joshua Kanter.  Exh.
152.

b.  THC's Tax Returns

THC filed consolidated Federal income tax returns (and
amended returns) reporting taxable income or losses for the years
and in the amounts as follows:

| TYE Aug. 31 | Losses |
| --- | --- |
| 1978 | ($132,095) |
| 1979 | (973,792) [amd.] |
| 1980 | 38,351 |
| 1981 | -- |
| 1982 | -- |
| 1983 | -- |
| 1984 | (7,552,865) |
| 1985 | (5,930,863) |
| 1986 | (5,652,815) |
| 1987 | (6,166,172) |

Exhs. 153-160.  THC's tax returns for 1981 to 1983 are not
part of the record.

4. <u>The Administration Co., Inc., and Principal Services Accounting Corp.</u> (STJ report at 28-32)

The Kanter-related entities described above, particularly IRA and THC, required a clerical staff to assist in bookkeeping and ministerial tasks. Meyers, Transcr. at 2890-2892; Grogan, Transcr. at 1396-1397, 1410. During the mid-1970s to early 1980s, these ministerial tasks were performed by clerical assistants and bookkeepers, such as Meyers and Grogan, who were employees of Kanter's law firm (Levenfeld & Kanter) but who worked for Kanter nearly full time. <u>Id.</u>

By 1981, bookkeeping for IRA, THC, and other Kanter-related entities had become so voluminous that The Administration Co., Inc. (TACI), was organized for that purpose. Meyers, Transcr. at 2901, 2908-2909.[37] *TACI was incorporated in the State of Delaware on September 21, 1981, and was authorized to do business in the State of Illinois. Its articles of incorporation stated that it was "to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware." In TACI's application to do business in the State of Illinois, a more comprehensive statement of TACI's purpose was*

---

[37] *The Administration Co., Inc. (TACI) was organized at the insistence of some of the members of Kanter's law firm who complained that law firm employees working under Kanter were performing extensive nonlegal services for which the law firm was not being compensated.*

that the corporation would engage in consultant and advisory work, including investment, management, and advisory services. On the date TACI was incorporated, Weisgal, as trustee of the Pyramid Trust, subscribed to the total number of shares authorized to be issued by the corporation. Sharon Meyers was the Pyramid Trust's sole beneficiary. Sharon Meyers was the sole director of TACI and was its initial president and treasurer from 1981 through 1985.

TACI was organized to assist its clients in their financial and investment activities. TACI's clients included individuals, corporations, partnerships, trusts, various clients of Kanter, and members of his law firm. However, not all of the clients of TACI were clients of Kanter's law firm. At various times, TACI had hundreds of clients, including Kanter, IRA, and THC. From 1981 through 1988, TACI had between 200 to 500 clients.

TACI had several employees at any given time, mostly clerical assistants, bookkeepers, and accountants. TACI received moneys for and on behalf of clients and paid out moneys either to clients or to third parties on behalf of clients. TACI maintained books and records for each of these clients and, in many instances, prepared clients' tax returns. TACI charged a fee for its services.

With respect to moneys TACI collected and held for its clients, instead of having a separate bank account for each client, at the suggestion of the bank where TACI did business, a single bank account was opened, in TACI's name, which served as a common depository fund for all of TACI's clients. That account was known as the TACI Special E Account.[38] TACI's books and records reflected each client's balance of money in the account and also reflected the deposits or withdrawals by each client affecting that client's balance in the account. TACI also maintained at its bank another similar account known as the TACI Special Account, which was also for the benefit of TACI's clients. This account was not used as an operating account for TACI's clients but rather was used to pool or aggregate idle funds of TACI's clients. The moneys in this account were utilized generally to buy certificates of deposit because a higher rate of return could be realized for TACI's clients through aggregating their funds to purchase larger-denomination certificates of deposit. Funds from this account were also lent to other TACI clients. Deposits to and withdrawals from the TACI Special E Account and the TACI Special Account were posted to the

---

[38] The bank insisted that TACI have a single bank account, as opposed to hundreds of bank accounts for separate clients, because this saved the bank considerable administrative expenses. During this period, the bank did not charge account holders banking fees either for checks deposited to their accounts or for checks written on their accounts.

appropriate client accounts.  TACI issued annual tax statements and reports to its clients and the Internal Revenue Service on the interest income earned by each client on that client's funds in the TACI Special E Account and the TACI Special Account.

Kanter, as a client of TACI, had funds of his own in both the TACI Special E Account and the TACI Special Account.  TACI, as part of its services and acting on Kanter's behalf, paid some of Kanter's business and personal expenses out of Kanter's funds in these accounts.  All checks issued by TACI on behalf of a client were debited against the balance such client had in the accounts.  If a client had a negative balance in the accounts, that debit amount was considered an indebtedness by the client to TACI.  Any positive balance a client had in the accounts was considered money belonging and owed to said client.

Included among the services provided by TACI were bookkeeping services for its clients.  This included keeping books and records for clients and the preparation of individual income tax returns.  TACI prepared Kanter's income tax returns for all or some of the years at issue.

TACI's offices were located either at the law firm offices of Kanter or in close proximity thereto.

Meyers, who was president of TACI, directed the staff and employees of TACI until 1985.  Linda Gallenberger (Gallenberger), a C.P.A., became vice president of TACI in 1982 and worked under

*the direction of Meyers. When Meyers left TACI, Kanter briefly served as acting president of TACI and, thereafter, Gallenberger became TACI's president from 1985 through 1988.*

TACI employed several other clerical assistants, bookkeepers, and accountants, including Lisa Klopman Shanker (Shanker, Transcr. at 998), Sharon Bayers (Bayers, Transcr. at 1005-1006), Rosemary Snedden (Bayers, Transcr. at 1010), Rosaline Weiss (Weiss, Transcr. at 796), Phyllis Dassinger (Dassinger, Transcr. at 629-630), and Kim Moxely Roehn (Roehn, Transcr. at 967-968).

Kanter sometimes instructed Meyers, Gallenberger, and other TACI staff on how a particular transaction should be recorded, where a particular check should be deposited, or to whom moneys should be paid. Meyers, Transcr. at 2900, 2911 2934; Gallenberger, Transcr. at 1939, 1957.

Grogan maintained the books and records and prepared tax returns for IRA and THC. Grogan, Transcr. at 1400-1403, 1415-1417, 1476. Grogan also prepared Kanter's tax returns. Grogan, Transcr. at 1479-1480. Kanter instructed Grogan on how THC's assets were to be invested and how the tax returns for IRA and THC should be prepared. Grogan, Transcr. at 1421, 1479-1480.

TACI filed for bankruptcy in February 1988.[39]  Lawrence Korrub served as TACI's bankruptcy attorney.  Korrub, Transcr. at 1805.  During TACI's 1988 bankruptcy proceedings, the records that TACI maintained for Kanter and Kanter-related entities were not turned over to Korrub.  Korrub, Transcr. at 1807-1808.  The only documents that Korrub received were copies of TACI's tax returns.  Id.  During TACI's bankruptcy, Gallenberger sent TACI's books and records, including the bank statements and canceled checks related to the TACI Special E and TACI Special Accounts, to Kanter.  Gallenberger, Transcr. at 1970-1973.

At the time of TACI's bankruptcy, a new corporation, Principal Services Accounting Corp. (PSAC), was organized.  All of PSAC's outstanding shares of stock were initially owned by ARO Trust, of which trust Kanter was the trustee.  In 1989, Gallenberger became the president of PSAC.  Gallenberger, Transcr. at 1978-1980.  In 1990, Linda Gallenberger purchased from ARO Trust all of PSAC's shares for $100 and her assumption of PSAC's outstanding debts, which totaled over $100,000.

Prior to TACI's filing for bankruptcy, PSAC took over a number of TACI's clients, including Kanter, IRA, and THC.  PSAC

---

[39]  The STJ report, at 32 n.14, incorrectly stated that the record was not clear as to why TACI went bankrupt.  TACI filed for bankruptcy after the Internal Revenue Service (IRS) assessed a number of tax return preparer penalties against the firm for various infractions.  Gallenberger, Transcr. at 1973-1974.

*performed services for clients similar to those which TACI had provided to TACI's clients.  For a short period in 1989, PSAC also established two accounts similar to the TACI Special E Account and the TACI Special Account.*

*The fees PSAC received from its clients were not sufficient to fund PSAC's operations.*  **From the time PSAC came into existence in 1989 until the time Gallenberger purchased the stock of PSAC from the ARO Trust in 1990, PSAC borrowed over $100,000 from BWK and THC to pay its employees' salaries.  Gallenberger, Transcr. at 1980-1982, 1987, 2041.  BWK lent the money to PSAC either directly or through the TACI Special E Account. Gallenberger, Transcr. at 1983-1984.**

**Beyond 1990, PSAC did not generate enough fees to cover its operational costs, continued to operate at a loss, and borrowed money from BWK.  Gallenberger, Transcr. at 1985-1986.  At the time the record in these cases was closed, PSAC had not repaid the loans from BWK.  Id.  When borrowing money, Gallenberger either contacted Kanter about the loan or went ahead and borrowed the money herself.  Gallenberger, Transcr. at 1986-1987.**

**PSAC's bookkeeping procedures and return preparation procedures were essentially the same as TACI's.  Gallenberger, Transcr. at 1988-1989, 2078.  Any questions that Gallenberger had**

**regarding accounting matters were answered by Kanter or Freeman.**
**Id.**

**PSAC was located at Kanter's law firm, Neal, Gerber & Eisenberg. George, Transcr. at 1282-1283. PSAC moved simultaneously with Kanter's law firm. George, Transcr. at 1283-1284.**

II. <u>Introductory Statement and Brief Introduction of The Five</u>
   (STJ report at 24-28)

   A. <u>The STJ Report</u>

*A certain group of persons and/or entities has been referred to by the parties collectively as "The Five". The Five, for the most part, play a prominent role in connection with the additions to tax for fraud. Respondent contends that The Five made payments over a number of years to Kanter, Ballard, and/or Lisle that were kickbacks or payoffs devised by Kanter, Ballard, and/or Lisle. These various transactions or activities involving The Five and the payments by them have been identified and referred to by respondent as the "Prudential scheme", the "Travelers transaction", and the "Kanter transaction". For instance, under the Prudential scheme, respondent contends that Ballard and Lisle used their positions at Prudential to influence and cause Prudential to award business to individual members of The Five. In return for Ballard's and Lisle's services, each member of The Five made payments to an entity or entities owned*

*or controlled by Kanter. In turn, Kanter and/or entities under Kanter's control transferred some or all of those payments to one or more entities, and, through a succession of transfers, the moneys ultimately filtered down to Ballard, Lisle, and Kanter, either as corporate capital contributions or in the form of loans, which were never repaid and later written off as uncollectible. Respondent variously characterized the operation as "schemes" by which payments by The Five went figuratively into a "black box" from which there was a "drop down" to and through various entities until the moneys reached Ballard, Lisle, and Kanter. In actuality, respondent argues, the payments under the Prudential scheme constituted kickback income to Kanter, Ballard, and Lisle, which Kanter, Ballard, and Lisle fraudulently failed to report on their respective income tax returns.*

*As the Court understands the case, respondent's claim of fraud is not based, per se, on the payments by The Five to Kanter or any of the other entities to which such payments were directed. The record is clear, and respondent does not challenge the fact, that all payments made by The Five were reported as income on the Federal income tax returns of the entities receiving such payments. Respondent's claim of fraud essentially is based upon (1) the failure of Ballard, Lisle, and Kanter to report, as income, amounts that were "dropped down" to them as loans that were never repaid, and (2) as to Kanter, for moneys he*

*personally earned that he directed be paid to IRA or other entities he controlled and, as to which, Kanter failed to report on his individual income tax returns.*

*Respondent maintains that the failure of Kanter, Ballard, and Lisle to report the Prudential scheme, Travelers transaction, and Kanter transaction income constituted fraud under section 6653(b), for 1978 through 1989. The entities that make up The Five and a brief description of each follows:*

*(1) Hyatt Hotels Corp., a subsidiary of Hyatt Corp. (Hyatt). Hyatt manages hotels in the United States, Canada, and the Caribbean. As indicated previously, members of the Pritzker family control the ownership of Hyatt. Kanter represented the Pritzkers for years as their attorney. In 1979, IRA acquired KWJ Corp., a corporation that had been receiving certain "commission" payments from Hyatt on the management fees Hyatt earned in operating the Hyatt Embarcadero Hotel at San Francisco, California. The Hyatt Embarcadero Hotel had been developed and was owned by a joint venture in which Prudential was a participant. The commission payments, respondent contends, constituted part of the kickback scheme.*

*(2) Bruce J. Frey, D.M. Interstate, the B.J.F. Development Co. Partnership, and BJF, Inc. Bruce J. Frey was the principal in each of these latter entities. Mr. Frey, through these entities, managed apartments, office buildings, and commercial*

properties. He and these entities were also heavily involved in a number of condominium conversion projects in various cities around the country, in many of which Prudential held interests. Mr. Frey and his related entities shared certain fees with Kanter and his related entities, which respondent also contends constituted part of the kickback scheme.

(3) William D. Schaffel. Mr. Schaffel was a mortgage broker and real estate developer. Mr. Schaffel also assisted a New Jersey general contracting company to obtain certain construction contracts. From 1979 through 1986, he had extensive business dealings on behalf of individuals he represented with Prudential and Travelers. Mr. Schaffel shared with Kanter and his related entities brokerage and development fees, which respondent claimed was part of the kickback scheme.

(4) Property Management Systems, Inc. (PMS). The chairman and chief executive officer of PMS was Kenneth Schnitzer. PMS managed office buildings and other commercial real estate for others pursuant to property management contracts. A relatively small portion of its business included contract cleaning or janitorial services on some Texas commercial properties it managed. At one point, IRA acquired and owned a 47.5-percent stock interest in PMS. Certain fees of PMS were also shared with

*Kanter and his related entities, which respondent claimed was part of the kickback scheme.[40]*

*(5) Essex Hotel Management Co. (Essex Partnership). The Essex Partnership had the following partners holding the partnership interests indicated:*

| Partner | Percentage partnership interest |
|---|---|
| IRA | 26.125 |
| THC | 21.375 |
| Motor Hotel Management Co.(MHM) | 47.500 |
| John Connolly | 5.000 |

*John Eulich was the majority shareholder of Motor Hotel Management Co. (MHM), a corporation, that was engaged in the hotel management business. John Connolly's hotel management company managed two hotels that were owned by Prudential. The partnership agreement for the Essex Partnership is dated January 1, 1982. One of the Essex Partnership's purposes was to provide consulting and liaison services to some of its partners in connection with their management of certain hotels. A substantial portion of the management fees earned by John Connolly and MHM was paid to the Essex Partnership, which respondent contends was a part of the kickback scheme.*

---

[40] **There is no evidence that any PMS fees were shared with Kanter and his related entities.**

B.  Comments Regarding the Introductory Statement and Brief
    Introduction of The Five

The first two paragraphs of the introductory statement in the STJ report regarding The Five do not include findings of fact but rather represent a statement of the Special Trial Judge's understanding of respondent's theory of the cases.  A review of respondent's posttrial briefs reveals that the Special Trial Judge misunderstood and/or misstated respondent's position.

As an initial matter, the STJ report stated that it was respondent's contention The Five made payments "In return for Ballard's and Lisle's services".  This statement suggests that respondent asserted The Five were aware Ballard and Lisle were using their influence to steer business to them and The Five intended to compensate Ballard and Lisle for their actions.  To the contrary, respondent's theory regarding the manner in which the kickback scheme was carried out is articulated in respondent's Opening Brief at 568-567, as follows:

> Suppose A says to B, "If I introduce you to C, and you do business with C's company, then I want 50% of whatever money you make on the deal."  If B did business with C, and, in turn, paid A 50% of what he made, that is not a kickback.  A received a finder's fee.  However, further suppose, A went to C and said, "Whatever business you give to B, I will give you a percentage of the money B gives to me."  In this situation, B may not even know about the arrangement between A and C.  B may believe he is getting business from C because he does good work.  Nevertheless, respondent maintains that when C gives business to B with the understanding that he will eventually receive money generated by that business from A, that is a kickback.

Thus, respondent argued in his posttrial briefs that Schaffel, Frey, Schnitzer, and Eulich generally were unaware Ballard and Lisle were using their influence at Prudential to steer business opportunities to them, and they generally believed they were compensating Kanter for his influence.  As discussed in greater detail, see infra pp. 229-235, in the light of respondent's theory the STJ report gave undue weight to testimony by The Five that they did not participate in a kickback scheme.

The STJ report also incorrectly stated:  "respondent's claim of fraud is not based, per se, on the payments by The Five to Kanter or any of the other entities to which such payments were directed."  Respondent clearly asserted in his opening brief that Kanter's, Ballard's, and Lisle's actions were fraudulent because (1) they knew all the payments from The Five to IRA and THC represented income that was taxable to each of them individually, and (2) Kanter, Ballard, and Lisle intentionally used IRA and THC to (a) shelter the payments from The Five from taxation, and (b) to channel the payments to themselves disguised as capital contributions, loans, and payments to family members. Respondent's Opening Brief at 556-557.

In addition, the statement in the STJ report limiting respondent's theory of fraud to the failure of Kanter, Ballard, and Lisle to report as income amounts "dropped down" to them in the form of loans is inaccurate and incomplete.  In fact,

respondent claimed that Carlco, TMT, and BWK were owned by Lisle, Ballard, and Kanter, respectively, and, therefore, a much larger portion of the payments from The Five, a total of some $6.7 million, was transferred to Kanter, Ballard, and Lisle through so-called capital contributions to Carlco, TMT, and BWK. Id. at 459-473, 598-601. Though not to be ignored, the loans represented relatively small amounts of the moneys that respondent alleged were passed along from The Five, through Kanter-related entities, to Kanter, Ballard, and Lisle.

III. Details Regarding The Five

A. Certain Payments Made by The Five (STJ report at 32-33)

*Prior to and during the years at issue, Prudential was perhaps the largest holder of commercial real estate in the United States. By the late 1970s, it either held or was responsible for managing an estimated $20 billion in commercial real estate properties. In addition to its extensive commercial real estate holdings in numerous cities throughout the United States, since the 1960s, Prudential also was involved in developing commercial real properties and in extending financing to other real estate developers on various real estate projects around the country.*

*As indicated previously, by the middle of 1982, Ballard and Lisle each had left Prudential. After leaving Prudential, Lisle obtained a similar position at Travelers. Respondent's case for*

*fraud is based upon payments made over several years from several*

*entities and/or individuals that have been collectively referred*

*to by respondent as The Five. The following narrative describes*

*The Five and the nature of their payments.*

1. <u>Hyatt Corp.'s Payment of a Share of Its Profits on the Embarcadero Hotel's Management Contract to KWJ Corp.</u>
(STJ report at 33-37)

*From 1968 through 1972, Ballard and J.D. Weaver (Weaver), an*

*executive with Tenneco Corp. (Tenneco) played instrumental roles*

*in their respective employers' joint development of what would*

*become the Houston Hyatt Hotel.* **Weaver was president of**

**Tenneco's real estate development subsidiary. Ballard, Transcr.**

**at 115.** *Ballard negotiated the Houston Hyatt Hotel's management*

*contract with A.N. Pritzker of Hyatt Corp.* **A.N. Pritzker and his**

**sons had reputations as tough negotiators. Ballard, Transcr. at**

**125. Hyatt Corp. was awarded the management contract for the**

**Houston Hyatt Hotel no later than 1970. Ballard, Transcr. at**

**114-120, 126.[41]**

**Lisle also worked on the Houston Hyatt Hotel project for**

**Prudential. Friend, Transcr. at 767-768, 772-777. A.N. Pritzker**

---

[41] **Hugo M. Friend, Jr. (Friend), a Hyatt Corp. vice president, met Ballard and assisted Lisle and Tenneco representatives in the selection of architects and contractors for the Houston project during 1968 or 1969, a fact which suggests that Hyatt Corp. was awarded the management contract for the Houston Hyatt Hotel well before 1970. Friend, Transcr. at 750, 767-768, 773.**

**first introduced Kanter to Lisle as one of Hyatt Corp.'s representatives during the period 1968 to 1970 in connection with the Houston Hyatt project. Exh. 2030, at 10-11. Beginning in 1970, Lisle oversaw the development and construction of the Houston Hyatt Hotel as president of PIC Realty. Ballard, Transcr. at 115, 119; Exh. 2030, at 2.**

*During the early 1970s, before the Houston Hyatt Hotel was completed, Prudential was also participating in a joint venture to develop and own the Embarcadero Hotel in San Francisco.* **Along with Prudential, the other partners in the Embarcadero Hotel project were David Rockefeller, Trammel Crow, and John Portman (an architect). Ballard, Transcr. at 130; Friend, Transcr. at 759.** *As none of the joint venture participants possessed the experience, knowledge, and skill needed to manage and operate the hotel, they endeavored to have an experienced major hotel management company operate the hotel under a long-term management contract.*

*Lisle was supervising the Embarcadero Hotel's development for Prudential and was involved with Prudential and the other joint venture participants in the selection of a management company to manage the hotel. Del Webb, a well-known hotel operator and owner of a large hotel management company, and*

*Intercontinental Co., another large hotel management company, were competing for the management contract.*

*A.N. Pritzker also was interested in having the Hyatt Corp. manage the hotel because the Embarcadero Hotel then would become the third or fourth Hyatt-operated hotel in the United States at which major conventions could be held. As a result of Ballard's experience in negotiating the Houston Hyatt Hotel's management contract, Knab (Ballard and Lisle's superior at Prudential) directed Ballard to review and evaluate the terms of the proposed management contracts to be considered for the Embarcadero Hotel.* **Kanter addressed some tax issues on behalf of Hyatt Corp. with regard to the Embarcadero Hotel. Kanter, Transcr. at 3669.**

**The Embarcadero Hotel was considered a spectacular property, and both Del Webb and A.N. Pritzker wanted the management contract for their respective companies. Ballard, Transcr. at 135-137, 142.** *Initially, Lisle was not interested in having Hyatt Corp. manage the Embarcadero Hotel.* **Lisle opposed Hyatt Corp.'s participation in the bidding on the Embarcadero Hotel management contract because A.N. Pritzker had recently paid John Portman to prepare a set of plans for another hotel in the Nob Hill area of San Francisco. Ballard, Transcr. at 135-137.** *However, Weaver, the Tenneco executive who had worked with Ballard in developing the Houston Hyatt Hotel, eventually*

*persuaded Lisle to allow Hyatt Corp. to be considered for the*

*Embarcadero Hotel's management contract.*[42] **Weaver intervened**

**with Lisle on behalf of Hyatt Corp. because A.N. Pritzker**

**promised Weaver a 10-percent share of the "retained profits"**

**Hyatt Corp. might earn managing the Embarcadero Hotel if Weaver**

**could persuade Lisle to allow Hyatt Corp. to bid on the contract.**

**Ballard, Transcr. at 127, 135-137;**[43] **Exh. 362.**

---

[42] *Tenneco Corp., Weaver's employer, apparently did not have any equity or other interest in the Embarcadero Hotel project.  The record does not fully disclose the circumstances that caused and led Mr. Weaver to persuade Lisle to allow Hyatt Corp. to compete for the Embarcadero Hotel's management contract, nor does the record disclose what specific past dealings Mr. Weaver may have had with Lisle.  While both Lisle and A.N. Pritzker died before the trial of the instant cases, Mr. Weaver's testimony was not offered by the parties.  As Lisle had previously worked in Prudential's Houston regional office, Lisle, in all likelihood, had already been acquainted with Mr. Weaver, as Mr. Weaver had been employed in Tenneco's real estate operations for some time and, beginning in about 1968, had worked with Ballard in putting together the development project for the Houston Hyatt Hotel.*  (Emphasis added.)

**The first clause emphasized above is incorrect.  The circumstances that led Weaver to influence Lisle to allow Hyatt Corp. to bid on the Embarcadero Hotel management contract are set forth in additional findings of fact in the text that follows.**

**The second clause emphasized above is notable.  Ballard denied ever meeting Weaver.  Ballard, Transcr. at 247.  Ballard's testimony on this point was not credible.**

[43] **Ballard testified:  "Mr. Weaver was bugging Mr. Lisle to let Pritzker bid on the hotel."  Ballard, Transcr. at 127.**

**Ballard recognized that Lisle alone held the power to bar Hyatt Corp. from bidding on the Embarcadero Hotel management contract, and there is no suggestion the other partners in the Embarcadero Hotel project had any direct input regarding the bidding process.  Ballard, Transcr. at 130, 135-137.**

*Subsequently, Ballard, Lisle, other Prudential employees, and representatives of the other joint venture participants met with Del Webb and A.N. Pritzker to obtain their respective bids on the Embarcadero Hotel's management contract.*  **The third bidder, Intercontinental Co., unexpectedly did not attend the bid meeting.  Ballard, Transcr. at 136, 269.  Ballard considered it unusual for Del Webb to attend such a meeting in person, as opposed to sending a representative.  Ballard, Transcr. at 138.**

*During the meeting, Mr. Webb refused to submit a bid on behalf of his hotel management company, as Mr. Webb claimed that it was his understanding that Mr. Webb's company was to receive the management contract.  Although Lisle and other representatives of the joint venture participants then asked Mr. Webb how he believed this was so, Mr. Webb refused to elaborate. A.N. Pritzker offered to have Hyatt Corp. enter into a management contract for the Embarcadero Hotel substantially similar to the Houston Hyatt Hotel's management contract.  As Hyatt Corp. submitted the only bid, A.N. Pritzker's proposal was accepted,*

*and a management contract for the Embarcadero Hotel along those lines was ultimately entered into by Hyatt Corp., Prudential, and the other joint venture participants.* **Hyatt Corp. was awarded the Embarcadero Hotel management contract without any competing bid.  Ballard, Transcr. at 136.**

*KWJ Corp. was an S corporation solely owned by Weaver.  In early 1971, shortly after winning the Embarcadero Hotel management contract, Hyatt Corp. entered into a "Memorandum Of Agreement" with KWJ Corp. (the Hyatt/KWJ agreement), whereby Hyatt Corp. agreed to pay KWJ Corp. an annual commission generally equal to 10 percent of Hyatt Corp.'s "net cash profits" from the Embarcadero Hotel management contract.*  **The Hyatt/KWJ agreement stated:  "KWJ has been the principal factor in bringing the parties together and aiding in the negotiations" with regard to the Embarcadero Hotel management contract.  Exh. 362, at 2.**

**The Hyatt/KWJ agreement purportedly was authorized by Hyatt Corp.'s executive officers under a document entitled "Certificate of Secretary", which bore the signature of Hugo M. Friend, Jr. (Friend), an executive vice president, secretary, and director at Hyatt Corp. during the period in question.  Exh. 362; Friend, Transcr. at 748-749, 753.  Friend's sister was married to Jay Pritzker, one of A.N. Pritzker's sons.  Friend, Transcr. at 750.**

The Certificate of Secretary stated that a special meeting of Hyatt Corp.'s executive committee of the board of directors had been held, and a resolution was adopted authorizing Hyatt Corp. to enter into an agreement with KWJ Corp. "for KWJ's services rendered in connection with * * * [Hyatt Corp.'s] entering into a lease" with regard to the Embarcadero Hotel. Exh. 362. Friend first learned of the Hyatt/KWJ agreement well over a year later, in June 1972, and he was surprised to see that his name had been signed on the document. Friend, Transcr. at 752-755. Friend investigated further and learned that Donald Pritzker, another of A.N. Pritzker's sons and president of Hyatt Corp. at the time, had his secretary, Joanne Brown, sign Friend's name on the document. Friend, Transcr. at 754. Friend also learned the agreement was entered into because of Weaver's substantial influence in obtaining the Embarcadero Hotel management contract for Hyatt Corp. Friend, Transcr. at 764. Another Hyatt Corp. document, a "Memorandum To The Files", prepared by Leonard W. Stoga, Hyatt Corp.'s chief financial officer, dated February 27, 1982, stated that Weaver earned the fee "as a result of arranging the management agreement between Hyatt * * * and Prudential." Exh. 464; Stoga, Transcr. at 804-807.

Following the Embarcadero Hotel deal, Hyatt Corp. abandoned the Nob Hill hotel project.  Ballard, Transcr. at 135-137. Prudential later built 8 to 10 Hyatt hotels in cities including New Orleans, Cambridge (Massachusetts), Indianapolis, Nashville, Chicago, and Oahu, Hawaii.  Ballard, Transcr. at 135; Friend, Transcr. at 770-771.  Friend often conferred with Ballard and/or Lisle when Hyatt Corp. contemplated replacing a hotel manager at a Prudential-financed hotel.  Id.

Kanter purportedly met Ballard and Weaver for the first time in the fall of 1972 at the opening of the Houston Hyatt Hotel. Kanter, Transcr. at 3602-3603, 3652; Friend, Transcr. at 759.[44]

*Kanter testified he first learned of Hyatt Corp.'s agreement to share its fees on the Embarcadero Hotel's management contract with KWJ Corp. in about 1973, when A.N. Pritzker asked Kanter to review the agreement.*

Ballard testified he learned of the Hyatt/KWJ agreement from A.N. Pritzker, after the fact and in connection with discussions regarding the other Prudential-financed hotels mentioned above. Ballard, Transcr. at 134-135.  Ballard testified that A.N. Pritzker volunteered that Hyatt Corp. paid a finder's fee to

---

[44]  The record strongly suggests Kanter met Ballard and Weaver during the period 1968 to 1970--the same time A.N. Pritzker introduced Kanter to Lisle in connection with the Houston Hyatt Hotel project.  Exh. 2030, at 10-11.

Weaver on the Embarcadero Hotel, but A.N. Pritzker sought to assure Ballard that Hyatt Corp. did not pay finder's fees on its management contracts. Id.

In early 1975, a dispute arose between Weaver and Hyatt Corp. with regard to the commission due to KWJ Corp. for 1974. Friend informed Weaver that the Embarcadero Hotel did not generate a net profit for 1974. Exh. 9101. Weaver wrote to Friend and claimed that Hyatt Corp.'s revenue from the Embarcadero Hotel for 1974 under its management contract with Prudential was $612,201 and that KWJ Corp. was entitled to 10 percent of that amount. Id. A.N. Pritzker responded to Weaver by letter and asserted that KWJ Corp.'s share of the fees would have to be reduced by a share of Hyatt Corp.'s home office expenses. Exh. 9102. Weaver wrote back to A.N. Pritzker disagreeing with this approach. Exh. 9103.

During 1975, A.N. Pritzker brought the Hyatt/Weaver dispute to Kanter's attention and requested his advice. Kanter, Transcr. at 3646-3650. *During this period, Kanter and Weaver discussed and negotiated Mr. Weaver's sale of KWJ Corp. to Kanter's "client", IRA. Following these negotiations, in his letter to Kanter dated March 10, 1976, Mr. Weaver confirmed "our understanding regarding my granting to your client a right [option] to purchase all of the outstanding shares of stock of*

KWJ Corp." for $150,000 and Mr. Weaver's continuing right to receive an amount equal to 30 percent of the payments KWJ Corp. received from Hyatt Corp. on the Embarcadero Hotel's management contract.[45]

Kanter testified that Weaver agreed in the mid-1970s to sell KWJ Corp. to IRA for $150,000 because he needed the money. Kanter, Transcr. at 3652-3653. There is no indication in the record that the option Weaver granted to Kanter had any independent value--Weaver simply granted IRA an open-ended option to purchase KWJ Corp. for $150,000. Exh. 9103. As discussed below, IRA's purchase of KWJ Corp. was delayed until 1979 after Hyatt Corp. had become a privately held corporation.[46]

---

[45] Hyatt Corp.'s fees under the Embarcadero Hotel's management contract were based, in substantial part, on the hotel's operational profits. The Embarcadero Hotel opened for business in 1973. During the first few years of the hotel's operation, the "commissions" KWJ Corp. received from Hyatt Corp. were less than Mr. Weaver had expected. According to Kanter, at the time he and Mr. Weaver negotiated KWJ Corp.'s sale to IRA, Mr. Weaver needed money. Beginning in about the late 1970s the Embarcadero Hotel's profits increased significantly. Part of this increased profitability was attributable to improvements that Hyatt Corp. helped to finance by lending about $1 million to the Embarcadero Hotel's owners for certain improvements to the hotel.

[46] Although Hyatt Corp. often did pay finder's fees or commissions to individuals helping it to obtain valuable business contracts, Hyatt Corp. also did not want to publicize the specific payment amounts. It believed that such public disclosure would cause other individuals to demand similar compensation for future business opportunities to Hyatt Corp.

In the meantime, correspondence from Hyatt Corp. to Weaver shows that (1) Hyatt Corp. revised its Embarcadero Hotel management contract with Prudential sometime in late 1975, (2) a question arose whether KWJ Corp.'s commission would be computed under the old Embarcadero Hotel management contract or the new Embarcadero Hotel management contract, (3) Hyatt Corp. paid KWJ Corp. $54,848 for 1976 and $60,739 for 1977,[47] and (4) Weaver was informed in 1978 that the Embarcadero Hotel's performance was improving and commission payments to KWJ Corp. would be increasing. Exh. 364; Exh. 9103, at 12; Exh. 4003.

By letter dated September 27, 1979, Kanter informed Weaver that IRA wanted to proceed with the purchase of KWJ Corp., effective retroactively to November 1, 1978. Exh. 365. *In 1979, IRA purchased 100 percent of KWJ Corp.'s outstanding shares of stock from Mr. Weaver.* Specifically, IRA issued to Weaver a $150,000 promissory note which provided that Weaver was to be paid $10,000 on or before November 30, 1979, and $140,000 (with interest at 12 percent) on or before July 31, 1980. Exh. 9103, at 29. On November 26, 1979, 4 days before IRA was obliged to pay Weaver $10,000 in cash on the note, Grogan, on behalf of IRA,

---

[47] Hyatt Corp.'s payments to KWJ Corp. normally were remitted in the spring of the year immediately following the contract year. Exh. 4003.

sent Weaver a letter requesting that Weaver accept "a note of a third party, International Films, Inc." (IFI), one of IRA's subsidiaries, reflecting an obligation due from IFI to IRA in full payment of the $10,000 amount due.  Exh. 9103, at 30. Weaver agreed to this proposal. On November 30, 1979, Grogan, on behalf of IRA, sent Weaver a document purporting to be an IFI note payable to IRA for $10,000 which was assigned to Weaver. Exh. 9103, at 31-32.  On March 12, 1980, Meyers, on behalf of IFI, sent a letter to Weaver requesting that he agree to extend to July 1, 1980, the time in which IFI had to pay him $10,000. Exh. 9103, at 36.  On July 2, 1980, IFI purportedly paid Weaver $10,907.37 by check signed by Grogan.  Exh. 9103, at 37.  (The record does not reflect whether this check was negotiated.)  On August 1, 1980, Kanter sent Weaver a letter purportedly forwarding a check in the amount of $154,176.44 for the stock of KWJ Corp.  Exhs. 9103, 38.  (The record does not reflect whether this check was negotiated.)

The fact that Weaver did not receive payment on his sale of KWJ Corp. to IRA until August 1980 casts serious doubt on Kanter's testimony that Weaver agreed to sell KWJ Corp. for $150,000 in 1976 because he needed the money.  Kanter, Transcr. at 3652-3653.

As a result of IRA's purchase, KWJ Corp. was included as a subsidiary on IRA's 1979 consolidated tax return. Exh. 10, at 7, 19. IRA's 1979 consolidated return reflected KWJ Corp.'s assets, liabilities, and net worth as of January 1, 1979, as follows:

| Assets | Amount |
|---|---|
| Cash | $40,626 |
| Accrued income | 108,521 |
| Total assets | 149,147 |
| | |
| Liabilities | |
| | |
| Mortgages, notes, and bonds payable | 19,400 |
| Accrued expenses | 14,663 |
| Total liabilities | 34,063 |
| | |
| Net Worth | 115,084 |
| | |
| Common stock | 1,000 |
| Retained earning unappropriated | 53,968 |
| Previously taxed income | 60,116 |
| Total stockholder equity | 115,084 |

Exh. 10.

KWJ Corp.'s accrued income of $108,521 as of January 1, 1979, nearly equaled the sum of the $54,848 and $60,739 ($115,587) payments that KWJ Corp. received from Hyatt Corp. in 1976 and 1977, respectively. Exh. 9103, at 12; Exh. 4003. IRA's 1979 consolidated return reported that KWJ Corp. had gross receipts of $171,027 for 1979, and $51,308 of that amount (the 30 percent paid to Weaver) was deducted as a commission expense.

Exhs. 10, 4003. IRA's share of the 1979 Hyatt Corp. payment alone provided IRA with nearly the full $150,000 purchase price for KWJ Corp. KWJ Corp.'s contract with Hyatt Corp. was worth millions of dollars. Exh. 4003. By selling KWJ Corp. to IRA, Weaver gave up 70 percent of his contract rights under the Hyatt/KWJ agreement.

Neither Weaver nor Kanter immediately informed Hyatt Corp. that IRA had purchased KWJ Corp. Handelsman, Transcr. at 1136-1137. Consequently, Hyatt Corp. continued to send to Weaver checks made payable to KWJ Corp. Handelsman, Transcr. at 1136-1137; Stoga, Transcr. at 813. From 1977 through 1994, Hyatt Corp. paid KWJ Corp. approximately $2.5 million pursuant to the Hyatt/KWJ agreement. Exhs. 4003, 465, 466, 467, 378, 380, 381; Stoga, Transcr. at 808-811; Handelsman, Transcr. at 1141, 1143-1144. Weaver forwarded each of the Hyatt Corp. payments to Kanter. Exhs. 4003, 373, 9103 (e.g., Weaver letters to Kanter dated March 29, 1983, and March 12, 1984). Kanter then returned 30 percent of the Hyatt Corp. fees to Weaver, and IRA deducted those payments as a commission expense. Exh. 10, at 16; Exh. 14, at 7; Exh. 17, at 15-16; Exh. 18, at 20; Ex. 9103 (e.g., TACI check to Weaver dated March 27, 1984).

By letter dated March 29, 1983, Weaver forwarded to Kanter the most recent payment from Hyatt Corp. Weaver's letter stated in pertinent part:

Dear Burt:

Attached is the check from the Hyatt Corporation in the amount of $245,843.00, which represents K.W.J.'s commission for the year ending December 31, 1982.

Will you please deposit and issue appropriate checks to the participants. [Exh. 373].

*In December 1983, IRA liquidated KWJ Corp., and IRA's subsidiaries, BWK, Carlco, and TMT received its assets. BWK, Carlco, and TMT then formed a partnership called KWJ Co. (KWJ Partnership), to which they contributed all of the assets they received from KWJ Corp.'s liquidation. Carlco and TMT each had a 45-percent interest in KWJ Partnership; BWK had a 10-percent interest in the partnership.* **On January 10, 1984, Carlco, TMT, and BWK made capital contributions to KWJ Partnership in the respective amounts of $2,745, $2,745, and $610. Exh. 69, at 8; Exh. 93, at 9; Exh. 114, at 6; also Exh. 9104, at 10.**

Neither Weaver nor Kanter immediately informed Hyatt Corp. that KWJ Corp. had been liquidated. Exh. 9104; Handelsman, Transcr. at 1136-1137. Consequently, Hyatt Corp. continued to send to Weaver checks made payable to KWJ Corp. Id.

Beginning in 1984, the Hyatt Corp. payments that Weaver continued to forward to Kanter were no longer reported on IRA's consolidated returns. Rather, Carlco, TMT, and BWK reported their distributive shares of this money passed through to them from KWJ Partnership. Exhs. 69-74 (Carlco general ledgers); Exhs. 93-98 (TMT general ledgers); Exhs. 114-119 (BWK general ledgers).

In August 1992, after the IRS began its examination in these cases, Kanter informed Hyatt Corp. that IRA had purchased and later liquidated KWJ Corp., and that KWJ Corp.'s assets were transferred to Carlco, TMT, and BWK and then contributed to KWJ Partnership. Exh. 9104. As of the time of trial, Hyatt Corp. continued to send its payments to Weaver in the form of checks made payable to KWJ Corp. Handelsman, Transcr. at 1137.

During the period 1977 to 1994, Hyatt paid to KWJ Corp. the amounts set forth in the following table.[48]

---

[48] Hyatt Corp.'s records are inconsistent with IRA's records with regard to the years in which the payments listed above were paid. We rely on Hyatt Corp.'s records regarding the timing of the payments for purposes of these cases.

## Table 2

| Year | Amount |
|------|--------|
| 1977 | $54,848 |
| 1978 | 60,739 |
| 1979 | -- |
| 1980 | 171,027 |
| 1981 | 128,671 |
| 1982 | 246,717 |
| 1983 | 245,843 |
| 1984 | 265,846 |
| 1985 | 295,415 |
| 1986 | 330,376 |
| 1987 | 327,784 |
| 1988 | 281,926 |
| 1989 | 75,396 |
| 1990 | 24,340 |
| 1991 | 23,288 |
| 1992 | 21,332 |
| 1993 | 21,251 |
| 1994 | 14,911 |
| Total | 2,589,710 |

Exh. 4003. Although Hyatt Corp. was unable to find a record of any payment to KWJ Corp. for the 1978 contract year, Harold S. Handelsman, Hyatt Corp.'s general counsel, believed that a payment was made to KWJ Corp. for 1978. Handelsman, Transcr. at 1142.

As discussed in detail in additional findings of fact, infra pp. 192-194, KWJ Corp., and later KWJ Partnership, paid substantial amounts to Ballard's and Lisle's adult children during the period 1982 to 1989, and those amounts were deducted as consulting fees.

2.  Bruce Frey's Payments to IRA From 1980 Through 1985 and to THC in 1981, 1983, 1984, and 1987 (STJ report at 37-42)

*Bruce Frey was a certified property manager, real estate broker, and the principal in D.M. Interstate Management, Inc. (D.M. Interstate), a real estate property management company that was an S corporation.*[49]  **By January 1980, Frey organized a corporation, BJF Development, Inc. (BJF, Inc.), to engage in the business of condominium conversions.  Exh. 5800; Frey, Transcr. at 653-654.  As discussed in detail below, Frey, his business associate, James Wold (Wold), and BJF, Inc. (as general partners), organized a number of limited partnerships for the purpose of carrying out condominium conversion projects, selling the condominium units, and providing ongoing management services for the condominium association.  Exh. 5800; Frey, Transcr. at 659-660, 663.**

**On June 15, 1984, Frey, Wold, and BJF, Inc., as general partners, and TSG Holdings, Inc., FWID, Ltd., and THC formed a limited partnership known as BJF Development, Ltd. (BJF Partnership), to engage in condominium conversion projects and**

---

[49]  **The second, third, and fourth sentences in the opening paragraph of the STJ report describing business entities operated by Bruce Frey (Frey) are incorrect.  A correct statement of those facts is set forth in additional findings of fact in the text that follows.**

**related business.  Exh. 223.  BJF Partnership is discussed in greater detail below.**

*In many instances, Frey's limited partnerships acquired an apartment complex, renovated and converted it into condominium units, and sold the condominium units to individual purchasers.* **Frey explained that he purchased apartment buildings at their rental value and, after refurbishing and converting the apartments to condominium units, he was able to turn a profit by selling the units to individual owners.  Frey, Transcr. at 659.** *Frey and/or another entity owned by him also typically earned certain development and management fees on condominium conversions.  The development fees were for Frey's and/or his entity's services in managing and supervising the renovation and conversion work on the property, and the management fees were paid for their services in assisting the property's condominium association manage the property following the property's conversion.*

*After successfully engaging in his first condominium conversion project in Illinois in 1978 known as Moon Lake Village, Frey consulted with Kanter to obtain tax advice in connection with that project.* **Kanter was not involved as an investor or partner in the Moon Lake Village project.  Frey, Transcr. at 662-663.** *During their meeting or shortly thereafter,*

*Frey and Kanter discussed Frey's pressing need to raise capital for future condominium conversion projects. At that time, a condominium conversion craze was occurring in a number of major metropolitan areas throughout the country, and Frey was faced with having to raise large amounts of capital to acquire and convert apartment building properties in which he and other competing condominium converters were interested. Although Frey generally could obtain financing from a bank for most of a condominium conversion project's cost, the bank typically would require Frey and other investors to have a substantial investment in the project. Kanter indicated that **he** could help raise large portions of the capital that Frey needed for such condominium conversion projects.[50] However, Kanter stated, in return for such assistance, **he** would have to receive a share of any development and management fees that Frey earned from such projects.*

**Kanter made it clear to Frey that he would bring additional investors and capital to Frey's projects only if Frey agreed to**

---

[50] **The STJ report included statements in this sentence and the next that "Kanter and/or entities associated with him" could provide assistance to Frey in raising capital. As discussed in the text that follows, Frey was relying solely on Kanter to raise capital for his condominium conversion projects. Frey, Transcr. at 666-674. Aside from limited partner investments discussed below, there is no evidence that anyone acting on behalf of a Kanter-related entity, such as IRA or THC, provided any assistance or services to Frey.**

pay Kanter a share of the fees that Frey earned for a given project.  Kanter told Frey:  "I want to be on the same basis as you.  Whatever fees you participate in, I don't want you to have an edge; if I am going to bring capital in and add value to these partnerships, I don't want anyone to have an edge and I want to participate in those fees."  Frey, Transcr. at 671.  Frey acknowledged that Kanter "had a role of more than just a passive investor.  His role was bringing in capital into the venture."  Frey, Transcr. at 668.

*Beginning in 1979-80 with Frey's second and third condominium conversion projects known as Lakewood and 535 North Michigan Ave., respectively, entities associated with Kanter invested, as limited partners, in a number of Frey's condominium conversion projects.  The entities associated with Kanter that invested in these condominium projects included Zeus Ventures, Inc. (Zeus), a subsidiary of IRA, and Zion Ventures, Inc. (Zion), a subsidiary of THC.*  **Following through on his oral agreement with Frey, Kanter also brought other investors and capital to the Lakewood and 535 North Michigan Ave. projects.[51]  Frey, Transcr. at 663-674; Wold, Transcr. at 2880.  Kanter brought in the Marmon**

---

[51]  **In November 1979, D.M. Interstate Management, Inc., entered into an agreement to manage the Lakewood condominium property.  Exh. 223, app. A, pt. II, item 11.**

Trust as a major investor in the 535 North Michigan Ave. project. Frey, Transcr. at 666, 673.

In return for Kanter's bringing investors and capital to the Lakewood and 535 North Michigan Ave. projects, Frey paid Kanter 10 to 20 percent of the development and management fees Frey earned on those projects. Frey, Transcr. at 665-668; Wold, Transcr. at 2865. Frey remitted these payments to Kanter-related entities as directed by Kanter. Frey, Transcr. at 674; Wold, Transcr. at 2861. At the same time, Zeus and Zion received normal profits interests as limited partner investors in these projects. Frey, Transcr. at 666.

Prudential was not involved in either the Lakewood or the 535 North Michigan Avenue conversion projects. Frey, Transcr. at 663-677.

*The first condominium conversion project that Frey undertook involving Prudential was in connection with a 1,000 unit townhouse apartment complex called Village of Kings Creek at Miami, Florida. In late 1979 or early 1980, Frey approached a Prudential real estate department executive working in Prudential's Miami, Florida, regional office about purchasing the Village of Kings Creek apartment complex. The apartment complex was owned by a pension fund managed by Prudential. Frey offered to purchase the apartment complex for a cash price of about $20*

*million. He also advised the Prudential executive that another insurance company, Connecticut Mutual Life Insurance Co., would be joining Frey in purchasing the property. Prudential had already considered selling the apartment complex, and Frey's $20 million offer for the property significantly exceeded the property's appraised market value.*

*The Prudential executive consulted with Ballard about Frey's offer. Ballard advised the executive that Prudential, acting on the pension fund's behalf, should accept the offer, as Ballard felt that Prudential's refusal of such an offer might constitute a breach of fiduciary duty as investment manager of the pension fund.*

*In 1980, Prudential sold the Village of Kings Creek apartment complex to a limited partnership Frey organized to undertake conversion of the property to condominiums. Zeus and Zion participated as limited partners in this partnership,* **contributing $100,000 and $108,014, respectively, to the Village of Kings Creek partnership. Exh. 5800.** *Kanter also brought in another investor, First Illinois Enterprises, that made a substantial investment in the project.* **Wold, Transcr. at 2854.**

**During the Village of Kings Creek conversion process, Ballard visited the property "to see what was going on down there", and he met Wold. Ballard, Transcr. at 178. During this**

same period, Kanter introduced Frey to Ballard at Prudential's headquarters in Newark.  Ballard, Transcr. at 173-175.

*The Village of Kings Creek condominium conversion project was successful.*  **The Village of Kings Creek partnership made a distribution to its partners to cover the partners' share of tax liabilities.  Wold, Transcr. at 2854-2855.  In addition, Kanter received a share of development fees earned on the project by way of checks made payable to THC.  Exh. 457; Wold, Transcr. at 2855, 2860-2861.  Wold believed Kanter directed that the checks should be written to THC.  Wold, Transcr. at 2861.**

*Following Frey's success with the Village of Kings Creek project, the Miami regional office Prudential executive who Frey had dealt with in purchasing that property approached Frey about acquiring another Prudential apartment property in Florida. Beginning with this property, Prudential ultimately participated in a number of successful condominium conversion projects with Frey.  However, many, if not almost all, of these projects that Frey and Prudential undertook were joint ventures.  Entities associated with Kanter, including Zeus and Zion, also were investors in a number of these joint venture condominium conversion projects of Frey and Prudential.*

*Frey did not have to raise as much capital to engage in these joint venture projects with Prudential, as Prudential*

*already owned the apartment property to be converted and sold to individual condominium unit owners. Rather than Prudential's selling an apartment property to Frey and other investors, Prudential elected to participate as co-owner in a joint venture to convert and sell the property as condominium units. Prudential would contribute the property and receive (1) all initial condominium unit sale proceeds up to a specified amount based, in large part, on the property's appraised fair market value as a rental property, and (2) 50 percent of all other unit sale proceeds above the initial specified amount. Frey and other investors would usually form a limited partnership and were responsible for renovating and converting the property and selling the condominium units. The limited partnership that included Frey and other investors received the other 50-percent share of all unit sales proceeds above initial specified amount of the sales proceeds. Frey and/or an entity owned by him also earned development and management fees from the project.*

**Frey/Prudential joint venture projects included condominium conversions known as The Greens, Chatham, Calais, Valleybrook, and Old Forge. Frey, Transcr. at 677; Wold, Transcr. at 2868. Prudential and BJF, Inc., entered into a series of consulting agreements with regard to these projects between August 1, 1981, and December 1981. Exh. 223, app. A, pt. II, items 13, 16, 19;**

Exhs. 221, 5814.  Kanter received a share of development fees in connection with each of the Prudential joint venture condominium conversion projects listed above through checks made payable to Zeus.  Exh. 457; Wold, Transcr. at 2868-2870.

Kanter (through payments to Zeus) also received a share of the fees Frey earned with respect to a Prudential condominium project known as Galaxy Towers, a building that Lisle's PIC Realty had constructed.  Exh. 457, at  2, 4, 8; Exh. 2030, at 25. Although Prudential converted the Galaxy Towers to condominiums on its own, Prudential hired Frey to serve as a consultant for the conversion and to begin a marketing plan to sell the condominiums.  Frey, Transcr. at 684-685.  In exchange for these services, Frey's company received consulting fees.  Id.  In January 1982, Prudential and BJF, Inc., executed a consulting agreement regarding the Galaxy Towers.  Exh. 223, app. A, pt. II, at 8, No. 22.

*In the interim, on October 12, 1981, the existing agreement that Frey had to share development and management fees with* **Kanter** *was formalized in two separate written agreements.*[52]  *One*

---

[52]  The statement in the STJ report that Frey agreed to share his fees with "Kanter and/or entities associated with Kanter" is manifestly unreasonable.  Frey agreed to share fees with Kanter, and Frey entered into the participation agreements and remitted payments to Kanter-related entities only because Kanter directed him to do so.  Frey, Transcr. at 671-674.

*agreement was between BJF, Inc., and IRA's subsidiary, Zeus, and the other agreement was between BJF, Inc., and THC. These written agreements covered projects in which Prudential apartment properties were being converted, as well as other projects not involving Prudential's apartment properties.*

a.  The Frey/THC Agreement

On October 12, 1981, Frey sent a participation agreement to Kanter, as president of THC, regarding THC's "Participation in Condominium Conversions" which provided, in part:

> As requested, we are writing to confirm our prior agreement regarding the participation by us and our affiliates in capital contributions, profits and losses and Developers' Fees (excluding Developers' Fees in condominium conversions of properties of or for The Prudential Insurance Company of America and excluding legal, management or any other fees, which shall be retained by the recipients) in condominium conversions of properties.

> The properties [sic] of this letter agreement shall apply in the case of condominium conversions of those properties listed below and any other condominium conversions in which we agree to participate. Each of us may terminate this agreement at any time on forty-five (45) days or more prior written notice. The termination, however, shall be effective only with respect to new condominium conversions (*i.e.,* conversions of properties not under discussion between us or otherwise in process on the last day of the forty-five (45) day period).

> The participation in capital contributions and profits and losses shall be as follows:

> The Holding Company, a Delaware corporation, its nominees and/or affiliates--("THC")          33%

Bruce J. Frey and his nominee and/or
affiliates--("BJF")                               67%

The participation in Developers' Fees shall commence with
respect to fees received after October 1, 1981, and shall
be as follows:

THC                                                5%
BJF                                               95%
                                                 100%

As used herein, the terms capital contributions,
profits and losses and Developers' Fees refer to those
items allocated or allocable to us and our affiliates.

The properties presently subject to this letter
agreement are those properties which we are converting
as consultant to the Prudential Insurance Company of
America.  As you know, we are, of course, also
participating as partners in various other condominium
conversions (e.g. 535 N. Michigan Ave. Condominium,
Lake Howell Condominium, etc.), but our agreements in
those instances are subject to the terms of various
limited partnership agreements.  [Exh. 222.]

In sum, the Frey/THC agreement provided that, as to condominium

conversion projects involving Prudential properties, and any

future condominium conversion projects not involving Prudential,

properties, THC and Frey would participate in capital

contributions and profits and losses as 33-percent and 67-percent

partners, respectively.  In addition, after October 1, 1981, THC

would receive 5 percent of any development fees derived from any

condominium conversion projects not involving Prudential properties.

b.  <u>The Frey/Zeus Agreement</u>

On October 12, 1981, Frey sent a participation agreement to

Meyers (as president of Zeus, IRA's subsidiary) regarding

"Participation in Proceeds on Prudential Conversions" which

provided, in part:

> As requested, we are writing to confirm our prior
> agreement regarding the participation in the amounts
> realized or to be realized on the condominium conversion of
> properties of or for The Prudential Insurance Company of
> America ("Prudential").

> The terms of this letter agreement shall apply
> with respect to all conversions of Prudential
> properties heretofore and hereafter.

> As used in this letter agreement, the term "amounts
> realized" includes all amounts to be received by the
> converter as Developers' Fees and shares of assigned profits
> but excluding any management or other fees (which shall be
> retained by the Manager).

> *   *   *   *   *   *   *
> Of the amounts received as a Developers' Fee on
> Prudential conversions, BJF (or its counterpart in any
> future conversion) shall retain 75% of the amount received
> in reimbursement for any costs and expenses paid or incurred
> by it. BJF shall retain this 75% amount without regard to
> the actual amount of its costs and expenses and without any
> need to account for the same. Of the remaining 25%, BJF
> SHALL RETAIN 80% and shall distribute the remaining 20% to
> you.

> Of the amounts received as shares of assigned
> profits, BJF shall distribute 20% to you and retain the
> balance. BJF shall retain amounts under this letter
> agreement for itself and for distribution to its
> affiliates in such percentages as they have agreed.

> BJF shall make all distributions to you not later than
> 30 days after the date of this letter or receipt from

Prudential of the Developers' Fees and assigned profits (as the case may be). [Exh. 221.]

In sum, the Frey/Zeus agreement provided that Frey would pay to Zeus (1) the equivalent of 5 percent (20% x 25%) of development fees earned on Prudential condominium conversion projects, and (2) 20 percent of "assigned profits" on Prudential condominium conversion projects excluding any management fees. The Frey/Zeus agreement stated that the term "assigned profits" was intended to cover all compensation paid to BJF, Inc., by Prudential under certain condominium conversion consulting agreements (citing as an example a BJF/Prudential consulting agreement on a project known as Old Forge). Id.

The Frey/Zeus participation agreement formalized Frey's and Kanter's prior oral agreement to share development fees and extended that agreement to cover assigned profits on Prudential projects.

Consistent with Frey's oral agreement with Kanter, as subsequently formalized in the Frey/THC agreement and the Frey/Zeus agreement, BJF, Inc., remitted monthly, and later quarterly, payments to Kanter during the period December 1981 to late 1984, representing THC's and Zeus's shares of development fees and assigned profits arising from condominium conversion projects at Village of Kings Creek, Calais, Chatham, and

Valleybrook.  Exhs. 224, 225, 228 (checks written against a D.M. Interstate Management, Inc. account).

A letter to Kanter from BJF, Inc., dated October 31, 1983, stated in pertinent part:

Dear Mr. Kanter:

Please find enclosed our check #8135 for $15,000.00. This represents your 5% participation of our $300,000.00 incentive fees received from Prudential for 50% of units closed at Calais, Chatham and Valleybrook. [Exh. 225.]

The accompanying check, made payable to Kanter, was later voided and a replacement check was issued to Zeus.  Exh. 229; Exh. 456 at 16; Busse, Transcr. at 735-736.

c.  BJF Partnership

As previously mentioned, in June 1984, BJF Partnership was formed.  Exh. 223.  The partnership agreement provided that THC was entitled to 13.125 percent of the partnership's cash distributions, but THC was obliged to remit 17.5 percent of the partnership's capital contributions.  Id. at 12; Exh. 5802. Article II of the partnership agreement recited that the partners assigned or transferred to the partnership the items specified in part II of appendix A.  Exh. 223, at 8.  Part II of appendix A of the partnership agreement listed 24 items transferred to the partnership including (1) various management and consulting agreements between BJF, Inc., and Prudential related to

condominium conversion projects at Calais, Chatham, Valleybrook, and Galaxy Towers, and (2) "Two Participation Agreements with Burton J. Kanter regarding certain condominium conversions. These agreements have been terminated with respect to new conversions." Exh. 223, app. A., pt. II, at 5-8. The BJF Partnership agreement included representation and warranty clauses under which Kanter stated that (1) he did not need any consent, authorization, or approval to contribute the participation agreements to the partnership, (2) the terminations of the participation agreements were valid, binding, and effective, and (3) THC is a corporation owned by a trust all the beneficiaries of which are Kanter family members. Id. at 65, 70, par. 8.4(c).

THC did not make any direct cash contributions to BJF Partnership when it acquired its limited partnership interest. A June 20, 1984, letter to Kanter from a law firm involved in the matter indicated (1) THC was obliged to make a $29,913 cash contribution to the partnership, (2) THC owed $86,789 to FWID for making cash equivalent contributions on THC's behalf, and (3) THC should issue a secured note to FWID in the amount of $88,387 for contributing other assets to the partnership's capital on THC's behalf. Exh. 5802. On December 31, 1984, however, TSG Holdings purchased additional interests in BJF Partnership from THC and

the other partners.  Exhs. 5804, 5806, 5808.  THC's share of the payments made by TSG Holdings totaled $241,951, and THC actually received $197,757 of that amount (with $44,194 having been remitted to Frey in repayment of a portion of the amount that Frey had contributed to the partnership on THC's behalf.)  Exhs. 5809, 5811.

During the period October 1984 to July 1987, BJF Partnership issued separate checks to THC representing (1) shares of development fees for Village of Kings Creek, and (2) partnership distributions attributable to its limited partnership interests.  Exhs. 226, 457.  During the same period, BJF Partnership issued checks to Zeus representing (1) shares of development fees and incentive payments attributable to Prudential condominium conversion projects at Galaxy Towers, Calais, Chatham, and Valleybrook.  Exhs. 227, 457.

d.  Summary of Frey Payments to Zeus

During 1980 through 1985, Frey (through BJF, Inc., and BJF Partnership) paid to IRA's subsidiary, Zeus, the amounts set forth in the following table.[53]

---

[53] For a more detailed breakdown of the payments from Frey to Zeus, see app. 1 to this report.

## Table 3

| Year | Amount | Exhibits |
|------|--------|----------|
| 1980 | $127,372 | Exh. 12, stmts. 7 and 25, at 7, Kuck, Transcr. at 3371-3373 |
| 1981 | 105,764 | Exh. 14, at 7, ll. 2, 6, 7; Exhs. 5814, 5817; Kuck, Transcr. at 3378-3384 |
| 1982 | 538,781 | Exh. 17, at 16, l. 4; Kuck, Transcr. at 3409 |
| 1983 | 110,125 | Exhs. 18, 224, 456, 5815, 5818 |
| 1984 | 103,500 | Exhs. 19, 225, 456, 457, 5819 |
| 1985 | 128,763 | Exhs. 20, 457 |
| Total | 1,114,305 | |

e. Summary of Frey Payments to THC

During 1981 to 1987, Frey (through BJF, Inc., and BJF Partnership) paid to THC the amounts set forth in the following table.

## Table 4

| Year | Amount | Exhibits |
|------|--------|----------|
| 1981 | $80,616 | 5814, 5817 |
| 1982 | -- | -- |
| 1983 | 16,200 | 14, 224, 5815 |
| 1984 | 113,827 | 224-226 |
| 1985 | 256,557 | 226, 5810, 5811 |
| 1986 | -- | -- |
| 1987 | 33,570 | 226 |
| Total | 500,770 | |

3. Payments From William Schaffel to IRA From 1979 Through 1983 and to THC From 1984 Through 1986 (STJ report at 42-46)

William Schaffel (Schaffel) was a mortgage broker. In the summer of 1979, Kanter, who was in New York City on other unrelated business, contacted Schaffel and indicated he had a

*business proposition to present to him.* **Before this phone call from Kanter, Schaffel had never met Kanter in person, and he had spoken to Kanter only once on the phone several years earlier. Schaffel, Transcr. at 379-380.** *Kanter invited Schaffel to meet for further discussions over dinner at a New York City restaurant. He further told Schaffel that Ballard and Lisle, two friends of Kanter, would also be joining them for dinner. Schaffel accepted Kanter's invitation. In addition to learning more about the potential business opportunity that Kanter had mentioned, Schaffel was eager to meet and socialize with Ballard and Lisle, as he knew that they were senior Prudential real estate executives.*

*During the dinner, no business involving Prudential was discussed by Kanter, Ballard, Lisle, and Schaffel.* **Although Prudential business may not have been discussed at the dinner, Lisle recognized that Kanter's motivation for arranging the dinner was to see whether Schaffel might be able to do business with Prudential in the future. Exh. 2030, at 24.** *During the dinner, Kanter asked whether Schaffel would be interested in arranging the financing for a casino hotel to be built in Atlantic City, New Jersey. Prudential was not involved in the casino project. When Schaffel expressed interest, Kanter told Schaffel that, in return for* **Kanter's** *assistance to Schaffel in*

*obtaining the contract to do the casino's financing, **Kanter** would have to receive 50 percent of Schaffel's fees on the project.*[54]

*Although the Atlantic City casino project fell through, Schaffel subsequently had substantial business dealings with Prudential on behalf of certain individuals he represented. These business dealings included construction contracts that he helped obtain for Torcon, Inc. (Torcon), and financing for a number of large commercial real estate properties being developed by William Walters (Walters), a real estate developer in Denver, Colorado.*

**After the dinner meeting with Kanter, Ballard, and Lisle, Schaffel agreed to split with Kanter any brokerage fees that he might earn on Prudential-related transactions. Schaffel, Transcr. at 384-386. However, to protect his interests as a real estate broker, Schaffel insisted that Kanter's share of those fees be paid to an individual or entity with a real estate broker's license. Schaffel, Transcr. at 393. Kanter in turn directed Schaffel to make the payments to IRA, which held a corporate real estate broker's license through Schott, IRA's president at the time. Id.; Schott, Transcr. at 2119; Exh. 4022.**

---

[54] **The reference in the STJ report to "Kanter and/or an entity associated with Kanter" is manifestly unreasonable. Schaffel's testimony regarding the proposed casino project was that Kanter himself expected to share in any fees that Schaffel might earn on the deal. Schaffel, Transcr. at 383-386.**

*As discussed in detail below, between 1979 and 1983, Schaffel shared with IRA fees from business deals with Prudential. Some of the fees Schaffel and IRA shared were Prudential deals that took place after Ballard and Lisle had left Prudential.*

a. Sale of IBM Building

**Shortly after the dinner meeting described above, Schaffel participated as a real estate broker in a transaction involving Prudential's purchase of IBM, Inc.'s headquarters building in Lexington, Kentucky. Schaffel, Transcr. at 390. Transatlantic Group, a real estate brokerage based in Germany, approached Schaffel and inquired whether Prudential might be interested in purchasing the property. Id. Schaffel then arranged a meeting among himself, Transatlantic Group, and Ballard at Prudential's headquarters in Newark. Id. After the meeting with Ballard, the matter was referred to Prudential's field office in Kentucky for closing on Prudential's purchase of the property. Id. Schaffel split the brokerage fee on the transaction with Transatlantic and then split his share of the fee with Kanter. Id. at 390-391.**

b. Torcon Transactions With Prudential

Prior to 1979, Schaffel rented office space from Benedict Torcivia (Torcivia), the sole shareholder of Torcon, which was then perhaps the largest general contracting company in New

Jersey.  On or about July 24, 1979, Torcivia agreed to pay Mr. Schaffel a 1-percent fee for any construction work that Schaffel was "able to help Torcon obtain."  **Exh. 185; Torcivia, Transcr. at 361-362.  On August 2, 1979, in connection with the Torcivia agreement, Schaffel signed an agreement with IRA which stated:**

> The purpose of this letter is to confirm that I will pay to you fifty (50%) percent of any fees received by me with respect to construction jobs obtained for Torcon, Inc. in which I determine that you or your associates have been instrumental or helpful. My arrangement with Torcon, Inc. concluded with your concurrence that said Company will pay to me one (1%) percent based on the gross amount of the contract price of any such construction job.  [Exh. 186].

As previously discussed, Schaffel entered into this agreement with IRA only because Kanter identified IRA as an entity that held a corporate real estate brokerage license, which appeased Schaffel's concerns about sharing brokerage fees with someone other than a licensed real estate broker.

**After 1979, Torcon was awarded Prudential construction contracts referred to as the Parsippany Business Campus, Parsippany Hilton Hotel, Gateway Office Complex, and Princeton Interplex Complex.  Torcivia, Transcr. at 362.  Torcivia met Lisle at the groundbreaking for the Parsippany Hilton Hotel in 1980.  Torcivia, Transcr. at 363-364.**

c.  Walters's Transactions With Prudential

Walters was a commercial real estate developer who did most of his business in Colorado and Texas.  Walters, Transcr. at 314-315.  On October 19, 1981, Walters and Schaffel entered into two written agreements which provided that Schaffel would receive fees ranging from 1.75 to .875 percent of the aggregate permanent financing that Walters received from Prudential with regard to completed development projects referred to as the Ramada Renaissance and Cherry Creek Place II.  Exh. 189 (Ramada Renaissance); Exh. 190 (Cherry Creek Place II).  The agreements included an acknowledgment that Prudential provided the financing primarily as a result of Schaffel's efforts.  Id.  Before finalizing these transactions, Walters met with Ballard at Prudential's Newark headquarters.  Walters, Transcr. at 317-319.

On November 5, 1981, Barbara DiLanciano sent a letter to Schaffel, on behalf of IRA, regarding the Ramada Renaissance and Cherry Creek Place II development projects, which stated:  "this letter will serve as your notification and restatement of our arrangement wherein * * * [IRA], as your broker, is to receive one-half of the financing fee due you."  Exh. 471.  Prudential committed to provide $17 million and $15.6 million in financing for the Ramada Renaissance and Cherry Creek Place II projects, respectively.  Exhs. 189, 190.

d. Walters's Transactions With Travelers

*Lisle left Prudential in April 1982 and thereafter was employed at Travelers until April 1988.* **Exh. 2030, at 1.** *Schaffel eventually had substantial business dealings with Travelers on behalf of individuals he represented. A number of these business deals involved Travelers' financing of various real estate projects at Denver, Colorado, being developed by Walters. Shortly after Lisle began working at Travelers, Schaffel met and renewed his acquaintance with Lisle,* **and they resumed the business relationship relating to real estate development financing they had established at Prudential. Schaffel, Transcr. at 394-395.**

**On December 12, 1982, Walters and Schaffel entered into two written agreements which provided that Schaffel would receive fees of 1 percent of the aggregate financing that Walters obtained from Travelers with regard to development projects referred to as Cherry Creek National Bank and Stanford Place II. Exh. 195 (Cherry Creek National Bank); Exh. 196 (Stanford Place II). The Walters/Schaffel fee agreement pertaining to Cherry Creek National Bank was printed on Kanter & Eisenberg law partnership letterhead. Exh. 195.**

**In November 1983, Walters and Schaffel entered into four additional written fee agreements which provided that Schaffel**

would receive a fee of 1 percent of the aggregate financing that Walters obtained from Travelers with regard to four separate development projects. Exh. 193 (17th & Market Plaza); Exh. 197 (Orchard Place VIII); Exh. 198 (Orchard Place VII); Exh. 199 (Cherry Creek Building III). The record reflects that Lisle personally approved Travelers financing for several of these development projects. Exhs. 990, 993, 995.

By check dated November 9, 1983, Schaffel paid $213,750 to IRA representing 50 percent of the fees that Schaffel earned on the Stanford Place II project.[55] Exh. 204, at 2. After the Stanford Place II payment, however, Schaffel stopped paying IRA on Travelers transactions, and a dispute with Kanter followed.

*Sometime during 1984, Kanter contacted Schaffel and inquired why IRA was not receiving 50-percent of Schaffel's fees on Travelers deals. Schaffel took the position that the August 2, 1979, agreement between himself and IRA did not apply to deals with Travelers because Lisle had left Prudential.* Schaffel was concerned that the terms of his agreement with IRA were too comprehensive and costly. Schaffel explained: "Bob [Lisle] had moved on to Travelers and Claude [Ballard] had moved on to

---

[55] Thus, the recommended finding of fact in the STJ report, at 44, that Schaffel initially did not share with IRA the fees he earned on business deals with Travelers is incorrect as to the fee from the Stanford Place II project.

Goldman Sachs and I was no more dealing with The Prudential."

Schaffel, Transcr. at 395. *However, Kanter disagreed and maintained the August 2, 1979, agreement continued to apply.*

*In a letter dated August 28, 1984, to Schaffel, Kanter stated, in pertinent part:*

> *I am bothered by your failure to respect what I would have considered the essential intent of the agreement you entered into vis-a-vis the introduction of you to Prudential and the arrangement under which you would share the benefits of that introduction in connection with real estate transactions from which you were able to earn commissions, as well as the other construction contracts won by Ben.*

> *I appreciate that there may be some technical difficulty with the previous agreements as to whether they extend in the new circumstances to Travelers. However, in my view Travelers has replaced Prudential as a principal source of transactions because of the very personnel to whom you were first introduced. Accordingly, I am inclined to believe that the arrangement should have been continued.*

Kanter's letter reveals that he believed Schaffel was obliged to remit payments to IRA if Schaffel obtained any business from Ballard or Lisle wherever they might be employed.  Exh. 200.

*Lisle also discussed with Schaffel the dispute between Schaffel and Kanter.*[56]  *Although Lisle indicated that he did not*

---

[56]  **The recommended findings of fact adopted from the STJ report relating to Schaffel's discussions with Lisle are drawn solely from Schaffel's testimony on the subject.  Schaffel, Transcr. at 396.  Lisle stated that he had no recollection of any contacts from Schaffel or Kanter regarding the fee dispute**

(continued...)

*care about any arrangement between Schaffel and Kanter and did*

*not want to become involved in their apparent dispute, Lisle*

*expressed concern about a possible lawsuit being brought, and*

*such a lawsuit might cause some difficulty for Lisle at*

*Travelers.*

*Schaffel and Kanter eventually settled the dispute by*
**agreeing that (1) Schaffel was obliged to share fees with Kanter**
**only if he did business with Travelers, and (2) those fees would**
**be remitted to a new Kanter-related entity, THC.** *From 1984*
*through 1986, pursuant to the agreement, Schaffel paid a share of*
*his fees on business deals with Travelers to THC.* **Schaffel,**
**Transcr. at 396-399; Exh. 203; Exh. 206, at 1. The record does**
**not reflect the identity of the THC officer who held a real**
**estate broker's license.**

e. Schaffel's Payments to IRA and THC

**From 1979 to 1983, Schaffel paid $1,184,876 to Kanter (by**
**checks made payable to IRA) representing 50 percent of the**
**fees Schaffel received for (1) arranging Prudential construction**
**contacts for Torcon, and (2) obtaining Prudential financing for**
**Walters's projects, as set forth in the following table.**

---

56(...continued)
**described above. Exh. 2030, at 21, 23.**

## Table 5

| Amount | Exhibits |
|---|---|
| $100,000 | 204, at 2; 10, at 15, l. 10 |
| 244,920 | 12, at 25, statement 35 |
| 361,525 | 14, at 6; Kuck, Transcr. at 3375-3377 |
| 447,450 | 17, at 16 "general fee" |
| 30,981 | 204, at 1 |
| 1,184,876 | |

From 1983 to 1986, Schaffel paid $2,977,250 to Kanter (by checks made payable to IRA and THC) representing 50 percent of the fees that Schaffel received for obtaining Travelers financing for Walters's projects, as set forth in the following table.

## Table 6

| Date | Walters's Project | IRA | THC | Exhibit |
|---|---|---|---|---|
| 11-9-83 | Stanford Place II | $213,750 | -- | 204, at 2 |
| 10-30-84 | Orchard Place VII | -- | $85,000 | 206, at 1 |
| 10-30-84 | Orchard Assoc. III | -- | 15,000 | 206, at 2 |
| 10-30-84 | 17th & Market Assoc. | -- | 300,000 | 206, at 3 |
| 12-10-84 | Stanford Corp. Ctr. | -- | 200,000 | 206, at 4 |
| 1-23-85 | Stanford Corp. Ctr. | -- | 60,000 | 206, at 5 |
| 9-3-85 | Connecticut Plaza | -- | 1,100,000 | 206, at 6 |
| 4-21-86 | Stanford Corp. Place | -- | 440,000 | 206, at 7 |
| 11-19-86 | Boston Building | -- | 123,500 | 206, at 8 |
| 12-8-86 | Travelers Train. Ctr. | -- | 440,000 | 208, at 3 |
| Total | | 213,750 | 2,763,500 | |

Schaffel, Transcr. at 416-417, 422; Petitioners' Reply Brief at 314.

There is no evidence in the record that anyone representing or acting on behalf of IRA or THC was "instrumental or helpful" in obtaining financing from Prudential or Travelers for Walters's

**development projects or in arranging Prudential construction contracts for Torcon.**

f. <u>Four Ponds, FPC Subventure, and One River Partnerships</u>

*Kanter and Lisle invested in two real estate development projects that Schaffel and Torcivia were instrumental in organizing. Each development project was undertaken by a limited partnership. One project was through the One River Associates Limited Partnership (One River Partnership); the other project was through the Four Ponds Associates Limited Partnership (Four Ponds Partnership).*

(i). <u>Four Ponds Partnership</u>

**On or about March 21, 1980, Torcivia and Schaffel, as general partners, along with Kanter and other limited partners, formed the Four Ponds Partnership. Exh. 187. Four Ponds Partnership was formed to acquire real estate located in Middletown, New Jersey, and to construct an office building on the property. Id.; Schaffel, Transcr. at 402-404. Torcivia and Schaffel each acquired a 30-percent general partnership interest in Four Ponds Partnership, and Kanter acquired an 8-percent limited partnership interest. Exh. 213; Torcivia, Transcr. at 369-370; Exh. 9093; Exh. 187, par. 3.1. Lisle was not a direct partner in Four Ponds Partnership. Exh. 187.**

(ii). <u>FPC Subventure Partnership</u>

On January 1, 1981, the FPC Subventure Partnership was formed. Exh. 188. The partners of FPC Subventure Partnership were:

| Partner | Percentage Interest |
|---|---|
| Robert Lisle | 90.0 |
| Everglades Trust I, Roger Baskes Trustee | 1.8 |
| Everglades Trust II, Roger Baskes Trustee | 1.8 |
| Everglades Trust III, Roger Baskes Trustee | 1.8 |
| Everglades Trust IV, Roger Baskes Trustee | 1.8 |
| Everglades Trust V, Roger Baskes Trustee | 1.8 |
| Burton W. Kanter Revocable Trust, Burton W. Kanter, Trustee | 1.0 |
| Total | 100.0 |

Exh. 188, at 1, 11; Exh. 9091. Although the partnership agreement for FPC Subventure Partnership called for Lisle to make a $2,880 cash contribution to the partnership, Lisle did not recall making a capital contribution, and he believed (incorrectly) that he made a small investment directly in the Four Ponds Partnership. Exh. 2030, at 33.

(iii). <u>One River Partnership</u>

On November 16, 1981, Torcivia and Schaffel, as general partners, along with Kanter and other limited partners, formed the One River Partnership. Exhs. 986, 211. One River Partnership was formed to acquire real estate located in Middletown, New Jersey, and to construct an office building and

hotel on the property.  Exh. 986; Schaffel, Transcr. at 404-405.
Torcivia and Schaffel each acquired a 36-percent general
partnership interest in One River Partnership, and Kanter held an
8-percent limited partnership interest.  Exh. 986, sch. A.  Lisle
was not a direct partner in One River Partnership.  Id.  Kanter
made a $2,000 capital contribution to One River Partnership.  Id.

(iv).  Meyers's Memorandum Regarding Four Ponds Partnership

A "memorandum to file" (apparently prepared by Meyers),
dated April 14, 1982, stated that (1) although Kanter purportedly
acquired a limited partnership interest in Four Ponds Partnership
as a nominee, Kanter reported partnership items for Four Ponds
Partnership for the taxable year 1980 on his personal tax return,
(2) on January 1, 1981, Kanter (as nominee) transferred his 8-
percent limited partnership interest in Four Ponds Partnership to
Lisle (90 percent) and the Everglades Trusts (10 percent);[57] (3)
Lisle issued a promissory note to Kanter for $2,880; (4) Lisle
and the Everglades Trusts formed the FPC Subventure Partnership;
(5) the 8-percent Four Ponds limited partnership interest

---

[57]  Contrary to this statement in the memorandum, FPC
Subventure's tax return for 1981 indicated the five Everglades
Trusts initially each acquired 1.8-percent limited partnership
interests (for a total of 9 percent) and Kanter acquired a 1-
percent limited partnership interest.  Exh. 9091.  By 1982, FPC
Subventure's tax returns indicated the five Everglades Trusts
each held 2-percent limited partnership interests.  Id.

constituted a capital contribution to FPC Subventure Partnership, and (6) Four Ponds Partnership made a $400,000 cash distribution to Kanter on April 5, 1982, and Kanter transferred the distribution to FPC Subventure Partnership, which distributed $355,500 to Lisle and $39,500 to the Everglades Trusts, leaving $5,000 in FPC Subventure Partnership's account.  Exh. 9093.[58]

On May 3, 1982, Kanter wrote a letter to Schaffel which stated in pertinent part:

> The purpose of this letter, as we discussed, is to reflect the fact that I have been holding a partnership interest in Four Ponds Center Associates in my name on behalf of another partnership, known as FPC Subventure Associates.  There are two participants in that partnership, trusts for the benefit of members of my family and associates.  [Exh. 194.]

The letter also stated that the Four Ponds partnership agreement would not need to be modified so long as Kanter continued to hold the partnership interest in his name.  Id.  Schaffel and Torcivia were not aware Lisle was a partner in FPC Subventure Partnership.  Schaffel, Transcr. at 407; Torcivia, Transcr. at 371.

In 1982, Kanter transferred his 8-percent limited partnership interest in One River Partnership to FPC Subventure

----

[58]  Contrary to this statement in the memorandum, FPC Subventure's tax return for 1982 indicated the partnership made a cash distribution of $427,600, and a Schedule K-1, Partner's Share of Income, Deductions, and Credits, issued to Lisle indicated he received $384,840 (or 90 percent) of that amount. Exh. 9091.

Partnership in exchange for a promissory note of $2,000.  Exh.

915.

   (v).  FPC Subventure's Tax Returns

   During the years at issue, Kanter and Lisle reported their

distributive shares of FPC Subventure's partnership items of

income, loss, deduction, and credit.[59]  Exhs. 125-134 (Kanter);

---

[59]  On June 13, 1994, at the start of the trial in these
cases, respondent filed an amendment to answer seeking increased
deficiencies and additions to tax for fraud.  Included in
respondent's amendment to answer were allegations that Lisle was
not entitled to deduct losses related to FPC Subventure
Partnership because he never made a capital contribution to the
partnership (and, thus he was not a partner in the partnership)
and/or Lisle was not "at risk" within the meaning of sec. 465.
On June 13, 1994, Lisle filed a reply to respondent's amendment
to answer.  On July 26, 1994, Lisle filed a motion to strike
portions of respondent's amendment to answer.  Specifically,
Lisle moved to strike the portion of respondent's amendment to
answer pertaining to FPC Subventure Partnership on the ground the
transaction "does not relate to 'The Five' in any way."  Lisle
further alleged that respondent's attempt to raise the FPC
Subventure Partnership issue amounted to an attempt to use the
trial as an ongoing audit.  On July 28, 1994, respondent filed an
objection to petitioners' motion to strike and alleged that FPC
Subventure Partnership was directly related to The Five as
demonstrated by Schaffel's testimony during the first phase of
the trial.

   On July 28, 1994, the Court heard oral argument regarding
Lisle's motion to strike.  Transcr. at 3060-3096.  On July 28,
1994, Special Trial Judge Couvillion granted Lisle's motion to
strike insofar as respondent was seeking increased deficiencies
attributable to FPC Subventure Partnership.

   Given that petitioners' motion to strike was granted, the
FPC Subventure Partnership transactions will not increase the
amounts of Lisle's tax liabilities for the years remaining at
issue.  Nevertheless, our review of the record reveals that FPC
Subventure Partnership is highly relevant to respondent's theory
that Kanter, Ballard, and Lisle earned the payments remitted by

                                        (continued...)

417-421 (Lisle). The record shows that Four Ponds Partnership and One River Partnership (1) reported net losses in 1981 to 1984 and 1987 to 1989 totaling $1,067,131, and (2) made cash distributions to its partners in 1981 to 1984 and 1987 to 1989 totaling $731,080. Respondent's Opening Brief at 349-350, par. 1016, and Petitioners' Reply Brief at 663-664; Exhs. 125-134 (Kanter); Exhs. 417-421 (Lisle); Exhs. 9090-9094 (FPC Subventure Partnership tax returns and Schedules K-1 for Four Ponds Partnership and One River Partnership). Approximately 7 percent of Four Ponds' and One Rivers' partnership losses, described above, flowed through to Lisle through FPC Subventure Partnership. Exhs. 417-421.

Tax effects aside, during the period 1981 to 1989 Lisle received at least $682,520 in cash distributions from FPC Subventure Partnership.[60] Exhs. 9090-9094, 417-421. Consequently, FPC Subventure Partnership served for Lisle the dual purposes of (1) a tax shelter, and (2) a source of substantial cashflows.

---

[59](...continued)
The Five to IRA and THC. As discussed in additional findings of fact in the text that follows, we are convinced Kanter used FPC Subventure Partnership as a conduit to facilitate the transfer to Lisle of his share of fees that Schaffel paid to THC on Travelers transactions.

[60] **FPC Subventure Partnership's tax returns for 1985 and 1986 apparently were not made part of the record.**

4.  Schnitzer/PMS Payments From 1979 Through 1989 (STJ report at 46-49)

*During the 1960s and 1970s, Kenneth Schnitzer (Schnitzer)* *was a major real estate developer in the Houston, Texas, area.* **Schnitzer met Ballard and Lisle at Prudential's Houston regional office in the late 1960s. Schnitzer, Transcr. at 2153.**

*In 1974,* **Century Development Corp. (Century), a subsidiary of Century Corp.,** Schnitzer's family holding company, acquired for a price of $1.2 million a small real estate management company called Fletcher Emerson Co., Inc., whose name shortly thereafter was changed to Property Management Systems, Inc. (PMS). **Ross, Transcr. at 1213-1214.[61]** *Previously, Schnitzer had been involved in developing and managing high-rise office buildings through Century. By acquiring PMS, Century expected to diversify its operations and to secure a steady source of earnings, because the real estate development business it also engaged in typically was cyclical.*

**When Century purchased PMS in 1974, the purchase price of $1.2 million was based roughly on five times PMS's pretax earnings of approximately $250,000. Ross, Transcr. at 1169, 1172; Schnitzer, Transcr. at 2149. Walter Ross (Ross) was a**

---

[61] **Fletcher Emerson was purchased by a subsidiary of Century Development Corp. known as E.R.K. Enterprises, Inc. Exh. 278, tab 6.**

**C.P.A. and senior vice president of finance at Century when it purchased PMS. Ross, Transcr. at 1166. In 1974, Ross became president of Century Corp. Id. at 1165. According to Ross, it was customary in the industry to base the purchase price of a service corporation such as PMS on a multiple of the firm's pretax income. Id. at 1172-1173.**

*Originally, PMS's property management business was almost all in Texas, principally Houston and Dallas. PMS typically managed office buildings and other commercial real estate owned by others under property management contracts on a month-to-month basis. As of the time of PMS's 1974 acquisition by Century, although Prudential was perhaps PMS's biggest customer, PMS managed a relatively small number of Prudential's commercial real properties. Shortly after Century acquired PMS, Schnitzer attempted to expand substantially the size of PMS's property management business, as PMS typically earned only a relatively modest profit margin on its individual property management contracts. Schnitzer felt that the only way to increase PMS's profits was having a large volume of such management contracts.*

*To that end, in 1974, Schnitzer approached Ballard (who Schnitzer had previously dealt with in developing office buildings in Houston, Texas) and offered to have Century give Prudential a 50-percent stock interest in PMS. Although*

Prudential would not be paying anything for the 50-percent PMS stock interest, Schnitzer hoped that this would result in Prudential's awarding PMS a large number of additional property management contracts. Ballard informed his superiors at Prudential of Schnitzer's offer.

Initially, Prudential was interested in Schnitzer's offer. Schnitzer was invited to Prudential's Newark, New Jersey, corporate headquarters for further meetings and discussions with Prudential's management. Schnitzer met with Prudential's senior executives and corporate headquarters staff, including Prudential's chairman, and with Donald Knab (who headed Prudential's real estate department). Prudential was particularly interested in standardizing the reports it received on the operating results of its various commercial real properties around the country. However, Prudential ultimately declined Schnitzer's offer, because of the substantial number of pension plans whose real estate investment accounts Prudential managed. Prudential believed that having an ownership interest in PMS might be a potential conflict of interest and might present problems under the pension laws.

Although Prudential declined Schnitzer's offer, from 1974 through late 1977, PMS's property management business increased substantially, with Prudential being PMS's biggest customer. Pursuant to Schnitzer's discussions with Prudential's management

and corporate headquarters staff in 1974, PMS standardized its reports on the Prudential commercial real properties that PMS managed. By 1977, PMS had expanded its property management operations to other cities around the country, including Atlanta, Georgia; Los Angeles and San Francisco, California; Newark, New Jersey; and Portland, Oregon.

**Ballard introduced Schnitzer to Kanter at an Urban Land Institute meeting in Hawaii in the mid 1970s. Schnitzer, Transcr. at 2161-2164.** In 1977, Schnitzer and Kanter discussed Century's possible sale of a 47.5-percent stock interest in PMS to IRA. Kanter indicated that, through Kanter's business contacts, Kanter could obtain additional property management business for PMS with other parties, including possibly with the Pritzker family.[62]

In November 1977, Century sold a 47.5-percent stock interest in PMS to IRA for $150,000. The sale was made subject to Century's right to apply PMS's profits first to servicing the $1.1 million debt Century had incurred to purchase PMS in 1974.

---

[62] **The statement in the STJ report referring to "Kanter and/or IRA" is manifestly unreasonable. Schnitzer testified that Kanter suggested he could obtain additional business for PMS. Schnitzer, Transcr. at 2167. There is no credible evidence that anyone other than Kanter provided additional business opportunities for Schnitzer/PMS.**

IRA paid $50,000 at closing and issued a promissory note to PMS for the $100,000 balance. Exhs. 240, 241; Ross, Transcr. at 1200.

Schnitzer conferred with Ballard before agreeing to sell PMS's common stock to IRA. Schnitzer, Transcr. at 2166-2167. Schnitzer was content to sell PMS common stock to IRA at a bargain price in exchange for Kanter's promise to attempt to use his business contacts, including his relationship with the Pritzker family, to obtain more real estate management contracts for PMS. Schnitzer, Transcr. at 2167. Ross shared Schnitzer's view that PMS's common stock was sold to IRA at a bargain price in expectation that Kanter would use his many contacts to generate business for PMS. Schnitzer, Transcr. at 2170-2171; Ross, Transcr. at 1182, 1195, 1201.

Schnitzer and Ross were not relying on IRA, Schott, or Weisgal to generate additional business opportunities for PMS. Schnitzer and Ross were relying solely on Kanter to obtain additional business opportunities for PMS. Ross, Transcr. at 1195, 1201.

During the period 1976 to 1979, PMS obtained a growing number of management contracts from Prudential. Schnitzer, Transcr. at 2173. During the period 1976 to 1979, approximately 40 percent of PMS's revenue was derived from Prudential property

management contracts.  Exh. 977, at 10; Ross, Transcr. at 1188.
By the end of 1979, PMS's revenues had tripled from 1974 when
Century bought PMS for $1.2 million.  Exh. 977, at 4; Exhs. 750,
964.  PMS's gross income from 1976 to 1980 was:

| Year | Gross Income | Exhibit |
|------|------|------|
| 1976 | $3.4  million | 5751 |
| 1977 | 4.3  million | 278, tab 4 |
| 1978 | 6.0  million | 963 |
| 1979 | 7.7  million | 964 |
| 1980 | 9.6  million | 965 |

PMS's pretax earnings for 1976 through 1978 were $317,615,
$451,058, and $831,828, respectively.  Exh. 278, tab 14.

In March 1979, Kanter brought to Schnitzer's attention a
potentially large property management opportunity.  Exhs. 259,
260.  *Nevertheless, in late March 1979, Schnitzer informed Kanter
he was disappointed that Kanter had failed to produce the
additional property management business for PMS that had been
expected.  Schnitzer decided Century should purchase IRA's
47.5-percent PMS stock interest.*  **Exh. 262.  Kanter suggested he
might make a counteroffer to purchase Century's remaining shares
in PMS.  Exh. 263; Schnitzer, Transcr. at 2175.  By letter dated
July 17, 1979, Kanter proposed that IRA would purchase PMS's
remaining shares for $3.1 million to be paid in installments over
10 years.  Exh. 268.**  *On August 1, 1979, Schnitzer and Kanter
agreed that Century would purchase the PMS stock held by IRA for*

*a price of $3.1 million, to be paid to IRA over 10 years with interest.* **Exh. 270.**

In February 1989, Kanter wrote to Ross and inquired whether PMS would be interested in making an early, discounted final payment on the PMS stock repurchase agreement. **Exh. 344.** Kanter mentioned in his letter that IRA had assigned its contract rights under the IRA/PMS installment agreement and that any payment should be remitted to PSAC, Inc., which served as the depository for the assignee. Id. The record reflects that PMS accepted Kanter's proposal and remitted a final payment of $750,000 to PSAC in February 1989, and the payment was distributed to Carlco, TMT, and BWK, as discussed below. **Exh. 345.**

During the period 1979 to 1989, PMS made installment payments to IRA as set forth in the following table.

## Table 7

| Year | Payment | Principal | Interest |
|------|---------|-----------|----------|
| 1979 | $150,000 | $150,000 | -- |
| 1980 | 533,425 | 211,468 | $321,957 |
| 1981 | 534,696 | 309,308 | 225,388 |
| 1982 | 361,692 | 172,441 | 189,251 |
| 1983 | 361,692 | 186,655 | 175,037 |
| 1984 | 361,692 | 202,042 | 159,650 |
| 1985 | 361,692 | 218,696 | 142,996 |
| 1986 | 361,692 | 236,724 | 124,968 |
| 1987 | 361,692 | 256,217 | 105,475 |
| 1988 | 361,692 | 277,360 | 84,332 |
| 1989 | 840,423 | 822,841 | 17,582 |
| Total | 4,590,388 | 3,043,752 | 1,546,636 |

Exhs. 281, 284-346; Exhs. 14, 17, 18-24 (IRA tax returns).[63]

5.  Payments From Eulich/Essex Partnership to IRA and THC From 1982 Through 1989 (STJ report at 49-59)

a.  John Eulich

John Eulich (Eulich) was a real estate developer of office buildings, shopping malls, and warehouses in Houston and Dallas, Texas. In connection with his real estate development work, Eulich had known Ballard and Lisle since at least 1965, when Ballard and Lisle worked in Prudential's Houston regional office. A.N. Pritzker introduced Eulich to Kanter at the opening of a Hyatt hotel in the late 1960s or early 1970s. Eulich, Transcr. at 1617-1618.

---

[63]  Some of the quarterly checks that PMS remitted to IRA were not included in the record.

Eulich's real estate development activities were primarily conducted through Vantage, Inc., a corporation that he owned. In addition, Eulich later became a majority shareholder in Motor Hotels Management, Inc. (MHM). During some of the years at issue, MHM, IRA, THC, and Gateway Hotel Management Corp. were partners in the Essex Partnership, which partnership is discussed more fully below.

In 1968, Eulich acquired Rodeway Inns, a company that owned a small chain of garden court motels. Over the years, Rodeway Inns increased the number of its motels. In acquiring many of Rodeway Inn's additional motels, Rodeway Inns and Eulich obtained financing from Prudential. From 1968 through about 1973, in securing this financing for Rodeway Inns, Eulich dealt with Ballard. In about 1974, Eulich and Prudential became dissatisfied with the performance of the hotel management company that was managing and operating some 16 Rodeway Inns motels that had been financed by Prudential.

Eulich decided to establish his own hotel management company, MHM, to operate the motels. Eulich arranged to have Robert James (James), who had substantial hotel management experience, serve as MHM's president and manage MHM's day-to-day operations. MHM was incorporated on January 1, 1975. MHM's three shareholders eventually included Eulich (who was the

majority shareholder), James, and another longtime business associate, C. Huston Bell.

In persuading James to participate in the ownership and operation of MHM, it was agreed that MHM's hotel management business would be expanded. After MHM commenced its operations, although he generally was not involved in conducting MHM's day-to-day business operations, Eulich helped arrange financing for MHM and was actively engaged in marketing MHM's services to various outside parties in an effort to obtain additional hotel management business.

By the middle to late 1970s, MHM had acquired a good reputation for the hotel management services it offered. Prudential's real estate department staff generally were very satisfied with MHM's management of a number of hotel properties in which Prudential was involved. However, until about the early 1980's, MHM generally only managed smaller-size hotel properties, not large hotels. By about the early 1980s, MHM managed hotel properties nationwide in about 20 to 25 states, although to a more limited and lesser extent than it wished in the northeastern region of the country.

b. Allen Ostroff

In about 1976, Allen Ostroff became a Prudential real estate department employee and served as Prudential's in-house consultant on hotels and hotel operations. Prior to joining

Prudential, Ostroff had worked for a number of years for Hilton Hotels as a hotel manager and executive. Ballard was instrumental in Prudential's hiring of Ostroff, as Ballard had concluded that Prudential's real estate department needed to employ an individual possessing substantial expertise in hotels and hotel operations.

Previously, the real estate department staff in Prudential's regional offices negotiated hotel management contracts for Prudential's hotel properties on an ad hoc basis. By 1979, Ostroff had devised a model hotel management contract that Prudential's real estate department staff could use in negotiating such management contracts. Ostroff also worked on various hotel projects for Donald Knab, Ballard, and/or Lisle.

c. <u>Hotel Management Industry Trends</u>

At some point during the 1970s, the hotel management industry began to offer owners of large hotels relatively short-term management contracts for hotels, typically for terms ranging from 5 to 10 years. It was sometimes not desirable for a hotel owner to enter into a long-term management contract, particularly if the owner contemplated selling the hotel within the next 5 to 10 years, as an outstanding long-term management contract could make the hotel more difficult to sell. Rather than entering into a long-term management contract with a national hotel company, like Hilton Hotels, Hyatt Corp., or Marriott Hotels, an owner of

a large hotel frequently had its hotel operated under a franchise with a national hotel company like Hilton Hotels or Marriott Hotels.[64] For instance, under a franchise agreement with Hilton Hotels, the hotel owner could obtain the right to use the Hilton name as well as the services of the Hilton national hotel reservation system. The hotel owner then could have its Hilton-franchised hotel managed and operated under a short-term management contract with either Hilton Hotels (the franchisor) or another hotel management company.[65]

d. The Gateway Hilton and John Connolly

Beginning in 1976, one of Ostroff's first assignments at Prudential was to improve the operating condition of the Gateway, a hotel at Newark, New Jersey. The Gateway was located a few blocks from Prudential's corporate headquarters. The hotel was shabby, as Prudential had recently acquired it through foreclosure. Moreover, the class or type of customers that prior operators of the hotel catered to was not the type of clientele Prudential was comfortable with because other Prudential

---

[64] During the period relevant to these cases, Hyatt Corp. did not offer such franchise arrangements.

[65] A hotel management executive testified that a national hotel company, like Hilton Hotels, could not grant a hotel franchise to a hotel owner conditioned upon the owner's also entering into a management contract with it for the franchised hotel, as such action might violate the antitrust laws.

executives and individuals transacting business at Prudential's headquarters office frequently stayed at the hotel.

Ostroff first obtained a Hilton franchise for the Gateway. Although Hilton Hotels had been reluctant to grant Prudential a franchise, Ostroff obtained the franchise by pointing out to Hilton Hotels the other profitable business dealings it had with Prudential.

Ostroff next hired another hotel management company to take over the Gateway Hilton's management and operation. This management company was owned by Stanley Cox (Cox), an experienced hotel manager Ostroff had known during Ostroff's prior employment with Hilton Hotels. At some point, Cox assigned John Connolly (Connolly) to be the Gateway Hilton's onsite manager. Ostroff was extremely successful in turning around and substantially improving the Gateway Hilton's operating condition. Prudential corporate headquarters executives eventually were proud to have other Prudential executives and business visitors stay at the hotel. Prudential executives also made significant use of the hotel facilities for meetings and entertainment and were very pleased with the service that they and their guests received at the hotel.

Cox did not spend much of his own time actually running the Gateway Hilton. Over the years, Cox delegated more and more duties in the hotel's operation to Connolly. In 1981, Connolly

**was dissatisfied living in Newark and requested that Cox transfer**

**him to another hotel that Cox managed in Atlanta.  Connolly,**

**Transcr. at 2623.**[66]  **Although Cox granted Connolly's request,**

**Ostroff wanted Connolly to stay at the Gateway Hilton, and he**

**approached Cox with a proposal to transfer the Gateway Hilton**

**management contract to Connolly and give Cox another management**

**contract at a different hotel**.  **Connolly, Transcr. at 2623-2624.**

*Ostroff and his superiors at Prudential then decided to terminate*

*Prudential's management contract with Cox and awarded the*

*management contract to a hotel management company owned by*

*Connolly.*[67]

*Ostroff advised Connolly of Prudential's desire to have him*

*manage the Gateway Hilton; however, Ostroff advised Connolly that*

*he would have to establish a management company of his own*

*because Prudential did not want to have its employees involved in*

*operating the hotel and did not want any of the hotel's employees*

*to be Prudential employees.  All hotel employees would have to be*

---

[66]  The STJ report, at 54, incorrectly recommended as a finding of fact that "*Connolly informed Ostroff that he was considering leaving his position as onsite manager of the Gateway Hilton, because he felt he was not being adequately compensated for his services.*"

[67]  This recommended finding of fact is manifestly unreasonable.  As discussed in additional findings of fact, see <u>infra</u> pp. 138-144, John Connolly (Connolly) continued to manage the Gateway Hilton, but he neither organized nor operated a hotel management company.

*employees of Connolly's hotel management company. However, establishing such a hotel management company presented a problem for Connolly, as Connolly's management company, among other things, would be required to employ a financial manager and an accounting staff to prepare and issue the financial reports on the Gateway Hilton's operations that Prudential expected. Moreover, its full-time employment of such personnel to perform these and other required services could well be uneconomical, as Connolly's company would be managing only one or at most two hotels.* **As discussed in detail below, Kanter and Eulich provided a solution to assist Connolly in managing the Gateway Hilton.**

    e. <u>Gateway Hotel Management Co. and Essex Corp.</u>

*As previously mentioned, Eulich wanted MHM's hotel management business eventually to include MHM's management of a number of large hotels. Eulich previously knew Kanter from being involved in certain prior business ventures in which Kanter had helped raise capital. He believed that Kanter's business contacts, particularly those contacts attributable to Kanter's association with the Pritzker family, could be beneficial to MHM, as Kanter knew many people in the hotel industry, including individuals who owned the large hotels that MHM wanted to manage.* **From Eulich's perspective, an association with Kanter would be beneficial if MHM could obtain one hotel management contract for**

a large hotel through Kanter's efforts.  Eulich, Transcr. at
1647-1648.

*Kanter and Eulich were aware Connolly would need assistance
organizing a hotel management company for the Gateway Hilton.*
**Ballard was also aware of Connolly's needs, and he introduced
Eulich to Connolly as someone who would assist Connolly with the
support services he needed to properly manage the Gateway Hilton.
Connolly, Transcr. at 2620-2621, 2631.  Ballard believed Connolly
also met with Kanter.  Ballard, Transcr. at 184.  As discussed
below, Eulich (probably with Kanter's assistance) organized
Gateway Hotel Management Co. (GHM) for Connolly.[68]**

**In 1981, Eulich and Kanter organized a corporation called
Essex Hotel Management Co. (Essex Corp.).  Formby, Transcr. at
1502-1503; Eulich, Transcr. at 1650; Clifford, Transcr. at 1669-
1670.  By letter dated October 16, 1981, Eulich informed Connolly
that (1) GHM had been organized, (2) GHM was capitalized with
$10,000, and (3) Connolly would be expected to pay $2,000 to
Eulich from GHM's first distribution to cover his share (20**

---

[68]  The STJ report, at 55, included a recommended finding of
fact that "*Mr. Connolly, nevertheless, proceeded to organize a
hotel management company and incorporated Gateway Hotel
Management Corp. (GHM) some time in 1981.*"  This recommended
finding of fact is manifestly unreasonable.  As discussed in the
Court's additional findings of fact in the text that follows,
John Connolly did not organize a hotel management company, and he
was largely ignorant of the existence and function of the various
business entities with which he was associated.

percent) of GHM's capitalization.  Exh. 691.[69]  It appears,
however, the arrangement described above was not carried out
because, on March 2, 1982, Connolly and Essex Corp. executed an
option agreement (the GHM option agreement), which they
purportedly had agreed to on September 18, 1981, which recited
that Connolly owned 100 percent of GHM, Connolly was transferring
to Essex Corp. an option to acquire 80 percent of GHM (80 shares
at $100 per share) for 10 years and, in exchange for the option,
Essex Corp. would pay Connolly $1,000 per year for 10 years.
Exh. 817.  The record also includes an $8,000 promissory note,
dated December 15, 1981, from Connolly to Essex Corp. (the
Connolly promissory note) requiring annual payments for 9 years
and a final balloon payment in 1991.  Exh. 4015.[70]

    f.   MHM and GHM Hotel Management Contracts

In October 1979, MHM was awarded a management contract for a
new hotel being constructed on Madison Avenue in Morris Township,
New Jersey (the Madison Hotel).  Exh. 688.  In February 1980,
Prudential provided financing for this hotel.  Exh. 1010.  In
August 1981, MHM also began managing a newly opened Hilton Hotel

---

[69]  Eulich had no recall of these matters at trial.  Eulich,
Transcr. at 1649-1650.

[70]  The $8,000 amount apparently represents the balance of
the $10,000 initial capitalization of Gateway Hotel Management
Co. (GHM) (assuming Connolly paid $2,000 to Eulich in accordance
with the Oct. 16, 1981, letter described above).

in Allentown, Pennsylvania (the Allentown Hilton). Clifford, Transcr. at 1667.

*In late 1981, GHM received from Prudential a management contract to operate the Gateway Hilton, and, in February 1982, GHM received a management contract to operate another Hilton-franchised hotel that Prudential owned at Midland, Texas (the Midland Hilton).*[71] **Exh. 695. Eulich believed Kanter assisted MHM and Essex Partnership in obtaining the management contract for the Gateway Hilton. Eulich, Transcr. at 1634. Eulich's testimony on this point is revealing. In short, Eulich considered the Gateway Hilton management contract to fall within MHM's portfolio of contracts (even though the contract technically was awarded to Connolly/GHM) because MHM's employees provided all the essential services required to manage the hotel.**

g. <u>Essex Partnership</u>

**Essex Hotel Management Co. (Essex Partnership) was formed on January 1, 1982, and apparently was intended to supplant Essex**

---

[71] *Although Ostroff and Prudential ultimately awarded the Midland, Texas, hotel's management contract to GHM, GHM and MHM had each submitted bids on the Midland hotel's management contract. During this time, Prudential usually obtained bids from at least three hotel management companies for a particular hotel's management contract.* **Ballard and Lisle were aware Connolly was awarded the Gateway Hilton management contract, and Lisle was aware Connolly was awarded the Midland Hilton management contract. Exh. 695; Ballard, Transcr. at 186-187; Ostroff Transcr. at 1371, 1374, 1377-1378.**

Corp.[72]  **Formby, Transcr. at 1502-03, 1518-19, 1585-86.**  *The*
*partners of Essex Partnership and their partnership interests*
*were as follows:*

| Partner | Percentage partnership interest |
|---|---|
| *MHM* | *47.500* |
| *IRA* | *26.125* |
| *THC* | *21.375* |
| *Connolly* | *5.000* |

**Eulich attributed Connolly's relatively modest partnership
interest in Essex Partnership to the fact that Connolly received
a substantial salary from the Gateway Hilton.  Eulich, Transcr.
at 1635, 1643-1644.**

**Essex Corp. and Essex Partnership were both in existence
from January 1982 to December 1984.  Formby, Transcr. at 1502-
1503, 1516; Exh. 817.  General ledgers were maintained for Essex
Corp.  Exh. 697; Formby, Transcr. at 1516.  In some instances,
transactions pertaining to Essex Partnership were posted to the
general ledger of Essex Corp., rather than on the partnership's
books.  Formby, Transcr. at 1518.**

---

[72]  The STJ report, at 56, included the following recommended finding of fact:  "*Eulich, Kanter, and Connolly decided to form the Essex Partnership (Essex), which was organized in about late 1981*".  **This recommended finding of fact is manifestly unreasonable inasmuch as Connolly generally was unaware of Essex Partnership's organization and operation.**

On December 21, 1984, Essex Corp. assigned to Essex Partnership its rights under the GHM option agreement. Exh. 817, at 4. The record indicates Essex Corp. also transferred Connolly's promissory note to Essex Partnership. Exh. 4013. On October 26, 1987, Essex Partnership sent a check of $1,000 to Connolly. Id. The check was accompanied by a letter which explained that the check represented Essex Partnership's annual option payment to Connolly, and the letter included a request that Connolly remit to Essex Partnership his annual interest payment of $960. Id.

At trial, Connolly (1) did not know the identity of the partners of Essex Partnership, (2) believed he was offered a 5-percent partnership interest in Essex Partnership in exchange for his promise to refer to Eulich any hotel management contracts that GHM could not handle in the northeastern region of the country, and (3) did not understand that a portion of GHM's management fees was remitted to Essex Partnership. Connolly, Transcr. at 2631-2645.

Connolly could not recall any details about the GHM option agreement or whether he had received any payments pursuant to the option agreement. Connolly, Transcr. at 2661-2662; Exh. 4013. Connolly did not (1) know whether he had owned all of the shares of GHM, (2) recall speaking to Eulich about startup financing of

$10,000 for GHM, or (3) recall whether the board of directors held meetings at GHM or the membership of the board. Connolly, Transcr. at 2650-2653.

h.  Essex Partnership Operations

*Essex Partnership's stated purposes were*  (1) **"To engage generally in the consulting business and as a liaison intermediary between owners and operators of hotel properties"**, and (2) **"To enter into other partnership agreements * * *, to become a member of a joint venture, or to participate in some other form of syndication for investment; and to buy, sell, lease, and deal in services, personal property, and real property." Exh. 347.** *Although the partnership agreement required its partners to contribute the capital needed to operate the partnership, very little, if any, actual capital contributions were ever required from them.* **There is no evidence that IRA or THC contributed any capital to Essex Partnership. Petitioners' Reply Brief at 457.**

*Essex Partnership had no office, equipment, or employees because employees of MHM performed many of the consulting services that GHM needed.* **John Formby, an accountant working for Lexington Investment Co., provided services to MHM and was given a power of attorney to act on behalf of Essex Partnership.**

Formby, Transcr. at 1499-1503; Exh. 4007.[73] Although the power of attorney apparently was prepared in December 1982, it was executed "as of" January 1, 1982. Exh. 4007. Formby performed accounting services for Essex Partnership, and he performed the financial and accounting services that GHM required in connection its hotel management contracts. Formby, Transcr. at 1500-1504, 1590-1591; Exh. 4009.

i. GHM's and MHM's Representation and Marketing Agreements

*On January 1, 1982, Connolly executed on behalf of GHM an agreement titled "Representation and Marketing Agreement" with Essex Partnership (the GHM/Essex agreement) wherein GHM agreed to pay to Essex Partnership 75 percent of its fees on GHM's management contracts on the Gateway Hilton and the Midland Hilton Hotel.[74]* In return, Essex Partnership was to (1) "perform liaison functions between Gateway and certain hotel owners in connection with management contracts between such parties", (2) "perform liaison functions between Gateway and the owners of any additional properties which it is instrumental in securing for management by Gateway", (3) "use its best efforts to maintain

---

[73] Lexington Investment Co. owned a majority of Motor Hotels Management Co. (MHM). Formby, Transcr. at 1599.

[74] This document (Exh. 348) suggests the Midland Hilton management contract was awarded to Connolly/GHM earlier than January 1982.

satisfactory relations between the property owners and Gateway under any management contracts * * * and to maintain sufficient personnel to properly perform such functions", and (4) use its best efforts to secure management contracts satisfactory to Gateway". Exh. 348.

On January 1, 1982, MHM entered into a nearly identical "Representation and Marketing Agreement" with Essex Partnership (the MHM/Essex agreement) in connection with MHM's management contracts on the Allentown Hilton and the Madison Hotel. Exh. 349. *Although Prudential had helped finance the latter two hotels' construction, Prudential apparently had no involvement in awarding the Allentown Hilton and Madison Hotel management contracts to MHM, as the two hotels were owned by third parties.* MHM was required to pay to Essex Partnership 30 percent of its management fees from the operation of the Madison Hotel and 43 percent of the fees from the operation of the Allentown Hilton. Exh. 349, exh. A.

*An MHM employee testified that, in managing GHM, Connolly was essentially a "one-man show". A number of MHM's management personnel were instructed by MHM's management to do whatever they could to help Connolly with GHM's operations. For instance, MHM employees helped perform the financial and accounting services that GHM required in connection with its Gateway and Midland*

*hotel management contracts. In yet another instance, an MHM employee helped Connolly with union negotiations. Also, after Prudential awarded the Midland, Texas, hotel's management contract to GHM, MHM's employees helped Connolly find an onsite manager for that hotel. Although Connolly did give MHM some occasional help and advice, such as sales presentations to hotel owners, the volume of services that MHM employees furnished to GHM greatly exceeded the volume of services that MHM received from GHM and Connolly.*[75]

*In late 1983, Prudential awarded to MHM the hotel management contract for Prudential's Hilton-franchised Twin Sixties Hotel at Dallas, Texas (the Twin Sixties Hotel). Shortly thereafter, MHM and Essex Partnership entered into a new "Representation and Marketing Agreement" pursuant to which Essex Partnership received a percentage of MHM's fees under the Twin Sixties Hotel management contract.*[76] **Exh. 350, exh. A. The MHM/Essex agreement was modified to provide that MHM would pay 70 percent of its management fees from the Madison Hotel (an increase of 40**

---

[75] This paragraph appeared in the STJ report at 58-59 n.22.

[76] *Robert James, MHM's president, believed the consulting and participation agreement for the Twin Sixties Hotel was entered into to replace the income that Essex Partnership would lose following the expected termination of MHM's management contract for the Allentown Hilton, as the Allentown Hilton was then in the process of being sold.*

percent from the 30 percent required under the original agreement), 57 percent of its management fees from the Allentown Hilton (an increase of 14 percent from the 43 percent required under the original agreement), and 57 percent of its management fees from the newly acquired Twin Sixties Hotel management contract. Exh. 350, exh. A.

From 1982 through 1986, the specified percentage of fees Essex Partnership received under the various consulting and fee participation agreements it had with GHM and MHM varied and, at times, was adjusted.[77] In operating Essex Partnership, the partners agreed the fees GHM paid Essex Partnership generally would equal the fees MHM paid to the partnership. The partnership's specified percentage of fees under each consulting and fee participation agreement could easily be adjusted and modified, as each consulting and fee participation agreement was subject to cancellation on 30-to-90-days' notice. As a result, if a significant change occurred with respect to the compensation that GHM or MHM received under a particular hotel management contract, an offsetting change then could be effectuated in the

---

[77] On Jan. 1, 1986, Connolly executed a new Representation and Marketing Agreement on behalf of GHM which provided that GHM would pay to Essex Partnership 40 percent of the fees earned on the Gateway Hilton and Midland Hilton management contracts. Exh. 351. Formby believed this modification was made because Connolly's salary was no longer being paid by the Gateway Hilton. Formby, Transcr. at 1542.

*other consulting and fee participation agreements GHM and MHM had with Essex Partnership.*

*As the total fees that MHM paid to Essex generally equaled the total fees that GHM (Connolly's hotel management company) paid to Essex, the total fees MHM paid to the partnership roughly approximated MHM's distributive share of partnership income as a 47.5-percent partner in Essex Partnership. However, as indicated previously, MHM was not paid directly for the substantial services its employees rendered to GHM. Rather, as a partner in Essex Partnership, MHM received 47.5 percent of the partnership's income. Although IRA and THC, as partners, also received a combined 47.5 percent of the income of Essex, IRA and THC, in contrast to MHM, provided no similar substantial services to GHM.*

*Eulich and MHM's top management essentially viewed involvement in Essex Partnership as a marketing and sales device, whereby MHM eventually might obtain more management contracts for large hotels. By having MHM participate in Essex Partnership, Eulich hoped to have Kanter help MHM obtain additional hotel management contracts.*

**Eulich was not familiar with IRA or THC and testified in pertinent part:**

> **Kanter was the person whose influence and contacts that we wanted at MHM because of his--again, his involvement as one of the founders of Hyatt International, his**

involvement with the Pritzkers, and his involvement, significant involvement with this Mullett Bay Resort.

I mean, the man--he knew a lot of people in the hotel business, and he knew people who owned the types of properties that we wanted, and we were not able to attract, because we were running the two-story, you know, freeway-oriented motels. [Eulich, Transcr. at 1633-1634.]

*Eulich realized his goal of increasing MHM's hotel management business would take some time, as owners of large hotels did not frequently change hotel management companies with which they did business. In addition, MHM needed to increase its level of experience and expertise in managing and operating large hotels. The arrangement thus described involving Essex and its partners was apparently satisfactory to all who were involved with Essex irrespective of the disparate contributions among its partners.*

Connolly could not explain the benefits that GHM would receive under the GHM/Essex agreement; he did not expect anyone at Essex Partnership to perform liaison functions between himself and Prudential. Connolly, Transcr. at 2641-2644. Such a function or service would be unnecessary because Connolly believed that he had a "pretty solid relationship with all the people at Prudential." Id. at 2643.

Formby did not know what liaison functions Essex Partnership was expected to perform for GHM, and he believed that no such

activities occurred. Formby, Transcr. at 1548-1549, 1555; Exhs. 348, 351.

James, the president of MHM, could not identify a specific person or entity who would have acted as a liaison between the owners and operators of the hotel properties in question. James, Transcr. at 1735-1737. James did not know that IRA and THC were partners in Essex Partnership until he was shown the partnership agreement at trial. James, Transcr. at 1734-1737.

There were no officers or employees at Essex Partnership who could have engaged in consulting or acted as liaisons. Formby, Transcr. at 1534-1535. Eulich had never seen the Essex Partnership agreement or the consulting and fee agreements between MHM or GHM and Essex Partnership. Eulich could not explain the meaning of the phrase in article II of the Essex Partnership agreement referring to Essex Partnership's role as "liaison intermediary between the owners and operators of hotel properties". Eulich, Transcr. at 1631-1634.

j. Transfer of IRA's Essex Partnership Interest

On December 31, 1984, IRA transferred its 26.125-percent Essex Partnership interest to Carlco, TMT, and BWK. Carlco and TMT each received an 11.75-percent partnership interest in Essex, while BWK received a 2.6125-percent partnership interest in Essex. Exh. 69, at 16; Exh. 93, at 10; Exh. 114, at 6-7. Essex

Partnership apparently was not informed of the transfer and continued to make partnership distributions to IRA.  Petitioners' Reply Brief at 534.

k.  Payments to Essex Partnership and Essex Partnership Distributions

During 1982 to 1988, Essex Partnership reported that it received or accrued commission/consulting fee payments from GHM and MHM as follows:

| Year | GHM | MHM | Exhibits |
|------|-----|-----|----------|
| 1982 | $234,170 | $104,121 | 9074, at 2, acct. Nos. 400100 and 400200 |
| 1983 | 222,557 | 235,718 | 707, at 1; Exh. 678, statement 1 |
| 1984 | 268,663 | 242,116 | 726, 353 |
| 1985 | 225,487 | 230,847 | 4010, 354, statement 1 |
| 1986 | 68,000 | 123,089 | 4011, 355, statement 1 |
| 1987 | 172,963 | 388,632 | 837, 356 |
| 1988 | 142,761 | 238,889 | 828, 357 |
| Total | 1,334,601 | 1,563,412 | |

For the 1989 taxable year, Essex Partnership reported $293,261 in total income from consulting fees from MHM and GHM.  Exh. 358, supporting schedule at 1.

For the taxable years 1982 through 1989, Essex Partnership made distributions to IRA, THC, Connolly, and MHM as set forth in the following table.

## Table 8

| Year | IRA | THC | Connolly | MHM |
|------|------|------|----------|------|
| 1982 | $86,212 | $70,538 | $16,500 | $156,750 |
| 1983 | 78,375 | 64,125 | 15,000 | 142,500 |
| 1984 | 133,238 | 109,013 | 25,499 | 242,250 |
| 1985 | 120,175 | 98,325 | 23,000 | 218,500 |
| 1986 | 80,465 | 65,835 | 15,400 | 146,300 |
| 1987 | 120,698 | 98,753 | 23,100 | 219,450 |
| 1988 | 117,562 | 96,188 | 22,500 | 213,750 |
| 1989 | 51,727 | 42,322 | 9,900 | 94,051 |
| Total | 788,452 | 645,099 | 150,899 | 1,433,551 |

**Exh. 9074, at 2, acct. Nos. 320000 (1982); Exh. 678, statement 2, Schedule K-1, item f. (1983); Exh. 353, statement 2, Schedule K-1, item f. (1984); Exh. 354, statement 2, Schedule K-1, item f. (1985); Exh. 355, Schedule K-1 (1986); Exh. 356, reconciliation of partners' capital accounts (1987); Exh. 357, 1988 diagnostic Essex Hotel Management Co., at 2, reconciliation of partners' capital accounts (1988); Exh. 358, Schedule K-1 (1989); Petitioners' Reply Brief at 645.**

*In 1986, MHM was sold by Eulich to an unrelated company called Aircoa. Aircoa continued to allow MHM to participate as a partner in Essex Partnership until about 1990.*

B. Certain Loans, Payments, and Other Benefits That Ballard and Lisle and/or Their Family Members Received (STJ report at 59-64)

*Ballard and Lisle established respective grantor trusts (the CMB and the CMB II Trusts for Ballard and the RWL and the RWL II Trusts for Lisle). As grantor trusts, the income (or losses) of*

the trusts was taxable to Ballard and Lisle pursuant to sections 671 through 678.  The CMB, CMB II, RWL, and RWL II Trusts each made investments, as limited partners, in certain movie shelter partnerships.  Kanter or Solomon Weisgal (the trustee of the Bea Ritch Trusts that owned all of IRA's common shares) was the trustee of these trusts.  Each Ballard and Lisle trust held no assets other than its respective movie partnership interest.  Each trust financed the acquisition of its movie partnership interest through a loan from IRA and International Films, Inc. (IFI), a corporation in which IRA, at one time, was a majority shareholder.[78]  In making loans to the trusts, IRA originally provided the loan funds and received promissory notes from each of the trusts; IRA then transferred these trust notes to IFI, in exchange for IFI's notes.  The trust notes that IFI held, from a practical standpoint, were collectible only if the movie ventures

---

[78] The parties disagree as to whether these and other loans to Ballard and Lisle, various trusts of Ballard and Lisle, and to Mrs. Ballard were bona fide loans, and whether the parties to these transactions actually intended the funds to be repaid.  The terms "loan", "promissory note", and other similar terms are used herein for convenience and are not intended as ultimate findings or conclusions concerning whether a bona fide indebtedness actually existed.  Similarly, the parties dispute whether certain consulting payments that were made to Ballard's and Lisle's children from 1993 through 1989, which are more fully discussed infra, were in fact, compensation paid for the children's consulting work.  The use of terms indicating that consulting payments were made to the children should not be construed as conveying any legal conclusion as to whether such payments constituted compensation for services rendered.

*in which the trusts had invested proved successful, because the
trusts had no other assets available to creditors. IFI had no
recourse against Ballard and Lisle, individually, because the
trusts, not Ballard and Lisle, had borrowed the funds and issued
the promissory notes.[79]*

*Ultimately, the movie ventures in which the trusts invested
proved unsuccessful and were not profitable. Additionally, the
Internal Revenue Service later disallowed the deductions that
Ballard claimed on his tax returns with respect to these movie
investments and Ballard was required to pay additional taxes to
the Internal Revenue Service. In July 1985, Mrs. Ballard
borrowed about $160,000 from* **TMT** *to pay the income tax liability
that she and Ballard owed.[80]* **Exh. 94, at 10.**

*In 1987, IFI owed IRA in excess of* **$500,000** *and did not have
sufficient resources to repay IRA.* **Exh. 34, at 2.** *To "clean up"*

---

[79] *Kanter explained that, although, for Federal income tax
purposes, the taxable income or taxable loss of each grantor
trust was required to be reported on Ballard's or Lisle's tax
returns, the trusts were otherwise still separate legal entities
for State law purposes. Ballard and Lisle thus were not
personally liable upon the loans of their trusts, as Ballard and
Lisle had not personally guaranteed the loans. Kanter claimed
that he had helped the trusts obtain the loans because the movie
investments originally looked very promising.*

[80] **The STJ report incorrectly stated that Mary Ballard
borrowed the $160,000 from either IFI or IRA. As discussed in
detail in additional findings of fact, infra pp. 178-181, the
Ballards borrowed a total of $303,943 from TMT.**

IFI's liability to IRA, Lawrence Freeman (IRA's president) and Linda Gallenberger (a TACI employee and an officer of convenience for IRA) had IFI (of whom IRA was now sole shareholder) transfer all of its assets to IRA in satisfaction of IFI's liability to IRA. Substantially all of the assets IFI transferred consisted of promissory notes that had been issued by various third parties, including the above promissory notes of Ballard's and Lisle's grantor trusts, as well as other notes that Ballard and Lisle had issued individually.[81] On its books, IRA reduced IFI's liability to it by an amount equal to the full face amount of the notes IFI transferred.

As reflected by a memorandum dated July 17, 1987, Lawrence Freeman (IRA's president) and Linda Gallenberger agreed that the loans that IRA was holding that had been made to Ballard and Lisle, individually, and to their respective grantor trusts would be "forgiven", in view of the difficulty of collection.

In 1987, IRA sold for a stated price of $1 each to MAF, Inc. (MAF), a wholly owned subsidiary of Computer Placement Services, Inc., the promissory notes of Ballard's and Lisle's grantor trusts that IRA obtained from IFI. MAF had a relatively insubstantial amount of assets and operated out of the accounting

---

[81] The STJ report lacks detailed findings of fact regarding loans that IRA and other Kanter-related entities made to Ballard and Lisle individually. These matters are discussed in detail in additional findings of fact. See infra pp. 194-205.

*firm offices of Albert Morrison (MAF's president). Freeman (who*

*was then IRA's president) had asked Morrison (a certified public*

*accountant and longtime friend of Kanter) to be MAF's president.*

*Mr. Morrison received no salary for being MAF's president. As*

*MAF's president, he approved the purchase by MAF of the*

*promissory notes from the trusts as a favor to Kanter.[82]*

*IRA subsequently also sold 100 percent of IFI's outstanding*

*shares of stock to Linda Gallenberger for $1 in September 1988.*

*Shortly thereafter, Ms. Gallenberger placed IFI into bankruptcy.*

*On its 1987 tax return, IRA claimed losses with respect to*

*its sale of the trust notes to MAF. IRA also claimed bad debt*

*deductions with respect to the individual notes of Ballard and*

*Lisle that it obtained from IFI. It further claimed a $65,000*

*worthless security deduction with respect to the IFI shares that*

*were later sold to Ms. Gallenberger.*

*For substantially all of the period from about 1983 to 1989,*

*KWJ Corp. (an IRA subsidiary) and later the KWJ Partnership*

*(whose partners were IRA's subsidiaries BWK, Carlco, and TMT)*

*paid monthly "consulting fees" of $1,000 each to Ballard's two*

*daughters and to Lisle's son and daughter. After the Internal*

*Revenue Service commenced examinations of many of Ballard's,*

---

[82] **IRA's purported sale of promissory notes to MAF, Inc., is discussed in detail in additional findings of fact. See infra pp. 196-205.**

*Kanter's, and Lisle's respective returns for the years at issue,*
*Kanter, in February 1990, sent letters to the children*
*terminating KWJ Partnership's "consulting arrangement" with*
*them.[83] In two of these termination letters, Kanter apprised the*
*children that he had recently assumed IRA's presidency. He noted*
*that their consulting arrangement had begun when Lawrence Freeman*
*was IRA's president. In the letters, Kanter stated that the*
*children had done nothing for a number of years, and he blamed*
*Mr. Freeman for having KWJ Partnership continue to make monthly*
*payments to them.[84]*

*After becoming IRA's acting president in 1989, Kanter also*
*discussed with Ballard and with Lisle the payment of their*
*individual promissory notes that IRA held but had previously*
*deducted as bad debts on IRA's 1987 return. Since at least 1987,*
*Ballard had claimed that neither he nor his wife were liable on*
*the promissory notes that they had previously executed. In late*
*1992, Ballard agreed to pay IRA $120,000 in settlement of his*
*$196,000 debt to IRA on his promissory notes. Ballard also*
*entered into an arrangement, at about this time, to repay the*
*$160,000 loan his wife had received from* **TMT** *in July 1985.*

---

[83] *Melinda Ballard's consulting arrangement had been*
*terminated earlier in late 1988.*

[84] Pertinent portions of the text of these letters are
quoted <u>infra</u> pp. 193-194.

*Kanter reached a similar agreement with Lisle to discharge his debt to IRA. Originally, pursuant to certain payment negotiations Kanter and Lisle had in 1989, Lisle agreed to pay the debt in 2 years. He failed to do so, and he and Kanter discussed the matter again, until Lisle, at some point, agreed to pay the debt by the end of 1993. However, Lisle died before making any payment, and Kanter, acting on behalf of IRA, filed a claim against Lisle's estate.*

*Beginning in about 1990, Ballard was paid a salary by TMT, and Lisle was paid a salary by Carlco. Kanter, who was now IRA's president, agreed to have each of these IRA subsidiaries pay a salary to Ballard and Lisle. Ballard had requested that TMT pay him a salary. At various times from 1987 through 1989, some of Ballard's family trusts had also received loans from TMT in order to make certain real estate investments.*

## IV. Additional Findings of Fact: The Flow of Funds

Other than the limited discussion concerning loans to Ballard and Lisle and their family trusts set forth above, the STJ report did not include an analysis of the flow of funds that respondent offered as further proof that the payments from The Five constituted income earned by and properly taxable to Kanter, Ballard, and Lisle. The following additional findings of fact focus on the payments from The Five to IRA, THC, and other Kanter-related entities and how those funds were transferred to

Kanter, Ballard, and Lisle, including a number of purported loans
to Kanter, Ballard, Lisle, and their trusts.  Because some of the
payments from The Five to IRA were accumulated in IRA until 1983
and then transferred to Carlco, TMT, and BWK, we shall analyze
separately the transfers of funds for the periods before 1984 and
after 1983.

The Court's additional findings of fact are divided into
eight sections.  Section A provides both an overview of the
payments made by The Five to IRA and its subsidiaries in
connection with the various Prudential transactions from 1977 to
1989, and a breakdown of those payments for the periods 1977 to
1983 and 1984 to 1989.  Sections B, C, and D focus on the
distribution of those funds to Kanter, Ballard, Lisle, and their
family members and trusts for the periods 1977 to 1983 and 1984
to 1989.  Section E discusses payments made by The Five to THC
and its subsidiaries during the years at issue.  Sections F and G
discuss the distribution of those funds to Kanter and Lisle.

Where necessary to add context, we restate some of the
findings of fact set forth and properly supported by citations of
the record earlier in this report.  We do not repeat the
citations of the record for these findings of fact.

A.  Payments Made by The Five to IRA and Its Subsidiaries
    From 1977 to 1989

**The following is a summary of the payments The Five made to
IRA and its subsidiaries in connection with the various**

transactions discussed above during the entire period 1977
through 1989.

Table 9

| Year | Hyatt[1] | Frey | Schaffel | Schnitzer/ PMS | Eulich/ Essex | Total |
|------|------|------|----------|-----------|---------|-------|
| 1977 | $54,848 | -- | -- | -- | -- | $54,848 |
| 1978 | 60,739 | -- | -- | -- | -- | 60,739 |
| 1979 | -- | -- | $100,000 | $150,000 | -- | 250,000 |
| 1980 | 119,719 | $127,372 | 244,920 | 533,425 | -- | 1,025,436 |
| 1981 | 90,070 | 105,764 | 361,525 | 534,696 | -- | 1,092,055 |
| 1982 | 172,702 | 538,781 | 447,450 | 361,692 | $86,212 | 1,606,837 |
| 1983 | 172,090 | 110,125 | [2]244,731 | 361,692 | 78,376 | 967,014 |
| 1984 | 186,094 | 103,500 | -- | 361,692 | 133,238 | 784,524 |
| 1985 | 206,790 | 128,763 | -- | 361,692 | 120,175 | 817,420 |
| 1986 | 231,263 | -- | -- | 361,692 | 80,466 | 673,421 |
| 1987 | 229,449 | -- | -- | 361,692 | 120,698 | 711,839 |
| 1988 | 197,348 | -- | -- | 361,692 | 117,563 | 676,603 |
| 1989 | 52,777 | -- | -- | 840,423 | 51,727 | 944,927 |
| Total | 1,773,889 | 1,114,305 | 1,398,626 | 4,590,388 | 788,455 | 9,665,663 |

[1] Except for the amounts listed for 1977 and 1978 (which were paid to KWJ Corp. before IRA purchased all of KWJ Corp.'s common stock), the amounts that IRA received from the Hyatt Corp. payments are net of the 30-percent share paid to Weaver.

[2] The $244,731 amount listed as a Schaffel payment for 1983 includes the $213,750 that he paid to IRA following the first deal with Travelers.

See Tables 2, 3, 5, 7, and 8, supra, and accompanying citations
of the record.

During the period 1983 to 1989, IRA maintained cash deposits
as set forth in the following table:

### Table 10

| Year | Amount |
|------|--------|
| 1983 | $140,675 |
| 1984 | 54,201 |
| 1985 | 13,140 |
| 1986 | 326,783 |
| 1987 | [1]1,251,723 |
| 1988 | 1,332,565 |
| 1989 | [2]613,298 |

[1] In 1987, IRA sold stock (identified as Hyatt Air) and received proceeds of $1,115,560.  Exh. 22 (Form 6252); Exh. 9000, at 4.  IRA invested these proceeds in certificates of deposit between 1987 and 1989.  Exh. 34, at 1-2; Exh. 35.

[2] In 1989, IRA's cash on hand was reduced in substantial part by a loan of $600,000 that IRA made to Kanter.  Exh. 36, at 6; Exh. 9114, at 15.

**Exhs. 18-24, Schedules L.**

The remainder of this section is divided into two subsections.  Subsection 1 addresses all of the payments made by The Five during 1977 through 1983.  These payments were paid to and accumulated by IRA and reported on IRA's consolidated returns.  Subsection 2 addresses all of the payments made by The Five during 1984 through 1989.  These payments were paid to IRA and/or other Kanter-related entities and distributed to Carlco, TMT, and BWK, at a time when the latter entities were no longer part of IRA's consolidated group for tax reporting purposes.

1.  Payments Made During 1977 Through 1983

**As Table 9 reflects, during the period 1977 through 1983, IRA received (1) $670,168 from Hyatt Corp. (70 percent of Hyatt**

Corp.'s payments to KWJ Corp.),[85] $882,042 from Frey (through payments to IRA's subsidiary, Zeus), (3) $1,398,626 from Schaffel, (4) $1,941,505 from Schnitzer/PMS (through installment

---

[85] During 1977 through 1983, Hyatt Corp. paid a total of $907,845 to KWJ Corp. pursuant to the Hyatt/KWJ agreement. See Table 2, supra p. 90. In early 1979, IRA acquired from Weaver all of KWJ Corp.'s common stock for $150,000. At the time, KWJ Corp. had net assets of $115,084. The record also leaves open the possibility that Hyatt Corp. made a payment to KWJ Corp. for 1978 (a payment that would have been made in early 1979). See supra p. 90 (Handelsman). After 1978, Weaver forwarded the Hyatt Corp. payments to Kanter, who had TACI negotiate the checks and then distribute to Weaver his 30-percent share of each payment. Petitioners' Reply Brief at 537. IRA deducted the payments to Weaver as a commission expense. With the exception of interest income of $13,796, the payments from Hyatt Corp. represented KWJ Corp.'s sole source of funds. Exh. 9076 (Kuck Summary # 2.b.); Exh. 10, at 15; Exh. 14, at 6; Exh. 17, at 15; Exh. 18, at 19; Kuck, Transcr. at 3445-3446.

KWJ Corp.'s total application of funds for 1979 through 1983 was approximately $674,900 as follows:

| Year | Application | Amount | Exhibit |
|------|-------------|--------|---------|
| 1979 | Dividend to IRA | $60,000 | 10, at 4, sched. M-2, Kuck, Transcr. at 3446 |
| 1980 | -- | -- | -- |
| 1981/82 | Dividend to IRA | 260,000 | 14, at 40, l. 5 17, at 27; l. 28 25, at 21; Kuck, Transcr. at 3446-3447 |
| 1983 | Dividend to IRA | 297,900 | 18, at 30 |
| 1982 | Consulting Fees | 21,000 | 17, at 16, l. 23 |
| 1983 | Consulting Fees | 36,000 | 18, at 20 |
| Total | | 674,900 | |

payments of principal and interest), and (5) $164,588 from Eulich/Essex Partnership, for a total of $5,056,929.

Before 1984, all payments that IRA and its subsidiaries received from The Five in connection with the Prudential transactions described above were reported on IRA's consolidated returns. No tax was paid on this income because, during 1978 through 1983, IRA reported substantial net operating losses. See Table 1, <u>supra</u> p. 48.

2. <u>Payments Made During 1984 to 1989</u>

After 1983, Kanter altered the structure for the receipt of payments from The Five. Although Hyatt continued to issue checks payable to KWJ Corp., IRA (which purchased KWJ Corp. in 1979) liquidated the company in December 1983. At the same time, Carlco, TMT, and BWK formed the KWJ Partnership, which began receiving the Hyatt payments. Thereafter, the Hyatt payments were no longer reported on IRA's consolidated returns but were reported on the respective returns of Carlco, TMT, and BWK in accordance with their distributive shares (45/45/10 percent, respectively) of KWJ Partnership items. Exhs. 61-66 (Carlco); Exhs. 84-89 (TMT); Exhs. 106-111 (BWK).

In 1984, in connection with Lisle's move to Travelers, Schaffel made a final payment of $213,750 to IRA and then began making payments to THC.

Frey continued to make payments to IRA's subsidiary Zeus during 1984 and 1985.

Schnitzer/PMS continued to make principal and interest payments to IRA with the exception of its final (accelerated) payment, which was remitted to PSAC and then distributed to Carlco, TMT, and BWK.

In December 1984, IRA transferred its interest in Essex Partnership to Carlco (45 percent), TMT (45 percent), and BWK (10 percent). See discussion infra pp. 170-171. Therefore, IRA no longer reported income from Essex Partnership on its consolidated returns. Although Essex Partnership continued to make payments to IRA, those payments were transferred to Carlco, TMT, and BWK, which reported the payments in accordance with their distributive shares of Essex Partnership items. Exhs. 61-66 (Carlco); Exhs. 84-89 (TMT); Exhs. 106-111 (BWK).

As Table 9 reflects, during the period 1984 to 1989, IRA received (1) $1,103,721 from Hyatt Corp. (through payments to KWJ Corp.),[86] $232,263 from Frey (through payments to Zeus), (3) $2,648,883 from Schnitzer/PMS (through installment payments of

---

[86] During 1984 through 1989, Hyatt Corp. continued to issue checks to Weaver made payable to KWJ Corp., and Weaver continued to forward those checks to Kanter. After Kanter's office returned 30 percent of the payments to Weaver, KWJ Partnership received the balance or $1,103,721.

principal and interest), and (4) $623,867 from Eulich/Essex

Partnership, for a total of $4,608,734.[87]

After 1983, IRA reported as income only the payments from

Frey to IRA's subsidiary Zeus and the payments from PMS.  Exhs.

19-24 (Schedule 6252); Exh. 19, at 12; Exh. 20, at 16.

B. Distribution of the Funds Paid by The Five in Connection
   With the Various Prudential Transactions to Kanter,
   Ballard, Lisle, and Their Respective Family Members

This section is divided into three subsections.  The first

subsection provides background regarding Carlco, TMT, and BWK.

The second subsection discusses the transfer of funds from IRA to

Carlco, TMT, and BWK.  The third subsection discusses the

disposition of funds from Carlco, TMT, and BWK for the benefit of

Ballard, Lisle, Kanter, and their respective families.

1. Additional Details Regarding Management and Control of
   Carlco, TMT, and BWK

a. Carlco

Lisle and members of his family were officers of Carlco with

signatory authority on its various accounts.  Exh. 2030, at 35.[88]

There is no dispute that Lisle managed and controlled Carlco's

investments.  During 1984 through 1989, moneys from Carlco were

deposited in a brokerage account maintained at Goldman Sachs.

_____

[87] All payments from Schaffel during this period were
remitted to THC, as discussed infra pp. 207-208.

[88] For a list of Carlco's officers and directors for the
period in question, see app. 2 to this report.

Exh. 527.  The mailing address of this account was Lisle's home address.  Id.

  b.  TMT

Freeman, Gallenberger, and Meyers were listed as TMT's officers and directors during the period 1983 to 1989.[89]  There is no dispute Ballard managed and controlled TMT's investments.

TMT listed the following bank and brokerage accounts as assets on its general ledgers for 1983 through 1989:  A Wells Fargo account, a Citizen Bank account, a Goldman Sachs brokerage account, and a Kemper money market account.  Exh. 9014; Exhs. 92-98.

During 1984 through 1989, moneys from TMT were deposited in an account maintained at the Wells Fargo Bank in San Francisco.  The mailing address of this account was Ballard's home address.  Mary Ballard, Transcr. at 2817.  Ballard opened this account in the name of TMT, and he and his wife had signatory authority over it.  Ballard, Transcr. at 223-224; Exhs. 614-617.  The records for TMT were maintained at Ballard's home.

  c.  BWK

The officers and directors of BWK included Kanter, Meyers, Gallenberger, and Weisgal.[90]  Kanter testified that he did not

---

[89]  For a list of TMT's officers and directors for the period in question, see app. 3 to this report.

[90]  For a list of BWK's officers and directors for the period in question, see app. 4 of this report.

have the time to manage BWK's assets as he had originally planned.  Kanter, Transcr. at 3695.

2.  IRA's Transfers to Carlco, TMT, and BWK of Funds Paid by The Five

a.  Funds Paid by The Five to IRA During 1977 Through 1983 Transferred to Carlco, TMT, and BWK

During 1977 through 1983, payments made by The Five to IRA in connection with the various Prudential transactions discussed above totaled approximately $5 million.

Beginning in 1984, Kanter purportedly directed that IRA's "free-cashflow" be distributed in the ratio of 45 percent each to Carlco and TMT and 10 percent to BWK.  From 1984 through 1989, IRA generally transferred funds and other assets to Carlco, TMT, and BWK, in the respective 45/45/10 percent allocation ratio Kanter had directed.

During 1984, approximately $4.2 million was transferred from IRA to Carlco, TMT, and BWK in a 45/45/10 percent split by way of (1) transfers through the TACI Special E and the TACI Special Accounts and (2) distributions related to Essex Partnership and a partnership known as Sherwood Associates Partnership.  Exhs. 2003, 2006, 2010.

(i). <u>Transfers From Zeus to IRA</u>

The payments that Zeus received from BJF from 1980 through 1983, a total of $882,042, accumulated in Zeus until they were transferred to IRA in the steps outlined below.

(1) At a time unknown, but before March 25, 1983, IRA lent Zeus $51,000. Exh. 26, at 24, last item.

(2) On March 25, 1983, Zeus transferred $51,000 to IRA as a loan repayment. Exh. 26, at 24, last item.

(3) At a time unknown, but before October 21, 1983, IRA transferred $774,000 or a cash equivalent to THC in exchange for a receivable of $774,000 due from THC. Exh. 27, at 5 (AJE-25); Exh. 26, at 11 (11-22-83); Petitioners' Reply Brief at 491-492.

(4) On October 21, 1983, Zeus transferred $774,000 to IRA in exchange for the $774,000 THC receivable. Exh. 27, at 5 (AJE-25); Exh. 26, at 11 (11-22-83).

(5) At a time unknown, but before December 5, 1983, IRA transferred $13,000 or a cash equivalent to THC in exchange for a receivable of $13,000 due from THC. Exh. 26, at 23.

(6) On December 5, 1983, Zeus transferred $13,000 to IRA in exchange for a $13,000 THC receivable. Exh. 26, at 23; Kuck, Transcr. at 3428-3443. Thus, at the end of 1983, Zeus retained $44,042 of the $882,042 paid by BJF, and Zeus held THC notes receivable totaling $787,000.

On January 12, 1984, Zeus transferred $5,028 to IRA in exchange for a $5,028 THC receivable. Exh. 9070, at 2.

By the end of 1989, the THC receivables that Zeus received from IRA had not been repaid. Exh. 9070, at 2, 7 (1984 and 1989 general ledgers). There is no evidence in the record that Zeus ever accrued any interest or received any principal payment in connection with the THC receivables identified above.

(ii). IRA's Transfer of Its Interest in Essex Partnership

As previously mentioned, in December 1984 IRA distributed to Carlco, TMT, and BWK its 26.125-percent partnership interest in Essex Partnership. The details of that transaction are summarized as follows.

In January of 1984, IRA recorded the receipt of a $44,413 payment received from Essex Partnership as payables of $19,986 due to each of Carlco and TMT and $4,441 due to BWK. Exh. 29, at 6. On January 30, 1984, IRA issued a check in the appropriate amount to each of the corporations and recorded the payments as payment of the payables owed to Carlco, TMT, and BWK. Exh. 29, at 1. Additional distributions from Essex Partnership to IRA during 1984 totaling $88,825 were also treated as distributed directly to Carlco, TMT, and BWK, by reducing the additions to capital attributable to IRA's contributions of cash made to the corporations during the year. Exh. 29, at 17.

IRA recorded the distribution of the Essex Partnership interest on its books as follows:

| | |
|---|---|
| 1984 beginning value | $45,283 |
| Less distribution of investment as paid-in capital | (45,283) |
| Less distributions from Essex | |
| 5/8/84 | (26,125) |
| 7/6/84 | (26,125) |
| 10/4/84 | (36,575) |
| Plus "distb exxex dist as pd in" | <u>88,825</u> |
| Investment end of year | -0- |

Exh. 29, at 17.

Lisle professed to have no knowledge that Carlco held an interest in Essex Partnership.  Exh. 2030, at 39.

(iii).  <u>IRA's Transfer of Its Interest in Sherwood Partnership</u>

In December 1984, IRA also transferred to Carlco, TMT, and BWK its 50-percent partnership interest in Sherwood Associates Partnership (Sherwood), as more fully described below.

In 1982, IRA invested $175,000 in Sherwood and reported a partnership loss of $89,577 for that year.  Exh. 26, at 14. In 1983, IRA invested an additional $150,000 in Sherwood and reported a partnership loss of $287,165 for that year.  Exh. 26, at 30.

In 1984, IRA transferred its 50-percent partnership interest in Sherwood to TMT (22.5 percent), Carlco (22.5 percent), and BWK (5 percent).  Exh. 9014 (AJE 7 for 12/31/84); Exh. 69, at 16;

Exh. 93, at 10; Exh. 114, at 6-7; Petitioners' Reply Brief at 524-525. When IRA distributed its Sherwood Partnership interest to Carlco, TMT, and BWK in 1984, IRA reported a gain of $51,744 on the distribution (apparently representing the difference between IRA's capital contributions of $325,000 and partnership losses totaling $376,742 that IRA reported for 1982 and 1983). Exh. 19, at 5 of 25.

In 1985, IRA reported a long-term capital loss of $46,925 attributable to the sale of a note receivable from Sherwood. Exh. 20, at 5. IRA reported that it acquired the note receivable in October 1984 and sold the note for $1,000 on December 1, 1985. Id. Neither IRA's general ledger nor its trial balance ledger for 1984 reflects the acquisition of a Sherwood promissory note.

(iv). Accounting Treatment

Carlco, TMT, and BWK recorded IRA's cash distributions as capital contributions, and they recorded IRA's transfers of its Essex and Sherwood partnership interests as paid-in capital, as follows:

| Item | Carlco | TMT | BWK |
|------|--------|-----|-----|
| Cash | $1,870,535 | $1,870,535 | $415,674 |
| Essex distribution | (39,971) | (39,971) | (8,882) |
| Essex partnership | 20,377 | 20,377 | 4,528 |
| Sherwood partnership | 1 | 1 | 1 |
| Receivable | 148 | 148 | 148 |
| Consent dividend | | 105,202 | |
| Total 1984 additions | 1,851,090 | 1,956,292 | 411,469 |
| Paid-in capital | | | |
| Beginning year | 7,398 | 7,398 | 7,398 |
| Yearend 1984 | 1,858,488 | 1,963,690 | 418,867 |

Exh. 69, at 16; Exh. 93, at 10, Exh. 114, at 6-7; Exh. 29, at 18-20.

At the end of 1984, IRA's records reflected that it transferred capital contributions and paid-in capital to Carlco, TMT, and BWK as follows:

| Carlco | TMT | BWK |
|--------|-----|-----|
| $1,856,942 | $1,962,144 | $417,321 |

Exhs. 31, 29.

> (v). Additional Capital Contributions to Sherwood Partnership

Between 1984 and 1987, TMT, Carlco, and BWK made capital contributions to Sherwood, and their distributive shares of Sherwood's Partnership items (income/losses) were as follows:

|       | TMT     |             | Carlco   |             | BWK     |            |
|-------|---------|-------------|----------|-------------|---------|------------|
|       | Capital | Income/Loss | Capital  | Income/Loss | Capital | Income/Loss |
| 1984  | $41,400 | ($119,117)  | [1]$41,400 | ($119,117) | $9,200  | ($26,470)  |
| 1985  | 36,000  | (100,147)   | 36,000   | (100,147)   | 8,000   | (22,255)   |
| 1986  | --      | ( 74,101)   | --       | 74,102)     | --      | (16,468)   |
| 1987  | 11,137  | (121,462)   | 11,135   | (120,817)   | 2,475   | (26,998)   |
| Total | 88,537  | (414,827)   | 88,535   | (414,183)   | 19,675  | (92,191)   |

[1] The record includes a letter from Meyers to Lisle, dated Oct. 16, 1984, informing him that TACI applied $40,690 representing Carlco's share of an installment payment that IRA received from PMS to partially offset $41,400 that Carlco owed to Sherwood Partnership.  Exh. 2073.

Exh. 93, at 4; Exh. 94, at 5; Exh. 96, at 4 (TMT); Exh. 69, at 2, 7; Exh. 70, at 4; Exh. 72, at 4 (Carlco); Exh. 114, at 5; Exh. 115, at 4; Exh. 117, at 2 (BWK).

In 1986, Sherwood changed its name to Forest Activity. Exhs. 9013-9015.

  b.  Transfer of Funds Paid by The Five During 1984 Through 1989 to Carlco, TMT, and BWK

During 1984 through 1989, the moneys paid by The Five to IRA, other Kanter-related entities, and/or Carlco, TMT, and BWK totaled approximately $4.6 million.

  (i).  Hyatt Corp.

As previously discussed, payments under the Hyatt/KWJ agreement (after Weaver's 30-percent share) were distributed to Carlco, TMT, and BWK in a 45/45/10 percent split through KWJ Partnership.

KWJ Partnership's total source of funds during the years 1984 through 1989 was $1,359,691, which included capital contributions of $6,100, Hyatt Corp. payments of $1,103,721, and IRA loans of $249,870.  Petitioners' Reply Brief at 538.

IRA made loans to KWJ Partnership totaling $30,000, $45,000, $38,000, $48,000, $20,000, and $68,000 during 1984 to 1989, respectively.  See app. 5 to this report.  As of July 30, 1990 (the date KWJ Partnership filed its tax return for 1989), these loans had not been repaid.  Exh. 957.  These loans provided a large portion of the funds KWJ Partnership used to make consulting payments to Ballard's and Lisle's children as discussed in additional findings of fact infra pp. 192-194.

During 1984 to 1989, Carlco's, TMT's, and BWK's distributive shares of the Hyatt Corp. payments to KWJ Corp. were $496,539, $496,539, and $110,342, respectively.  Exhs. 61-66, 84-89, 106-111; Petitioners' Reply Brief at 538.

One additional matter regarding the Hyatt Corp. payments deserves mention.  On August 2, 1989, IRA issued checks of $22,619 each to Ballard and Lisle.  After the checks were issued to Ballard and Lisle, IRA records reflected a transfer of $45,237 to KWJ Partnership on August 8, 1989.  Also on August 8 and 15, 1989, IRA ledger entries reflected that the checks issued to Lisle and Ballard, respectively, were void.  Exh. 36, at 9.

Despite the fact that IRA's ledger entries showed that these checks were void, Lisle's 1989 return reflected that he actually cashed the check. Lisle reported the $22,619 on his individual tax return as income from the "KJW [sic] Company." Exh. 421, Statement 1.

(ii). <u>Frey</u>

The $232,263 that BJF paid to Zeus during 1984 and 1985 was not transferred directly to IRA. In 1986, Zeus apparently used these funds to purchase preferred stock in Windy City Corp. Exh. 9070. Nevertheless, the amounts paid to Zeus roughly equaled the otherwise unaccounted-for loans in the aggregate amount of $250,000 that IRA made to KWJ Partnership during the period 1984 to 1989. See app. 5 to this report.

(iii). <u>Schnitzer/PMS</u>

During the period 1984 to 1989, the $2,287,191 in installment payments that IRA received from PMS was transferred to Carlco, TMT, and BWK in a 45/45/10 percent split and treated as capital contributions.[91]

(iv). <u>Essex Partnership</u>

From 1984 through 1989, Essex Partnership paid a total of $623,865 to IRA. See Table 8 and accompanying citations of the

_____

[91] For a schedule listing the transfers of PMS installment payments from IRA to Carlco, TMT, and BWK, see app. 6 to this report.

record.  IRA distributed these payments as payables to Carlco, TMT, and BWK in a 45/45/10 percent split, and they in turn reported their respective shares of these distributions on their tax returns.  Exhs. 61-66 (Carlco); Exhs. 84-89 (TMT); Exhs. 106-111 (BWK).  Essex Partnership income was allocated to Carlco, TMT, and BWK during 1984 through 1989, as follows:

| Year | Carlco | TMT | BWK |
|------|--------|-----|-----|
| 1984 | $59,957 | $59,957 | $13,324 |
| 1985 | 54,079 | 54,079 | 12,018 |
| 1986 | 36,210 | 36,210 | 8,047 |
| 1987 | 54,314 | 54,314 | 12,070 |
| 1988 | 52,903 | 52,903 | 11,756 |
| 1989 | 23,277 | 23,277 | 5,173 |
| Total | 280,740 | 280,740 | 62,388 |

Exhs. 29, 32-36.

c.  Carlco, TMT, and BWK Capital Accounts

At the end of 1989, IRA's records reflected that it made capital contributions and transferred paid-in capital to Carlco, TMT, and BWK as follows:

| Carlco | TMT | BWK |
|--------|-----|-----|
| $2,938,173 | $3,320,267 | $652,250 |

Exh. 74, at 12-13 (Carlco); Exh. 98, at 9 (TMT); Exh. 119, at 2 (BWK).  The $382,094 difference between Carlco's and TMT's capital accounts at the end of 1989 was attributable to TMT's accounting for so-called consent dividends during the period 1984

to 1988.[92]  Notably, TMT reversed the consent dividends in 1989.

Exh. 98, at 9.  As a result, Carlco's and TMT's capital accounts

at the end of 1989 both equaled $2,938,173.

   3.  The Disposition of Funds From Carlco, TMT, and BWK for
       the Benefit of Ballard, Lisle, Kanter, and Their
       Families

   a.  Ballard's Use and Enjoyment of TMT's Assets

   (i).  TMT's Various Accounts

During the period 1984 to 1989, substantial portions of

TMT's funds were invested in CDs (American National Bank

(Chicago) and Wells Fargo Bank (San Francisco)), savings and

money market accounts (Citizen Bank, Wells Fargo, TACI, and

Kemper Money Market), and a Goldman Sachs brokerage account.

Exhs. 92-98; Exh. 93, at 7; Exh. 94, at 5-9; Exh. 614, at 2; Exh.

95, at 2, 6; Exh. 9014; Exhs. 614-617.  Ballard and his wife had

signatory authority over the Wells Fargo savings account.

Ballard, Transcr. at 223-224.

   (ii).  Loans From TMT to Ballard and Ballard Entities

Seabright Corp. was owned by the Mary Family Trust.  Mary

Ballard, Transcr. at 2813-2815, 2823.  The beneficiaries of the

Mary Family Trust were Mary Ballard and her three daughters.  Id.

---

[92]  TMT recorded consent dividends of $105,202, $97,206,
$82,633, $31,960, and $65,093 (a total of $382,094) for 1984 to
1988, respectively.  Exh. 93, at 11; Exh. 94, at 11; Exh. 98, at
9.

Kanter served as trustee.  Id.  Seabright Corp. owned Seabright Farm located outside Little Rock, Arkansas.  Id. at 2822.[93]

TACI's June 30, 1984, trial balance ledger reflected that loans had been made to Ballard, Seabright Trust,[94] and Seabright Corp. as follows:

| Ballard | Seabright Trust | Seabright Corp. |
|---------|-----------------|-----------------|
| $10,000 | $11,300 | $29,840 |

Exh. 175, at 3-4; Exh. 174, at 93, 95, 97-98.

On August 7, 1984, money was transferred from the TACI Special E Account to the TACI Special Account designated for Ballard, Seabright Trust, and Seabright Corp. in the following amounts:

| Ballard | Seabright Trust | Seabright Corp. |
|---------|-----------------|-----------------|
| $10,599 | $12,253 | $31,435 |

Exhs. 5426, 5425, 5416.  This transfer of funds had the effect of eliminating the outstanding loans from TACI's books and records in that the loans were treated as having been paid.  Exh. 179, at 29 (ref. Nos. DPO80, DPO79, DPO81).  In connection with this transaction, as IRA was transferring funds to Carlco, TMT, and

---

[93]  The records of Seabright Corp. were maintained at Ballard's residence.  Mary Ballard, Transcr. at 2817.  Mary Ballard was an officer of Seabright Corp.  Id.

[94]  Ballard believed Seabright Trust invested in tax-sheltered investments.  Ballard, Transcr. at 248.

BWK as capital contributions, book entries were made reflecting that the three loans described above were transferred to TMT. Exh. 93, at 8-9.

From 1984 through 1989, Seabright Trust and Seabright Corp. received additional loans from TMT. The balances on these loans at the end of each year were as follows:

| Year | Seabright Trust | Seabright Corp. | Exhibit |
|------|-----------------|-----------------|---------|
| 1984 | $53,055 | $31,440 | 93, at 8-9 |
| 1985 | 79,155 | 31,520 | 94, at 9-10 |
| 1986 | 100,155 | 36,520 | 95, at 40 |
| 1987 | 100,155 | 41,520 | 96, at 2 |
| 1988 | 135,155 | 41,520 | 97, at 2 |
| 1989 | 135,155 | 41,520 | 98, at 4 |

The record does not include any promissory notes issued in connection with the loans to Seabright Trust or Seabright Corp. There is no evidence that either Seabright Trust or Seabright Corp. paid interest or principal on the loans from TMT. As of December, 31, 1989, the loans had not been repaid. Exh. 98, at 4.

From 1984 through 1989, TMT made loans totaling $303,943 to Claude Ballard and Mary Ballard. The balances due on these loans at the end of each year were as follows:

| Year | Claude Ballard | Mary Ballard | Exhibit |
|------|----------------|--------------|---------|
| 1984 | $10,599 | -- | 93, at 4 |
| 1985 | 10,599 | $160,000 | 94, at 10 |
| 1986 | 16,599 | 160,000 | 95, at 4 |
| 1987 | 36,943 | 160,000 | 96, at 2-3 |
| 1988 | 136,943 | 160,000 | 97, at 2 |
| 1989 | 146,943 | 160,000 | 98, at 4 |

An agreement dated December 26, 1986, purported to provide for the repayment of the $160,000 loan to Mary Ballard with Macy's preferred convertible stock that Ballard owned. Exh. 9098. However, TMT's accounting records do not indicate that the $160,000 loan was ever repaid or that the Macy's stock was transferred to TMT in accordance with the December 26, 1986, agreement. Exh. 98, at 4.[95]

(iii). TMT's Property Transferred to Ballard

In 1986, TMT paid $100,000 to acquire property described in TMT's general ledger as "LAND ST. FRANCIS COUNTY [ARKANSAS] 414.28 ACRE". Exh. 95, at 4. An adjusting journal entry for 1986 regarding this transaction stated "to record purchase of 2/7 on 414.28 acres in St. Francis County, Arkansas." Id. An adjusting journal entry for 1987 regarding this transaction stated "to r/c amounts loaned to Claude for purchase of Fairfield Planting Co. (See agreement in file)." Exh. 9014, at 34. The 414.29 acres of Arkansas land were no longer listed as a TMT

---

[95] As discussed supra p. 158, Kanter and Ballard negotiated the repayment of this debt in late 1992.

asset.  Exh. 96, at 4.  Fairfield Planting Co. (Fairfield) was an S corporation involved in farm operations in Arkansas.  Exh. 95, at 4; Ballard, Transcr. at 236.

On January 20, 1987, Ballard executed a promissory note which provided that (1) Ballard agreed to pay to TMT, on demand, the principal sum of $100,000, and (2) the note would not bear interest, but TMT was entitled to receive 90 percent of the "dividends" paid to Ballard by Fairfield.  Exh. 9018.  At the same time, Ballard and Mary Ballard, acting as TMT's president, executed an agreement which stated that (1) Ballard was executing a promissory note to TMT and was pledging 1,000 shares of Fairfield common stock as security for the note, and (2) TMT, as part of the transaction, agreed to advance in the future "any deficits incurred by * * * Ballard in the operations of Fairfield * * * and is to receive 90% of the dividends paid by Fairfield".  Id.  Ballard and Mary Ballard (acting in her individual capacity) also executed an assignment which stated that "for the purpose of securing the payment of all indebtedness now owing, or which may at any time hereafter be owing" by Ballard to TMT, the Ballards assigned to TMT 1,000 shares of Fairfield common stock.  Id.

In 1987, TMT apparently paid an additional $20,344 to Fairfield, and this amount was treated as an additional loan to Ballard.  Exh. 96, at 2.

The Ballards reported Fairfield items of income and loss on their 1987, 1988, and 1989 tax returns.  Exhs. 391-393.

When Gallenberger was questioned about the accounting entries for the Fairfield transaction, she could not recall the details and suggested Ballard should be questioned on the matter.[96]  Ballard believed that (1) he owed TMT approximately $200,000 on the Fairfield transaction, (2) TMT continued to receive "interest" on the deal, (3) he owned two-sevenths of Fairfield, (4) the initial Fairfield investment was $1,350,000 and the investment had increased in value to approximately $2,350,000, and (5) the Fairfield transaction was a good deal for TMT and a bad deal for Ballard.  Ballard, Transcr. at 249-250, 286-288.  There is no evidence in the record that TMT ever received any payments (interest, dividends, or otherwise) attributable to Ballard's promissory note described above.

The record is unclear as to whether TMT ever owned shares in Fairfield that it could transfer to Ballard.  Ballard asserted in Petitioners' Reply Brief at 625-626 that because Fairfield was an

---

[96] Petitioners argued in their Reply Brief at 626 that respondent failed to establish any relevant facts regarding the accounting surrounding the Fairfield transaction because respondent failed to question Gallenberger about the matter.  To the contrary, respondent's counsel questioned Gallenberger about the details of the transaction, and her reply ultimately was "ask Claude".  Gallenberger, Transcr. at 2477-2481.

S corporation, TMT could not own stock in the company. LaRue, Transcr. at 3587. Nevertheless, TMT's adjusting journal entries identified the property that was transferred to Ballard as "Fairfield Planting Company" (Exh. 9014, at 34), while TMT's general ledger identified the asset that was transferred to Ballard as land (not shares of stock). Exh. 96, at 4.[97]

Gallenberger could not explain the Fairfield transaction at all, and Ballard's testimony regarding the matter was inconsistent with TMT's general ledger entries. Ballard's explanation suggests that (1) Ballard received a TMT asset worth considerably more than the amount recorded on TMT's books, and (2) Ballard issued a promissory note to TMT that he never intended to repay.

(iv). <u>Investment in Melinda Ballard's Company</u>

Ficom International, Inc. (Ficom), was a corporation organized by Ballard's daughter, Melinda Ballard, in 1983. Melinda Ballard, Transcr. at 3721, 3724. In 1986, TMT transferred $4,000 to Ficom as a loan. Exhs. 9014, 614. In 1988, TMT recorded in its trial balance ledger a $15,000

---

[97] TMT's general ledger reflected an additional transaction involving what appears to be separate property in St. Francis County, Ark., identified as land valued at $424,800, along with a building ($25,200), and building improvements ($10,925). Exh. 95, at 4.

investment in Ficom stock.  Exh. 9014, at 6.  The entry included a handwritten notation "W/O in 1989."  Id.; Exh. 97, at 5.  In 1989, TMT recorded in its trial balance ledger a $15,000 long-term capital loss on its investment in Ficom, with an adjusting journal entry explaining the writeoff as follows:  "To w/o worthless stock of Ficom as per note on 1988 TB [trial balance]".  Exh. 9014, at 21 (AJE 6).  TMT claimed a long-term capital loss of $15,000 related to the Ficom transaction on its tax return for 1989.  Exh. 89, Sch. D.  As of December 31, 1989, $1,000 of TMT's loan to Ficom had not been repaid.  Exh. 98.

(v).  Ballard's Disclosures to Goldman Sachs

Goldman Sachs had a conflict of interest policy regarding partners' and employees' outside business affiliations, which required a written request for consent to establish an outside business affiliation.  Exh. 5938, at 3-4.  Goldman Sachs also had a private securities transaction policy requiring all partners and employees to notify Goldman Sachs when they personally became involved in any private securities transactions, including an investment in a private tax shelter.  Id. at 4.

During the period 1987 to 1989, Ballard reported as income on his tax returns substantial director's fees from Seabright Corp.  Exhs. 391-393.  On October 14, 1988, Ballard submitted a disclosure statement to Goldman Sachs which stated:  "I am

personally involved in substantial farming operations individually as well as in partnership form.  Family trusts control two corporations which are similarly involved."  Exh. 9072.  At trial, Ballard testified that the family trusts referred to in his disclosure statement to Goldman Sachs were the Bea Ritch Trusts, which purportedly owned IRA (and ostensibly TMT), and the two corporations he was referring to were TMT and Fairfield.  Ballard, Transcr. at 235-236.

Ballard's testimony on this point is inconsistent with his earlier testimony and is not credible.  In particular, Ballard testified that, as of 1987, he owned Fairfield--there is no evidence that a trust owned Fairfield.  The family trusts and two corporations mentioned in Ballard's disclosure statement were the Orient Trust (which owned TMT) and Mary Family Trust (which owned Seabright Corp.).

On June 13, 1989, Goldman Sachs issued a memorandum regarding "Outside Business Activities and Private Investment" reminding Goldman Sachs personnel of NYSE and NASD rules that required each general partner and employee to obtain prior written approval with respect to outside business activities and private investments.  Exh. 5938, at 11.  In response to this reminder, on August 2, 1989, Ballard submitted to the Goldman Sachs compliance department a Request for Approval of Outside

Business Activities and/or Private Investments Form. Exh. 1029. In response to a direction to provide a "Complete description of the investment or business affiliation. What is it and who else is involved in it as principals? Does it involve a public or private company?", Ballard answered, in part: "Farmland--Have been buying and selling for years." Id. Ballard did not identify IRA or TMT as principals and/or private companies with regard to these activities.

When Ballard became the director of an organization called ICM Property Investors, Ballard submitted to Goldman Sachs an "Outside Business Activities Information and Request Form". Exh. 1031. Ballard's involvement with this organization was through a "close friend" who controlled the property. Id. In contrast, Ballard never submitted such a form to Goldman Sachs with respect to TMT, which he purportedly was managing for IRA at Kanter's request.

(vi). TMT's Assets

During 1984, 1985, and 1986, TMT had total assets of $2,015,911, $2,289,151, and $2,520,852, respectively. Exhs. 93, 94, 95. TMT's cash holdings during 1984, 1985, and 1986 totaled $1,899,873, 1,906,516, and $50,803, respectively. Id. By 1986, TMT had transferred approximately $1.2 million to a Goldman Sachs

brokerage account and invested approximately $900,000 in real estate investments.  Id.

During 1987, 1988, and 1989, TMT had total assets of $2,773,138, $3,240,582, and $4,855,921, respectively.  Exhs. 9014, 96-98.  TMT's cash holdings during 1987, 1988, and 1989 totaled $232,635, $243,386 and $492,817, respectively.  Id. TMT's notes receivable during 1987, 1988, and 1989 totaled $433,618, $472,618, and $482,618, respectively.  Id.  During 1987, 1988, and 1989, TMT's investments in bonds (including municipal bonds) totaled $1,102,948, $1,288,862, and $1,477,690, respectively.  Id.

b.  Lisle's Use and Enjoyment of Carlco's Assets

(i).  Carlco's Various Accounts

During 1984 through 1989, Carlco's funds were deposited in TACI accounts, a brokerage account (Goldman Sachs), and in bank accounts (Connecticut National Bank and North Dallas Bank). Exhs. 527, 610, 611, 612.  The mailing addresses for Carlco's accounts were Lisle's home address, and Lisle and Donna Lisle (his wife) had signatory authority over these accounts.  Id.[98]

---

[98]  The Lisles and Henry Lisle (Lisle's brother) had signatory authority on the Goldman Sachs brokerage account.  Exh. 527.

(ii).  Lisle's Personal Use of Carlco's Funds

During 1983 to 1991, RWL Cinema Trust I[99] made annual payments of $2,948.50 to New Jersey Life Insurance Co.  Exh. 1121, at 4.  RWL Cinema Trust I made these payments out of annual loans of $3,000 from a variety of Kanter-related entities (IFI, TACI, IRA, and BWK).  Id.  In 1985, TACI made one (and only one) loan of $3,000 to RWL Cinema Trust I.  Id.

On April 12, 1985, Lisle wrote a check of $3,000 against funds in Carlco's account at Connecticut National Bank to repay a loan from TACI.  Exh. 612 (April bank statement, check No. 1011, Bates 000318).  The memo section of this check stated:  "Payment on Loan".  Id.  Lisle used Carlco's funds to repay the loan TACI made to RWL Cinema Trust I.  This payment did not generate a loan from Carlco to RWL Cinema Trust, or a loan from IRA to the RWL Cinema Trust, or a loan from Carlco to Lisle,  Exh. 70; Exh. 32. No loan arose from this transaction because the money in the Connecticut National Bank account belonged to Lisle, and he used that money to pay a personal debt.

(iii).  Carlco's Assets

During 1984 through 1989, Carlco's assets totaled $1,967,188, $2,327,066, $2,699,998, $3,078,545, $3,728,530, and

---

[99]  The RWL Cinema Trust I, a Lisle grantor trust, is discussed in greater detail infra pp. 195-205, with regard to loans from other Kanter-related entities.

$4,404,569, respectively. Exhs. 9015, 61-66. During 1984 through 1989, Carlco's assets were invested almost entirely in municipal bonds. <u>Id.</u>

    c. <u>Kanter's Use and Enjoyment of BWK's Assets</u>

    (i). <u>Salaries and Officer Compensation Paid to Kanter and His Son</u>

During 1984 through 1989, Kanter and his son, Joshua Kanter, received salaries from BWK in the following amounts:

| Year | Burton Kanter | Joshua Kanter |
|------|---------------|---------------|
| 1984 | $40,000 | -- |
| 1985 | 40,000 | $9,000 |
| 1986 | 40,000 | 13,000 |
| 1987 | 30,000 | 4,000 |
| 1988 | 30,000 | -- |
| 1989 | 30,000 | -- |
| Total | 210,000 | 26,000 |

Exhs. 115-119 (BWK ledgers); Exhs. 106-111 (BWK returns). Kanter testified, however, that he did not have time to manage BWK. Kanter, Transcr. at 3695.

    (ii). <u>Loans</u>

On April 11, 1985, BWK lent $400,000 to Kanter. Exh. 115, at 3. By the end of 1987, the $400,000 loan had not been repaid. Exh. 117. In 1988 and 1989, the $400,000 loan was reduced by approximately $30,000 each year by adjusting journal entries which treated the reduction of the loan as salary to Kanter. Exh. 9013, at 1, 11 (AJE 2); Exh. 5504. BWK's ledgers and

returns reflect interest income from CDs only, and there is no indication that Kanter paid any interest on the $400,000 loan. Exhs. 107-111, 115-119.

During the period 1987 to 1989, BWK lent a total of $236,000 to PSAC to support its operations. Gallenberger, Transcr. at 1985-1986; Petitioners' Reply Brief at 636. There is no evidence that any principal or interest was paid to BWK on these loans. Id.

(iii). Gifts

BWK's general ledger for 1986 included an August 4, 1984, entry for $1,000 which stated: "JANIS (Kanter) GIFT." Exh. 2006. A subsequent entry in BWK's general ledger suggests Kanter reimbursed BWK for the above-referenced gift in March 1987. Id. There is no suggestion in the ledger that Kanter paid BWK any interest related to this transaction.

C. Other Means Used To Transfer Funds for the Benefit of Ballard, Lisle, Kanter, and Their Respective Families

1. Payments From IRA, KWJ Corp., and KWJ Partnership

a. IRA Payments to Ballard and Lisle in 1982

In 1982, Ballard received $12,500 from IRA as a director's fee. Exh. 473. Ballard asserted he was not an IRA director and the payment was for consulting services. Ballard, Transcr. at 218.

On March 2, 1982, IRA paid Lisle $1,157.84.  Exh. 606 (Bates No. 0003209).

    b.  <u>Consulting Fees Paid by KWJ Corp. and KWJ Partnership to Ballard's and Lisle's Adult Children</u>

Melinda Ballard and Karen Ballard Hart were Ballard's daughters.  Melinda Ballard, Transcr. at 3720; Hart, Transcr. at 2776.  Amy Albrecht was Lisle's daughter, and Thomas Lisle was Lisle's son.  Albrecht, Transcr. at 914; Thomas Lisle, Transcr. at 927.

In 1982, KWJ Corp. began paying Thomas Lisle, Amy Albrecht, and Melinda Ballard $1,000 each per month by checks drawn on the TACI Special E Account.  Exh. 17, at 16, l. 23; Kanter, Transcr. at 3644-3645; Exh. 9100.  These payments continued during 1983.  Exh. 18, at 20; Exh. 935; Melinda Ballard, Transcr. at 3723; Thomas Lisle, Transcr. at 930-931.

Beginning in 1984, after KWJ Corp. was liquidated, Thomas Lisle, Amy Albrecht, and Melinda Ballard continued to receive $1,000 each per month from the newly formed KWJ Partnership.  Exh. 176 (multiple pages 2-20).  In November 1984, Karen Ballard Hart also began receiving $1,000 per month from KWJ Partnership.  <u>Id.</u> at 18.  These payments generally continued until 1989.  Exhs. 476, 9009.

The payments to the Ballard and Lisle children from KWJ Corp. and KWJ Partnership totaled $323,000, as summarized below:

| Year | KWJ Partnership | KWJ Corp. |
|------|-----------------|-----------|
| 1982 | -- | $21,000 |
| 1983 | -- | 36,000 |
| 1984 | $38,000 | -- |
| 1985 | [1]47,000 | -- |
| 1986 | 49,000 | -- |
| 1987 | 48,000 | -- |
| 1988 | 48,000 | -- |
| 1989 | [2]36,000 | -- |
| Total | 266,000 | 57,000 |

[1] Melinda Ballard received a total of $11,000 in 1985 and $13,000 in 1986.  Melinda Ballard, Transcr. at 3743-3744.

[2] Of the $36,000 paid in 1989, Lisle's children received at least $18,000, and Ballard's children received at least $12,000. Exhs. 431, 957.

Exh. 17, at 16, l. 23 (1982); Exh. 18, at 20 (1983); Exh. 176, at 2, 5, 6, 8, 11, 12, 13, 15, 16, 18, 20; Exh. 475, at 1, 3, 5, 6, 8, 10, 12, 14, 16, 18, 20; Exh. 479; Albrecht, Transcr. at 919 (1984 to 1989).

In early February 1990, after the Internal Revenue Service began examining Ballard's, Kanter's, and Lisle's tax returns for the years at issue, Kanter sent letters to Ballard's and Lisle's children terminating their "consulting arrangement".  Exhs. 476, 9009.  In his letter to Amy Albrecht, Kanter stated that "fundamentally no services appear to have been performed for a

number of years". Exh. 476. Kanter explained why Albrecht continued to receive the monthly payments as follows:

> Regrettably, from * * * [IRA's] point of view (clearly not yours), Mr. Freeman was preoccupied during that time with other personal difficulties that were protracted and distractive of his attention in virtually every respect. I do not believe you are aware of any of those difficulties and there is no need to dwell on the point, other than to tell you that during that time, he paid no attention to the activities of * * * [IRA] and its affiliates, and those who were simply administering tasks on behalf of * * * [IRA] routinely continued to make payments to you since they had no contrary instructions.

Exh. 476, at 2; Albrecht, Transcr. at 921. The record includes a nearly identical letter that Kanter wrote to Thomas Lisle. Exh. 9099; Thomas Lisle, Transcr. at 937.

### 2. Additional Loans

### a. IRA Loans to Kanter

IRA lent various amounts to Kanter during the period 1982 to 1989. Exhs. 25, 26, 29, 32-36. By the end of 1989, Kanter owed $600,000 to IRA. Exh. 36, at 6. There is no evidence of notes for these loans, and there is no evidence that any principal or interest was paid on these loans.

### b. Loans to Ballard, Lisle, Their Family Members, and Their Trusts

### (i). Ballard's Grantor Trusts

Ballard was the settlor of the following grantor trusts, with the trustees and beneficiaries, as indicated:

| Trust name | Type of trust | Trust established | Trustee | Beneficiary | Exhibit |
|---|---|---|---|---|---|
| CMB Cinema | [1]Grantor | 10/23/73 | Kanter/ Weisgal | Ballard's wife and children | 5102 |
| CMB Cinema II | Grantor | 7/15/75 | Kanter | Ballard's wife and children | 5020 |
| Summit | Grantor | 6/3/80 | Weisgal | Ballard's wife and children | 5105 |
| Seabright | Grantor | 11/2/81 | Kanter | Ballard's children | 5001 |

[1] In 1979, the CMB Cinema Trust was divided into 10 separate trusts. Exh. 5102.

On May 29, 1976, CMB Cinema Venture Partnership was formed. Exh. 5104. The partners were the CMB Cinema Trust (10 percent) and the CMB Cinema Trust II (90 percent) with respect to the Division B participation. Id. sch. A.

(ii). Lisle's Grantor Trusts

Lisle was the settlor of the following grantor trusts with the trustees and beneficiaries as indicated:

| Trust Name | Type of Trust | Trust Established | Trustee | Beneficiary | Exhibit |
|---|---|---|---|---|---|
| RWL Cinema | Grantor | 10/23/73 | Kanter | Lisle's descendants | 5019 |
| RWL Cinema II | Grantor | 7/15/75 | Kanter | Lisle's wife and children | 5000 |
| Basking Ridge | Grantor | 6/3/80 | Weisgal | Lisle's wife and children | 5103 |

Ballard's CMB Cinema Trust was formed on the same day as Lisle's RWL Cinema Trust (October 23, 1973), Ballard's CMB Cinema Trust II was formed on the same day as Lisle's RWL Cinema Trust II (July 15, 1975), and Ballard's Summit Trust was formed on the

same day as Lisle's Basking Ridge Trust (June 3, 1980). We shall refer to these various entities collectively as Lisle's grantor trusts and Ballard's grantor trusts.

(iii). International Films, Inc.

International Films, Inc. (IFI), was incorporated in September 1973. Exh. 955. As of August 31, 1986, IRA owned 71 percent of IFI's voting stock. Id. IRA's general ledger reflected that its basis in its IFI stock was $65,000. Exh. 34, at 7. At the end of 1987, CMB Cinema Venture also was an IFI shareholder. Exh. 5932.

IRA lent substantial sums to IFI, and, as of January 1987, IFI owed $507,708 to IRA. Exh. 34, at 2. As discussed below, Ballard's and Lisle's grantor trusts borrowed substantial sums from IFI to invest in IFI tax shelters.

(iv). Harbor Exchange Lending Operation

Harbor Investments, Inc., was incorporated on July 21, 1978, and its stated business purpose was investments. Exh. 153, at 19. The firm's name was changed in fiscal year ending August 31, 1980, to Harbor Exchange Lending Operation (HELO). Exh. 156, at 22. Active Business Corp. (Active) owned 100 percent of the voting stock of HELO, and THC owned 100 percent of Active's stock. Exh. 156, at 12, 21. THC filed a consolidated return with both Active and HELO for the fiscal years ending August 31,

1978, 1979, 1980, and 1984.  Exh. 153, at  18, 19, 25; Exh. 154, at 24, 27; Exh. 156, at 22; Exh. 157, at  6.

Before 1983, IRA transferred $1,189,900 to HELO purportedly as loans.  Exh. 26, at 23.

(v).  Loans to Lisle and His Trusts

During the 1970s and 1980s Kanter-related entities, including IRA, IFI, TACI, BWK, and HELO, made loans of more than $200,000 to Lisle and Lisle's grantor trusts.  Exh. 1120; Exh. 1121, at 2-4; Exh. 5016, Exh. 5932; Exh. 9006, at 2.

(vi).  Loans to the Ballards and Their Trusts

During the 1970s and 1980s, Kanter-related entities, including IRA, IFI, TACI, HELO, and TMT, made loans of more than $550,000 to Ballard, his family members, and Ballard's grantor trusts.  Exh. 1119; Exh. 1122; Exh. 5911; Exh. 5932; Exh. 9189; Exh. 9005, at 2, l. 18 (AJE 9); Exh. 174, at 93, 95; Exh. 175, at 3-4.

IRA transferred receivables of $160,400 and $500 due from Ballard, individually, to IFI in exchange for receivables due from IFI in like amounts.  Exh. 9005, at 4, ll. 24-26 (AJE 21); Exh. 26, at 28.

(vii).  Writeoff of Loans and Claimed Losses

Before the end of 1983, HELO lent $95,000 to Lisle's Basking Ridge Trust and $106,200 to Ballard's Summit Trust.  Exh. 9006,

at 2 (AJE 9); Exh. 1104.  By the end of 1983, a transaction took place between IRA and HELO which had the effect of (1) decreasing IRA's outstanding receivables due from HELO by $201,200, (Exh. 9006, at 2 (AJE 9); Exh. 26, at 23), and (2) increasing IRA loans to Basking Ridge Trust and Summit Trusts by $201,200.  Exh. 9006, at 2 (AJE 9); Exh. 26, at 26.  In short, IRA obtained HELO's receivables due from Basking Ridge Trust and Summit Trust.  IRA's adjusting journal entry stated that the purpose of this transaction was "to adjust for loans made to Basking Ridge and Summit via HELO (remove HELO from middle)."  Exh. 9006, at 2, l. 16.  Simultaneously with this book entry transaction, Basking Ridge Trust was credited with a payment of $10,300, leaving $84,700 due on its loan, and Summit Trust was credited with a payment of $10,100, leaving $96,100 due on its loan.  Exh. 26, at 26.  IRA then transferred to IFI the receivables due from Basking Ridge Trust and Summit Trust for a receivable of $180,800 due from IFI.  Exh. 9006, at 5 (AJE 27).

Loans to Ballard, Lisle, and their grantor trusts were either sold for $1 or written off as bad debts as described in the following steps.

## Step 1

As of December 17, 1987, IFI held receivables due from Ballard, Lisle, and their grantor trusts totaling $582,646, as follows:

### IFI Receivables

| | |
|---|---|
| Ballard | $35,748 |
| Ballard | 160,900 |
| CMB Cinema | 70,650 |
| CMB II | 16,675 |
| Summit | 96,100 |
| CMB Cinema | |
|   Ventures | 250 |
|    Subtotal | $380,323 |
| Lisle | $28,284 |
| RWL Cinema | 21,500 |
| RWL II | 67,839 |
| Basking Ridge | 84,700 |
|   Subtotal | 202,323 |
|    Total | 582,646 |

Exh. 9019, at 3; Exh. 5932; Petitioners' Reply Brief at 572.

Additionally, as of December 17, 1987, IFI held receivables due from the entities and individuals totaling $538,013, as follows:

### IFI Receivables

| | |
|---|---|
| Safari Trust | $98,450 |
| HGA Cinema | 133,695 |
| Elk Invest. | 76,500 |
| Interalia | 125,000 |
| Hargen | 8,000 |
| THC | 29,500 |
| Abernathy | 67,098 |
|   Total | 538,243 |

Petitioners' Reply Brief at 572.

## Step 2

As previously mentioned, IRA held a receivable of $507,648 due from IFI.  Exh. 34, at 2.  On December 17, 1987, IRA exchanged its $507,648 receivable due from IFI for all of IFI's remaining assets, which included a partnership interest in 1984 Development Partnership (assigned a value of $55,288), and IFI's receivables listed below:

### IFI Receivables

| | |
|---|---:|
| Ballard | $35,748 |
| Ballard | 160,900 |
| CMB Cinema Trust | 70,650 |
| CMB Cinema Trust II | 16,675 |
| HELO (re: Summit) | 96,100 |
| CMB Cinema Ventures | 250 |
| Lisle | 28,284 |
| RWL Cinema | 21,500 |
| RWL Cinema II | 67,839 |
| HELO (re: Basking Ridge) | 84,700 |
| Safari Trust | 98,450 |
| HGA Cinema | 133,695 |
| Elk Invest. | 76,500 |
| Interalia | 125,000 |
| Hargen | 8,000 |
| THC | 29,500 |
| Abernathy | 67,098 |
| Total | 1,120,889 |

Petitioners' Reply Brief at 573-576; Exh. 9019

## Step 3

MAF, Inc. (MAF), was a subsidiary of a Kanter-related entity known as Computer Placement Services, Inc.  Gallenberger, Transcr. at 2025-2027.  Albert Morrison, Jr., a C.P.A., served as

MAF's president as a favor to Freeman.  Morrison, Transcr. at 4505, 4513, 4519.  Morrison was a longtime friend of Kanter. Morrison, Transcr. at 4518.

Simultaneously with the transfer of IFI's receivables to IRA (listed above), IRA sold 10 of the receivables (with a face value of approximately $800,000) to MAF, Inc., for $1 per receivable or a total of $10.  Exh. 5911, at 6 (AJE 9, ll. 17-29); Exh. 5911, at 9 (AJE 23, ll. 26-28); Exh. 34.  The 10 receivables in question were those of Safari Trust, CMB Cinema Trust, CMB Cinema Trust II, RWL Cinema Trust, RWL Cinema Trust II, HGA Cinema Trust, Elk Investment Partnership, Inter Alia, Hargen, and HELO (the Basking Ridge Trust and Summit Trust notes).  Exh. 5911, at 6 (AJE 9); Petitioners' Reply Brief at 574.

### Step 4

With regard to Ballard's promissory notes (totaling $196,648) and Lisle's promissory note ($28,284), IRA's adjusting journal entries for 1987 reveal that IRA (1) substantially discounted the value of these notes, as well as a small receivable due from CMB Cinema Ventures (Exh. 5911, at 7 (AJE 12)), and (2) wrote off the balances, $84,889 due from Ballard and $12,185 due from Lisle, as bad debts.  Exh. 5911, at 10 (AJE 28, lines 15-19).  IRA's adjusting journal entry stated that this transaction was undertaken "to write-off worthless notes."  Exh.

34, at 5 (acct. Nos. 1210 and 1211); Exh. 5911, at 10 (AJE 28, lines 15-19). IRA claimed a bad debt loss with respect to Ballard's and Lisle's notes on its tax return for 1987. Exh. 22.

By the end of 1987, IRA still held a receivable of $485,825 due from HELO and a receivable of $345,869 due from Cedilla Investment Co. Exh. 9189. On December 22, 1987, IRA sold to MAF for $1 the HELO and Cedilla Investment Co. receivables totaling $831,692. Exh. 34, at 13, first entry; Exh. 5911 (AJE 32, last page).

On December 22, 1987, IRA also sold its interest in 1984 Development Partnership to MAF for a promissory note for $1,000. Exh. 9189. IRA claimed a long-term capital loss of $22,862 attributable to this transaction on its 1987 tax return. Exh. 22, Schedule D.

Morrison (through MAF) entered into the transactions with IRA described above merely as an accommodation to Kanter. Morrison, Transcr. at 4530. After purchasing the notes from IRA, MAF did no other business. Morrison, Transcr. at 4517.

By the end of 1987, neither Ballard nor Lisle owed any portion of their original loans totaling $196,648 and $28,284, respectively, to either IRA or IFI. CMB Cinema Ventures no longer owed $250 to either IRA or IFI. Likewise, Ballard's and

Lisle's grantor trusts' original loans totaling approximately $357,000 were no longer owed to IRA or IFI. Exh. 34.

In 1987, Ballard reported $2,400,252 of total income on his Federal income tax return, including $212,309 of interest and dividend income and $1,018,367 of capital gain income. Exh. 391. In 1987, Ballard had the resources to repay either IRA or IFI the loans he had received individually and through his trusts. Although IRA wrote off Ballard's receivable as a bad debt, Ballard did not report the discharge of this indebtedness as income on his 1987 tax return or on subsequent returns. Exhs. 391-393.

In 1987, Lisle reported $746,923 of total income on his Federal income tax return, including $255,707 of interest and dividend income. Exh. 418. In 1987, Lisle had the resources to repay either IRA or IFI the loans he had received individually and through his trusts. Although IRA wrote off Lisle's receivable as a bad debt, Lisle did not report the discharge of this indebtedness as income on his 1987 tax return or on subsequent returns. Exhs. 418-421.

Neither Ballard, Lisle, nor their grantor trusts paid any interest to IFI or IRA on the loans to them which were subsequently written off as bad debts or sold for $1. Exhs. 383-393, Exhs. 417-421; Exhs. 954, 955 (IFI returns). The record

does not include loan documents or notes evidencing the loans to Ballard, Lisle, and their grantor trusts.

At the end of 1987, IRA sold its IFI stock to Gallenberger for $1. Exh. 5912, at 7 (AJE 6). In addition to receiving the IFI stock, Gallenberger was given $3,000 identified as accounting fees. Exh. 9020; Exh. 35, at 12. IRA claimed a long-term capital loss of $65,000 attributable to this transaction on its 1987 tax return. Exh. 22, Schedule D.

In March 1989, approximately 2 years after IFI transferred receivables of $1,120,889 to IRA, IFI filed for bankruptcy. Exh. 627. At the time of the bankruptcy filing, Gallenberger was IFI's vice president, and she owned 100 percent of its stock. At the time of IFI's bankruptcy, IFI owed debts to the following creditors:

| Creditor | Reason | Amount of Claims |
|---|---|---|
| IRS | 1984 taxes | $5,500 |
| Kanter | Legal services | 750 |
| Neal, Gerber & Eisenberg | Legal services | 550 |
| PSAC | Services | 700 |
| I&F Corp. | Services | 775 |
| Total | | 8,275 |

Exh. 627.

(viii).  Loans to Lisle's RWL Cinema Trust During
1988 to 1990

**In 1988, the year after IRA wrote off Lisle's loans and the loans to RWL Cinema, RWL Cinema II, and Basking Ridge Trust, as described above, IRA made another loan of $6,000 to the RWL Cinema Trust.  Exh. 1121, at 4; Exh. 35, at 4.  In addition, Kanter lent a total of $6,000 to Lisle's RWL Cinema Trust during 1989 and 1990.  Exh. 1121, at 4.**

D.  Summary of Funds Paid by The Five to IRA and Disposition
of Those Funds for the Benefit of Kanter, Ballard,
Lisle, and Their Families

The following table is a summary of the funds paid by The Five to IRA during 1977 through 1989 and the disposition of those funds for the benefit of Ballard, Lisle, Kanter, and their respective families.

## Table 11

| | |
|---|---|
| Total funds IRA received from The Five 1977-89 | $9,665,663 |

IRA Distributions to Carlco/TMT/BWK 1984-89

| | | |
|---|---:|---:|
| IRA capital contributions 1984-89 | (6,528,596) | |
| IRA noncapital contributions 1984 | (44,411) | |
| KWJ distributions | (973,158) | |
| Essex distributions | (623,865) | |
| | (8,170,030) | (8,170,030) |
| Total | | 1,495,633 |

Distributions to Ballard and Lisle,
their family members and their
family/grantor trusts (as opposed to
transfers to Carlco, TMT and BWK)
(Spread sheet below)     (904,304)

    [1]591,329

| Ballard's Source | Ballard | CMB Cinema Trust | CMB Cinema Trust II | Summit Trust | CMB Cinema Ventures | Ballard's Family | Total |
|---|---|---|---|---|---|---|---|
| IRA | $35,748 | $70,650 | $16,675 | $96,100 | $250 | -- | |
| Loans | 160,900 | -- | -- | -- | -- | -- | |
| KWJ | | | | | | | |
| (1983) | -- | -- | -- | -- | -- | $12,000 | |
| (1984-89) | -- | -- | -- | -- | -- | 128,000 | |
| IRA Director's fee | 12,500 | -- | -- | -- | -- | -- | |
| Total | 209,148 | 70,650 | 16,675 | 96,100 | 250 | 140,000 | 532,823 |

| Lisle's Source | Lisle | RWL Cinema Trust | RWL Cinema Trust II | Basking Ridge Trust | Lisle's Family | |
|---|---|---|---|---|---|---|
| IRA Loans | $28,284 | $67,839 | $21,500 | $84,700 | -- | |
| | -- | 6,000 | -- | -- | -- | |
| IRA Payment | 1,158 | -- | -- | -- | -- | |
| KWJ | | | | | | |
| (1983) | -- | -- | -- | -- | $24,000 | |
| (1984-89) | -- | -- | -- | -- | 138,000 | |
| Total | 29,442 | 73,839 | 21,500 | 84,700 | 162,000 | 371,481 |
| | | | | | | 904,304 |

[1] The $591,329 difference can be accounted for by way of the amounts IRA (and Zeus) invested in (1) Frey's partnerships (at least $100,000), Sherwood Partnership ($325,000), PMS ($150,000), and the $18,000 IRA transferred to Carlco, TMT, and BWK in 1983 in exchange for common stock. These amounts (totaling $593,000) were unavailable for distribution to Carlco, TMT, and BWK.

E. Payments Made by The Five to THC and Its Subsidiaries During 1981 Through 1989

Schaffel, Frey, and Essex Partnership made payments to THC and its subsidiaries during 1981 through 1989 totaling $3,909,369 as set forth in the following table:

### Table 12

| Year | Schaffel | Frey | Essex | Total |
|------|----------|------|-------|-------|
| 1981 | -- | $80,616 | -- | $80,616 |
| 1982 | -- | -- | $70,538 | 70,538 |
| 1983 | -- | 16,200 | 64,125 | 80,325 |
| 1984 | $600,000 | 113,827 | 109,013 | 822,840 |
| 1985 | 1,160,000 | 256,557 | 98,325 | 1,514,882 |
| 1986 | 1,003,500 | -- | 65,835 | 1,069,335 |
| 1987 | -- | 33,570 | 98,753 | 132,323 |
| 1988 | -- | -- | 96,188 | 96,188 |
| 1989 | -- | -- | 42,322 | 42,322 |
| Total | 2,763,500 | 500,770 | 645,099 | 3,909,369 |

See Tables 4, 6, 8; Petitioners' Reply Brief at 645-646.

During 1984 to 1986, Schaffel made payments to THC totaling $2,763,500 representing Kanter's share of fees that Schaffel earned arranging Travelers financing for Walters's projects.

During 1981 through 1987, Frey made payments to THC totaling $500,770. These payments included shares of development and management fees pursuant to Kanter's and Frey's oral agreement, as well as shares of profits from Prudential projects and development fees from projects not involving Prudential properties pursuant to the Frey/THC agreement. These payments served to compensate Kanter for using his influence to obtain Prudential projects for Frey and for using his influence to bring

wealthy investors to Frey's projects not involving Prudential properties.

During 1982 through 1989, Essex Partnership made payments to THC totaling $645,009 representing cash distributions on THC's partnership interest.  These payments served to compensate Kanter for obtaining hotel management contracts for MHM.

F.  Distribution of Funds From THC to Kanter

The payments THC received from Schaffel, Frey, and Essex Partnership during the years at issue generally were deposited into THC's bank account.  Petitioners' Reply Brief at 646.

During 1983, THC transferred $2,335,298 from its account to TACI's accounts.  Exhs. 148, 149, 174; Petitioners' Reply Brief at 646.[100]  These transfers were identified in THC's general ledgers as investments, loans, or repayments of loans. Petitioners' Reply Brief at 647.  During 1983, $1,339,843 was transferred from TACI's accounts back to THC identified as returns on THC's investments, loans from TACI, and repayments of earlier loans from THC to TACI.  Exh. 5406, Petitioners' Reply

---

[100]  See app. 7 to this report.

Brief at 647-648.[101]  At the end of 1983, THC had $392,539 in TACI's accounts.  Petitioners' Reply Brief at 648-649.

During 1984, THC transferred $1,194,000 from its bank account to TACI's accounts.  Exhs. 149, 150; Petitioners' Reply Brief at 649.[102]  These transfers were identified in THC's general ledgers as investments, loans, or repayments of loans.  Petitioners' Reply Brief at 649-650.  During 1984, $756,300 was transferred from TACI's accounts to THC's account, and in most instances these transfers were identified as returns on THC's investments.  Exh. 5406; Petitioners' Reply Brief at 650-651.[103]  By the end of 1984, the net increase in THC's funds deposited with TACI was $434,700, for a total of approximately $827,000.  Petitioners' Reply Brief at 651-652.

During 1983 and 1984, a total of $1,525,458 was transferred from the TACI Special Account to Kanter's personal bank account identified as loans and retainer fees, as follows:

---

[101]  See app. 8 to this report.  Only portions of THC's general ledgers were provided to respondent.  Nevertheless, at the end of 1983, THC had approximately $400,000 remaining in TACI accounts.  Petitioners' Reply Brief at 648-649; Exh. 174.

[102]  See app. 9 to this report.

[103]  See app. 10 to this report.

| Transfer | Amount | Appendix |
|----------|--------|----------|
| 1983 (loans) | $407,458 | 11 |
| 1984 (loans) | 909,000 | 12 |
| 1983 (retainer fees) | 24,000 | 13 |
| 1984 (retainer fees) | 24,000 | 14 |
| 1984 (loans) | 161,000 | 15 |
| Total | 1,525,458 | |

Exh. 9078; Petitioners' Reply Brief at 654-655.

Kanter's personal bank account records for the period December 1982 through December 1984 show that Kanter made withdrawals for his personal benefit and the benefit of his family. Exh. 5408 (items 1-730); Petitioners' Reply Brief at 652-653.

As of October 31, 1987, Kanter had outstanding loans from TACI totaling $1,346,641. Exh. 9113; Petitioners' Reply Brief at 656-657.

As discussed, supra pp. 64-65, TACI filed for bankruptcy in February 1988. Lawrence Korrub, TACI's bankruptcy attorney, never received the records that TACI maintained for Kanter and his related entities because Gallenberger sent TACI's books and records, including the bank statements and canceled checks related to the TACI Special E and TACI Special Accounts, to Kanter. Gallenberger, Transcr. at 1970-1973. There is no evidence of notes for any of the funds transferred from the TACI accounts to Kanter's personal bank account, nor is there any

evidence that Kanter repaid the approximately $1.3 million that he owed TACI at the time of its bankruptcy. Considering all of the circumstances, we infer that Kanter directed the transfer of THC'S funds into TACI's accounts as well as the subsequent transfers from TACI's accounts into his personal bank account. Kanter did not intend to return these funds to either TACI or THC because these funds belonged to Kanter.

G. The Flow of Funds From Four Ponds and One River Through FPC Subventure to Kanter and Lisle

As previously discussed, Kanter acquired an 8-percent limited partnership interest in Four Ponds Partnership and transferred that partnership interest to FPC Subventure Partnership. Lisle acquired a 90-percent interest in FPC Subventure Partnership in exchange for a $2,880 promissory note. Kanter then acquired an 8-percent limited partnership interest in One River Partnership and transferred that interest to FPC Subventure Partnership in exchange for a $2,000 promissory note. As a result of his interest in FPC Subventure Partnership, Lisle indirectly held partnership interests in Four Ponds Partnership and One River Partnership. FPC Subventure Partnership's primary sources of income were Four Ponds Partnership and One River Partnership. Exhs. 914-917.

Four Ponds Partnership and One River Partnership (1) reported net losses for 1981 to 1984 and 1987 to 1989 totaling $1,067,131, and (2) made cash distributions to its partners in 1981 to 1984 and 1987 to 1989 totaling $731,080. Respondent's Opening Brief at 349-350, par. 1016; Petitioners' Reply Brief at 663-664; Exhs. 125-134 (Kanter); Exhs. 417-421 (Lisle); Exhs. 9090-9094 (FPC Subventure Partnership tax returns and Schedules K-1 for Four Ponds Partnership and One River Partnership).[104] Approximately 7 percent of Four Ponds Partnership's and One River Partnership's losses, described above, flowed through to Lisle from FPC Subventure Partnership. Exhs. 417-421.

The cash distributions made to FPC Subventure Partnership from Four Ponds and One River were deposited into the TACI Special E Account. Exh. 205; Exh. 176, at 10, 15; Exh. 174, at 126-127. Shortly after the money from Four Ponds and One River was deposited into the TACI Special E Account, 90 percent of that money was distributed directly to Lisle. Exh. 176, at 10, 15; Exhs. 914-917; Exh. 5415. During the period 1981 to 1989, Lisle received a total of $682,520 in cash distributions from FPC Subventure Partnership. Exhs. 9090-9094, 417-421. A Schedule K-1 that FPC Subventure Partnership issued to Lisle for 1989 showed

_____

[104] FPC Subventure Partnership's tax returns for 1985 and 1986 apparently were not made part of the record.

that his capital account at the end of 1989 was negative $2,745,636.  Exh. 9092.

A Schedule K-1 that Four Ponds issued to Kanter for 1989 showed that Kanter/FPC Subventure Partnership's capital account at the end of 1989 was a negative $1,288,755.  Exh. 215.  A Schedule K-1 that One River Partnership issued to Kanter for 1989 showed that Kanter/FPC Subventure Partnership's capital account at the end of 1989 was negative $1,767,981.  Exh. 9094.

FPC Subventure Partnership was a conduit that Kanter used to transfer to Lisle a share of the payments that Schaffel made to THC on Travelers transactions from 1984 to 1986.

V.  Additional Findings of Fact Regarding the Examination Process and Summons Enforcement Proceedings

As previously discussed, the Kanters paid a small amount of Federal income tax for 1978.  The Kanters filed tax returns for 1979 to 1989 reporting no tax liability.

A.  Failure To Cooperate During the Audit

During the late 1980s, the IRS began an examination of Kanter's and IRA's tax returns.  Lunk, Transcr. at 1040-1042.  When Kanter met with IRS examiners and they requested certain documentation, Kanter informed the examiners that he would frame the issues in the case, not the IRS.  Dion, Transcr. at 831-834.

In connection with the Kanter examination, IRS agents interviewed Lisle on January 10, 1990 (Exh. 2030), and Ballard in February 1990.  Lunk, Transcr. at 1040.  After these interviews, the IRS began to examine Lisle's and Ballard's tax returns.

It was during this period that (1) Kanter wrote to Ballard's and Lisle's children and explained that he was terminating their purported consulting agreements, (2) Ballard and Lisle began to be paid for managing Carlco and TMT, and (3) Kanter began to negotiate with Ballard and Lisle regarding the loans IRA wrote off as bad debts in 1987.

During the examination process, Kanter, Ballard, Lisle, and their associates failed to produce information the IRS requested orally and/or through written information document requests.  Lunk, Transcr. at 1042-1050, 1059.  Kanter produced only documents related to Schedule A deductions under examination.  Lunk, Transcr. at 1056-1057; Dion, Transcr. at 832-835, 837-838.  Kanter, Ballard, and Lisle failed to produce records sought by the IRS concerning their grantor trusts and other related entities.  Lunk, Transcr. at 1057-1058.

B.  IRS Summonses

The IRS issued summonses to Ballard, Lisle, Schott, and Gallenberger (in her individual capacity and as an officer of

PSAC, which purportedly possessed documents pertaining to Kanter, Ballard, and Lisle (and related entities)).[105]

The summons to PSAC dated October 1, 1990, requested, in part, documents pertaining to PSAC, IRA and its subsidiaries, THC and its subsidiaries, BWK, and the Bea Ritch Trusts.  The summons requested production of the cash receipts journals, cash disbursement journals, general ledgers, subsidiary ledgers, and ledgers for all bank accounts including the TACI Special E Account.  Exh. 9046.  The summons also requested production of documents pertaining to any corporations or partnerships in which Kanter, his family, and/or his family trusts were shareholders. Id.

C.  Summons Enforcement

In addition to the summonses described above, the IRS served summonses on Administrative Enterprises, Inc. (predecessor to PSAC), PSAC, Zion, and BK Children's Trust (the four Kanter-related entities) during 1990 and 1991.  In 1994, the Government filed with the U.S. District Court for the Northern District of Illinois a petition to enforce the four summonses.  On April 4, 1994, the District Court issued an order to show cause why the four Kanter-related entities should not be compelled to comply with the four summonses.  The District Court conducted hearings

_____

[105]  See app. 16 to this report.

related to the Government's petition on April 20 and May 19, 1994.  At the latter hearing, Weisgal testified that at the time he received the summons served on him as trustee of the BK Children's Trust (one of the 25 Bea Ritch Trusts), some of the documents, including documents relating to the Kanters, had been turned over to TACI and some documents had been discarded as part of a 3-year record retention and discard policy.  See United States v. Administration Co., 74 AFTR 2d 94-5252, 94-2 USTC par. 50,479 (N.D. Ill. 1994); Exh. 9047--Mem. Op. and Ord. of May 20, 1994.

Gallenberger testified at the May 19, 1994, hearing that documents relating to TACI were never returned to her from TACI's bankruptcy counsel.[106]  She testified that many records of PSAC, Administrative Enterprises, Zion, and the Kanters no longer existed.  Gallenberger testified that she disposed of some

_____

[106]  During TACI's bankruptcy proceeding, the only documents that Korrub, TACI's bankruptcy counsel, may have received from TACI were copies of its tax returns.  He received none of the books and records of TACI's clients.  Korrub, Transcr. at 1807-1808.

In any event, the documents which were the subject of the IRS summons enforcement proceeding did not include TACI's tax returns.  The summons sought the books and records of one primary "client", namely, the Kanters, relating to transactions involving the Kanters for 1983, 1985, 1986, 1987, and 1988.  United States v. Administration Co., 74 AFTR 2d 94-5256, 94-2 USTC par. 50,480 (N.D. Ill. 1994), affd. 46 F.3d 670 (7th Cir. 1995).  These records were not given to Korrub; instead, Gallenberger gave them to Kanter.  Gallenberger, Transcr. at 1969-1973.

documents after receipt of the IRS summons.  United States v. Administration Co., supra; Exh. 9047--Mem. Op. and Ord. of May 20, 1994.

The District Court concluded that none of the summoned documents were produced and the Kanters and the four Kanter-related entities acted in bad faith in failing to comply with and blocking enforcement of the summonses.  The District Court ordered Gallenberger, on behalf of PSAC, to appear before the IRS by May 24, 1994, and produce the records sought by the summonses. United States v. Administration Co., supra; Exh. 9047--Mem. Op. and Ord. of May 20, 1994.

Although Gallenberger appeared before the IRS and testified and produced some documents on May 24, 1994, she did not search all of the records in her possession but instead looked in every fifth, sixth, or seventh file.  On June 10, 1994, the Government filed with the District Court a motion to hold Gallenberger in contempt.  On June 22, 1994, the District Court held a further hearing.  The District Court noted that PSAC operated much like a registered agent and a document repository primarily for the benefit of Kanter-related entities, and most of PSAC's over 2000 files related to Kanter.  United States v. Administration Co., 74 AFTR 2d 94-5256, 94-2 USTC par. 50,480 (N.D. Ill. 1994), affd. 46

F.3d 670 (7th Cir. 1995); Exh. 9047--Mem. Op. and Ord. of June 22, 1994, at 3-4.

During the June 22, 1994, hearing, Gallenberger explained to the court that she produced very few documents because very few of PSAC's documents related to transactions between the subject entities and PSAC. The District Court rejected Gallenberger's narrow interpretation of the summons and concluded the summons fairly encompassed all the documents in the possession of PSAC in any manner related to the Kanters or Kanter-related entities. The District Court also concluded that Gallenberger's sampling of documents did not discharge her duty to make all reasonable efforts to comply with the court's order. Finding a "glaring deficiency in her compliance", the District Court, by order dated June 22, 1994, held Gallenberger in contempt of court and granted her until July 1, 1994, to purge herself of contempt by fully complying with the court's order. United States v. Administration Co., 74 AFTR 2d 94-5256, at 94-5258, 94-2 USTC par. 50,480, at 85,772; Exh. 9047--Mem. Op. and Ord. of June 22, 1994, at 4-5.

Gallenberger appealed the District Court's order of June 22, 1994, holding her in civil contempt, to the Court of Appeals for the Seventh Circuit. The Court of Appeals affirmed the District

Court's order.  See United States v. Administrative Enters., 46 F.3d 670 (7th Cir. 1995).

D.  Requests for Production of Documents

PSAC maintained records for Kanter, a number of his family trusts, and IRA and THC.  Before trial, there were "agreements * * * [between respondent and petitioners] that certain third party production [records of THC] would be made".  Shortly before the close of discovery, the agreement fell apart.  United States v. Administration Co., 74 AFTR 2d 94-5252, at 94-5255, 94-2 USTC par. 50,479, at 85,770.  Kanter first promised to produce THC's books and records in the possession of PSAC and then, in early February 1994, notified respondent that the THC records were records of third parties over whom Kanter had no control.  Id. Kanter's position was that THC was a third party and discovery on Kanter was not discovery on THC.  Dick, Transcr. at 2509.  In the summons enforcement proceedings, the District Court found that this "eleventh-hour" change of position by the Kanters was indicative of bad faith on the part of the Kanters.  United States v. Administration Co., 74 AFTR 2d 94-5252, at 94-5254, 94-2 USTC par. 50,479, at 85,769.

At the start of the trial in these cases, respondent issued subpoenas to various Kanter-related entities requesting production of documents.  Exh. 9045.  In addition to the books

and records of IRA, THC, Carlco, TMT, and BWK, respondent requested production of documents relevant to determining the ownership of these entities, including stock ledgers and records of stockholders.  At the start of the trial, Kanter's counsel informed the Court that no documents would be produced because the subpoenas were served on Gallenberger and she was not the custodian of records for IRA, THC, Carlco, TMT, and BWK.  Dick, Transcr. at 26-27.  Kanter's counsel informed the Court that Kanter was the custodian of the records in question.  Dick, Transcr. at 26-27.  Respondent then served Kanter with subpoenas for the documents in question.  Transcr. at 28.

Petitioners produced complete THC trial balances only for 1980 and 1981.  Exhs. 5850, 5851.  Respondent possessed from prior audits (1) partial general ledgers of THC for 1983, 1984, and 1985, Exhs. 148-150, and (2) partial trial balances of THC for 1983 and 1984, Exhs. 161-162; Gallenberger, Transcr. at 2510-2511.  There are no complete receipts and disbursement journals, general ledgers, or trial balances for THC for 1980, 1981, 1982, 1985 (partial), 1986, 1987, 1988, and 1989.  Accordingly, payments made by Schaffel, Frey, and Eulich/Essex Partnership to THC are not traceable through THC's books and records.

Gallenberger had in her possession the records of THC for 1986, 1987, and 1988 and at some point turned those records over

to Kanter.  Gallenberger, Transcr. at 2510, 2713.  After respondent requested production of the THC records, Kanter never asked Gallenberger for them.  Gallenberger, Transcr. at 2517. Kanter possessed THC's records but failed to produce them.

Kanter also possessed the books and records of IRA, TMT, Carlco, and BWK.  When respondent requested production of the records of IRA, TMT, Carlco, and BWK, they had to be retrieved from Kanter.  Gallenberger, Transcr. at 2714-2715.

Gallenberger and Kanter possessed records relevant to determining the ownership of IRA and THC.  At the summons enforcement hearing, Gallenberger testified that she had the information available to decide, herself, the ownership of any of PSAC's clients.  United States v. Administration Co., 74 AFTR 2d 94-5256, 94-2 USTC par. 50,480 (N.D. Ill. 1994); Exh. 9047--Mem. Op. and Ord. dated June 22, 1994, at 6.

Neither Gallenberger nor Kanter produced stock ledgers for IRA, THC, Carlco, TMT, or BWK.  With respect to Carlco, TMT, and BWK, the only documents Kanter produced concerning ownership were copies of initial stock certificates showing that the Kanter, Ballard, and Lisle family trusts owned the preferred stock of BWK, TMT, and Carlco, respectively, and a copy of an initial stock certificate showing that IRA owned the common stock of these entities.  No documentary evidence was introduced to show

whether ownership changed from the initial issuance dates of the stock certificates that Kanter produced.

When the trustees of Kanter's family trusts, Baskes and Weisgal, were asked to produce documents, they, likewise, failed to do so, on the ground that they did not have the requested information in their possession. Weisgal, Transcr. at 469-470; Baskes, Transcr. at 574-578.

PSAC had a "policy" of refusing to turn documents over to anyone other than their owner. Exh. 429; Exh. 9021, at 4; Gallenberger, Transcr. at 2733-2734.

OPINION

A. The Parties' Positions

Respondent determined that (1) Kanter, Ballard, and Lisle earned the moneys The Five paid to IRA, THC, and other Kanter-related entities during the years at issue; (2) Kanter later directed and allocated much of that money to himself, Ballard, and Lisle primarily through BWK (10 percent), TMT (45 percent), and Carlco (45 percent), respectively; and (3) Kanter and Lisle shared fees that Schaffel paid to THC on Travelers transactions (with Lisle receiving a portion of his share through FPC Subventure Partnership).

Respondent first contends that IRA, THC, Carlco, TMT, BWK, and other Kanter-related entities were shams and/or nothing more than the alter egos of Kanter, Ballard, and Lisle. In the

alternative, respondent maintains that, by directing The Five to remit their payments to IRA and THC, and distributing those payments to Carlco, TMT, BWK, and others, Kanter, Ballard, and Lisle violated the assignment of income doctrine. Finally, respondent asserts the Court should reallocate the income in dispute to Kanter, Ballard, and Lisle pursuant to section 482.[107]

Petitioners assert the payments from The Five were earned and properly reported as taxable income by IRA, THC, and other Kanter-related entities. Petitioners also dispute respondent's assertion that the payments from The Five represented kickback payments to Kanter, Ballard, and Lisle. Petitioners deny that any kickback scheme existed.

The Commissioner's deficiency determinations normally are presumed to be correct, and the taxpayer bears the burden of proof. Welch v. Helvering, 290 U.S. 111, 115 (1933). On the other hand, the Commissioner bears the burden of proof with regard to (1) any increase in the deficiency raised in the pleadings, and (2) any case involving the issue of fraud with intent to evade tax. Rule 142(a) and (b); see sec. 7454(a).

There is no dispute the payments from The Five constituted taxable income to the persons or entities that earned the income.

_____

[107] The STJ report, at 84, incorrectly stated that respondent improperly attempted to raise sec. 482 for first time on brief. The record reflects that respondent timely raised the issue in his amendment to answer. In addition, contrary to petitioners' arguments, respondent raised this issue on brief. See Respondent's Opening Brief at 449-550, 553.

Thus, the first issue in these cases is a simple one: Did Kanter, Ballard, and Lisle earn the payments from The Five?

B.  The Assignment of Income Doctrine

In United States v. Basye, 410 U.S. 441, 450 (1973), the Supreme Court reiterated the longstanding principle that income is taxed to the person who earns it, stating: "The principle of Lucas v. Earl, [281 U.S. 111, 115 (1930)], that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands today as a cornerstone of our graduated income tax system." For a more recent formulation of this principle, see Commissioner v. Banks, 543 U.S. 426 (2005) (holding a contingent-fee agreement should be viewed as an anticipatory assignment to the attorney of a portion of the client's income from any litigation recovery).

When payments are remitted to a corporation, as is the case here, a question may arise whether the corporate entity earned the income. Generally, a corporate entity will be recognized for tax purposes. In Moline Props. Inc. v. Commissioner, 319 U.S. 436, 438-439 (1943), the Supreme Court established the following test for determining whether a corporation will be recognized as a separate taxable entity:

> The doctrine of corporate entity fills a useful purpose in business life. Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands

> of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity. * * * [Fn. refs. omitted.]

On the other hand, if a corporation (or another legal entity such as a trust or partnership) was not formed for a substantial business purpose, and does not engage in actual business activities, the corporate entity amounts to a sham that may be disregarded for tax purposes. See Helvering v. Clifford, 309 U.S. 331 (1940); Gregory v. Helvering, 293 U.S. 465 (1935). Avoiding taxation is not a legitimate business activity in the normal course. Natl. Investors Corp. v. Hoey, 144 F.2d 466, 468 (2d Cir. 1944).

Even if a corporation is not a sham because it is engaged in some legitimate business activity, payments to a corporation may nevertheless be reallocated to another person or entity under the assignment of income principles mentioned above. In a corporate context, particularly in cases involving closely held personal service corporations, the determination of the true earner of income can be difficult. In Johnson v. Commissioner, 78 T.C. 882, 890-891 (1982), affd. without published opinion 734 F.2d 20 (9th Cir. 1984), a professional athlete who had conveyed the exclusive rights to his personal services to a corporation contended that the corporation, rather than he, was taxable on amounts paid directly to it by his employer. Recognizing that a

corporation can act only through its employees and agents, this Court set forth two requirements that must be met before the corporation, rather than the service-performing individual, can be considered to control the earning of the income. These requirements are: (1) The corporation must have had the right to direct or control the individual's activities in some meaningful manner, and (2) there must exist between the corporation and the person or entity using the services a contract or similar indicium recognizing the corporation's controlling position. Id. at 890-891.

The U.S. Courts of Appeals for the Seventh Circuit and the Federal Circuit apply a more flexible facts and circumstances approach. Schuster v. Commissioner, 800 F.2d 672, 677-678 (7th Cir. 1986), affg. 84 T.C. 764 (1985); Fogarty v. United States, 780 F.2d 1005, 1012 (Fed. Cir. 1986).

In United States v. Newell, 239 F.3d 917 (7th Cir. 2001), the Court of Appeals for the Seventh Circuit addressed both the assignment of income doctrine and concepts of alter ego in a factual setting analogous to the facts presented in these cases. In Newell, the taxpayer was president and a 50-percent shareholder of LPM, Inc. (Inc.), a commodity trader. Pursuant to a contract, Inc. earned a fee of $1.3 million from a client during 1993, and the taxpayer directed the client to pay the fee to LPM, Ltd. (Ltd.), a Bermuda corporation. Neither the

taxpayer, Newell, nor Inc. reported the payment to Ltd. as income. The taxpayer subsequently was convicted of willfully filing false Federal income tax returns for 1994 for both himself and Inc.

On appeal, that taxpayer argued in pertinent part that the Government was improperly allowed to proceed on an assignment of income theory and the Government failed to prove its case beyond a reasonable doubt. The taxpayer asserted that Inc. assigned its contract to Ltd., and, therefore, the $1.3 million payment was taxable to Ltd. The Court of Appeals rejected the taxpayer's arguments.

With regard to the assignment of income doctrine, the Court of Appeals stated:

> To shift the tax liability, the assignor [taxpayer/
> Inc.] must relinquish his control over the activity that
> generates the income; the income must be the fruit of the
> contract or the property itself, and not of his ongoing
> income-producing activity. *  *  * This means, in the case
> of a contract, that in order to shift the tax liability to
> the assignee the assignor either must assign the duty to
> perform along with the right to be paid or must have
> completed performance before he assigned the contract;
> otherwise it is he, not the contract, or the assignee, that
> is producing the contractual income--it is his income, and
> he is just shifting it to someone else in order to avoid
> paying income tax on it. * * * [Id. at 919-920.]

In addition to these points, the Court of Appeals noted that it was not entirely accurate for the taxpayer to assert he was prosecuted under the assignment of income doctrine where it was not clear there in fact was an assignment and, even if there was,

the assignment was a sham inasmuch as the taxpayer attempted to transfer his income to his alter ego (Ltd.). Id. at 920; see Leavell v. Commissioner, 104 T.C. 140 (1995) (holding that compensation paid by Houston Rockets to a wholly owned personal service corporation of one its players was includable in the player's gross income).

Before proceeding, we shall first explain, as completely as possible, why we have rejected as manifestly unreasonable certain of the credibility determinations and associated legal conclusions in the STJ report.

C. Errors in the STJ Report[108]

The STJ report was based on two fundamental misconceptions regarding respondent's position which resulted in (1) compelling evidence largely being ignored, (2) credibility determinations regarding The Five that were not relevant to a determination whether a kickback scheme existed among Kanter, Ballard, and Lisle, and (3) credibility determinations regarding Kanter, Ballard, and Lisle that were manifestly unreasonable. A detailed examination of the substantial record in these cases, along with a review of the parties' posttrial briefs, demonstrates that the ultimate holding recommended in the STJ report, i.e., that

_____

[108] We observe at the outset that the STJ report is organized in an unorthodox fashion. Although organized in separate sections labeled "General Findings of Fact" and "Discussion", the Discussion portion of the report includes findings of fact that are not contained in the General Findings of Fact portion of the report.

Kanter, Ballard, and Lisle did not participate in a kickback scheme, is directly contradicted by the overwhelming objective evidence in these cases and thus is manifestly unreasonable.

As outlined below, the STJ report reflects a fundamental misunderstanding regarding respondent's theory as to the means and manner by which Kanter, Ballard, and Lisle conducted the kickback scheme. Further, the analysis in the STJ report is based on the misconception that respondent conceded IRA, THC, and other Kanter-related entities were not shams. As a result, the question of the validity of these entities was never broached. These errors and others are explored in greater detail below.

1. The STJ Report Reflects a Misunderstanding of Respondent's Theory Regarding the Kickback Scheme

In rejecting respondent's assertion that Kanter, Ballard, and Lisle earned, received, shared, and failed to report as income a substantial amount of kickback payments, the STJ report, at 72-77, repeatedly emphasizes that Frey, Schaffel, Schnitzer, and Eulich uniformly denied that their payments to IRA, THC, and other Kanter-related entities were intended to compensate Ballard or Lisle in any way. These statements reveal the STJ report is based on a fundamental misunderstanding of respondent's theory regarding the organization and operation of the kickback scheme.

Respondent argued that Kanter, Ballard, and Lisle did not disclose their scheme to Schaffel, Frey, Schnitzer, and Eulich. Respondent's Opening Brief at 568-567, quoted supra p. 71,

included a discussion describing the kickback scheme as a matter that generally was known only to Kanter, Ballard, and Lisle. Respondent theorized that Ballard and Lisle agreed to steer Prudential business to The Five (and Lisle agreed to steer Travelers business to Schaffel) with the understanding that Kanter would share with Ballard and Lisle any fees he was able to obtain from The Five. In other words, respondent conceded that Schaffel, Frey, Schnitzer, and Eulich were not aware Ballard and Lisle were using their influence to steer business to them. In respondent's view, Schaffel, Frey, Schnitzer, and Eulich simply agreed to pay Kanter if he was successful in influencing his clients and other wealthy contacts in the real estate industry to generate business for them. Having misconstrued respondent's position, the STJ report repeatedly cites the testimony of Schaffel, Frey, Schnitzer, and Eulich as compelling evidence in support of its conclusion that Kanter, Ballard, and Lisle did not engage in a kickback scheme.

We acknowledge the STJ report also credits Kanter and Ballard's testimony, and Lisle's statement to IRS agents, that they were not engaged in a kickback scheme. As we shall discuss in significant detail below, it was manifestly unreasonable to give any credence to this testimony.

## 2. Discussion Regarding Assignment of Income

The STJ report, at 81, erroneously states that respondent conceded IRA, THC, and other Kanter-related entities were not shams for tax purposes. In fact, Respondent's Opening Brief at 718 stated in pertinent part:

> Respondent asserts that the evidence shows that the family owned entities [including IRA, THC, TMT, Carlco, and BWK] should be disregarded as separate taxable entities. Alternatively, if not disregarded, they are not taxable on the moneys paid by The Five under the assignment of income doctrine and the 'controller of the income" analysis.

Respondent's Opening Brief at 719-723 is devoted entirely to the argument that IRA, THC, and other Kanter-related entities were shams that should be disregarded for tax purposes.

Proceeding on the misconception that respondent conceded IRA and THC were valid entities for tax purposes, the STJ report, at 81-82, summarily concludes that the assignment of income doctrine is inapplicable to payments IRA and THC received from PMS, Essex Partnership, and Hyatt/KWJ Corp. because "IRA and/or THC owned the property interests or property rights that generated the income in question." No consideration is given to whether IRA's and THC's interests were nominal or illusory. In connection with the foregoing, the STJ report, at 82-84, concludes the payments from Frey and Schaffel to IRA and/or THC did not represent an assignment of income because "IRA and THC * * * exercised

significant control over Kanter's activities",[109] and Frey and Schaffel both entered "into an agreement to obtain the services from IRA and/or THC." Again, no consideration is given to whether IRA and THC merely served as Kanter's alter egos. Because respondent never conceded that IRA and THC were not shams, these portions of the STJ report are manifestly unreasonable.[110]

3. <u>Failure To Address Respondent's Flow-of-Funds Argument</u>

The STJ report, at 81 note 35, states that respondent's kickback theory was "unsupported by the evidence". What is lacking, however, is any mention or discussion of respondent's detailed flow-of-funds analysis. We can only conclude the STJ report did not contain an analysis of the flow of funds because of the misconception that respondent conceded IRA, THC, Carlco, TMT, BWK, and other Kanter-related entities were not shams. A thorough evaluation of the evidence concerning the flow of funds is crucial to a just and proper determination in these cases.

4. <u>Incomplete Discussion Regarding Loan Arrangements</u>

The STJ report, at 78-80, rejects respondent's argument that Ballard and Lisle received portions of their shares of the

---

[109] There are no recommended findings of fact in the STJ report in support of a finding that IRA or THC exercised significant control over Kanter. As discussed below, the record shows just the opposite.

[110] The question whether IRA and THC were shams also was particularly relevant to respondent's determination that Kanter, Ballard, and Lisle were liable for additions to tax for fraud.

kickback payments through loans from IRA to Ballard and Lisle, their family members, and grantor trusts. Although the STJ report mentions that loans were extended to Ballard and Lisle, individually, as well as to their family members, no attempt was made to quantify those loans, and there is little indication any consideration was given to respondent's argument these loans were shams; i.e., the loans were not properly documented, no principal or interest was ever paid on the loans, and some of the loans ultimately were written off as bad debts or sold for $1.

The STJ report, at 79, does include a brief discussion of the validity of loans to Ballard's and Lisle's grantor trusts. The STJ report, at 79 note 32, rejects Kanter's testimony that IRA made nonrecourse loans to Ballard's and Lisle's grantor trusts because the movie investments underlying those loans "were particularly promising". The STJ report acknowledges a lender operating at arm's length would have demanded some financial guaranty or collateral from the grantors of those trusts before extending those loans. The STJ report also acknowledges that Ballard and Lisle were valuable business contacts to Kanter and Kanter traded on those contacts to obtain "business arrangements with other third parties". Id. at 79. Despite these observations, the STJ report simply concludes Kanter "may have helped to arrange favorable loans for Ballard and Lisle out of gratitude for their friendship and the business advantages that

friendship conferred" upon Kanter.[111]  Id. at 80.  A detailed analysis of the magnitude, validity, and treatment of all loans that Ballard, Lisle, and their grantor trusts received from IRA, IFI, BWK, and other Kanter-related entities is lacking in the STJ report.

5.  <u>Discussion Regarding Consulting Payments to Ballard's and Lisle's Adult Children</u>

Much like the loan discussion outlined above, the STJ report, at 80-81, acknowledges Kanter may have considered the consulting arrangements with Ballard's and Lisle's adult children to be "favors" to Ballard and Lisle.  The STJ report then rationalizes the consulting payments by pointing out that Ballard and Lisle managed TMT's and Carlco's assets at no charge to IRA until 1990.  Significantly, although recognizing the possible relationship between the consulting payments to the Ballard and Lisle children and Ballard's and Lisle's management of TMT and Carlco, the STJ report fails to explore the circumstances surrounding Kanter's termination of the consulting payments in 1990 and Kanter's nearly simultaneous decision to begin compensating Ballard and Lisle for managing TMT and Carlco.  At the very least, these circumstances raised the question whether

_____

[111]  The STJ report, at 80 note 34, also refers to FPC Subventure Partnership as another example of a favorable transaction between Kanter and Lisle, and it acknowledges that the record fails to disclose whether Lisle repaid Kanter for his 90-percent interest in that partnership.  However, the STJ report does not contain any further recommended findings of fact with respect to this transaction.

the consulting payments constituted income assigned by Ballard and Lisle to their children. As discussed in detail infra pp. 293-295, a close examination of Kanter's letters terminating the consulting payments to the children is indicative of an attempted coverup of that question.

6. Manifestly Unreasonable Credibility Determinations

a. Testimony Offered by The Five

As previously discussed, because respondent asserted that Kanter, Ballard, and Lisle did not disclose their kickback scheme to Schaffel, Frey, Schnitzer, and Eulich, the conclusion in the STJ report that The Five testified credibly that they did not intend for their payments to IRA or THC to serve as kickbacks to Ballard and Lisle is not dispositive of the matter.

b. Ballard's Testimony Regarding the Hyatt Transaction

The STJ report, at 76 note 29, states that Ballard's testimony that he discussed the Hyatt/KWJ fee agreement with A.N. Pritzker "dispels the notion that there was collusion between Ballard, Lisle, Kanter, and Weaver with respect to [Weaver's finder's] fees." Ballard's testimony lacked credibility. First, the testimony was self-serving on its face and uncorroborated by any other witness. Second, A.N. Pritzker seemed intent upon keeping the Hyatt/KWJ agreement a secret, even within the Pritzker family, and, therefore, it seems implausible that A.N. Pritzker would have spontaneously volunteered this information to

Ballard, or anyone else at Prudential.  Ballard did not offer any explanation why A.N. Pritzker revealed the information to him. Finally, even assuming Ballard had such a conversation with A.N. Pritzker, indignation was the natural reaction any forthright Prudential executive would have had to the disclosure.  Ballard's indignation, however, was feigned.  A critical examination of the flow of funds clearly and convincingly shows that Ballard earned and received a share of the Hyatt Corp. payments under the Hyatt/KWJ agreement after the payments passed through IRA, KWJ Partnership, and TMT.  Ballard had unfettered use, enjoyment, and control over TMT's funds, and he surely did not want to disclose his role in the Hyatt transaction to A.N. Pritzker.  Thus, the recommended conclusion in the STJ report that Ballard's testimony was sufficient to dispel the notion there was "collusion" among Ballard, Lisle, Kanter, and Weaver with regard to the payments that Hyatt Corp. remitted to KWJ Corp. was manifestly unreasonable.

   c.  Kanter's Testimony Regarding Deconsolidation

   The STJ report, at 81 note 35, treats as credible Kanter's testimony that Carlco, TMT, and BWK were removed from IRA's consolidated group for tax-reporting purposes because Kanter was concerned about the impact of Carlco's investments in tax-exempt bonds on IRA's interest deductions.  While Kanter's explanation may have seemed plausible with regard to Carlco, it did

absolutely nothing to explain why it was necessary or desirable to remove TMT and BWK from IRA's consolidated group. Considering all the circumstances surrounding Carlco, TMT, and BWK, see discussion infra pp. 278-288, Kanter's testimony lacked credibility. Carlco, TMT, and BWK were removed from IRA's consolidated group in 1984 to reflect the reality that those entities were owned and controlled by Lisle, Ballard, and Kanter, respectively, and each would be responsible for its own tax liabilities going forward.

d. Kanter's Testimony Regarding IRA

The STJ report, at 83 note 36, treats as credible Kanter's testimony that he served as an adviser, attorney, and consultant to IRA and he made recommendations to Freeman and Weisgal, who made final decisions regarding IRA's investments. This credibility determination was manifestly unreasonable inasmuch as (1) Kanter conceded that, for several years during the 1980s, Freeman was too concerned with his own legal woes to manage IRA, and (2) Weisgal could recall little about IRA's operations. As discussed infra pp. 276-278, IRA was simply Kanter's alter ego, and Kanter's testimony to the contrary lacked credibility.

e. Kanter's, Ballard's, and Lisle's Denials

The STJ report, at 72-81, treats as credible Kanter's and Ballard's testimony, and Lisle's statement to IRS agents, that they were not engaged in a kickback scheme during the years at

issue. As discussed in detail below, these credibility determinations were manifestly unreasonable because there is overwhelming objective evidence of record, particularly through a critical evaluation of the flow of funds, which demonstrates that with so-called capital contributions, loans that were never repaid, and other payments to Kanter, Ballard, and Lisle and their families, IRA transferred to Carlco and/or Lisle, TMT and/or Ballard, and BWK and/or Kanter, in a roughly 45/45/10 percent split, all of the payments from The Five (and nothing more). The flow-of-funds analysis also demonstrates that Kanter, Ballard, and Lisle had unrestricted use and enjoyment of the assets IRA transferred to BWK, TMT, and Carlco, and they treated those assets as their own. Similarly, the flow-of-funds analysis demonstrates that Kanter and Lisle shared the payments that The Five made to THC.

   D. Summary of Kanter's, Ballard's, and Lisle's Transactions With The Five

   1. An Overview

   The record in these cases presents an overwhelming amount of testimony and documentary evidence in support of respondent's determinations that Kanter, Ballard, and Lisle earned income in the form of the payments from The Five that were remitted to IRA, THC, and their subsidiaries. Consistent with our findings of fact as set forth above, and all the inferences that fairly may be drawn from those facts, we conclude the statements in the STJ

report to the effect that Kanter, Ballard, and Lisle testified credibly they were not engaged in a kickback scheme during the years at issue are manifestly unreasonable.

We have often emphasized that fraud may be proved by circumstantial evidence because direct evidence of fraud generally is not available. See, e.g., Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992). More often than not (and as is certainly the case here), fraud can be established only through circumstantial evidence and the inferences to be drawn therefrom. See, e.g., DiLeo v. Commissioner, 96 T.C. 858, 874 (1991).

There is direct evidence the payments from The Five to IRA and THC represented income earned by Kanter. The transactions in question in these cases, however, were carried out in such a way that respondent must rely on circumstantial evidence in support of his determination that Ballard and Lisle earned substantial portions of the payments from The Five. There is no direct evidence that Kanter, Ballard, and Lisle agreed to share the payments from The Five, nor is there much in the way of direct evidence that Ballard and Lisle used their influence to steer Prudential or Travelers business to The Five. As explained below, however, there is plenty of evidence that Kanter, Ballard, and Lisle had the opportunity and wherewithal to carry out the alleged scheme. Ballard and Lisle certainly were in a position

to influence Prudential and Travelers to award business to The Five, and to varying degrees they were directly involved in the decisions that led to Prudential's and Travelers' business dealings with The Five. Those factors, in combination with the flow of funds--the fairly precise division of the proceeds of the scheme among the three--remove all doubt in these cases in respondent's favor. We conclude that all the circumstances, when gathered together and viewed as a whole, constitute compelling and unmistakable evidence that Kanter, Ballard, and Lisle earned the income in question and Kanter's and Ballard's conduct in these matters was fraudulent.[112]

Kanter, an experienced and knowledgeable tax attorney, established a complex web of corporations, partnerships, and trusts as part of a plan to receive, disguise, launder, and distribute payments from The Five to himself, Ballard, and Lisle. The complex laundering mechanism of sham corporations and other entities that Kanter put together included among others IRA, THC, Carlco, TMT, BWK, KWJ Partnership, Essex Partnership, Zeus, IFI, HELO, TACI, and PSAC.

Ballard and Lisle were sophisticated and experienced businessmen who held two of the highest ranking executive positions within the real estate division at Prudential's

---

[112] The Court of Appeals for the Fifth Circuit has already ruled that Lisle is not liable for additions to tax for fraud. Estate of Lisle v. Commissioner, 341 F.3d 364 (5th Cir. 2003).

national headquarters. Ballard later was a partner at Goldman Sachs. Lisle later held the highest ranking executive position within the real estate division at Travelers. Kanter, Ballard, and Lisle fully understood and appreciated their obligations to report income correctly and to pay taxes on that income. It was a conflict of interest for Ballard or Lisle to have received compensation in any way (directly or indirectly) with funds Kanter received in connection with introductions he made to Ballard or Lisle. Exh. 2030, at 31.

Kanter had many influential clients and business contacts involved in commercial property management and major hotel management businesses. Kanter represented the Pritzkers (the founders of Hyatt Corp.) and had longstanding friendships with Ballard and Lisle. Thus, Kanter marketed himself as more than just an attorney to his clients and commercial real estate professionals--he offered additional services such as raising capital and using his influential contacts to generate business. In return for these services, Kanter demanded and routinely received a percentage or share of the fees and profits that the business opportunities generated for his business associates.

Beginning in the early to mid-1970s, Kanter, Ballard, and Lisle concluded that, with Ballard's and Lisle's positions of authority at Prudential, and Kanter acting as a broker/

intermediary, the three together could generate and share enormous fees and profits.  The three men recognized that Kanter's skills as an attorney, combined with his client list and business contacts in the commercial real estate industry, neatly complemented Ballard's and Lisle's ability to influence Prudential's business decisions pertaining to its large commercial real estate holdings throughout the country. Accordingly, without disclosing Ballard's and Lisle's direct roles in the scheme, Kanter approached various businessmen, including Schaffel, Frey, Schnitzer, and Eulich, and offered to assist them in raising capital and/or obtaining property management contracts for their businesses in exchange for a share in the fees or profits generated by these business opportunities. Although Kanter arranged to have these fees and profits paid to IRA or THC (or their subsidiaries), Schaffel, Frey, Schnitzer, and Eulich uniformly stated that they were relying on Kanter, and Kanter alone, to provide them with the additional business opportunities they were seeking.  Largely unbeknownst to Schaffel, Frey, Schnitzer, and Eulich, however, Kanter, Ballard, and Lisle had agreed to share any fees and profits paid to Kanter to the extent that Ballard and Lisle were able to exert their influence to steer Prudential business to Kanter's contacts.

Considering their relative positions, Kanter, Ballard, and Lisle agreed to share the fees and profits 45 percent each to

Ballard and Lisle and 10 percent to Kanter.  Kanter's smaller

share of the payments reflected the fact that Ballard and Lisle

really controlled the purse strings and Kanter's role primarily

was to (1) set up fee-sharing arrangements with other

businessmen, and (2) structure entities and arrange the

accounting measures needed to disguise the true nature of the

payments, and (3) do his best to shelter the payments from

Federal income tax.  Kanter and Lisle agreed to a similar

arrangement after Lisle moved on to Travelers.

In addition to his agreement with Ballard and Lisle, Kanter

arranged some transactions so that he could be compensated

separately through payments to THC.  Kanter made such

arrangements with regard to transactions with Frey and Eulich.

The Hyatt transaction, the event that first brought Kanter,

Ballard, and Lisle together in the early 1970s, was carried out

in a slightly different fashion, as we shall explain in detail

below.

The Five received additional business as a result of

Kanter's, Ballard's, and Lisle's efforts and compensated Kanter

(through payments to IRA, THC, and other Kanter-related

entities).  IRA, THC, and the other Kanter-related entities did

not earn any of the amounts paid to them by The Five.  IRA, THC,

and the other Kanter-related entities performed no services, and

they merely served as nominees or conduits to receive payments

from The Five. With regard to the transactions with The Five, Kanter was not an agent, officer, or employee of IRA or its subsidiaries during the years at issue, except in 1989 after the IRS began its investigation. Kanter was not controlled by IRA. To the contrary, Kanter controlled IRA.

The payments from The Five were distributed by various means either directly to Ballard, Lisle, and Kanter or indirectly through loans, investments, or consulting payments to them, their family members, or trusts and/or other entities established for the benefit of their families. To conceal Ballard's and Lisle's involvement in the scheme, and in an attempt to avoid having to report the amounts earned from the scheme on their individual tax returns, Kanter established TMT to serve as Ballard's alter ego, and Carlco to serve as Lisle's alter ego. The funds that Kanter transferred to TMT and Carlco were Ballard's and Lisle's shares of the fees and profits earned on the transactions with The Five. Ballard and Lisle owned TMT and Carlco, respectively, and they had unfettered use and enjoyment of the assets held nominally by those corporations. FPC Subventure Partnership was a conduit through which Kanter passed to Lisle his share of fees paid to Kanter by Schaffel in regard to Travelers transactions.

2. <u>The Hyatt Transaction</u>

Kanter first met Lisle in the late 1960s, and he met Ballard no later than the early 1970s, in connection with the

construction and opening of the Houston Hyatt Hotel.  Ballard and Lisle had been involved in the development of the Houston Hyatt Hotel as Prudential representatives.  Kanter was connected to the project through his representation of the Pritzker family and the award to Hyatt Corp. of the management contract for the hotel. J.D. Weaver was also involved in this project as a representative of Tenneco, which had partnered with Prudential to construct the hotel.

After winning the Houston Hyatt Hotel management contract, A.N. Pritzker wanted to submit a bid for Hyatt Corp. on the Embarcadero Hotel management contract.  Lisle, however, was opposed to such a bid because Hyatt Corp. was proposing to build another hotel in the San Francisco area.  A.N. Pritzker somehow came to believe that Weaver might be able to influence Lisle to allow Hyatt Corp. to submit a bid on the Embarcadero Hotel.  In this regard, A.N. Pritzker agreed with Weaver that if Weaver could persuade Lisle to allow Hyatt Corp. to submit a bid on the contract, and if Hyatt Corp. were awarded the Embarcadero Hotel management contract, Hyatt Corp. would pay Weaver 10 percent of Hyatt Corp.'s profits on the management contract.

Lisle and Ballard were both present at the Embarcadero Hotel bid meeting.  Ballard was assigned to attend the Embarcadero Hotel bid meeting and evaluate the various bids.

Weaver's effort to influence Lisle was successful. Unexpectedly, Intercontinental Co., one of the bidders, withdrew at the last minute and did not attend the bid meeting. A second bidder, Del Webb, who surprisingly attended the meeting in person (as opposed to sending a representative), refused to submit a bid because he believed he had already been awarded the contract. In the absence of a competing bid, Hyatt Corp. was awarded the Embarcadero Hotel management contract on the same terms on which it had agreed to manage the Houston Hyatt Hotel.

The record reflects that Weaver did much more than simply influence Lisle to permit Hyatt Corp. to submit a bid on the Embarcadero Hotel management contract. After Hyatt Corp. won the Embarcadero Hotel management contract, Hyatt Corp. entered into an agreement to pay 10 percent of Hyatt Corp.'s annual "net cash profits" from the contract to KWJ Corp., Weaver's closely held corporation. The Hyatt/KWJ agreement stated that Weaver "has been the principal factor in bringing the parties together and aiding in the negotiations" with regard to the Embarcadero Hotel management contract. In addition, the Hyatt/KWJ agreement was executed under the unusual circumstances that initially only A.N. Pritzker and his two sons knew the agreement existed. When other Hyatt Corp. executives later investigated the matter (including Friend--A.N. Pritzker's son-in-law), they determined the Hyatt/KWJ agreement represented a reward to Weaver for his

"substantial influence" in "arranging the management agreement" on the Embarcadero Hotel between Hyatt Corp. and Prudential.

We infer from all the facts and circumstances that Weaver recognized he would gain nothing by simply persuading Lisle to permit Hyatt Corp. to bid on the Embarcadero Hotel management contract. Weaver would be compensated only if Hyatt Corp. were to win the bidding on the contract. Consequently, Weaver informed Lisle and Ballard of A.N. Pritzker's promise to pay 10 percent of the Embarcadero Hotel management contract to Weaver, and Weaver agreed to share any payments he might receive from Hyatt Corp. with Ballard and Lisle if they used their influence to arrange for Hyatt Corp. to win the contract. Lisle and Ballard agreed to Weaver's proposal, and they arranged for Hyatt Corp. to win the contract. That Weaver did more than simply persuade Lisle to permit Hyatt Corp. to bid on the Embarcadero Hotel contract is evidenced by the Hyatt Corp. internal documents which stated that Weaver "arranged" the contract for Hyatt Corp.

The record indicates Kanter became aware of the Hyatt/KWJ agreement in the early 1970s when A.N. Pritzker presented the matter to him seeking advice. During this same period, Kanter was assisting Ballard and Lisle in establishing the grantor trusts they would use to invest in his movie shelters, and Kanter initiated discussions with Weaver regarding the sale of KWJ Corp. to IRA. We infer from the timing of these events that Kanter

learned that Weaver agreed to share with Lisle and Ballard any payments that KWJ Corp. might receive under the Hyatt/KWJ agreement, and Kanter was offered a share of these payments in exchange for structuring the receipt and disbursement of the payments to the participants in a manner that would conceal Lisle's and Ballard's involvement in the matter. In particular, Kanter arranged IRA's purchase of KWJ Corp., the liquidation of KWJ Corp., and the formation of KWJ Partnership.

The transfer of KWJ Corp. to IRA was facilitated under the cover of an open-ended option (with no apparent independent value) that Weaver granted to IRA in 1976 to purchase KWJ Corp. for $150,000. Kanter's testimony that Weaver entered into this option agreement because he needed the money is wholly discredited by the fact that Weaver received nothing under the option agreement until mid-1980--4 years later.

Although there was some initial discord between Hyatt Corp. and Weaver regarding the payments that KWJ Corp. would receive under the Hyatt/KWJ agreement, we attribute this development to the Pritzkers' reputation as aggressive negotiators who wanted to pay as little as possible to KWJ Corp. Nevertheless, Hyatt Corp. did pay substantial sums to KWJ Corp. pursuant to the Hyatt/KWJ agreement, and, as described in the flow-of-funds analysis below, approximately 70 percent of those payments were transferred through IRA to KWJ Partnership and on to Carlco, TMT, and BWK in

a 45/45/10 percent split. KWJ Partnership was also used as a conduit to transfer funds to Ballard's and Lisle's adult children in the form of so-called consulting payments.

Kanter, Ballard, and Lisle earned the income associated with the portion of the Hyatt Corp. payments that were routed through IRA and KWJ Partnership. Kanter, Ballard, and Lisle attempted to assign that income to IRA and later to KWJ Partnership and its partners, Carlco, TMT, and BWK. Kanter, Ballard, and Lisle failed to report this income on their own tax returns.

Through the Hyatt transaction, Kanter, Ballard, and Lisle came to realize that Kanter's skills as an attorney, his client list, and his business contacts in the commercial real estate industry neatly complemented Ballard's and Lisle's ability to influence Prudential's business decisions pertaining to its large commercial real estate holdings throughout the country. The Hyatt transaction set the stage for Kanter's, Ballard's and Lisle's dealings with Schaffel, Frey, Schnitzer, and Eulich, summarized below.

3. Schaffel

In the late summer of 1979, Schaffel met Kanter, Ballard, and Lisle for dinner in New York. Lisle understood that Kanter arranged the dinner in part to see whether Schaffel might be able to do business with Prudential. Shortly thereafter, Schaffel agreed to share with Kanter any fees he might earn on

construction contracts between Prudential and Torcon. In the early fall of 1981, Schaffel also agreed to share with Kanter any fees he might earn on financing that Prudential might provide for Walters's development projects. Kanter agreed to share with Ballard and Lisle any fees he might receive from Schaffel if they used their influence at Prudential to award construction contracts to Torcon or to provide financing for Walters's projects.

While Ballard and Lisle were still employed at Prudential, Schaffel received (1) real estate broker's fees on the sale of IBM's headquarters building to Prudential, (2) fees related to Prudential construction contracts awarded to Torcon, and (3) fees related to financing that Prudential provided for Walters's development projects. Schaffel shared these fees with Kanter by way of payments to IRA.

Although some of the Prudential transactions that generated fees for Schaffel were initiated after Ballard and Lisle left Prudential, the inference may fairly be drawn that those transactions were an outgrowth of Ballard's and Lisle's earlier decisions to do business with Schaffel, which allowed Schaffel (and his clients) to establish a favorable reputation with Prudential.

In 1982, Lisle left Prudential and accepted a position as the head of Travelers' real estate department. Pursuant to his

agreement with Kanter, Lisle assisted Schaffel by approving a number of financing deals between Travelers and Walters for various development projects. Schaffel remitted one payment to IRA arising from a Travelers financing deal that he brokered shortly after Lisle began working at Travelers. Schaffel then balked at making any additional payments to IRA. A dispute between Schaffel and Kanter ensued, and Kanter convinced Schaffel that he was obliged to continue to share with Kanter any fees and commissions that he might earn on Travelers financing transactions. At this point, Schaffel did not want to remit any further payments to IRA, and Kanter directed Schaffel to make his payments to THC.

Although Schaffel remitted his payments to either IRA or THC, those entities were used only as conduits to appease Schaffel's concerns over the legality of sharing broker's fees with a nonbroker. There is no evidence in the record that anyone representing IRA or THC was "instrumental or helpful" in obtaining financing from Prudential or Travelers for Walters's development projects or in obtaining Prudential construction contracts for Torcon.

Schaffel understood that Kanter himself would exert influence in an attempt to obtain Prudential and Travelers business for Schaffel and his clients. We conclude Kanter obtained such business from Prudential with the help of Ballard

and Lisle, and from Travelers with the help of Lisle.  There is no direct evidence that Kanter agreed to share with Ballard and Lisle any payments he might receive from Schaffel.  However, a number of factors, including the dinner meeting in New York, Ballard's immediate role in Prudential's purchase of the IBM building, Ballard's and Lisle's ability to influence Prudential's awards of construction contracts to Torcon and financing transactions for Walters's projects, Lisle's direct role in awarding Travelers financing for Walters's projects, the details concerning the Kanter/Schaffel fee dispute, and the divisions of the Schaffel payments made to IRA and THC as discussed in the flow-of-funds analysis below, provide compelling circumstantial evidence that Kanter, Ballard, and Lisle agreed to share the Schaffel payments.  Consequently, for tax purposes, Kanter, Ballard, and Lisle were the true earners of the fees that Schaffel paid to IRA on Prudential transactions, and Kanter and Lisle were the true earners of the fees that Schaffel paid to IRA and THC on Travelers transactions.

Kanter used IRA as a repository for the Schaffel payments and as a conduit to channel the payments to himself, Ballard, and Lisle.  Kanter, Ballard, and Lisle attempted to assign to IRA the income they earned from Schaffel, and they failed to report their shares of that income on their individual returns.  As discussed in the flow-of-funds analysis below, Kanter later transferred

Ballard's and Lisle's shares of the fees that Schaffel paid to IRA to them through TMT and Carlco, and he received his own share through BWK.

Kanter and Lisle attempted to assign income that they earned on Travelers transactions to THC, and they failed to report that income on their individual returns. There is insufficient evidence to demonstrate that funds that Schaffel paid to THC were distributed directly to Lisle. Nevertheless, as discussed in the flow-of-funds analysis below, Kanter transferred at least a portion of Lisle's share of Travelers fees to Lisle through FPC Subventure Partnership.

4. Frey

Frey was a real estate developer engaged in condominium conversion projects. Condominium conversion projects generally were capital intensive enterprises. Kanter told Frey that he could bring investors with substantial capital to Frey's condominium conversion projects but that he would only do so if Frey provided Kanter with an equal share of any development and management fees generated by the conversion projects. Frey orally agreed to this arrangement. Although he remitted Kanter's share of development and management fees to THC as directed by Kanter, Frey understood that it was Kanter who would bring the deep-pocket investors to his projects.

Kanter also arranged for subsidiaries of IRA (Zeus) and of THC (Zion) to invest in some of Frey's projects as limited partners.

In early 1980, Ballard approved the sale by a pension fund managed by Prudential of a large apartment complex in Florida known as Village of Kings Creek to a limited partnership organized by Frey. Ballard visited the project during the conversion period. Frey was very successful in converting the property to condominiums. Shortly thereafter, in the fall of 1981, Prudential entered into a several joint venture condominium conversion projects with Frey (under which Frey managed the conversion of Prudential properties into condominiums).

At this time, Kanter and Frey committed their earlier oral fee-sharing agreement to writing. The Frey/THC participation agreement provided that for condominium conversion projects involving Prudential properties, and any future condominium conversion projects not involving Prudential properties, THC and Frey would participate in capital contributions and profits and losses as 33-percent and 67-percent partners, respectively. In addition, after October 1, 1981, THC would receive 5 percent of any development fees derived from any condominium conversion projects not involving Prudential properties. Frey agreed to share development fees with THC as a way to compensate Kanter for

bringing investors and capital to his condominium conversion projects.

The Frey/Zeus agreement formalized Frey's and Kanter's prior oral agreement to share development fees and expanded that agreement to include "assigned profits" on Prudential condominium conversion projects. In particular, Frey agreed to remit to Zeus a 5-percent share of development fees and a 20-percent share of assigned profits earned on Prudential conversion projects because Kanter promised to use his influence to aid Frey in obtaining additional condominium conversion projects from Prudential.

There is no direct documentary evidence that Kanter agreed to share with Ballard and Lisle any payments he might receive from Frey. Nevertheless, considering all the circumstances, including Ballard's role in the Village of King's Creek transaction, the numerous Prudential projects initiated with Frey in the fall of 1981, and the division of the Frey payments as discussed in the flow-of-funds analysis below, we infer Kanter surreptitiously agreed with Ballard and Lisle that if they used their positions of authority at Prudential to influence Prudential to contract with Frey as the developer in the conversion of Prudential properties, Kanter would share with Ballard and Lisle the development fees and assigned profits payments that he expected to receive from Frey. Kanter also agreed to share with Ballard and Lisle any profits that Zeus

might make by participating as a limited partner in various Frey
partnerships.

The Frey-Zeus agreement reflected Frey's recognition that
Kanter's influence in delivering several Prudential condominium
projects in the summer and fall of 1981 was extremely valuable.
At a time when investors were aggressively competing for
properties to convert to condominiums and for capital to complete
those conversions, Prudential provided a ready supply of such
properties, and these projects did not require large infusions of
capital.

In 1984, Frey, Kanter, and others formed BJF Partnership to
engage in condominium conversion projects.  The BJF Partnership
agreement included a list of assets that the partners contributed
to the partnership.  Among the listed items were two
participation agreements--the Frey/THC agreement and the
Frey/Zeus agreement dated October 21, 1981.  Kanter, acting on
behalf of THC, transferred to BJF Partnership rights to the
Frey/Zeus agreement.  Kanter, however, asserts that he neither
owned nor controlled IRA or Zeus.

Frey made payments to Zeus and THC.  By directing Frey to
make payments to Zeus on Prudential condominium conversion
projects, Kanter, Ballard and Lisle attempted to assign income
that they earned on those projects to Zeus.  By directing Frey to

make payments to THC, Kanter attempted to assign income that he earned on non-Prudential condominium conversion projects to THC.

### 5. Schnitzer/PMS

Schnitzer was interested in increasing the number of property management contracts awarded to PMS, a subsidiary of Century, a company he controlled. To this end, in 1974, Schnitzer approached Ballard (with whom Schnitzer had previously dealt in developing office buildings in Houston, Texas) and offered to give Prudential a 50-percent stock interest in PMS. Although Prudential ultimately declined Schnitzer's offer, from 1974 through 1977 PMS's property management business increased substantially, with a large percentage of its contracts coming from Prudential.

In 1977, Schnitzer and Kanter discussed Century's possible sale of a 47.5-percent stock interest in PMS to IRA. Kanter told Schnitzer that he had various business contacts, including the Pritzker family, through which Kanter could obtain additional property management business for PMS. Before agreeing to sell PMS's common stock to IRA, Schnitzer conferred with Ballard to obtain his view as to whether Kanter could deliver additional management contracts for PMS. In November 1977, Century sold a 47.5-percent stock interest in PMS to IRA at a bargain price of $150,000.

Schnitzer and Ross were not relying on IRA, Schott, or Weisgal to generate additional business opportunities for PMS. Schnitzer and Ross were relying solely on Kanter to obtain additional business opportunities for PMS.

During the period 1976 to 1979, PMS expanded its portfolio of management contracts, and its growth was attributable in large measure to additional contracts from Prudential, which represented approximately 40 percent of its revenue.

In late March 1979, Schnitzer informed Kanter that he was disappointed with Kanter's failure to deliver additional property management business for PMS, and he wanted to buy back the PMS stock held by IRA. Kanter made a counteroffer to purchase all of the PMS stock that Schnitzer owned for $3.1 million. Ultimately, Schnitzer agreed to pay IRA $3.1 for its PMS stock with payments to be made in installments over 10 years. In February 1989, PMS made an early, discounted final payment to PSAC, which transferred the funds to IRA for distribution to Carlco, TMT, and BWK.

Once again, although there is no direct evidence of an agreement among Kanter, Ballard, and Lisle to share profits from the PMS transaction, the surrounding circumstances strongly support an inference that an agreement was in place. We begin with the fact that Ballard and Lisle were aware that Schnitzer was so anxious to expand PMS's management business that he was

willing to part with a large share of the company at a bargain price.  Against this backdrop, Schnitzer conferred with Ballard before agreeing to sell a large stake in PMS to IRA.  Ballard and Lisle, of course, were in a position to increase PMS's portfolio of Prudential management contracts.  Considering that the PMS installment payments eventually were divided among Carlco, TMT, and BWK (as discussed in the flow-of-funds analysis below), we infer that Kanter, Ballard, and Lisle recognized they could earn easy profits by acquiring stock in PMS, and they agreed to share those profits before IRA acquired the PMS stock.

Kanter, Ballard, and Lisle used IRA as a conduit to obtain a 47.5-stock interest in PMS and to conceal Ballard's and Lisle's involvement in the matter.  The substantial appreciation that IRA realized between the $150,000 purchase price for the PMS stock in November 1977 and the $3.1 million sale price in August 1979--the latter amount being paid in installments over 10 years--represented income that was earned by Kanter, Ballard, and Lisle.  Kanter, Ballard, and Lisle improperly attempted to assign income from the PMS transaction to IRA.  As discussed in the flow-of-funds analysis below, Kanter shared the income derived from the PMS stock sale with Ballard and Lisle through distributions to TMT, Carlco, and BWK.

6.  Eulich/Essex Partnership

Eulich was interested in obtaining management contracts for large hotels for his company, MHM, and in 1981 he approached Kanter for assistance in this regard.[113]  At the time, MHM was managing one large hotel (the Madison Hotel) in New Jersey.  In August 1981, MHM was awarded a contract to manage another large hotel, the Allentown Hilton.

Beginning in the fall of 1981 and into early 1982, Kanter and Eulich organized Essex Corp. and Essex Partnership.  The organization of these entities coincided with Prudential's decision to award the management contracts for the Gateway Hilton (fall 1981) and the Midland Hilton (no later than February 1982) to Connolly (the onsite manager of the Gateway Hilton).  Ballard and Lisle were instrumental in awarding these contracts to Connolly, even though they knew that Connolly did not have the support services (personnel) to manage the hotels on his own.

---

[113]  Eulich testified in pertinent part:

Kanter was the person whose influence and contacts that we wanted at MHM because of his--again, his involvement as one of the founders of Hyatt International, his involvement with the Pritzkers, and his involvement, significant involvement with this Mullett Bay Resort.

  I mean, the man--he knew a lot of people in the hotel business, and he knew people who owned the types of properties that we wanted, and we were not able to attract, because we were running the two-story, you know, freeway-oriented motels.  [Eulich, Transcr. at 1633-1634.]

Ballard introduced Eulich to Connolly as someone who would assist Connolly with the support services he needed to properly manage the Gateway Hilton. Eulich then organized Gateway Hotel Management Co. (GHM) to make it appear as if Connolly was the owner of a hotel management company. In early 1982, Connolly and Essex Corp. executed the GHM option agreement, which they purportedly agreed to on September 18, 1981, and which recited that (1) Connolly owned 100 percent of GHM, (2) Connolly was transferring to Essex Corp. an option to acquire 80 percent of GHM (80 shares at $100 per share) for 10 years and, (3) in exchange for the option, Essex Corp. would pay Connolly $1,000 per year for 10 years. The record also includes the Connolly promissory note dated December 15, 1981, from Connolly to Essex Corp., in the amount of $8,000, subject to 8 percent interest, payable for 9 years with a final balloon payment due in 1991. Because the payments under the Essex option offset the amounts due from Connolly under the promissory note, we infer that these transactions were nothing more than a sham to make it appear that

Connolly had adequately capitalized GHM.[114]  At best, GHM was capitalized with $2,000.

The partners of Essex Partnership and their partnership interests were as follows:

| Partner | Percentage Partnership Interest |
|---------|---------------------------------|
| MHM | 47.500 |
| IRA | 26.125 |
| THC | 21.375 |
| Connolly | 5.000 |

At trial, Connolly (1) did not know the identity of the partners of Essex Partnership, (2) believed he was offered a 5-percent partnership interest in Essex Partnership in exchange for his promise to refer to Eulich any hotel management contracts that GHM could not handle in the northeastern region of the country, and (3) did not understand that a portion of GHM's management fees was remitted to Essex Partnership.

Essex Partnership's stated purposes were (1) "To engage generally in the consulting business and as a liaison intermediary between owners and operators of hotel properties", and (2) "To enter into other partnership agreements * * *, to

---

[114]  At trial, Connolly (1) could not recall any details about the GHM option agreement or whether he had received any payments pursuant to the option agreement, (2) did not know whether he had owned all of the shares of GHM, (3) could not recall speaking to Eulich about startup financing of $10,000 for GHM, and (4) could not recall whether the board of directors held meetings at GHM or the membership of the board.

become a member of a joint venture, or to participate in some other form of syndication for investment; and to buy, sell, lease, and deal in services, personal property, and real property."

In connection with the formation of Essex Partnership, GHM and MHM entered into separate representation and marketing agreements with Essex Partnership. GHM agreed to pay to Essex Partnership 75 percent of its fees on GHM's management contracts on the Gateway Hilton and the Midland Hilton. MHM agreed to pay to Essex Partnership 30 percent of its management fees from the operation of the Madison Hotel and 43 percent of the fees from the operation of the Allentown Hilton. In return, Essex Partnership agreed to (1) "perform liaison functions" between certain hotel owners and GHM and MHM in connection with management contracts between such parties, (2) "perform liaison functions" between the owners of any additional properties which it was instrumental in securing for management by GHM or MHM, (3) "use its best efforts to maintain satisfactory relations" between the property owners and GHM and MHM "and to maintain sufficient personnel to properly perform such [management] functions", and (4) "use its best efforts to secure management contracts" satisfactory to GHM and MHM.

Essex Partnership had no offices and no employees. Very few, if any, capital contributions were made to Essex

Partnership.  The record reflects that personnel associated with MHM in effect provided all the financial and accounting services that GHM required to fulfill its hotel management contracts.  For the most part, Connolly simply continued to serve as the onsite manager of the Gateway Hilton.

In late 1983, Prudential awarded to MHM the hotel management contract for the Twin Sixties Hotel.  Shortly thereafter, MHM and Essex Partnership modified their representation and marketing agreement to provide that MHM would pay 70 percent of its management fees from the Madison Hotel and 57 percent of its management fees from the Allentown Hilton and the newly acquired Twin Sixties Hotel management contract.  On January 1, 1986, Connolly executed a new representation and marketing agreement on behalf of GHM which provided that GHM would pay to Essex Partnership 40 percent of the fees earned on the Gateway Hilton and Midland Hilton management contracts.

Over time, the total fees that MHM paid to Essex Partnership generally equaled the total fees that GHM paid to the partnership, and the total fees MHM paid to the partnership roughly approximated MHM's distributive share of partnership income as a 47.5-percent partner in Essex Partnership.  However, as indicated previously, MHM was not paid directly for the substantial services its employees rendered to GHM.  Rather, as a partner in Essex Partnership, MHM received 47.5 percent of the

partnership's income.  Although IRA and THC, as partners, also received a combined 47.5 percent of the income of Essex Partnership, IRA and THC, in contrast to MHM, provided no services to GHM.

Eulich and MHM's top management essentially viewed Essex Partnership as a marketing and sales device whereby MHM eventually might obtain more management contracts for large hotels.  In addition, MHM needed to increase its level of experience and expertise in managing and operating large hotels. Because of the substantial services that MHM was providing GHM, Eulich considered the Gateway Hilton and Midland Hilton management contracts to be part of MHM's management business.

Connolly could not explain the benefits that GHM would receive under the GHM/Essex representation and marketing agreement; he did not expect anyone at Essex Partnership to perform liaison functions between himself and Prudential.  From MHM's standpoint, Formby did not know what liaison functions Essex Partnership was expected to perform for GHM, and he believed that no such activities occurred.  James, MHM's president, could not identify a specific person or entity who would have acted as a liaison between the owners and operators of the hotel properties in question.  James did not know that IRA and THC were partners in Essex Partnership until he was shown the partnership agreement at trial.  Eulich had never seen the Essex

Partnership agreement or the representation and marketing agreements between MHM and Essex Partnership.  Eulich could not explain how Essex Partnership would serve as "liaison intermediary between the owners and operators of hotel properties".  There were no officers or employees at Essex Partnership who could have engaged in consulting or acted as liaisons.

Between 1982 and 1988, GHM paid $1,334,601 and MHM paid $1,563,412 to Essex Partnership.  During 1982 through 1989, Essex Partnership distributed $788,452 to IRA and $645,099 to THC.

On December 31, 1984, IRA transferred its Essex Partnership interest to Carlco, TMT, and BWK.  Carlco and TMT each received an 11.75-percent partnership interest in Essex, while BWK received a 2.6125-percent partnership interest in Essex.  Essex Partnership apparently was not informed of the transfer and continued to make partnership distributions to IRA.

The record reflects that Connolly was little more than a pawn with regard to Essex Partnership.  Connolly knew very little about GHM or Essex Partnership, and we infer from his testimony that he was happy simply to receive a substantial salary for ostensibly managing both the Gateway Hilton and the Midland Hilton.  In fact, MHM provided the necessary management support services for all of the hotels in question.  Kanter, Ballard, and

Lisle used Essex Partnership as a conduit to receive a portion of the management fees paid to GHM on the Gateway Hilton and Midland Hilton management contracts (through distributions to IRA), and Kanter received a separate portion of those same management fees (through distributions to THC). As discussed in the flow-of-funds analysis below, the distributions that IRA received from Essex Partnership were distributed to Carlco, TMT, and BWK. Essex Partnership represented an effort by Kanter, Ballard, and Lisle to assign to IRA and/or THC income that they earned.

E. Flow-of-Funds Analysis

The Court's additional findings of fact regarding the flow of funds from The Five to IRA and from IRA ultimately to Kanter, Ballard, and Lisle are summarized in table 11. Table 11 shows that with so-called capital contributions, loans that were never repaid, and other payments to Kanter, Ballard, Lisle, and their families, IRA transferred to Carlco and/or Lisle, TMT and/or Ballard, and BWK and/or Kanter, in a roughly 45/45/10 percent split, all of the payments from The Five (and nothing more). The flow-of-funds analysis also demonstrates that Kanter, Ballard, and Lisle had unrestricted use and enjoyment of the assets IRA transferred to BWK, TMT, and Carlco, and they treated those assets as their own.

The Court's additional findings of fact regarding the flow of funds from The Five to THC, and ultimately to Kanter and

Lisle, are set forth supra pp. 207-213.  Although the funds paid by The Five to THC could not be traced directly to Kanter and Lisle because of a lack of complete general ledgers for THC and TACI for the years in question, we are satisfied that the transfers of funds between THC, TACI, and Kanter documented in the record demonstrate that Kanter used the funds from THC as his own.  We likewise conclude that Kanter arranged FPC Subventure Partnership as a conduit to pass to Lisle at least a portion of Lisle's share of the fees that Schaffel paid to THC.

The following summary (subsections 1-4) highlights the more important aspects of the flow of funds.

1.  Payments to IRA:  1977 Through 1983

During the period 1977 through 1983, IRA (and Zeus) received in the aggregate approximately $5 million in payments from The Five.  Although IRA reported these payments as income on its tax returns, IRA paid very little in taxes.

In 1984, IRA began distributing some of its cash and partnership interests to Carlco, TMT, and BWK in a 45/45/10 percent split.  Specifically, during 1984, IRA transferred approximately $4.2 million to Carlco, TMT, and BWK.  The distributions to Carlco and TMT represented a large portion of Lisle's and Ballard's shares of the payments that IRA received from The Five.

2. <u>Payments to IRA: 1984 Through 1989</u>

After 1983, the structure through which the payments were received from The Five changed. Although Hyatt Corp. continued to make payments to KWJ Corp., IRA had liquidated the company and distributed its assets to Carlco, TMT, and BWK, which formed KWJ Partnership in early 1984. Thereafter, the Hyatt Corp. payments were distributed by IRA to KWJ Partnership and reported on the returns of Carlco, TMT, and BWK. Similarly, IRA had transferred its interest in Essex Partnership to Carlco, TMT, and BWK. Thereafter, IRA no longer reported the distributive income from Essex Partnership on its returns. Instead, the distributive share of income was reported on the returns of Carlco, TMT, and BWK, respectively.

During the period 1984 through 1989, The Five made payments to IRA (and Zeus) in the aggregate amount of $4.6 million. IRA distributed (1) $1,103,721 that it received from Hyatt Corp. to KWJ Partnership (and to Carlco, TMT, and BWK), and (2) $623,865 that it received from Essex Partnership to Carlco, TMT, and BWK. IRA also transferred to Carlco, TMT, and BWK $2,287,191 in installment payments that it received from PMS during 1984 to 1989.

Although there is no direct evidence that Zeus transferred to IRA the approximately $232,000 in payments that it received from Frey during 1984 and 1985, that amount nearly equals the

approximately $250,000 that IRA lent to KWJ Partnership during 1985 to 1989 (which was used to make consulting payments to Ballard's and Lisle's adult children, discussed below).

By the end of 1989, IRA's records reflected that it had transferred capital contributions and paid-in capital to Carlco, TMT, and BWK as follows:

| Carlco | TMT | BWK |
|--------|-----|-----|
| $2,938,173 | $2,938,267 | $652,250 |

3.  <u>IRA Loans to Kanter, Ballard, and Lisle</u>

a.  <u>IRA Loans to Ballard and Ballard's Trusts</u>

During the period 1974 to 1988, IRA, IFI, and HELO made loans to three of Ballard's grantor trusts (CMB Cinema Trust, CMB Cinema Trust II, and Summit Trust) as well as separate loans to Ballard individually.  As of December 1987, IFI held receivables or notes due from Ballard and his grantor trusts totaling approximately $380,000.

b.  <u>IRA Loans to Lisle and Lisle's Trusts</u>

During the period 1974 to 1990, IRA, IFI, HELO, TACI, and BWK made loans to three of Lisle's grantor trusts (RWL Cinema Trust, RWL Cinema Trust II, and Basking Ridge Trust) as well as separate loans to Lisle individually.  As of December 1987, IFI held receivables or notes due from Lisle and his grantor trusts totaling approximately $202,000.

c.  Sale of Grantor Trust Notes for $1

In December 1987, IRA held a receivable of $507,648 due from IFI.  IRA transferred the receivable back to IFI in exchange for all of IFI's assets, which included receivables due from Ballard's and Lisle's grantor trusts as well as receivables due from Ballard ($196,648) and Lisle ($28,284), respectively.  IRA then sold certain of the receivables due from Ballard's and Lisle's grantor trusts (with a face value of approximately $384,000) for $1 each to MAF, Inc.  Morrison, MAF's president, admitted that MAF engaged in the transactions merely as an accommodation to Kanter.  In addition, after writing down the value of the receivables due from Ballard and Lisle to $84,889 and $12,185, respectively, IRA treated these receivables as bad debts for which it claimed deductions on its 1987 tax return.

After the IRS began its examination, Kanter contacted Ballard and Lisle to discuss repayment of their debts.  These discussions were merely postexamination window dressing.

d.  IRA Loans to Kanter

At the end of 1989, IRA's records reflected loans to Kanter totaling $600,000.  There is no evidence that any principal or interest was paid on these loans.

e.  Additional Loans to Lisle's Grantor Trust

Between 1988 and 1990, IRA and Kanter made additional loans to Lisle's RWL Cinema Trust.  These additional loans suggest that either the earlier loans to RWL Cinema Trust were not worthless when IRA wrote them off or the transfers were never valid loans in the first place.

f.  Consulting Payments to Ballard's and Lisle's
    Adult Children

From 1984 to 1989, IRA made loans to KWJ Partnership totaling $249,000.  KWJ Partnership was formed by Carlco (45 percent), TMT (45 percent), and BWK (10 percent), which were managed by Lisle, Ballard, and Kanter, respectively.  As of July 30, 1990 (the date KWJ Partnership filed its tax return for 1989), these loans had not been repaid.

During much of the period 1982 to 1989, KWJ Corp. and KWJ Partnership paid $1,000 per month to Ballard's and Lisle's adult children and deducted the payments (which totaled $313,000) as consulting fees.  As the managers of Carlco and TMT, Lisle and Ballard were aware of and acquiesced in these payments.  Although it appears that some of the children contacted Kanter at various times with recommendations and suggestions for investments, the record reflects that for many of the years in question they did little or nothing to earn the payments.  In fact, in letters to the children terminating the payments in February 1990, Kanter stated that "no services appear to have been performed for a

number of years", and Kanter explained that the payments had continued because IRA's president, Freeman, "paid no attention to the activities of * * * [IRA] and its affiliates, and those who were simply administering tasks on behalf of * * * [IRA] routinely continued to make payments to you". These payments represented Ballard's and Lisle's shares of some of the payments remitted to IRA by The Five that Ballard and Lisle attempted to assign to their children.

4.  Payments to THC:  1981 to 1989

During the period 1981 to 1989, Schaffel, Frey, and Essex Partnership paid approximately $4 million to THC.  The payments from Frey ($500,770) and Essex Partnership ($645,099) represented moneys that Kanter earned using his influence to bring deep-pocket investors to Frey's condominium conversion projects (and his personal investment (through Zion) in those deals) and arranging hotel management contracts for MHM.  Kanter improperly attempted to assign his earnings on these transactions to THC.

On the other hand, the approximately $2.8 million that Schaffel paid to THC between 1984 and 1986 (ostensibly as Kanter's share of the fees that Schaffel earned arranging Travelers financing for Walters's development projects) represented income earned by both Kanter and Lisle.  Kanter and Lisle improperly attempted to assign this income to THC.  As

discussed below, Kanter passed at least a portion of Lisle's share of this income to Lisle through FPC Subventure Partnership.

a. FPC Subventure Partnership

Kanter, purportedly as a nominee, acquired 8-percent limited partnership interests in both Four Ponds Partnership and One River Partnership--two partnerships organized by Schaffel and Torcivia for real estate development projects. A "memorandum to file", dated April 14, 1982, stated (1) on January 1, 1981, Kanter (as nominee) transferred his 8-percent limited partnership interest in Four Ponds Partnership to Lisle (90 percent) and the Everglades Trusts (10 percent); (2) Lisle issued a promissory note to Kanter for $2,880; (3) Lisle and the Everglades Trusts formed FPC Subventure Partnership; (4) on April 5, 1982, Four Ponds Partnership made a $400,000 cash distribution to Kanter; and (5) Kanter transferred the Four Ponds distribution to FPC Subventure Partnership, which distributed $355,500 to Lisle and $39,500 to the Everglades Trusts, leaving $5,000 in FPC Subventure Partnership's account.[115]

Contrary to Kanter's testimony, Schaffel and Torcivia were not aware that Lisle was a partner in FPC Subventure Partnership.

---

[115] Contrary to the "memorandum to file", FPC Subventure's tax return for 1982 and a Schedule K-1 issued to Lisle indicate the partnership made a cash distribution of $427,600 and Lisle received $384,840 (or 90 percent) of that amount.

In 1982, Kanter also transferred his 8-percent limited partnership interest in One River Partnership to FPC Subventure Partnership in exchange for a $2,000 promissory note.

During the years at issue, Kanter (who held an interest in FPC Subventure through grantor trusts) and Lisle reported distributive shares of FPC Subventure's partnership items of income, loss, deduction, and credit on their individual tax returns. However, Four Ponds Partnership and One River Partnership (1) reported net losses in 1981 to 1984 and 1987 to 1989 totaling $1,067,131, and (2) made cash distributions to its partners in 1981 to 1984 and 1987 to 1989 totaling $731,080. Approximately 7 percent of Four Ponds' and One Rivers' partnership losses, described above, flowed through to Lisle through FPC Subventure Partnership.

In addition to these favorable tax effects, during the period 1981 to 1989 Lisle received at least $682,520 in cash distributions from FPC Subventure Partnership.[116] Consequently, FPC Subventure Partnership served for Lisle the dual purposes of (1) a tax shelter, and (2) a source of substantial cash distributions. Kanter structured FPC Subventure Partnership as a

---

[116] FPC Subventure Partnership's tax returns for 1985 and 1986 apparently were not made part of the record.

conduit to transfer to Lisle at least a portion of his share of payments remitted to THC.[117]

b. THC Transfers to Kanter

During the period 1983 to 1984, THC transferred substantial sums of money into TACI accounts, and TACI transferred smaller amounts back to THC. During this same period, Kanter received substantial loans from TACI, and many of these loans, totaling approximately $1.3 million, had not been repaid when TACI filed for bankruptcy in early 1988. There is no evidence that Kanter ever paid any principal or interest on these loans.[118] Kanter arranged for transfers from THC to TACI and from TACI to himself with no intention of repaying TACI or THC.

F. Kanter-Related Entities Were Shams

1. IRA and THC

IRA, THC, and their subsidiaries served no legitimate business purpose with regard to the transactions at issue in these cases. The entities did not have employees and generally only used the services of bookkeepers and administrators to record transactions, receive and disburse funds, and handle

---

[117] As previously noted, an earlier ruling in these cases bars an additional allocation of income from the Travelers transactions to Lisle. Because we are convinced that Lisle received at least $682,250 from the Travelers transactions, we shall take this factor into account and reduce the allocation to Kanter by a like amount.

[118] Gallenberger believed the TACI bank records that would have clarified many of the questions surrounding Kanter's loans were last in Kanter's possession.

banking matters.  The bookkeepers and administrators simply followed Kanter's instructions (which sometimes were conveyed through Freeman, Weisgal, Meyers, and/or Gallenberger).

IRA's officers and directors, including Freeman and Weisgal, did not manage any business or provide any meaningful services to The Five.  Kanter disclosed that for several years Freeman had been distracted by his own legal woes and did not manage IRA. Weisgal recalled very little regarding any matters concerning IRA's operations and was not aware of anyone at IRA who provided services to The Five.

Schaffel, Frey, Schnitzer, and Eulich uniformly testified that they were looking to Kanter, and Kanter alone, to use his influence with his wealthy and well-connected clients and business contacts in an effort to generate additional business opportunities for them.  Kanter's statements in his dealings and negotiations with The Five are equally revealing that Kanter would be providing the services and expected to be compensated for those services.  In the end, The Five entered into contracts with and made payments to IRA, THC, and their subsidiaries only because Kanter directed them to do so.

There is no evidence of any contract between IRA and Kanter, nor is there any evidence that IRA controlled Kanter's activities in any way.  To the contrary, Kanter orchestrated all business matters concerning IRA or THC and their subsidiaries, and

Kanter's instructions were carried out by administrators and bookkeepers including Freeman, Weisgal, Meyers, and Gallenberger. There is no evidence that anyone at IRA or THC provided any services to The Five.  Kanter directed The Five to execute agreements with and make their payments to IRA, THC, and their subsidiaries in an effort to conceal that Kanter, Ballard, and Lisle earned the payments remitted by The Five.  IRA, THC, and their subsidiaries were Kanter's alter egos.  Kanter, Ballard, and Lisle improperly attempted to assign their income to IRA, THC, and their subsidiaries.

### 2.  Carlco, TMT, and BWK

### a.  Diversification and Deconsolidation

Kanter testified that (1) IRA always held a controlling interest in Carlco, TMT, and BWK; (2) IRA transferred a substantial portion of its cash and other property to Carlco, TMT, and BWK beginning in 1984 as a "free cashflow" asset allocation; (3) the allocation would allow for diversification of IRA's investments in that Carlco (with Lisle as manager) was to invest primarily in municipal bonds), TMT (with Ballard as manager) was to invest primarily in real estate, and BWK (with Kanter as manager) was to make assorted investments; and (4) Carlco and TMT were removed from IRA's consolidated group of corporations for tax reporting purposes (by issuing shares of preferred stock to trusts for the benefit of Ballard's and

Lisle's families) to ensure that (a) Carlco's investments in municipal bonds would not imperil IRA's interest deductions, and (b) no one at IRA (such as Freeman) would be able to second-guess Ballard's and Lisle's investment decisions. None of these assertions withstands serious scrutiny.

The record shows that (1) IRA acquired 1,000 shares of common stock of Carlco, of TMT, and of BWK in December 1983, and (2) Carlco preferred stock was issued to Christie Trust (Lisle's family trust), TMT preferred stock was issued to the Orient Trust (Ballard's family trust), and BWK preferred stock was issued to the BK Children's Trust (one of the Bea Ritch Trusts). The record, however, is devoid of stock ledgers or related information for these corporations after early 1984. Respondent requested a comprehensive set of corporate records for Carlco, TMT, and BWK; however, petitioners failed to produce such records for the period after 1984. Although the paper record (stock certificates) suggests that IRA owned a controlling interest in Carlco, TMT, and BWK, the manner in which Kanter, Ballard, and Lisle handled the assets that IRA transferred to those entities (discussed supra pp. 178-194) indicates that, in substance, Lisle owned Carlco, Ballard owned TMT, and Kanter owned BWK.

In 1984, Kanter directed IRA to transfer a substantial portion of its cash on hand to Carlco, TMT, and BWK in a 45/45/10 percent split. IRA also transferred to Carlco, TMT, and BWK its

partnership interest in Essex Partnership and its interest in KWJ Corp. (both of which provided a steady stream of cash payments and distributions), and IRA distributed to Carlco, TMT, and BWK the annual installment payments that it received from PMS. These distributions did not, however, represent an allocation of IRA's "free cash-flow" as Kanter alleged. IRA was transferring to Carlco, TMT, and BWK shares of the payments derived (and to be derived) from transactions with The Five.

Two facts demonstrate that Kanter's explanation regarding the distributions to Carlco, TMT, and BWK are not to be believed. First, we note that the only asset transferred to Carlco, TMT, and BWK with no apparent connection to The Five was a portion of IRA's interest in Sherwood/Forest Activities Partnership. By our reckoning, this partnership did not provide any cashflow at all and merely served as a source of deductions to shelter from taxation a portion of Carlco's, TMT's, and BWK's income for 1984 to 1987. Kanter's explanation is also belied by the fact that IRA held large of amounts of cash during the period 1984 to 1989 (particularly 1987) that it invested in CDs rather than distribute to Carlco, TMT, and BWK. Thus, although Kanter recommended that Carlco, TMT, and BWK should receive funds from IRA in a 45/45/10 percent split of IRA's free cashflow, Kanter's recommendation was instead part of a preexisting agreement among Kanter, Ballard, and Lisle to share payments from The Five.

There likewise is no support for Kanter's assertion the allocations to Carlco, TMT, and BWK would allow for diversification of IRA's investments.[119]  While Lisle invested Carlco's assets primarily in municipal bonds, the record reflects that Ballard also invested up to 30 percent of TMT's assets in bonds, including municipal bonds.  In addition, as of 1989, another 20 percent of TMT's assets was allocated to cash and notes receivable (many of which were due from Ballard).  Under the circumstances, Kanter's purported asset allocation achieved very little in the way of diversification of investments.

Finally, Kanter's explanation for the removal of Carlco, TMT, and BWK from IRA's consolidated group of corporations for tax reporting purposes is implausible.  First, even if it were logical to remove Carlco from IRA's consolidated group to protect IRA's interest deductions, this explanation does not clarify why TMT and BWK (which were to invest primarily in real estate and other miscellaneous investments, respectively) were likewise removed from the consolidated group.  There was no indication that TMT's and BWK's planned investments would imperil IRA's tax deductions.  Moreover, if Carlco, TMT, and BWK had truly remained subsidiaries of IRA as Kanter contended, their removal from IRA's consolidated group for tax-reporting purposes would have done

_____

[119]  Kanter did not manage the funds in BWK.  As Kanter testified:  "BWK didn't work out that way because I just didn't have the time to pay attention to it."  Kanter, Transcr. at 3701.

nothing to shield Ballard and Lisle from oversight or second-guessing by IRA's officers.

In sum, IRA's transfers to Carlco, TMT, and BWK represented Lisle's, Ballard's, and Kanter's shares of the payments derived (and to be derived) from transactions with The Five. Further, Carlco, TMT, and BWK were removed from IRA's consolidated group to reflect the reality that those corporations were owned and controlled by Lisle, Ballard, and Kanter, respectively, and they would each be responsible for their own taxes going forward.

b. <u>Use and Enjoyment of Carlco's, TMT's, and BWK's Assets</u>

We do not credit Kanter's explanations for the transfers to Carlco, TMT, and BWK, and for the removal of those entities from IRA's consolidated group. The record shows that Lisle, Ballard, and Kanter had unrestricted use and enjoyment of Carlco's, TMT's, and BWK's assets, respectively.

(i). <u>Carlco</u>

In April 1985, Lisle wrote a check for $3,000 against funds in the Connecticut National Bank account to repay a loan that TACI made to RWL Cinema Trust (one of Lisle's grantor trusts). The memo section of this check stated: "Payment on Loan". In short, Lisle used Carlco's funds as his own to pay a debt of his grantor trust.

In addition, Carlco owned a 45-percent partnership interest in KWJ Partnership. IRA made substantial loans to KWJ

Partnership which in turn KWJ Partnership used to make so-called consulting payments to Ballard's and Lisle's adult children during the period 1983 to 1989. Lisle was aware of and acquiesced in these payments, and he was aware that the children were not providing any meaningful services in exchange for the payments.

We conclude Lisle owned Carlco and all of its assets, and Lisle used Carlco as a conduit for receiving his share of the payments from The Five.

(ii). TMT

During 1984, TMT purportedly made loans to Ballard, Seabright Trust, and Seabright Corp.[120] By 1989, TMT's outstanding loans to Seabright Trust and Seabright Corp. totaled $135,155 and $41,520, respectively. The record does not include any promissory notes issued in connection with the loans to Seabright Trust or Seabright Corp. There is no evidence that either Seabright Trust or Seabright Corp. paid interest on the loans from TMT. As of the time of trial, the loans had not been repaid.

From 1984 through 1989, TMT lent $146,943 and $160,000 to Claude and Mary Ballard, respectively. Although Ballard

---

[120] Ballard believed Seabright Trust was an entity used to make tax-sheltered investments. Seabright Corp., which owned a farm in Arkansas, was owned by the Mary Family Trust, a trust for the benefit of Ballard's wife and daughters.

purportedly arranged in December 1986 to repay the $160,000 loan to Mary Ballard with Macy's preferred stock, TMT's accounting records do not indicate that the $160,000 loan was ever repaid.

In 1986, TMT paid $100,000 for an asset described in TMT's general ledger as "LAND ST. FRANCIS COUNTY [ARKANSAS] 414.28 ACRE".[121]  This asset was subsequently removed from TMT's general ledger, and adjusting journal entries indicated that an asset identified as "Fairfield Planting Company" was transferred to Ballard, and Ballard's loans from TMT were increased by $100,000.

When Gallenberger was questioned about this transaction, she could not recall the details and suggested Ballard should be questioned on the matter.  Ballard testified that (1) the transaction involved his acquisition of stock in Fairfield Planting Co., an S corporation involved in farm operations in Arkansas; (2) he owed TMT approximately $200,000 on the transaction; (3) TMT continued to receive "interest" on the deal; (4) he owned two-sevenths of Fairfield; (5) the initial Fairfield investment was $1,350,000, and the investment had increased in value to approximately $2,350,000; and (6) the Fairfield transaction was a good deal for TMT and a bad deal for him.

---

[121]  TMT's general ledger also reflected a separate transaction involving what appears to be another property in St. Francis County identified as land ($424,800), along with a building ($25,200) and building improvements ($10,925).

The record also includes a promissory note that Ballard purportedly executed on January 20, 1987, which provided (1) Ballard agreed to pay to TMT, on demand, the principal sum of $100,000, and (2) the note would not bear interest but TMT was entitled to receive 90 percent of the "dividends" paid to Ballard by Fairfield.  At the same time, Ballard's wife, Mary Ballard, acting as TMT's president, and Ballard signed an agreement which stated that (1) Ballard was executing a note to TMT and was pledging 1,000 shares of Fairfield common stock as security for the note, and (2) TMT, as part of the transaction, agreed to advance in the future "any deficits incurred by * * * Ballard in the operations of Fairfield * * * and is to receive 90% of the dividends paid by Fairfield".  Mary Ballard, acting in her individual capacity, and Ballard also signed an assignment which stated that "for the purpose of securing the payment of all indebtedness now owing, or which may at any time hereafter be owing" by Ballard to TMT, the Ballards assigned to TMT 1,000 shares of Fairfield common stock.

In 1987, TMT apparently paid an additional $20,344 to Fairfield, and this amount was treated as an additional loan to Ballard.

The Ballards reported Fairfield items of income and loss on their 1987, 1988, and 1989 tax returns.

Ballard's explanation for this transaction and petitioners' treatment of the matter in their reply brief are contradictory. It is not clear that TMT ever owned shares in Fairfield Planting Co. that it could transfer to Ballard. See Petitioners' Reply Brief at 625-626. In any event, Ballard's testimony suggests the asset he received, described by him as stock in Fairfield Planting Co., was worth considerably more than the $100,000 charged to him as a loan. Finally, the terms of Ballard's promissory note associated with this transaction suggest self-dealing and an effort to create an instrument for a debt that would never be repaid. In the absence of any evidence in the record that TMT ever received any payments (interest, dividends, or otherwise) attributable to Ballard's promissory note, we conclude that the promissory note was a sham.

TMT's records show that in 1988, TMT purportedly purchased $15,000 of stock in Ficom International, Inc., a corporation organized by Ballard's daughter, Melinda Ballard. The entry reflecting the investment includes a handwritten notation "W/O in 1989." In 1989, TMT recorded in its trial balance ledger a $15,000 long-term capital loss on its investment in Ficom. Adjusting journal entry No. 6 explained the writeoff as follows: "To w/o worthless stock of Ficom as per note on 1988 TB [trial balance]". TMT claimed this loss as a deduction on its 1989 tax return.

In addition, TMT owned a 45-percent partnership interest in KWJ Partnership. IRA made substantial loans to KWJ Partnership which in turn KWJ Partnership used to make so-called consulting payments to Ballard's and Lisle's adult children during the period 1983 to 1989. Ballard was aware of and acquiesced in these payments, and he was aware that the children were not providing any meaningful services in exchange for the payments.

Ballard made loans to himself and his family members from TMT's assets with no intention of repaying those loans, and he transferred property acquired by TMT to himself in exchange for an illusory promissory note. We conclude Ballard owned TMT and all of its assets, and Ballard used TMT as a conduit for receiving his share of the payments from The Five.

(iii). BWK

During 1984 through 1989, Kanter and his son, Joshua Kanter, received salaries from BWK totaling $210,000 and $26,000, respectively. However, Kanter admitted that he never had the time to manage BWK's investments.

In April 1985, BWK lent $400,000 to Kanter. By the end of 1987, the $400,000 loan had not been repaid. In 1988 and 1989, the $400,000 loan was reduced by approximately $30,000 each year. Adjusting journal entries treated these loan reductions as salary that otherwise would have been paid to Kanter. There is no evidence that Kanter paid any interest on the $400,000 loan.

During the period 1987 to 1989, BWK lent a total of $236,000 to PSAC to support its operations.  At the time the record in these cases was closed, PSAC had not repaid the loans from BWK.

We conclude Kanter owned BWK and all of its assets, and Kanter used BWK as a conduit for receiving his share of the payments from The Five.

G.  Cracks in the Kanter Facade

We have adopted many of the general findings of fact recommended in the STJ report.  The findings so adopted, combined with the Court's additional findings of fact regarding (1) the manner in which Kanter, Ballard, and Lisle carried out the transactions with The Five, (2) the flow of the funds, and (3) the use and enjoyment of the assets transferred to Carlco, TMT, and BWK, constitute overwhelming objective evidence that Kanter, Ballard, and Lisle participated in a complex, well-disguised scheme to share kickback payments earned jointly by Kanter, Ballard, and Lisle.

We briefly list the following items (subsections 1-7) as further evidence that Kanter, Ballard, and Lisle earned the payments that The Five remitted to various Kanter-related entities.

1.  The Hyatt Transaction

In March 1983, Weaver forwarded to Kanter the most recent payment from Hyatt Corp. to KWJ Corp.  Weaver's letter requested

that Kanter deposit the check "and issue appropriate checks to the participants." In using the word "participants", Weaver was referring to Kanter, Ballard, and Lisle.

Later, in August 1989, IRA issued checks for $22,618.80 each to Ballard and Lisle. After the checks were issued to Ballard and Lisle, IRA records reflected a transfer of $45,237 to KWJ Partnership on August 8, 1989. Also on August 8 and 15, 1989, IRA ledger entries reflected that the checks issued to Lisle and Ballard, respectively, were void. Despite the fact that IRA's ledger entries stated that these checks were voided, Lisle's 1989 return reflected that he actually cashed the check. Lisle reported $22,619 on his return as income from the "KJW [sic] Company." The checks issued to Ballard and Lisle reflected that Ballard and Lisle (as opposed to KWJ Partnership) earned shares of all Hyatt Corp. payments to KWJ Corp.

2. Frey

An October 1983 letter from BJF, Inc., to Kanter remitted a check made payable to Kanter. The letter stated that the check represents "your 5% participation of our $300,000.00 incentive fees received from Prudential for 50% of units closed at Calais, Chatham and Valleybrook." Although the check was later voided and replaced with a check made payable to Zeus, the letter reflected that it was Kanter (along with Ballard and Lisle), not Zeus, who earned a share of Frey's incentive fees.

In addition, when BJF Partnership was formed in 1984, the partnership agreement recited that among the items transferred to the partnership by the partners were "Two Participation Agreements with Burton J. Kanter regarding certain condominium conversions. These agreements have been terminated with respect to new conversions." The BJF Partnership agreement included representation and warranty clauses under which Kanter stated that (1) he did not need any consent, authorization, or approval to contribute the participation agreements to the partnership, and (2) the termination of the participation agreements was valid, binding, and effective. This transaction is significant because the participation agreements referred to were the Frey/Zeus agreement and the Frey/THC agreement. Contrary to Kanter's assertion that he did not own or control IRA or Zeus, this transaction suggests that Kanter exercised complete control over those entities.

3. Schaffel

Although Kanter testified that Prudential business was not a subject of discussion at his 1979 dinner meeting with Ballard, Lisle, and Schaffel, Lisle believed that it was obvious Kanter arranged the meeting to see whether Schaffel might be able to do business with Prudential.

In addition, the 1984 dispute between Schaffel and Kanter over whether Schaffel was required to continue making payments to

IRA reveals that both Schaffel and Kanter understood that their fee-sharing agreement was inextricably tied to Ballard and Lisle. Schaffel hoped to restrict the fee-sharing agreement to Prudential transactions only,[122] whereas Kanter maintained the agreement required Schaffel to share any fees arising from his business dealings with Ballard and Lisle wherever they might be employed.

4.  Schnitzer/PMS

In February 1989, Kanter wrote to Ross and inquired whether PMS would be interested in making an early, discounted final payment under the IRA/PMS installment agreement.  Kanter mentioned in his letter that IRA had assigned its contract rights under the IRA/PMS installment agreement and that any payment should be remitted to PSAC, which served as the depository for the assignee. There is no evidence in the record that IRA ever assigned its rights under the IRA/PMS installment agreement to another party.  Kanter used the term "assignment" because he knew the payments belonged to himself, Ballard, and Lisle, and he had

---

[122]  Schaffel explained that he stopped making payments to Kanter/IRA in 1983 because "I said, 'The deal is off.  Bob [Lisle] has moved and I am not going to, you know--the relationship is over.'"  Schaffel, Transcr. at 402.  Schaffel also testified:  "I didn't believe that [Kanter] was entitled to that money because we had left the Investment Research agreement because Bob [Lisle] had moved on to Travelers and Claude [Ballard] had moved on to Goldman Sachs and I was no more dealing with The Prudential."  Schaffel, Transcr. at 395.

already instructed PSAC to transfer the final payment in appropriate shares to Carlco, TMT, and BWK.

### 5. Loans to Ballard

TACI's June 30, 1984, trial balance ledger reflected that loans had been made to Ballard, Seabright Trust, and Seabright Corp. Although there is no indication whether these loans originated from TACI, IRA, or some other Kanter-related entity, subsequent accounting entries resulted in the transfer of these loans to TMT. The transfer of these loans to TMT was not a random event--the treatment of these loans reflected that Ballard owned TMT's assets, and, therefore, his loans were charged to TMT.

### 6. Ballard's Disclosures to Goldman Sachs

In October 1988, Ballard submitted to Goldman Sachs a disclosure statement concerning his outside business affiliations. Ballard's disclosure stated: "I am personally involved in substantial farming operations individually as well as in partnership form. Family trusts control two corporations which are similarly involved." Ballard's reference to "Family trusts" was to Orient Trust (which owned TMT) and Mary Family Trust (which owned Seabright Corp.). In this regard, it is worth noting that Ballard reported as income substantial director's fees from Seabright Corp. during 1987 to 1989. Ballard's explanation at trial that the family trusts he was referring to

were the Bea Ritch Trusts, which owned IRA (and purportedly TMT), strains credulity.

In August 1989, Ballard submitted to the Compliance Department at Goldman Sachs a Request for Approval of Outside Business Activities and/or Private Investments Form. In response to a direction to provide a "Complete description of the investment or business affiliation. What is it and who else is involved in it as principals? Does it involve a public or private company?", Ballard answered, in part: "Farmland--Have been buying and selling for years." If Ballard was managing TMT for IRA as he and Kanter contend, Ballard would have been required to disclose to Goldman Sachs that TMT and/or IRA were the principal owners of the farmland that Ballard was buying and selling.

The record also shows that Ballard did disclose to Goldman Sachs that he served as the director of an organization called ICM Property Investors. His involvement in this organization was through a "close friend" who controlled the organization. Ballard never submitted such a form to Goldman Sachs with respect to TMT because Ballard owned TMT.

7. <u>Kanter's Letters to the Ballard and Lisle Children</u>

In early February 1990, after the IRS began examining Ballard's, Kanter's, and Lisle's tax returns for the years at issue, Kanter sent letters to Ballard's and Lisle's children

terminating their "consulting arrangement" and stating that "fundamentally no services appear to have been performed for a number of years". Kanter's letters went on to state that Freeman was so preoccupied with his own legal woes during the latter half of the 1980s that he was not managing IRA and the persons issuing the checks were simply "administering tasks".

Upon closer examination, Kanter's letters to the children are remarkable in that they demonstrate Kanter's attempt to rewrite history in the face of an expanding IRS examination. In fact, Kanter's letters were inconsistent with both the record in these cases and earlier explanations Kanter offered for the organization of Carlco, TMT, and BWK.

Recall that IRA liquidated KWJ Corp. in late 1983 and transferred its rights under the Hyatt Corp./KWJ agreement to Carlco, TMT, and BWK in a 45/45/10 percent split as part of an alleged free cashflow asset allocation. Carlco, TMT, and BWK in turn formed KWJ Partnership, which received both the Hyatt Corp. payments and loans from IRA (which were used to fund the payments to Ballard's and Lisle's children). Recall also Kanter's explanation that Carlco, TMT, and BWK were removed from IRA's consolidated group of corporations in 1984 in part to ensure Ballard and Lisle could manage TMT's and Carlco's assets (which included the cash distributions from KWJ Partnership and loans from IRA) without interference from IRA's officers. Consistent

with this explanation, Ballard and Lisle, as TMT's and Carlco's managers, were fully cognizant of the payments that KWJ Partnership was making to their children. Kanter's letters contradict this scenario, are not credible, and represent an 11th-hour attempt by Kanter to recharacterize the payments to Ballard's and Lisle's children as a clerical or administrative error.

Kanter's letters were also inconsistent with the record in these cases to the extent Kanter suggested that no one was managing IRA during the latter half of the 1980s. Although Kanter's letters rang true in the sense that Freeman was not managing IRA (in fact, Freeman never managed IRA), the record in these cases amply demonstrates that someone was in firm control of IRA's affairs. Recall, for example, that in 1987 IRA (1) engaged in a complex transfer of notes with IFI and then sold 10 of those notes for $1 each to MAF, and (2) discounted and then wrote off as bad debts notes due from Ballard and Lisle individually. As had been the case all along, the person firmly in charge of IRA's affairs was Kanter.

H.  Conclusion and Schedule of Income Adjustments

As previously discussed, we have weighed the recommended findings of fact and credibility determinations set forth in the STJ report against the entire record in these cases. On the basis of our review, with particular emphasis on the additional

findings of fact that we have culled from the record in an effort to fully illuminate the transactions in dispute, we reject as manifestly unreasonable the STJ report's acceptance of Kanter's and Ballard's testimony, and Lisle's statement to IRS agents, that they were not participants in a kickback scheme. There is abundant and overwhelming objective evidence of record that the payments from The Five constituted income earned by Kanter, Ballard, and Lisle (and in some instances by Kanter alone) and that income was delivered to Kanter, Ballard, and Lisle by way of a circuitous and well-concealed route through various Kanter-related entities. The objective evidence regarding Kanter's, Ballard's, and Lisle's general conduct and the flow of funds in these cases wholly discredits petitioners' testimony that they were not involved in a kickback scheme. Consequently, we reject petitioners' testimony as inherently improbable and conclude, contrary to the STJ report, that Kanter, Ballard, and Lisle earned income in the form of payments from The Five during the years at issue and failed to report that income on their tax returns.

Kanter arranged to conceal Ballard's and Lisle's roles in the scheme by funneling the payments from The Five to sham entities including IRA, THC, Carlco, TMT, BWK, and FPC Subventure Partnership. Those entities served no legitimate business

purposes, and they were nothing more than the alter egos of their

masters.

The following schedule lists the total amounts of payments

from The Five to IRA during 1977 to 1989 and the portions of

those payments that constitute income properly attributable to

Kanter, Ballard, and Lisle:

| Year | Total payments To IRA[1] | Kanter | Ballard | Lisle |
|------|------|--------|---------|-------|
| 1977 | $54,848 | -- | -- | -- |
| 1978 | 60,739 | $6,074 | $27,333 | $27,333 |
| 1979 | 250,000 | 13,636 | 61,364 | 61,364 |
| 1980 | 1,025,436 | 56,899 | 455,310 | 455,310 |
| 1981 | 1,092,055 | 107,842 | 485,289 | 485,289 |
| 1982 | 1,606,837 | 159,321 | 716,940 | 716,940 |
| 1983 | 967,014 | 95,338 | 429,020 | 429,020 |
| 1984 | 784,524 | 77,089 | 346,899 | 346,899 |
| 1985 | 817,420 | 80,379 | 361,703 | 361,703 |
| 1986 | 673,421 | 65,979 | 296,903 | 296,903 |
| 1987 | 711,839 | 69,821 | 314,191 | 314,191 |
| 1988 | 676,603 | 66,297 | 298,335 | 298,335 |
| 1989 | 944,927 | 93,129 | 419,081 | 419,081 |

[1] The Court is not persuaded that Ross's testimony regarding the manner in which Century valued PMS when it purchased the company in 1974 provides a sound basis for determining the value of PMS stock when IRA purchased PMS shares in 1977 or when IRA sold those PMS shares in 1979. Consequently, we have accounted for the Schnitzer/PMS installment payments to IRA during 1979 to 1989 (see table 7, supra, p. 131) by reducing the total principal payment for each year by $13,636 to reflect the return of the $150,000 that IRA paid for the PMS shares in 1977 (i.e., $150,000/11 years = $13,636 per year).

The following schedule lists the total amounts Schaffel,

Frey, and Eulich/Essex Partnership paid to THC during 1981 to

1989 and the portions of those payments that constitute income properly attributable to Kanter:[123]

| Year | Total payments to THC | Kanter |
|---|---|---|
| 1981 | $80,616 | $80,616 |
| 1982 | 70,538 | 70,538 |
| 1983 | 80,325 | 80,325 |
| 1984 | 822,840 | 595,333 |
| 1985 | 1,514,882 | 1,287,375 |
| 1986 | 1,069,335 | 841,828 |
| 1987 | 132,323 | 132,323 |
| 1988 | 96,188 | 96,188 |
| 1989 | 42,322 | 42,322 |

Issue II.  Whether Kanter and Ballard Are Liable for Additions to Tax for Fraud

OPINION

Having determined the payments from The Five represented income earned by Kanter, Ballard, and Lisle, we must review respondent's determinations that Kanter and Ballard are liable for additions to tax for fraud.

In asserting that a taxpayer is liable for the addition to tax for fraud, the Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year at issue was due to fraud.  Sec. 7454(a); Rule 142(b).  Consequently, the Commissioner must establish (1) an underpayment, and (2) that some part of the underpayment is due

_____

[123]  Kanter's total share of the $2,763,500 in payments that Schaffel remitted to THC during 1984 to 1986 has been reduced to $2,080,980 to account for the $682,520 that we conclude Kanter transferred to Lisle (representing Lisle's share of a portion of the Schaffel payments) by way of FPC Subventure Partnership.

to fraud.  <u>King's Court Mobile Home Park, Inc. v. Commissioner</u>, 98 T.C. 511, 515-516 (1992); <u>Truesdell v. Commissioner</u>, 89 T.C. 1280, 1301 (1987).

Fraud is an intentional wrongdoing by the taxpayer with the specific purpose of evading a tax known or believed to be owing. <u>Stoltzfus v. United States</u>, 398 F.2d 1002, 1004 (3d Cir. 1968); <u>McGee v. Commissioner</u>, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975).  The Commissioner's burden of proving fraud is met if it is shown that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  <u>Stoltzfus v. United States</u>, <u>supra</u> at 1004-1005; <u>Rowlee v. Commissioner</u>, 80 T.C. 1111, 1123 (1983).

The existence of fraud is a question of fact to be resolved from the entire record.  <u>DiLeo v. Commissioner</u>, 96 T.C. 858, 874 (1991), affd. 959 F.2d 16 (2d Cir. 1992); <u>Gajewski v. Commissioner</u>, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).  The taxpayer's entire course of conduct can be indicative of fraud.  <u>Stone v. Commissioner</u>, 56 T.C. 213, 224 (1971).  Because fraud can rarely be established by direct proof of the taxpayer's intention, fraud may be established by circumstantial evidence and reasonable inferences drawn from the record.  <u>DiLeo v. Commissioner</u>, <u>supra</u> at 874-875; <u>Rowlee v. Commissioner</u>, <u>supra</u> at 1123.  However, the

mere suspicion of fraud is insufficient because fraud is not to be inferred or presumed.  Carter v. Campbell, 264 F.2d 930, 935 (5th Cir. 1959).

In Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the U.S. Court of Appeals for the Ninth Circuit set forth a nonexclusive list of circumstantial factors that may give rise to a finding of fraudulent intent. Such "badges of fraud" include:  (1) Understatement of income; (2) maintenance of inadequate records; (3) failure to file income tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; and (6) failure to cooperate with tax authorities.

In addition, substantial understatements of income for successive years are strong evidence of fraudulent intent. Rogers v. Commissioner, 111 F.2d 987, 989 (6th Cir. 1940), affg. 38 B.T.A. 16 (1938); Conforte v. Commissioner, 74 T.C. 1160, 1201 (1980), affd. in part and revd. on another issue 692 F.2d 587 (9th Cir. 1982); Otsuki v. Commissioner, 53 T.C. 96, 107-108 (1969); see also Baumgardner v. Commissioner, 251 F.2d 311, 316 (9th Cir. 1957), affg. T.C. Memo. 1956-112.

A.  Failure To Report Substantial Amounts of Income

Kanter and Ballard both filed tax returns during the years at issue and were fully aware of their obligations to report all of their income and pay Federal income taxes.  However, Kanter

and Ballard failed to report substantial amounts of income for successive years that they earned in the form of payments from The Five.

B. Concealment of the True Nature of the Income and the Identity of the Earners of the Income

Kanter created a complex structure of corporations, partnerships, and trusts (including, among others, IRA, THC, Carlco, TMT, BWK, KWJ Corp., KWJ Partnership, Essex Partnership, Zeus, Zion, IFI, HELO, TACI, and PSAC) to receive, distribute, and conceal the income that Kanter, Ballard, and Lisle earned during the years at issue. Payments from The Five that Kanter, Ballard, and Lisle earned and secretly agreed to share were remitted to IRA and THC or one of their subsidiaries. The payments were commingled with funds from other entities in TACI's accounts and later PSAC's accounts. Large amounts of money were distributed to various entities and individuals, including Kanter, Ballard, and Lisle, through IRA, THC, HELO, and IFI. The distributions were disguised as loans and recorded as receivables. Kanter's use of the various sham entities, and Ballard's complicity in that scheme, made it difficult and sometimes impossible to trace the flow of the money and are substantial evidence of their intent to evade tax.

C. Use of Sham, Conduit, and Nominee Entities

Kanter used sham, conduit, and nominee entities to conceal the income that he and Ballard earned from The Five. As

discussed above, IRA and THC did not serve any legitimate business purpose with regard to the transactions in dispute. Rather than engage in substantial business activities, IRA and THC served as nothing more than conduits and shams to collect and distribute payments that represented income taxable to Kanter and Ballard. Similarly, TMT and BWK were entities created to conceal the true nature of the payments remitted by The Five to Kanter and Ballard. Kanter and Ballard owned and controlled BWK and TMT, respectively. These entities were the repositories of their income. Ballard used IRA, and later TMT, as nominees to receive and hold his income. Likewise, entities such as KWJ Partnership and Essex Partnership were used as conduits solely to conceal the nature of the income and disguise the transfer of funds to Kanter and Ballard and members of their families.

D. Reporting Kanter's and Ballard's Income on IRA's and THC's Tax Returns

Kanter and Ballard reported their income on IRA's tax returns. Kanter also reported some of his income on THC's tax returns. Income was reported on IRA's and THC's returns to create the appearance that those entities earned the income, rather than Kanter and Ballard. Moreover, those corporations paid very little in taxes. Later, Kanter and Ballard reported income that they earned on the Hyatt Corp. transaction and the Eulich/Essex Partnership transaction on the returns of TMT and BWK.

E.  Commingling of Kanter's and Ballard's Income With Funds
    Belonging to Others

Kanter and Ballard commingled their income with funds belonging to others.  Kanter directed and oversaw the commingling of the moneys.  Commingling of the income in TACI's and PSAC's accounts with other unrelated income was designed to conceal the nature of the income and the identities of the true earners of the income.  Kanter plainly attempted to disguise the nature and source of the income by channeling the moneys through conduit entities in an array of transfers over a period of many years.  Obviously, Kanter and Ballard did not want Prudential and others (particularly the IRS) to know about the payments and their failure to report their income.

F.  Phony Loans

Kanter transferred substantial amounts of money from IRA and related entities to himself and Ballard (as well as other entities such as KWJ Partnership) labeled as loans and recorded as receivables in an effort to conceal distributions of the income in question.  Many of these purported loans were not properly documented, and there was little evidence of any meaningful payments of principal or interest.  Kanter later arranged sham sales of some of these receivables for $1, and in other instances the loans were discounted and then written off as bad debts.  Still other IRA holdings were treated as worthless securities.  Similarly, Ballard transferred substantial amounts

from TMT to himself, his wife, Mary Ballard, and his daughter, Melinda Ballard, labeled as loans and stock investments. Most of these purported loans were not properly documented, and there was little evidence of any meaningful payments of principal or interest. We also infer from notations in TMT's books and records that a so-called investment in Melinda Ballard's company was prearranged to be written off as a worthless security the following year. Finally, Kanter received substantial transfers from TACI, labeled as loans, that appear to amount to nothing more than transfers of funds from THC to himself.

## G. False and Misleading Documents

Kanter used false and misleading agreements with Schaffel and Frey to create the appearance that Frey's agreements were with Zeus and THC as opposed to Kanter himself. Similarly, in the Eulich/Essex Partnership transaction Kanter used false and misleading representation and marketing agreements to create the appearance that the partnership would provide services for GHM and MHM when in fact MHM simply provided services for GHM.

## H. Failure To Cooperate During the Examination Process

Kanter made it clear to IRS examination personnel from the beginning that he did not intend to cooperate and he would frame the issues for examination, not the IRS. We are also convinced Kanter directed Gallenberger (an officer of TACI and PSAC) and Weisgal (the trustee of the Bea Ritch Trusts) to withhold

documents from the IRS, or to simply turn the documents over to Kanter. TACI and PSAC had a standing policy of refusing to turn documents over to anyone other than their owner.

Kanter's campaign of obfuscation and delay was particularly evident during summons enforcement proceedings. The District Court, in two separate rulings, concluded Kanter failed to cooperate, acted in bad faith, and allowed documents to be destroyed even after the IRS summonses for those documents had been issued. First, the District Court observed: (1) Weisgal testified that, after receiving a summons to compel production of documents, some summoned documents relating to the Kanters had been turned over to TACI, and some documents were discarded as part of an alleged 3-year record retention policy;[124] and (2) Gallenberger testified that she disposed of some documents related to Kanter after receipt of the IRS summons. United States v. Administration Co., 74 AFTR 2d 94-5252, 94-2 USTC par. 50,479 (N.D. Ill. 1994). In addition, the District Court went on to conclude that Kanter acted in bad faith inasmuch as he first promised to produce the documents sought from TACI, PSAC, THC, and other Kanter-related entities and then abruptly asserted in early February 1994 that the entities in question were third-

---

[124] The alleged record retention policy was, at best, applied inconsistently. In any event, the alleged policy provided no excuse for destroying documents that were the subject of an outstanding IRS summons.

parties over whom he had no control.  Id. at 94-5254, 94-2 USTC par. 50,479, at 85,769.

Less than a month later, the same District Court judge held Gallenberger in contempt for a continuing failure to comply fully with the IRS summonses.  United States v. Administration Co., 74 AFTR 2d 94-5256, 94-2 USTC par. 50,480 (N.D. Ill. 1994). Gallenberger's contempt citation was affirmed on appeal.  See United States v. Administrative Enters., 46 F.3d 670 (7th Cir. 1995).

We infer from all the facts and circumstances that Ballard agreed with Kanter's strategy of obfuscation and delay in a deliberate effort to hinder respondent's efforts in these cases.

I.  Conclusion

In the light of all these factors, we conclude respondent has demonstrated by clear and convincing evidence that Kanter and Ballard filed false and fraudulent tax returns for each of years at issue.  Specifically, we sustain respondent's determinations that (1) Kanter's underpayments for 1978 to 1984 and 1986 to 1989, attributable to payments from The Five, were due to fraud with intent to evade tax, and (2) Ballard's underpayments for 1978 to 1982, 1984, and 1987 to 1989, attributable to payments from The Five, were due to fraud with intent to evade tax.

Consequently, Kanter and Ballard are liable for additions to tax for fraud as asserted in respondent's amended pleadings.[125]

Consistent with the foregoing, we reject Kanter's and Ballard's assertions that the period of limitations governing assessment and collection has expired for some of the years at issue. In short, the period of limitations remains open for each of years at issue pursuant to section 6501(c)(1) which provides that tax may be assessed at any time in the case of a false and fraudulent tax return with the intent to evade tax.

Issue III.  Whether Commitment Fees Paid to Century Industries, Ltd., During 1981 to 1984 and 1986 Are Includable in Kanter's Income (STJ report at 86-92)[126]

FINDINGS OF FACT

*At issue is whether certain entities that claimed to be partners in Century Industries, Ltd. (Century Industries or the partnership) should be disregarded as partners of the partnership for Federal income tax purposes and whether 50 percent of the partnership's income for 1981, 1982, 1983, 1984, and 1986, instead, constitutes income earned by Kanter for those years.*

_____

[125]  Inasmuch as respondent asserted various other additions to tax against Kanter and Ballard strictly as alternatives to respondent's assertion of the fraud additions (which we sustained above with regard to income Kanter and Ballard earned from The Five), we need not consider the alternative additions to tax.

[126]  The remainder of the issues discussed in this report pertain only to the Kanters. Hereinafter, references to petitioners are to the Kanters.

Century Industries was a partnership organized in 1979, and its partners were the Bea Ritch Trusts, Solomon Weisgal (individually and for his own account, rather than as trustee of the Bea Ritch trusts), and Earl Chapman. The 25 Bea Ritch Trusts (collectively), Weisgal, and Chapman each held one-third interests in the partnership. The partnership's objective was to engage in highly leveraged investments in which the partners would contribute relatively minimal amounts of their own capital. The partnership was ultimately unsuccessful in such investments.

In early 1980, the partnership was reconstituted. Chapman withdrew from the partnership, new partners were admitted, and the partnership's investment focus was changed. The reconstituted partnership **purportedly** would engage in investments in which its partners would be required to contribute larger amounts of capital. The new partners included Kanter, four family trusts for the benefit of Weisgal's family members (James Children's Trust, Lawrence Children's Trust, Lee Children's Trust, and Richard Children's Trust), and Atlay Valley Investments General Partnership (Atlay Partnership), another investment partnership composed of irrevocable trusts for the benefit of Mr. Weisgal's family. During 1980 and 1981, the partners in Century Industries, their capital interests, and their initial capital contributions were as follows:

| Partner | Partnership Int. | Capital Contrib. |
|---|---|---|
| Atlay Partnership | 29 percent | $290 |
| Bea Ritch Trusts | 49 percent | 490 |
| James Children's Trust | 5 percent | 50 |
| Lawrence Children's Trust | 5 percent | 50 |
| Lee Children's Trust | 5 percent | 50 |
| Richard Children's Trust | 5 percent | 50 |
| Kanter | 1 percent | 10 |
| Weisgal | 1 percent | 10 |

In 1984, Cypress Lane Investment (a general partnership comprised of 30 irrevocable trusts for the benefit of Weisgal's family) replaced Atlay Partnership as a 29-percent partner in Century Industries.

Century Industries had no office or employees of its own and operated out of Weisgal's accounting firm offices. After 1981, its partners did not make additional capital contributions until sometime in 1986. During 1986 and 1987, its partners made the following additional capital contributions:

| Partner | 1986 Capital Contrib. | 1987 Capital Contrib. |
|---|---|---|
| Bea Ritch Trusts | $29,900 | 490 |
| Cypress Lane Inv. | 17,900 | 31,900 |
| James Children's Trust | 3,000 | 5,500 |
| Lawrence Children's Trust | 3,000 | 5,500 |
| Lee Children's Trust | 3,000 | 5,500 |
| Richard Children's Trust | 3,000 | 5,500 |
| Kanter | 6,100 | 3,600 |
| Weisgal Revocable Trust | 6,100 | 3,600 |

From 1981 through 1986, Century Industries received payments that Kanter contends were "standby commitment fees" to compensate Century Industries for considering various investment proposals.[127]  *From 1981 through 1986, Century Industries received fees from the following entities in the amounts indicated:*

| Payer | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|
| Bayshore Marina | -- | -- | -- | -- | -- | $50,000 |
| Century Capital | -- | $3,000 | -- | -- | -- | -- |
| City & Suburban Distributors | -- | -- | -- | -- | $3,000 | -- |
| Computer Place-ment Services | $13,500 | 7,000 | -- | -- | -- | -- |
| CPS Inv. | -- | -- | $500 | $2,000 | 3,500 | -- |
| Delphi Indus. | -- | -- | -- | -- | 3,000 | -- |
| IRA | 4,000 | 3,000 | -- | -- | 4,000 | -- |
| James Ins. Tr. | -- | -- | 5,000 | -- | -- | -- |
| Ry. Placement Services | -- | -- | 4,500 | -- | -- | -- |
| Satcorp | -- | -- | -- | 75,000 | -- | -- |
| Silite | 17,500 | 7,000 | 18,000 | 13,000 | 11,000 | 12,000 |
| Stockholder | -- | -- | -- | 3,000 | -- | -- |
| TACI | -- | -- | -- | -- | 4,500 | -- |
| THC | -- | -- | 1,000 | -- | -- | -- |
| Waco Capital | -- | -- | -- | -- | 1,000 | -- |
| Zion | -- | -- | 4,000 | -- | -- | -- |
| | 35,500 | 20,000 | 33,000 | 93,000 | 30,000 | 62,000 |

Silite, Inc. (Silite), paid Century Industries periodic retainer fees.  Weisgal, Transcr. 4939-4946, 4962-4965; Exhs. 9235, 9240, 9241; Exh. 9243, at 1, 4; Exh. 9244, at 2, 3; Exh. 9245, at 1, 3.  Kanter and Weisgal performed the analyses of

---

[127]  The recommended finding of fact in the STJ report, at 88, that Century Industries earned standby commitment fees is manifestly unreasonable.  As discussed in detail below, the record shows Kanter and Weisgal earned the fees in question.

investment opportunities for Silite.  Weisgal, Transcr. at 4939-4946; Kanter, Transcr. at 4962-4965.

On February 1, 1984, Century Industries sent an invoice to Satcorp for $100,000 for "Consultation, analysis, & recommendations regarding financial advice and structuring in connection with investment placement opportunities".  Exh. 9243, at 2.  On September 12, 1984, Satcorp and Century Industries (by Weisgal), executed a letter agreement which stated in pertinent part:

> This letter will briefly outline the relationship between Satcorp, Inc. ("Satcorp") and Century Industries, Ltd. ("Century") so as to encompass Burton Kanter and Solomon Weisgal serving as so-called "financial engineers" for Satcorp and its existing operating companies and other projects it may undertake.  The scope of involvement will be principally planning and structuring of transactions for financings for Satcorp, its operating companies and its future projects.  It is intended that Century will consider participating in the actual process of raising financings, subject to fee arrangements to be agreed upon in connection therewith, but will not be routinely responsible for any such activities.
>
> To accommodate the foregoing and the overall relationship as it has been discussed, Century will bill fees in addition to those outlined below for services performed in connection with specific ventures, provided all conflicts are disclosed and the decision with respect to building in such fees has carefully and conscientiously taken into account any impact on successful fund raising.

The specific current engagement will be compensated as follows:

1.  <u>Fees</u>

a)   Century will be guaranteed payment of $100,000 to be paid over a period of 18 months from January 1, 1984; specifically, $25,000 to initiate the engagement (already received), $25,000 90 days thereafter (already received), and the balance to be paid in equal monthly increments over the 12 months commencing July 1, 1984.

b)   In addition, Century will maintain records of the billings and time allocated so that if it "runs over" within the first 12 months, based on usual hourly rates, Century will be paid the difference as billed.

2. <u>Equity</u>

a)   Century will vest to an amount of shares equivalent to 7.5% of the outstanding common stock of Satcorp as computed on December 8, 1983 to be issued ... (during 1984 and 1985).  Whenever possible Century will apply its fees to individual offerings of finance, so as to spread the burden to various projects.

b)   It is to be understood that in the event of death or permanent disability of either Burton Kanter or Solomon Weisgal, at Satcorp's option it may request that the aforementioned shares be redelivered and exchanged for non-voting shares representing in all other respects the same equity interest as represented prior to the exchange.  The purpose of this option is to accommodate Century's desire to maintain a continuing equity interest without being subject to redemption or other call, but at the same time to be certain that Satcorp is completely comfortable with those persons or entities who may succeed to the stockholdings in those circumstances mentioned.

Exh. 9246.

On November 20, 1984, Weisgal sent an invoice on behalf of Century Industries to City & Suburban Distributors, Inc. (C&S), in the amount of $6,000, for special tax and consulting services through October 31, 1984.  Exh. 9244, at 8, 10.  A letter accompanying the invoice stated:

> Burt [Kanter] and I have gotten our thoughts together and reviewed all of our records regarding the time that we have spent from inception of our conversations through October 31, 1984.
>
> The enclosed bill for $6,000 represents the dollar reflection of the time involved.  We have addressed this bill to City & Suburban Distributors, Inc. and I presume that this is the correct entity.
>
> If for some reason you would prefer this charge billed to a different company, please let me know.  [Id.]

On December 24, 1984, Century Industries sent a second letter to C&S describing the work Century Industries performed during May to September 1984 as including overall financial planning, consideration of leverage debt financing, consideration and evaluation of debt financing coupled with additional equity, review and identification of sources of bank financing, conference with lenders, review identification of potential equity sources, and various meetings and updates with Angelo and John Geocaris.  Exh. 9244, at 9.

*From 1983 through 1986, Kanter and Weisgal received the following guaranteed payments from Century Industries:*

| *Year* | *Kanter* | *Weisgal* |
|--------|----------|-----------|
| *1983* | *$2,000* | *$2,000* |
| *1984* | *12,000* | *--* |
| *1985* | *7,500* | *--* |
| *1986* | *6,000* | *6,000* |

*Beginning in about 1987, Century Industries made certain investments that required significant additional capital contributions from its partners. Some of these investments proved to be unsuccessful. Ultimately, in 1988 or 1989, the partnership was dissolved. Its affairs were wound up and its remaining investments with any value were distributed to the partners.*

*Century Industries filed Forms 1065 (U.S. Partnership Returns) for 1980 through 1986* **which demonstrate that Century Industries made only a relatively small number of investments and incurred minimal expenses during that period.** *On these returns, the partnership reported the following items of income and expenses:*

|  | 1980 | 1981 | 1982 | 1983 | 1984 | 1985 | 1986 |
|---|---|---|---|---|---|---|---|
| *Income* | | | | | | | |
| Unspecified | -- | -- | -- | -- | -- | -- | $62,000 |
| Flankin Ltd. | -- | -- | $3,026 | $5,186 | $5,198 | $7,047 | 6,056 |
| Real Est. Loan Assn. | -- | -- | -- | -- | -- | 2,107 | 897 |
| Dividends | -- | $2,526 | -- | -- | -- | -- | -- |
| Interest | -- | 7 | -- | -- | -- | -- | -- |
| Dividends & int. | -- | -- | 3,314 | 2,812 | 6898 | 7113 | 4347 |
| Form 4684 | -- | -- | -- | (4,100) | -- | -- | -- |
| Other income/fees | $1,000 | 35000 | 20,000 | 33,000 | 93,000 | 33,000 | -- |
| Total income | 1,000 | 37,533 | 26,340 | 36,898 | 105,096 | 46,267 | 73,300 |
| *Deductions* | | | | | | | |
| Bank charges | -- | $5 | -- | -- | -- | -- | $613 |
| Legal fees | -- | -- | $625 | -- | -- | $1,000 | -- |
| Admin. services | -- | -- | 3,000 | -- | -- | -- | -- |
| Advertising exp. | -- | -- | 2,652 | -- | -- | -- | -- |
| Guaranteed pmts. | -- | -- | -- | $4,000 | $12,000 | 7,500 | 12,000 |
| Bus. & tax consulting serv. | -- | -- | -- | -- | 12,345 | 7,500 | 25,000 |
| Telephone | -- | -- | -- | -- | 376 | 300 | 5 |
| Copying | -- | -- | -- | -- | 19 | 764 | 10 |
| Messenger service | -- | -- | -- | -- | 15 | 9 | 14 |
| Travel | -- | -- | -- | -- | 2,134 | 726 | -- |
| Printing | -- | -- | -- | -- | 92 | -- | -- |
| Air fare | $30 | -- | -- | -- | 928 | -- | -- |
| Miscellaneous | -- | -- | -- | -- | 330 | 249 | 11 |
| Office services | -- | -- | -- | -- | -- | -- | -- |
| Total Deducs. | 970 | 37,528 | 20,063 | 32,898 | 76,857 | 28,219 | 35,647 |

The $62,000 "unspecified income" shown above for 1986 consisted of fees.

In notices of deficiency issued to the Kanters for 1981 to 1984 and 1986, respondent determined that Century Industries income for those years constituted Kanter's income. **On brief, respondent asserted that for 1981 through 1984 and 1986, Kanter is taxable on 50 percent of the ordinary income reported by**

**Century Industries plus any guaranteed payments he received during those years.  Respondent's Opening Brief at 796.**

*Respondent issued a notice of final partnership administrative adjustment (FPAA) to Century Industries reallocating some of the partnership's 1986 income to Kanter.  No FPAA was issued to Century Industries for 1983 and 1984.  In effect, respondent disregarded all of the other partners in Century Industries except Kanter and Weisgal.*

OPINION

A.  The Parties' Arguments

Petitioners contend:  (1) All of Century Industries' partners during 1981 to 1984 and 1986 should be respected as partners for tax purposes; (2) no additional partnership income should be attributed to Kanter as his taxable income; and (3) the Court lacks jurisdiction to review respondent's determinations for 1983, 1984, and 1986 in the context of these deficiency cases because Century Industries was a partnership subject to the unified partnership administrative and litigation provisions found in subchapter C of chapter 63 of subtitle F of the Internal Revenue Code enacted as part of the Tax Equity and Fiscal Responsibility Tax Act of 1982 (TEFRA), Pub. L. 97-248, 96 Stat. 324.

Respondent asserts that, for tax purposes, Kanter and Weisgal are the only two persons who should be recognized as

partners in Century Industries and each should be treated as owning a 50-percent interest. Respondent asserts that, until 1987, the other purported partners' interests in Century Industries were shams, as the ostensible partnership between them and Kanter and Weisgal existed only to shift income Kanter and Weisgal earned, i.e., the fees paid to Century Industries, to their family trusts--the other purported partners.

Respondent further maintains the Court has subject matter jurisdiction over the 1983, 1984, and 1986 adjustments to Kanter's taxable income from Century Industries because the only persons to be recognized as Century Industries partners for tax purposes are Kanter and Weisgal, and, therefore, the partnership is a small partnership specifically excepted from the TEFRA partnership provisions.

B. TEFRA Partnership Provisions

The TEFRA provisions generally are applicable to specified partnerships and other entities filing partnership returns for taxable years beginning after September 4, 1982. TEFRA sec. 407(a)(1), (3), 96 Stat. 670. The TEFRA provisions were designed to provide unified administrative and judicial procedures for the determination and review of partnership items. A "partnership item" is defined to include, among other things, the partnership's aggregate and each partner's share of items of income, gain, loss, deduction, or credit of the partnership.

Sec. 6231(a)(3); sec. 301.6231(a)(3)-(1)(a)(1)(i), Proced. &
Admin. Regs.

Section 6231(a)(1)(A) defines the term "partnership" and
identifies the partnerships that are subject to the TEFRA
partnership provisions.  Section 6231(a)(1)(B), in general,
excludes "small partnerships" from the section 6231(a)(1)(A)
definition of "partnership".[128]  A small partnership generally is
a partnership (1) that has 10 or fewer partners, (2) all of whose
partners are either estates or natural persons who are U.S.
citizens or resident aliens, and (3) where each partner's share
of each partnership item is the same as the partner's share of
every other partnership item.  Sec. 6231(a)(1)(B)(i); sec.
301.6231(a)(1)-1T(a)(1) through (3), Temporary. Proced. & Admin.
Regs., 52 Fed. Reg. 6789 (Mar. 5, 1987).  A determination of
whether a partnership qualifies as a small partnership is to be
made for each of the partnership's taxable years.  Sec.
301.6231(a)(1)-1T(a)(4), Temporary. Proced. & Admin. Regs., 52
Fed. Reg. 6789 (Mar. 5, 1987).

C.  The STJ Report

Applying the test articulated in Commissioner v. Culbertson,
337 U.S. 733, 742 (1949), the STJ report, at 103-105, recommended
holding that each of the named partners of Century Industries

---

[128]  A small partnership may elect to have the TEFRA
partnership provisions apply.  Sec. 6231(a)(1)(B)(ii).  However,
the parties agree Century Industries made no such election for
1983 through 1986.

formed a good faith intent to conduct an enterprise with a business purpose. The STJ report implicitly accepted Kanter's testimony that Century Industries (as opposed to Kanter and Weisgal) earned the commitment fees in exchange for the partnership's evaluating and considering whether it would invest in various business opportunities presented to it.

D. Analysis

In Commissioner v. Culbertson, supra, the Supreme Court held that to be treated as a partner in a partnership for Federal income tax purposes, a person must have contributed either capital or services to the partnership. Id. at 738-740. However, in Culbertson, the Court declined to impose a rigid standard for determining partner status and instead held the governing test is "whether, considering all the facts * * * the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Id. at 742.

After Culbertson, Congress enacted statutory provisions to address the recognition of partners in family partnerships in which capital is a material income-producing factor. Specifically, section 704(e)(1) provides, as to partnerships in which capital is a material income-producing factor, that a person owning a capital interest in such a partnership must be recognized as a partner, whether that person's capital interest

was acquired by purchase or gift.  However, if appropriate, partnership income (otherwise allocable to the donee of a partnership interest) can be reallocated to ensure that the donor of a partnership interest receives reasonable compensation for services the donor renders to the partnership.  Sec. 704(e)(2); sec. 1.704-1(e)(3), Income Tax Regs.  For purposes of section 704(e)(1), the determination of whether capital is a material income-producing factor must be made with reference to all of the facts presented in the particular case.[129]

As discussed in greater detail below, we agree with respondent that, other than Kanter and Weisgal, Century Industries' purported partners are not to be recognized as partners during the period 1981 to 1986 because they did not intend to conduct a business enterprise.  The contrary recommended holding in the STJ report was manifestly unreasonable.  Inasmuch as Kanter and Weisgal were the only partners of Century Industries recognizable for Federal income

---

[129]  In general, capital is considered a material income-producing factor if a substantial portion of the gross income of the partnership's business is attributable to the use of capital.  Further, capital will not usually be considered a material income-producing factor where the income of the business consists principally of fees, commissions, or compensation for personal services performed by the partnership's members or employees.  On the other hand, capital is ordinarily a material income-producing factor if operation of the business requires substantial inventories or substantial investment in plant, machinery, or other equipment.  Carriage Square, Inc. v. Commissioner, 69 T.C. 119, 126-127 (1977); sec. 1.704-1(e)(1)(iv), Income Tax Regs.

tax purposes, and Century Industries did not file an election under section 6231(a)(1)(B)(ii) to have the exception for small partnerships not apply, it follows that Century Industries was a small partnership, within the meaning of section 6231(a)(1)(B), to which the TEFRA partnership procedures do not apply. Consequently, we hold the Court has jurisdiction in these deficiency cases to determine whether half of the payments to Century Industries during 1983, 1984, and 1986 represent income earned by Kanter.

The record shows that, other than Kanter and Weisgal, Century Industries' purported partners rendered no services and contributed only insignificant amounts of capital to the partnership during the years at issue. Moreover, capital was not a material income-producing factor for Century Industries during 1981 to 1986. No funds of any significance were collected from the alleged partners until 1986, and most of Century Industries' income during the period 1981 to 1986 consisted of fees and commissions. Although Kanter asserted that the partnership was formed as an investment vehicle, the partnership did not make any significant investments during the period 1981 to 1986. During the same period, Kanter and Weisgal provided professional services for Silite, Satcorp, C&S, and others and arranged for the payments for those services to be remitted to Century Industries. Thus, insofar as Century Industries is respected as

a partnership for the years in question, the partnership was limited to Kanter and Weisgal, and, therefore, Kanter is taxable on a one-half distributive share of Century Industries' income.

Petitioners aver that Century Industries earned the fees in question as compensation for evaluating whether it would make certain investments. There is no direct evidence to support this assertion. To the contrary, the objective evidence of record demonstrates that the fees paid to Century Industries represented compensation to Kanter and Weisgal for services they provided to the payors, and those services were unrelated to any potential investment by Century Industries. For example, a September 12, 1984, letter from Century Industries to Satcorp stated (1) Kanter and Weisgal would serve as so-called financial engineers for Satcorp and Kanter and Weisgal would be principally involved in planning and structuring transactions for financing for Satcorp, its operating companies, and its future projects, and (2) Century Industries would consider participating in the actual process of obtaining financing, but it "will not be routinely responsible for any such activities." Similarly, letters from Weisgal to C&S in late 1984 revealed that Century Industries billed C&S for services provided by Kanter and Weisgal including financial planning, consideration of leverage debt financing, consideration and evaluation of debt financing coupled with additional equity, review and identification of sources of bank financing,

conference with lenders, review identification of potential equity sources, and various meetings and updates with Angelo and John Geocaris.

In sum, the record shows that Kanter and Weisgal were billing C&S at some sort of hourly rate, the services provided to Satcorp and C&S related to an evaluation of various forms and sources of debt financing those companies might pursue, and there was no mention in these letters that Century Industries was considering investing its own funds in any of the enterprises.

Weighing the overwhelming objective evidence summarized above against Kanter's and Weisgal's testimony, we conclude the testimony was inherently implausible and not credible, and the STJ report was manifestly unreasonable in accepting that testimony in the light of the documentary record in these cases. We hold that one-half of Century Industries income during 1981 to 1984 and 1986 is income taxable to Kanter for those years.

Issue IV.   Whether Kanter Received Unreported Income From Hi-
            Chicago Trust During 1981 to 1983 (STJ report at 106-
            111)[130]

Respondent determined that payments of $42,720, $19,247, and $109,399 Hi-Chicago Trust made to THC during 1981, 1982, and 1983, respectively, constituted income earned by Kanter.  The parties filed with the Court a stipulation of settled issues in which Kanter conceded the adjustment for the taxable year 1981.  The parties disagree whether the payments Hi-Chicago Trust made to THC during 1982 and 1983 represent Kanter's income.

FINDINGS OF FACT

*Hi-Chicago Trust was established in 1972.  The trust's beneficiaries included members of Hyman Federman's family.  Federman is a friend of Kanter.  Neither Kanter nor Kanter's family are or have been beneficiaries of the trust.*

*From Hi-Chicago Trust's inception in 1972 through at least 1989, Kanter was trustee for the trust.  The trust instrument*

_____

[130]   The STJ report recommended holding that respondent is barred from making any determination concerning the taxable year 1983 on account of the expiration of the period of limitations governing assessment and collection for that year.  As previously discussed, we determined that Kanter's income tax returns for the years at issue were fraudulent, and, therefore, the period of limitations remains open pursuant to sec. 6501(c)(1).

The foregoing aside, the Court's disposition of this issue represents in large measure a wholesale adoption of the recommended findings of fact and conclusions of law set forth in the STJ report.

grants to the trustee broad powers with respect to making investments on the trust's behalf.

At the time of the trust's creation, Kanter, Federman, and the trust's beneficiaries orally agreed Kanter or Kanter's designee generally would have: (1) The right to receive payment of an amount equal to 10 percent of any gains the trust realized upon the sale or disposition of a trust investment, and (2) an option to obtain from the trust a 10-percent portion of any trust investment property upon payment to the trust of 10 percent of the trust's cost for that investment property. In the event the foregoing option was exercised, the trust would distribute in-kind to Kanter or Kanter's designee a 10-percent portion of that property. These payment obligations and option rights were to last as long as the trust remained in existence. Pursuant to the above arrangement between Kanter, Federman, and the trust's beneficiaries, during 1980 through 1983, Hi-Chicago Trust paid THCthe following amounts on or about the dates indicated:

| Date | Payment |
|------|---------|
| 12/16/80 | $80,000 |
| 8/11/81 | 33,925 |
| 10/23/81 | 8,795 |
| 10/13/82 | [1]19,247 |
| 2/18/83 | 50,000 |
| 3/15/83 | 22,224 |
| 5/11/83 | 6,199 |
| 9/14/83 | 1,227 |
| 9/14/83 | 29,749 |

<sup>1</sup> **The $12,711 amount listed in the STJ report is erroneous. See Exh. 9123.**

*Hi-Chicago Trust, on its income tax returns for fiscal years ending February 28, 1981, through February 28, 1984, claimed deductions with respect to the above payments to THC. On the trust's return for fiscal year ending February 28, 1981, the payment to THC was characterized as "fiduciary fees". On the trust's return for the fiscal year ending February 28, 1982, the payments to THC were characterized as "participation fees". On the trust's returns for its fiscal years ending February 28, 1983, and February 28, 1984, the payments to THC were claimed, respectively, as "commissions" and "commissions expenses". The trust claimed no deductions for fiduciary fees on its 1982, 1983, and 1984 fiscal year returns. Kanter, as the trust's trustee, signed the trust's 1981, 1982, 1983, and 1984 fiscal year returns.*

OPINION

A.   The Assignment of Income Doctrine

In United States v. Basye, 410 U.S. at 450, the Supreme Court reiterated the longstanding principle that income is taxed to the person who earns it, stating:  "The principle of Lucas v. Earl [281 U.S. at 115], that he who earns income may not avoid taxation through anticipatory arrangements no matter how clever or subtle, has been repeatedly invoked by this Court and stands

today as a cornerstone of our graduated income tax system."  A
more recent expression by the Supreme Court of the same principle
appears in Commissioner v. Banks, 543 U.S. 426 (2005).

B.  The Parties' Arguments

Petitioners contend the payments THC received from Hi-
Chicago Trust are not taxable to Kanter under the assignment of
income doctrine.  Petitioners argue Kanter held a property
interest with respect to the trust and he transferred that
property interest to THC well before the years at issue.
Petitioners also deny the payments THC received from the trust
were compensation for Kanter's personal services.

Respondent, on the other hand, contends that under the
assignment of income doctrine, the payments were taxable
compensation for Kanter's personal services.

C.  Analysis

Whether the payments to THC are income to Kanter turns on
whether the payments were compensation for Kanter's personal
services.  Kanter testified that, pursuant to the 1972
arrangement among himself, Federman, and the trust beneficiaries,
Kanter was granted a "carried interest" as to Hi-Chicago Trust's
investment gains and investment properties.  Kanter claimed this
"carried interest" arrangement was totally independent of his
serving as Hi-Chicago's trustee and the payments to THC were not
compensatory.  Kanter added that, at some point during the 1970s,

he had transferred his "carried interest" in Hi-Chicago Trust to THC.

Kanter's testimony on this point is self-serving and unconvincing. In effect, petitioners assert Federman and the trust beneficiaries, in agreeing to the 1972 arrangement, made a "gift" to Kanter. However, the Court does not believe Federman and the trust beneficiaries were acting out of a "detached and disinterested generosity" to Kanter. See Commissioner v. Duberstein, 363 U.S. 278, 285-286 (1960). Undoubtedly Federman and the trust beneficiaries were eager to have Kanter serve as trustee and manage the trust's investments inasmuch as Kanter had extensive business contacts and he offered the promise of lucrative returns on the trust's investments. Such profitable trust investments could greatly benefit the trust's beneficiaries. The "carried interest" provided a direct financial incentive to Kanter, as trustee and manager, to seek out and make profitable investments on behalf of Hi-Chicago Trust.[131]

---

[131] Petitioners offered no testimony from Federman or the trust beneficiaries. Nor did petitioners present any evidence as to whether a gift tax return was filed with respect to the granting of the "carried interest" to Kanter in the early 1970s. Petitioners' failure to offer such evidence leads the Court to conclude this evidence would have been harmful to petitioners' case. See Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).

In addition, as respondent points out, the compensatory nature of the arrangement is confirmed by the trust's tax treatment of the payments to THC. The 1981 payment the trust made to THC was deducted as a trustee's fee, and the 1982 payment was specifically characterized on the trust's return as a "commission". Indeed, Kanter, as trustee, signed all the trust's returns. Although Kanter, in his testimony, denied that the trust's payments were compensation to him, he did not describe what, if any, specific services THC had performed in exchange for the trust's payments. Kanter also offered no evidence regarding the terms and conditions of his purported assignment of the "carried interest" to THC.

The Court concludes the payments from Hi-Chicago Trust to THC represented compensation to Kanter for his personal services, and, as such, those payments are includable in Kanter's taxable income for 1982 and 1983 under the assignment of income doctrine.[132]

---

[132] On brief, petitioners argue that, even if the arrangement was compensatory, Kanter realized taxable income only in 1972, at the time he received the "carried interest", not in 1982. This argument was not timely raised and, in any event, is not persuasive.

Issue V.   Whether Kanter Is Taxable on Income Attributed to
           the Bea Ritch Trusts for 1986 and 1987 (STJ report at
           111-121)[133]

FINDINGS OF FACT

A.   The Bea Ritch Trusts

*As noted earlier, the Bea Ritch Trusts consist of 25
separate trusts, established on or about January 1, 1969, for the
benefit of Kanter, Kanter's family, and other relatives of
Kanter.[134]  Initially, Kanter was a beneficiary of each of the 25
trusts.  Since about 1969, Weisgal has been the trustee for each
of the 25 trusts.*

*In the common trust instrument, dated January 1, 1969, that
established each of the 25 trusts, Bea Ritch (Kanter's mother)
was identified as the trusts' settlor.  She purportedly funded
each trust with a corpus of $100.*  **There is no evidence Bea Ritch
actually contributed $100 each to the trusts or that she made any
subsequent contributions to the trusts.**  *The common trust
instrument granted the trustee (who has always been Weisgal) an
extremely broad sprinkle power.  In addition, Kanter was given a*

---

[133]  As discussed below, although this issue concerns
Kanter's tax liability for 1986 and 1987, Kanter did not appeal
the decision entered in his case at docket No. 24002-91 on Sept.
24, 2001, concerning his liability for the taxable year 1987, and
that decision is now final.  See secs. 7481(a)(1), 7483.  Because
the operative facts are largely the same for both 1986 and 1987,
we nevertheless shall speak to both years.

[134]  See app. 17 to this report.

*power of appointment with respect to each trust.  In this*

*connection, the trust instrument provided, in pertinent part:*

> *3.1. <u>Income and Principal</u>.  The Trustee is hereby authorized to distribute all or as much of the net income or principal or both of a separate trust to the beneficiary or to one or more of the beneficiaries of such trust as the Trustee deems to be in the best interests of said beneficiary or beneficiaries.*

> *3.2. <u>Limited Powers of Appointment</u>.  The Grantor's son may, during his lifetime and upon his death, appoint all or any part of the trust estate of each separate trust of which he shall be a beneficiary to or for the benefit of any person, persons, or charitable organization *  *  **

**Kanter asserted that, by January 20, 1977, he had renounced all beneficial interests in the Bea Ritch Trusts.**

**At some unknown point before 1987, 60 trusts (the various JSK Trusts) were added as beneficiaries of the Bea Ritch Trusts. Exhs. 135, 9187, 9269, 9270, 9271.  The original and additional beneficiaries of each of the Bea Ritch Trusts are set forth in detail in appendix 17.  Kanter was the trustee for each of the 60 additional trusts which became the beneficiaries of the Bea Ritch Trusts.  Exhs. 9187, 9269, 9270, 9271.**

**No evidence was introduced at trial as to terms of, or the identity of the beneficiaries of, the 60 additional trusts that became beneficiaries of the Bea Ritch Trusts.  No evidence was introduced at trial as to how the 60 trusts were appointed beneficiaries of the Bea Ritch Trusts.**

As of January 1, 1987, the Bea Ritch Trusts possessed substantial assets and financial net worth. Since their inception, each of the 25 trusts filed Federal income tax returns for the fiscal year ending September 30. On their returns covering the period 1969 to 1986, the trusts, collectively, reported substantial income, deductions, and losses from numerous investments. These investments included the trusts' ownership of all of IRA's outstanding stock, their ownership of substantial stock interests in THC, and their acquisition in 1973 of a collective 18-percent interest in the Oyster Bay Associates Partnership that invested in a cable television venture.

B. Oyster Bay Associates Partnership

Prior to the 1970s, Kanter initiated a practice at his law firm, Levenfeld and Kanter (Levenfeld/Kanter), under which the law firm's partners, their family members, and/or their family entities were offered the opportunity to participate in various investment opportunities that came to the attention of Kanter and other members of the firm. Participation in these investments was on a voluntary and individual basis. A partner (or that partner's family members or family entities) was allowed to subscribe to, and obtain a maximum percentage ownership interest in, the investment equal to that partner's law firm partnership percentage interest. In the event any partner decided either (1) not to participate, or (2) not to invest up to the initial

*maximum ownership interest amounts for that partner, then the unsubscribed portion of the investment was available to other partners desiring an increased investment. By investing and taking part in a particular investment opportunity, the partners were acting individually, and not as a law firm. They and/or their families made such investments on their own behalf and were not investing on the law firm's behalf. Pursuant to this practice, Kanter and the Bea Ritch trusts invested, during the 1970s, in a number of investment opportunities that came to the attention of Kanter and the law firm's other partners.*

On September 1, 1973, a number of Levenfeld/Kanter's partners joined in forming a partnership known as Oyster Bay Associates (OBA). Statland Exh. 2; Statland, Baskes Transcr. on 5/27/87 (PM) (hereinafter Baskes Transcr.) at 6-13. OBA's partners included Levenfeld/Kanter partners, entities owned by Levenfeld/Kanter partners, or members of their families. Id. Each Levenfeld/Kanter partner or his family entity that became a partner of OBA shared in the profits and losses of OBA in the same percentage in which the partner shared in the profits and losses of Levenfeld/Kanter in 1973. Baskes Transcr. at 12-13. The partners contributed to OBA total capital of $100,000. Statland Exh. 14. During 1974, OBA's partners received

distributions greater than their 1973 capital contributions to OBA. Statland Exh. 14.

Kanter chose to participate in OBA. Statland Exh. 2; Baskes Transcr. at 7-13. Kanter could have participated personally in OBA but designated the Bea Ritch Trusts to participate in OBA up to his 18-percent interest in Levenfeld/Kanter. Id. The Bea Ritch Trusts acquired an 18-percent partnership interest in OBA and contributed $18,000 to OBA. Statland Exhs. 2, 14. During 1974, the Bea Ritch Trusts received distributions from OBA greater than the capital contributions of $18,000 they made to the partnership in 1973. Statland Exh. 14.

On September 1, 1973 (the same day OBA was formed), an Illinois general partnership, Long Island Cable Communications Development Co. (Long Island Cable), was formed. Statland Exh. 2B. Long Island Cable's partners included class A partners and one class B partner, OBA. Id. The Long Island Cable partnership agreement stated the partnership was formed to negotiate for the purchase of certain existing franchise rights and equipment collectively constituting a cable television system in Nassau County, New York, and thereafter to operate those franchise rights by the construction of additional cable communication facilities and marketing those facilities in New York and/or Illinois. Id.

Long Island Cable's class A partners, their percentage interests, and their capital contributions were as follows:

| Partner | Percentage | Capital Contributed |
|---|---|---|
| Charles F. Dolan | 60 | $100,000 |
| Steven Miller | 25 | 40,000 |
| Peter Strauss | 15 | 25,000 |
| Total | 100 | 165,000 |

Id. at 7.

Long Island Cable's partnership agreement provided that OBA (the class B partner) agreed to contribute or secure additional partners to contribute all additional cash required to advance the business of Long Island Cable. Id. at 2. The Long Island Cable partnership agreement also provided that the profits and losses of Long Island Cable were to be shared by the class A partners in their respective partnership percentage interests until January 1, 1977, or the first date the class B partner, OBA, was called upon to contribute capital to Long Island Cable, whichever date occurred earlier, and thereafter the profits and losses were to be shared seven-eighths by the class A partners and one-eighth by the class B partner, OBA. Id. at 2-3.

On January 25, 1974, a New York limited partnership, Long Island Cable Communications Development Co. (LICCDC), was formed. Statland Exh. 3A. LICCDC's general partners were Communications Development Long Island Corp., a New York corporation (CDLIC),

Communications Management Corp., a Delaware corporation (CMC), and Charles F. Dolan (Dolan). Id. at 1-2. OBA owned all of the stock of CMC. Exh. 7319 (next to last page). Kanter was the president and Baskes was the vice president of CMC. Id.

LICCDC's limited partners included class A and class B participants. Statland Exh. 3A, at 4. The class A participants consisted of various persons who contributed to the partnership cash of $1,015,000 and $485,000 in 1974 and 1975, respectively. Statland Exh. 3, at 3-4. The class B participants consisted of OBA and Eagle Ventures, Inc. (EV). Id. at 4.

The LICCDC partnership agreement provided that LICCDC was formed to carry on the business of constructing, owning, altering, repairing, financing, operating, promoting, and otherwise exploiting one or more cable television systems in Nassau and Suffolk Counties in the State of New York. Statland Exh. 3A, at 2. The LICCDC partnership agreement stated:

> Any additional cash required to complete the equity portion of the 450 mile addition of the Oyster Bay system which cannot be borrowed by the Partnership shall be contributed half by the General Partners and half by the Class B Participants, provided, however, that neither the General Partner nor the Class B Participants shall be required to make capital contributions after June 30, 1976. [Id. at 4-5.]

Article 6.4 of the LICCDC partnership agreement stated: "payment from the General Partner or from the Class B Participants is due

and payable within forty-five (45) days of any call therefor by the General Partner". Id. at 5. The General Partner, as defined in the partnership agreement, included Dolan, CDLIC, and CMC. Id. at 22-24; Exh. 7319 (next to last page).

The LICCDC partnership agreement provided that profits and losses would be shared as follows: 99 percent by the class A participants and 1 percent by Dolan until January 1, 1977; if payout had not occurred by January 1, 1977, then 5.5 percent to Dolan and CDLIC, 83.5 percent to class A participants, and 11 percent to class B participants, respectively, until payout occurred; and after payout (or after January 1, 1977, if it had occurred by then, 64 percent to Dolan and CDLIC, 1 percent to CMC, 22.5 percent to class A participants, and 12.5 percent to class B participants, respectively. Statland Exh. 3A, at 6-7. Payout was defined to occur on the date on which the cumulative cashflow, which was to have been distributed to the partners since the inception of the partnership, equaled or exceeded $1,500,000. Id. at 7.

Class C and D interests in LICCDC were created by an amendment to the LICCDC partnership agreement on January 1, 1975. Statland Exh. 4. On the same day, Dolan and OBA formed the Hempstead-Babylon Partnership (HB) to acquire the class C and D interests. Statland Exh. 5. Within 10 days, on January 10,

1975, the class C interests were sold to Nassau/Suffolk Cablevision Investors for $4,500,000. Statland Exh. 5B.

Levenfeld/Kanter's law firm partners sometimes raised capital for investments and businesses owned by the firm's clients. Statland Exh. 23. Kanter and other Levenfeld/Kanter partners participating in OBA solicited and obtained from various investors the funds OBA promised to contribute to LICCDC. Kanter, Transcr. at 4591, 4681-4684; Exhs. 7312, 7313, 7315-7318; Statland Exhs. 6, 22-24, 26; Statland Exh. 53 (Dolan Deposition), at 69-71, 129, 130, 138, 165, 179, 194; Baskes Transcr. at 37-41. Kanter personally solicited investors for LICCDC including, but not limited to, Genesis Ventures and Hugh Hefner. Exhs. 7310, 7311; Kanter, Transcr. at 4683-4684. As a result of the funds raised by Kanter and other Levenfeld/Kanter partners for LICCDC, OBA never contributed more than $2,000 in cash or property to LICCDC. Statland Exhs. 12, 16-19; Baskes Transcr. at 33-34.

In exchange for the funds Kanter and other Levenfeld/Kanter partners raised for LICCDC, OBA received its interest in LICCDC and additional interests in LICCDC through additional partnerships including HB, Bergen-Westchester (BW), and Yorkshire Partners (YP) for which OBA paid no cash or other property. Statland Exhs. 5, 10; Exh. 7307; Statland Exhs. 12, 16-19; Baskes Transcr. at 33-34; Statland Exh. 53 (Dolan Deposition), at 71.

As of June 13, 1978, LICCDC changed its name to Cablevision Systems Development Co. (Cablevision). Statland, Exh. 20.

*In about 1984, one of Kanter's former law partners, Donald Statland, commenced an action in Illinois State court against Kanter and other Levenfeld/Kanter partners in an action captioned Statland v. Levenfeld, et al., No. 84 CH 6494 (the Statland case), concerning their involvement in Cablevision. Statland alleged, among other things, that the Levenfeld/Kanter partners, in substantial part, had obtained their and/or their families' Oyster Bay Associates partnership interests in exchange for the law firm's services and the law partners' efforts to recruit unrelated, third-party investors. Statland claimed he was entitled to a share of the Oyster Bay Associates partnership interests because those partnership interests represented law firm partnership income. Ultimately, the Illinois State court ruled against Statland and held, among other things, that Statland was not entitled to a share of the Oyster Bay Associates partnership interests.*

The Bea Ritch Trusts' tax returns for the fiscal year ended September 30, 1987, included aggregate net long-term capital gains from the HB, BW, and YB partnerships of $1,143,248, $274,660 and $615,460, respectively. Exh 9186. HB, BW, and YP recognized these capital gains when they sold (during 1986)

interests in LICCDC/Cablevision.  Exhs. 9186, HB, BW and YP Schedules K-1; 7307.  As discussed above, the Bea Ritch Trusts acquired their HB, BW, and YP partnership interests indirectly through their partnership interests in OBA.  Exh. 9186, HB, BW and YP Schedules K-1.

*Over the years, the Bea Ritch Trusts made substantial loans to Kanter.*  TACI's general ledger reflects that Kanter borrowed $150,000 from the Bea Ritch Trusts during 1986 and repaid $10,000 to the trusts during that year.  Exh. 9110 (ledger tab).  *As of January l, 1987, Kanter owed a total of $287,030 to the Bea Ritch Trusts.[135]  As of January 1, 1989, Kanter owed the trusts $1,311,430 as a result of additional loans from the trusts.*  Kanter also borrowed substantial sums from IRA and THC during the period 1987 to 1989.  Exhs. 9110 (TACI ledger for 1986), 9111 (Kanter ledger for 1987, Bates No. 000106), 9114.

*Respondent determined in the notice of deficiency issued to the Kanters for 1987 that the Bea Ritch Trusts were Kanter's grantor trusts under section 671.  Respondent further determined that, as such, all or portions of the following items constituted taxable income, losses, or deductions of Kanter: (1) $1,094,896*

---

[135]  **The foregoing suggests that, as of Jan. 1, 1986, Kanter owed approximately $147,000 to the Bea Ritch Trusts.  Exhs. 9110 (TACI ledger for 1986), 9111 (Kanter ledger for 1987, Bates No. 000106).**

*of the trusts' gross receipts; (2) $295,298 of the trusts'*

*interest income; (3) dividend income of $325; (4) passive*

*activity partnership losses totaling $261,040; (5) $3,094,058 of*

*net capital gain income;[136] and (6) certain investment interest*

*expenses.*

OPINION

A. <u>Grantor Trust Provisions of Sections 671 Through 678</u>

Section 671 provides that if the grantor or another person

is treated as the owner of all or a portion of a trust under

sections 672 through 678, that person must include in income all

---

[136] The STJ report, at 115 note 49, recommended that respondent should not be permitted to argue on brief that $2,033,368 of this adjustment represented long-term capital gain realized by the Bea Ritch Trusts in 1986 (as opposed to 1987) attributable to investments in Oyster Bay Associates Partnership (OBA). We reject the recommendation in the STJ report that respondent's assertion on this point represented a "new matter" not properly before the Court. A review of the record reveals (1) Kanter's tax liability for 1986 is at issue at docket No. 26251-90, (2) Kanter was not surprised or prejudiced with regard to the matter because his counsel elicited testimony from Gallenberger that the income was recognized in 1986 (Gallenberger, Transcr. at 4483-4485); (3) respondent promptly made an oral motion to conform the pleadings to the proof and respondent's motion apparently was granted (Transcr. at 4495-4500), (4) Kanter did not identify any evidence which he was prevented from introducing as a result of respondent's motion, and (5) respondent's assertion that the item is taxable to Kanter in 1986 is not inconsistent with the original determination that the Bea Ritch Trusts were Kanter's grantor trusts, it did not require new evidence, and it merely reflected a good-faith error in the timing of when specific income was earned. Consistent with this Court's holding in <u>Achiro v. Commissioner</u>, 77 T.C. 881, 890 (1981), respondent's oral motion to amend the pleadings will be granted, and we decline to shift to respondent the burden of proof on this point.

items of income, deductions, and credits attributable to the portion of the trust of which the person is deemed the owner. Sections 672 through 678 prescribe a number of detailed rules with respect to various circumstances under which a grantor or other person will be deemed the owner of all or a portion of a trust. For example, section 674(a) generally provides a grantor will be treated as the owner of any portion of a trust whose income, without the approval of an adverse party, is subject to a power of disposition held by the grantor or a nonadverse party. In still another instance, section 675(3) provides a grantor will be treated as the owner of any portion of a trust in respect of which the grantor has directly or indirectly borrowed the corpus or income of the trust, where the grantor has not completely repaid the loan, including interest, before the beginning of the taxable year. However, section 675(3) does not apply to a loan from the trust bearing an adequate interest rate and having adequate security, if the loan is made by an independent trustee to the grantor.

In applying the grantor trust rules described above, the principle of substance over form is particularly applicable considering the potential for manipulation of trusts. See Zmuda v. Commissioner, 79 T.C. 714 (1982), affd. 731 F.2d 1417 (9th Cir. 1984); Lazarus v. Commissioner, 58 T.C. 854, 864 (1972), affd. 513 F.2d 824 (9th Cir. 1975). The grantor of a trust may

be the person who actually funded the trust as opposed to the person named as the grantor in the trust instrument.  United States v. Buttorff, 761 F.2d 1056, 1060-1061 (5th Cir. 1985); Schulz v. Commissioner, 686 F.2d 490, 496 (7th Cir. 1982), affg. T.C. Memo. 1980-568.  In Schulz, for example, the taxpayer's wife was considered the grantor of a family trust because the conveyance of the wife's assets to her husband (which were used to fund the trust) was disregarded.

B.  The Parties' Arguments

Petitioners contend the Bea Ritch Trusts were not Kanter's grantor trusts during 1986 or 1987.  Petitioners assert Kanter's mother, not Kanter, was the trusts' nominal and true settlor. Although the 25 trusts made a number of profitable investments attributable to Kanter's advice and recommendations to Weisgal (the trusts' trustee), petitioners maintain Weisgal made all final investment decisions for the trusts.

Respondent, on the other hand, advances a number of arguments in contending the 1986 and 1987 adjustments to Kanter's income should be sustained.  Respondent contends Kanter is the true settlor of the Bea Ritch Trusts as evidenced by the substantial amounts he transferred to or for the benefit of the trusts over the years including (1) his share of payments from The Five to IRA and THC (discussed supra, Issue I) in which the Bea Ritch Trusts held substantial stock interests), (2) Kanter's

share of fees paid to Century Industries during 1981 to 1984 and 1986 (discussed supra, Issue III), with regard to which the trusts ostensibly held a 49-percent partnership interest, (3) the fees Kanter earned during 1981 to 1983 from Hi-Chicago Trust which Kanter attempted to assign to THC (discussed supra Issue IV) in which the trusts held substantial stock interests, and (4) the 18-percent partnership interest the trusts acquired in OBA. Respondent also asserts that sections 674(a) and 675(3) apply under the facts presented so as to attribute to Kanter all of the trusts' income for 1986 and 1987.

C.  The STJ Report

The STJ report, at 119-121, recommended holding (1) Kanter had not transferred to the Bea Ritch Trusts substantial amounts of income he earned from providing services to others, and (2) Kanter was not the "true settlor" of the Bea Ritch Trusts.  The STJ report recommended accepting Kanter's testimony in which he denied he was paid anything for his assistance in bringing in unrelated investors to the Cablevision project.

As discussed below, the objective evidence of record indicates Kanter transferred substantial sums of his own income to the Bea Ritch Trusts (directly and through IRA and THC) and Kanter (through the Bea Ritch Trusts) was compensated with partnership interests in LICCDC/Cablevision in exchange for recruiting investors for the Cablevision project.  Viewed in the

light of the entire record, the credibility determinations and recommended holding in the STJ report were manifestly unreasonable.

D. Analysis

In determining whether Kanter was the true settlor of the Bea Ritch Trusts, we begin with the manner in which the trusts were funded. The record indicates that if Bea Ritch transferred any of her own assets to the 25 Bea Ritch Trusts, she transferred no more than $100 to each trust or a total of $2,500. Notwithstanding the lack of any evidence that Bea Ritch transferred additional amounts to the Bea Ritch Trusts, Kanter invites us to conclude the Bea Ritch Trusts were so deftly managed that they were able to grow $2,500 in 1969 into many millions during the years at issue without the benefit of assignments of his earnings. Kanter did not introduce any evidence indicating the trusts' early investments were so extraordinarily successful. We decline to accept such a proposition where the record so clearly demonstrates (1) moneys Kanter earned and assigned to or for the benefit of the Bea Ritch Trusts represented the primary source of the trusts' increasing asset base, and (2) Kanter liberally used the Bea Ritch Trusts as a source of loans.

We have already determined Kanter employed IRA and THC as shams to receive, and shelter from taxation, income which Kanter

personally earned from a variety of transactions.  Kanter attempted to assign to IRA and THC substantial amounts of income which he earned in the form of payments from The Five.  The Bea Ritch Trusts owned all of IRA's common stock, and they held a substantial interest in THC.

Similarly, we conclude Kanter attempted to assign to Century Industries (in which the Bea Ritch Trusts purportedly held a 49-percent partnership interest) fees he earned evaluating investment opportunities for various third parties.  Kanter employed the same tactics in attempting to improperly assign to THC substantial fees he earned serving as trustee/investment manager for Hi-Chicago Trust.  Thus, during the period 1977 to 1989, the record reflects Kanter engaged in an active and sustained campaign to transfer his income to IRA, THC, and other Kanter-related entities for the ultimate benefit of the Bea Ritch Trusts.  We conclude Kanter is the grantor of the Bea Ritch Trusts.

In connection with the foregoing, Kanter failed to offer any rational explanation for the addition of 60 trusts as beneficiaries of the Bea Ritch Trusts after Kanter purportedly renounced his interests in those trusts.  Kanter was the only person vested with the power under the instrument creating the Bea Ritch Trusts to appoint new trust beneficiaries.  Under the circumstances, we infer Kanter appointed the new beneficiaries

and his earlier renunciations were, for all practical purposes, meaningless gestures.

In sum, we hold Kanter was the true settlor of the Bea Ritch Trusts--he funded the trusts over a period of many years, and he retained at all times a power to appoint the beneficiaries of the Bea Ritch Trusts that was tantamount to a power of disposition over the trusts' assets. See secs. 671, 674(a); sec. 1.671-2(e)(1), Income Tax Regs. ("[A] grantor includes any person to the extent such person either creates a trust, or directly or indirectly makes a gratuitous transfer * * * of property to a trust. * * *  If a person creates or funds a trust on behalf of another person, both persons are treated as grantors of the trust."); sec. 1.674(a)-1, Income Tax Regs.  Consequently, Kanter is taxable on the income of the Bea Ritch Trusts for 1986 and 1987.[137]

The Cablevision transactions in 1986 and 1987 were additional examples of Kanter's preferred modus operandi.  In particular, Kanter allowed the Bea Ritch Trusts to subscribe to the 18-percent partnership interest in OBA to which he was otherwise entitled.  Although the Bea Ritch Trusts invested $18,000 in OBA, as discussed above, those funds in all likelihood

---

[137]  To the extent we have already determined certain payments to Century Industries (for the year 1986) constituted Kanter's income, that income should not be attributed to Kanter a second time when computing his income for 1986 as the grantor of the Bea Ritch Trusts.

derived from earnings Kanter assigned to or for the benefit of the trusts. Moreover, the record shows that OBA received its interest in LICCDC/Cablevision and the additional related partnership interests in HB, BW, and YP solely in exchange for Kanter's and other Levenfeld/Kanter partners' efforts to raise capital for LICCDC/Cablevision. Thus, the Bea Ritch Trusts' partnership interests in HB, BW, and YP (acquired through OBA) represented nothing more than Kanter's compensation for recruiting additional investors for the Cablevision project.[138] Once again, Kanter improperly attempted to assign to the Bea Ritch Trusts income he earned as payments for his personal services. Accordingly, we hold Kanter, as grantor of the Bea Ritch Trusts, is taxable on the trusts' income for 1986 and 1987.

---

[138] Petitioners rely on the holding in Statland v. Levenfeld, Case No. 84 CH 6494, Circuit Court of Cook County, Illinois, Decision entered Jan. 28, 1988 (Exh. 9195), as proof that Kanter, his law firm partners, their family members, and other family entities that invested in OBA did not obtain their partnership interests in exchange for services the law firm performed. Although this point may be true, there is no dispute Kanter assisted Cablevision in finding additional investors. We conclude he was compensated for these efforts (as opposed to his legal services) with partnership interests in HB, BW, and YP.

Issue VI.   Whether Kanter Received Unreported Income From CMS
            Investors Partnership for 1982 to 1984 and 1987 to
            1989 (STJ report at 121-129)[139]

FINDINGS OF FACT

Respondent determined in notices of deficiency issued to the
Kanters for 1982 to 1984 and 1987 to 1989 that Kanter failed to
report income of $191,461, $232,900, $290,785, $29,998, $127,249,
and $279,596, respectively.[140]  As discussed in detail below,
these adjustments are attributable to respondent's determination
that Kanter attempted to assign to THC income that he earned in
respect of transactions involving CMS Investors Partnership (CMS
Investors).

**Much as in the Cablevision transaction (discussed supra**
**Issue V), members of the Levenfeld/Kanter law partnership and/or**
**entities established for the benefit of their families were**
**offered and acquired partnership interests in CMS Investors**
**during 1978.  Kanter, Transcr. at 4105-4107; Exh. 9134.  Kanter**

---

[139]  The Court's disposition of this issue represents in
large measure a wholesale adoption of the recommended findings of
fact and conclusions of law set forth in the STJ report.

[140]  These adjustments were resolved in petitioners' favor
and the decisions entered by the Court at docket Nos. 24002-91
(taxable year 1987), 26918-92 (taxable year 1988), and 25981-93
(taxable year 1989), on Sept. 24, 2001, were not appealed, and
are otherwise final.  See secs. 7481(a)(1), 7483.  Respondent,
however, challenges the recommended findings of fact and
conclusions of law in the STJ report, and, therefore, we are
obliged to address the CMS Investors Partnership issue for 1982
to 1984.

permitted THC to invest in his share of the CMS Investors offering.  Kanter, Transcr. at 4198-4199.

Delta Partnership (Delta) was formed on the same date that CMS Investors was formed and CMS Investors acquired a 95.5-percent partnership interest in Delta.  Exh. 9135.  Alpha Partnership (Alpha) was formed in May 1979, and CMS Investors acquired an 85.5-percent partnership interest in Alpha.  Exh. 9136.

In 1978, Delta made a substantial loan to another partnership, Shelburne Associates (Shelburne), which the latter used to purchase several feature-length motion pictures.  Exh. 9137.  In 1979, Alpha made a substantial loan to another partnership, Century Associates (Century), which the latter used to purchase several feature-length motion pictures.  Exh. 9138.

Respondent concedes Shelburne and Century both paid substantial legal fees to the Levenfeld/Kanter law firm. Respondent's Opening Brief at 920, par. 1382.

*Shelburne and Century subsequently transferred to Delta and Alpha substantial amounts, characterized as bonus payments, and CMS Investors received distributable shares of these bonus payments as a partner in Delta and Alpha.  THC, a CMS Investors partner, in turn received its distributable share of the bonus payments.  THC reported these payments as income on its income*

tax returns. As indicated, respondent determined that THC's share of the Shelburne and Century bonus payments represented Kanter's income.

This Court, in *Durkin v. Commissioner*, 87 T.C. 1329 (1986), affd. 872 F.2d 1271 (7th Cir. 1989), passed upon and made certain factual conclusions regarding the loan by Delta to Shelburne under which loan one of the bonus payments in dispute in these case was made. Under the terms of both loans, Shelburne and Century, as the debtors, were required not only to pay principal and interest to Delta and Alpha, but Shelburne and Century were also required, under certain conditions, to pay Delta and Alpha certain amounts referred to as bonus payments. These bonus payments were in fact paid, and both Shelburne and Century treated these bonus payments as interest and claimed deductions of such payments for income tax purposes. In *Durkin v. Commissioner*, *supra*, this Court held the Shelburne bonus payment did not constitute compensation for the use of money and, therefore, it was not deductible as interest. The Court further held the bonus payment essentially was nothing more than a mechanism to divert funds from Shelburne to Delta (and on to CMS Investors), "thereby increasing the income of the partnerships and trusts associated with or established for the benefit of the members of the law firm or their immediate families." *Durkin v. Commissioner*, *supra* at 1400.

*The parties here do not dispute the factual findings or the holding of the Court in Durkin v. Commissioner, supra. Nor do the parties deny that the bonus payments constitute income to the recipient partnerships.*

*On brief, respondent acknowledges Durkin did not address the question whether the family entities or the Levenfeld/Kanter law partners, individually, were taxable on the bonus payment paid by Shelburne to Delta. Respondent nevertheless argues Kanter is taxable on the share of the bonus payments paid by Shelburne and Century to Alpha and Delta, respectively, that flowed through CMS Investors to THC.*

OPINION

A. The Parties' Arguments

Petitioners contend the Court lacks subject-matter jurisdiction because the Levenfeld/Kanter law firm was a TEFRA partnership during the years at issue, and, in fact, respondent issued an FPAA to the law partnership for 1994 which included the subject adjustment. Petitioners also contend respondent is collaterally estopped from attributing the income at issue to Kanter by virtue of the Court's holding in Durkin v. Commissioner, supra. Finally, petitioners contend THC (as opposed to Kanter) was a partner in CMS Investors and should be recognized as such.

Respondent maintains that the portions of the bonus payments that eventually made their way to THC represent income taxable to Kanter under the assignment of income doctrine. See Lucas v. Earl, 281 U.S. 111 (1930). Respondent argues (1) the bonus payments were not paid for the use of funds but were used as a means to divert funds from Shelburne and Century to CMS Investors' partners, and (2) the bonus payments represented income earned by the individual partners of the Levenfeld/Kanter law partnership "through their actions in creating the right to receive the bonus payments and diverting them to their respective family entities." Respondent's Opening Brief at 927.

Respondent's position apparently is based on the Court's finding in Durkin v. Commissioner, supra, that the Shelburne bonus payment to Delta was not made for the use of money but was a mechanism to divert funds to CMS Investors and the various entities established for the benefit of the Levenfeld/Kanter law partners and/or their immediate families. Respondent argues there was no need for the loans to Shelburne and Century because Shelburne and Century would, in due course, realize funds from movie revenues that would alleviate the need for such financing. Therefore, respondent asserts, the loans were structured merely to create purported payments of interest which were, in effect, payments to Kanter and his law firm for legal services the firm provided in connection with movie syndications.

Respondent further asserts that the purpose of diverting the bonus payments to CMS Investors, which flowed through to THC and other Levenfeld/Kanter family entities, was the "improper avoidance of income, gift and estate taxes" because THC had large operating losses and, therefore, paid no income taxes on the bonus payments received.

B. Analysis

1. Subject Matter Jurisdiction

The jurisdictional question presented here turns on whether the bonus payments, in fact, were income to the Levenfeld/Kanter law partnership (which would make the adjustments partnership items subjected to the TEFRA partnership provisions). As previously discussed, the Court generally lacks jurisdiction in a deficiency proceeding brought under section 6213(a) to review adjustments to partnership items as defined under the TEFRA partnership procedures.

Pursuant to a longstanding practice, Levenfeld/Kanter's law partners were offered the opportunity to acquire partnership interests in CMS Investors (and indirectly Delta and Alpha). Participation was voluntary, and investments were made by a law firm member, a member's immediate family, and/or a family entity for their own accounts and not on behalf of the law partnership. Some of the law firm partners elected not to participate in the CMS Investors offering. The Levenfeld/Kanter law partnership did

not have any interest in or rights to the income from the venture.

Delta's and Alpha's loans to Shelburne and Century were not investment activities of the Levenfeld/Kanter law partnership. The law firm members who participated in these ventures had no intention to invest on the law firm's behalf. More importantly, the alleged diversions of funds from Shelburne and Century (in the form of the bonus payments) were not joint business endeavors of Levenfeld/Kanter's law partners, as only those members of the law firm and/or their families who invested in CMS Investors (and Delta and Alpha) would benefit from the bonus payments.

On the record presented, the Court concludes the bonus payments were not income attributable to the Levenfeld/Kanter law partnership. Consequently, the Court has subject matter jurisdiction over the CMS Investors income adjustments at issue in the instant deficiency cases inasmuch as they do not constitute partnership items within the meaning of section 6231(a)(3).[141]

---

[141] The CMS Investors income adjustments at issue likewise do not constitute partnership items to CMS Investors. The only question remaining before the Court is whether Kanter, as opposed to THC, should be treated as the true and actual partner in CMS Investors. Resolution of that issue does not require a determination concerning a partnership item within the meaning of sec. 6231(a)(3). See, e.g., Grigoraci v. Commissioner, T.C. Memo. 2002-202.

2. Whether Kanter Improperly Assigned Income to THC Through CMS Investors

Respondent does not dispute that Delta and Alpha lent millions of dollars to Shelburne and Century, respectively. In Durkin v. Commissioner, 87 T.C. 1329 (1986), this Court concluded the Delta loan constituted a valid debt for tax purposes. Respondent's theory, nevertheless, is that THC's distributive share of the bonus payments from Shelburne and Century represents Kanter's income because Kanter (and other members of his law firm) were the true investors and the true lenders, and THC (as a partner in CMS Investors) was, in effect, no more than an alter ego for Kanter. On the record presented, we disagree.

In Durkin v. Commissioner, supra at 1399-1401, the Court held that the Shelburne bonus payment did not constitute interest and, therefore, it was not deductible. The Court also suggested the Shelburne bonus payment was simply a distribution of profits from Shelburne to CMS Investors disguised as an interest payment. Id. at 1400. From these points, respondent infers that the loans giving rise to the bonus payments were, in effect, loans made by Kanter and his law partners. Respondent goes well beyond the holding of Durkin. The Court in Durkin made no such finding, and respondent has misinterpreted the case.

We reject the argument that Kanter attempted to assign to THC the income from the bonus payments. Although we have concluded Kanter used THC as a conduit to receive his share of

some of the payments from The Five, as well as income that he earned providing services to Hi-Chicago Trust, this transaction does not fit that mold. The payments to THC from The Five and Hi-Chicago Trust represented compensation to Kanter for personal services. Here, however, there is no evidence Kanter provided any personal services or assistance to CMS Investors, Alpha, Delta, Shelburne, or Century. Rather, Delta and Alpha made bona fide loans to Shelburne and Century. Under the circumstance, we see no justification for concluding that THC served as Kanter's alter ego for purposes of this transaction. Without more, THC's distributive share of CMS Investors' partnership items must be respected. Accordingly, we hold Kanter is not taxable on the income which flowed through CMS Investors to THC for the taxable years 1982, 1983, 1984.[142]

ISSUE VII.  Whether Kanter Received Unreported Income From Equitable Leasing Co., Inc., During 1983 (STJ report at 128-129)

FINDINGS OF FACT

Respondent determined in the notice of deficiency issued to the Kanters for 1983 that Kanter failed to report income of $635,250 for that year. As discussed in detail below, this adjustment is attributable to respondent's determination that Kanter attempted to assign to THC and Zion income he earned from

---

[142] Consequently, we need not address Kanter's collateral estoppel argument.

transactions involving Equitable Leasing Co., Inc. (Equitable Leasing).

Joel Mallin (Mallin) was a good friend and former law partner of Kanter who organized and promoted various equipment leasing transactions through Equity Leasing, his wholly owned company. Kanter, Transcr. at 4749; Mallin, Transcr. at 5172-5175. Mallin's leasing transactions were highly leveraged, and the residual value of the leased equipment provided the ostensible paper profit on his investors capital. Mallin, Transcr. at 5175-5186.

During 1983, Kanter allowed Mallin to include Zion as an investor in some of Equitable Leasing's offerings so that the offering would be fully subscribed and could close. Kanter, Transcr. at 4752. During 1983, Kanter also introduced additional investors to Mallin so that Equitable Leasing could complete certain transactions. Kanter, Transcr. at 4753, Mallin, Transcr. at 5213-5215.

During 1983, Equitable Leasing transferred funds totaling at least $635,250 to THC and Zion, as follows:

| Date | Amount | Payee | Exhibit |
|------|--------|-------|---------|
| 1/4/83 | $317,250 | Zion | 9203; 146, at 6 (AJE 32) |
| 1/24/83 | 9,500 | THC | 9203; 146, at 2 (AJE 8) |
| 6/1/83 | 6,500 | Zion | 9203, at 9 |
| 6/30/83 | 302,000 | THC | 9203; 148, at 12 |

Exh. 146, at 2 (AJE 8), provides an entry for $24,500 and states "Commission Income Consulting Fees to reclass C/R from Equitable Leasing on 9/21/82 & 1/25/83." It appears this $24,500 entry pertains to a $15,000 item from September 1982 combined with the $9,500 item dated January 24, 1983. As previously discussed, Zion was a subsidiary of THC during the year 1983.

THC's accounting records related to these transactions are inconsistent and contradictory. THC recorded about half of the funds it received from Equitable Leasing as loans and the other half as commissions. Exh. 146, at 2, 6 (AJE's 8 and 32); Exh. 148, at 12 (listing loans of $8,000 and $302,000 on June 27 and 30, 1983, respectively). However, THC's records also include an adjusting journal entry for $310,000 (which probably includes the $302,000 transferred to THC on June 30, 1983, and the $8,000 listed as a loan on June 27, 1983, see Exh. 148, at 12) and which appears to read: "N/P-Equitable Leasing, Commission Income, to reclassify funds from Eq. Leasing [date illegible]." Exh. 146, at 11 (AJE 59).

Mallin paid commissions to Kanter (through payments to THC and Zion) in exchange for Kanter's assistance in recruiting investors for his leasing transactions. Kanter, Transcr. at 4753; Mallin, Transcr. at 5213-5214.

OPINION[143]

The provision of section 61 that gross income includes all income from whatever source derived would encompass fees and commissions earned as compensation for services.  THC and Zion received payments from Equitable Leasing which were labeled inconsistently as commissions and/or loans.  Kanter asserts THC and Zion "received certain amounts from Equitable Leasing in the first six months of 1983 as an accommodation to allow Zion to make investments in certain offerings Equitable Leasing was promoting so that those offerings could become fully subscribed and close."  Petitioners' Reply Brief at 1245.

Respondent contends all the moneys Equitable Leasing transferred to THC and Zion were commissions paid to Kanter to compensate him for recruiting investors for Mallin's equipment leasing transactions.  Kanter argues the funds in question were loans.  We agree with respondent.

The record shows:  (1) Kanter recruited investors for Equitable Leasing's transactions, and (2) Mallin/Equitable Leasing paid commissions for these services to Kanter-related entities, THC and Zion.  Against this evidence, Kanter offered

---

[143] The STJ report recommended holding that respondent is barred from making any determination concerning the taxable year 1983 on account of the expiration of the period of limitations governing assessment and collection for that year.  As previously discussed, we determined that Kanter's income tax returns for the years at issue were fraudulent, and, therefore, the period of limitations remains open pursuant to sec. 6501(c)(1).

little in the way of rebuttal.  Although THC's accounting records labeled some of the funds it received from Equitable Leasing as loans, those entries were contradicted by other entries labeling the payments as commissions.  Kanter did not provide any additional evidence such as promissory notes or proof of principal or interest payments to corroborate THC's records. Given that Kanter controlled the entities involved, we resolve any doubts engendered by the record in respondent's favor. Considering all the circumstances, we sustain respondent's determination that the funds that Equitable Leasing transferred to THC and Zion during 1983 represented income that Kanter earned during 1983 and that he attempted to assign to THC and Zion. These payments are includable in Kanter's income for 1983.

Issue VIII.  Whether Kanter Received Unreported Income for 1982 According to the Bank Deposits Method of Income Reconstruction (STJ report at 129-133)

FINDINGS OF FACT

*During 1982, Kanter made a total of approximately $2.8 million in deposits to his three bank accounts at American National Bank at Chicago, Illinois.  Kanter maintained a check register in which he recorded the source and nature of the deposits made to these accounts.  In preparing the Kanters' 1982 joint individual Federal income tax return, Linda Gallenberger, Kanter's accountant, used the check register to determine what portion of his 1982 bank deposits represented taxable income.*

Respondent determined the Kanters failed to maintain or provide adequate books and records with respect to their taxable income for 1982. Respondent further determined Kanter had in excess of $2 million in unreported income for 1982, which unreported income determination was based upon respondent's analysis of deposits to Kanter's three American National Bank accounts. The deposit slips from which respondent reconstructed Kanter's 1982 taxable income did not specify the taxable or nontaxable nature of the deposits.[144] **At trial, Kanter offered into evidence his check register and a series of spreadsheets and a summary analysis of his bank deposits prepared by Gallenberger. Exhs. 9168-9172.**

Respondent conceded a portion of the subject adjustment, but maintains Kanter failed to report $1,303,207 of income for 1982 based on the bank deposits from the payors or sources in the amounts listed below:

[144] The record does not disclose whether the Kanters provided the check register to the revenue agent who examined their 1982 return. Apparently the revenue agent had been unsuccessful in obtaining a number of documents requested from the Kanters, as the agent attempted to reconstruct Kanter's 1982 taxable income based upon an analysis of Kanter's bank account deposits. To obtain copies of the bank account statements and other account information, the agent issued a third-party administrative summons to the bank.

| Payor Or Source | Funds Received | Characterization |
|---|---|---|
| THC | $787,129.17 | **Loan** |
| Computer Placement Service | 40,000.00 | **Loan** |
| TACI Special E Account | 190,077.83 | **Return of investment** |
| TACI Special Account | 286,000.00 | **Loan** |
| Total | 1,303,207.00 | |

**Transcr. at 4322.**

OPINION

A. The Commissioner's Use of the Bank Deposits Method of Income Reconstruction

Where a taxpayer fails to maintain or produce adequate books and records, the Commissioner is authorized under section 446 to compute the taxpayer's taxable income by any method which, in the Commissioner's opinion, clearly reflects income. Holland v. United States, 348 U.S. 121, 130-132 (1954); Meneguzzo v. Commissioner, 43 T.C. 824, 831 (1965); Sutherland v. Commissioner, 32 T.C. 862 (1959). The Commissioner has great latitude in selecting a method for reconstructing a taxpayer's income, and the method need only be reasonable in the light of all the surrounding circumstances.

This Court has long accepted the bank deposits method of income reconstruction. Nicholas v. Commissioner, 70 T.C. 1057, 1065 (1978); Estate of Mason v. Commissioner, 64 T.C. 651, 653 (1975), affd. 566 F.2d 2 (6th Cir. 1977). While not conclusive, bank deposits are prima facie evidence of income. Boyett v. Commissioner, 204 F.2d 205 (5th Cir. 1953), affg. a Memorandum

Opinion of this Court; <u>Haque Estate v. Commissioner</u>, 132 F.2d 775
(2d Cir. 1943), affg. 45 B.T.A. 104 (1941).

Taxpayers generally bear the burden of proving that the
Commissioner's determinations are erroneous; and in the case of a
bank deposits analysis, a taxpayer normally must show the
deposits came from a nontaxable source.  Rule 142(a); <u>Welch v.
Helvering</u>, 290 U.S. 111 (1933).

B.  <u>The Parties' Arguments</u>

Kanter contends respondent's reconstruction of his income
for 1982 under the bank deposits method is arbitrary and
excessive.  Kanter asserts (1) he maintained adequate records
(i.e., his check register) identifying the taxable and nontaxable
deposits to his bank accounts, and (2) respondent's determination
should not be accorded its normal presumption of correctness.
With regard to the latter point, Kanter maintains respondent
should bear the burden of proof on this issue or respondent
should have the burden of going forward with the evidence.
Kanter further asserts the credible evidence of record (which
includes his check register and Gallenberger's spreadsheets and
testimony) is sufficient to prove the deposits in question were
either proceeds of loans or return of investment funds.

Respondent contends Kanter has not satisfied his burden of
proof under Rule 142(a).  Respondent argues the testimony and
other evidence petitioners offered should be disregarded as self-

serving.  Respondent asserts Kanter offered no credible
documentation substantiating the nontaxable nature of the
$1,303,207 of deposits at issue.  Respondent emphasizes that two
of the disputed deposits are attributable to funds Kanter
received from the TACI Special E and TACI Special Accounts which
Kanter purportedly used to disguise payments to himself as loans.

C.  The STJ Report

The STJ report recommended holding for Kanter on this issue
on the grounds that (1) Kanter and Gallenberger testified
credibly that the questioned deposits were either loans to Kanter
or returns of Kanter's capital,[145] (2) Kanter's and Gallenberger's
testimony was corroborated by Kanter's check register, and (3)
respondent offered no evidence to rebut the above evidence and
testimony.

D.  Analysis

Considering the large amounts of the bank deposits in
question and Kanter's obfuscation during the examination process,
we cannot fault respondent for declining to accept Kanter's check
register as an adequate record of his taxable income for 1982.
Without more, respondent was wholly justified in employing the

---

[145] The STJ report, at 131-132, includes statements
suggesting that Kanter offered testimony regarding his bank
deposits for 1982 and that testimony was credible.  The Court is
unable to find any citation of Kanter's testimony on this point
in petitioners' posttrial briefs, nor is the testimony apparent
from a review of the transcript.

bank deposits method of income reconstruction to determine the correct amount of Kanter's taxable income for 1982.

Respondent's determination was not a so-called naked assessment, nor was it arbitrary or excessive. See, e.g., Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977). Respondent offered ample evidence linking Kanter to income-producing activities during 1982 including his law practice and the fees and commissions Kanter earned from, among others, The Five. Respondent identified four specific deposits that were determined to represent unreported income. Therefore, respondent's determination of unreported income is entitled to the normal presumption of correctness, and there is no basis for shifting to respondent either the burden of proof or the burden of going forward with the evidence. See, e.g., United States v. Esser, 520 F.2d 213, 217 (7th Cir. 1975).

As indicated, the record includes Kanter's check register, Gallenberger's spreadsheets and summaries, and Gallenberger's testimony regarding the methods she used in preparing the Kanters' tax return for 1982. Considering all the circumstances, particularly Kanter's and Gallenberger's misconduct as outlined by the District Court during the summons enforcement proceedings, we conclude it was manifestly unreasonable to conclude Kanter's testimony (if it exists) and Gallenberger's testimony was credible. See United States v. Administration Co., 74 AFTR 2d

94-5252, 94-2 USTC par. 50,479 (N.D. Ill. 1994); United States v. Administration Co., 74 AFTR 2d 94-5256, 94-2 USTC par. 50,480 (N.D. Ill. 1994).

We conclude the evidence Kanter offered on this issue was insufficient to satisfy his burden of proof. Given the large amounts of the deposits in question, not to mention Kanter's experience as a tax attorney, Kanter should have been prepared to offer additional records, such as loan documents, checks reflecting prior investments, checks reflecting principal or interest payments, or other accounting records in support of the proposition that the deposits in question were in fact loans or returns of capital. In the absence of such evidence, we sustain respondent's determination that Kanter failed to report $1,303,207 of income for 1982.

Issue IX.    Whether Kanter Received Barter Income From Principal
            Services Accounting Corp. During 1988 and 1989 (STJ
            report at 133-135)

Respondent determined in notices of deficiency issued to the Kanters for 1988 and 1989 that Kanter failed to report barter income he received from Principal Services Accounting Corp. (PSAC) during those years. These adjustments were resolved in petitioners' favor, and the decisions entered by the Court at docket Nos. 26918-92 (taxable year 1988) and 25981-93 (taxable year 1989) on September 24, 2001, were not appealed and are

otherwise final.  See secs. 7481(a)(1), 7483.[146]  Consequently, we need not consider this issue.

Issue X.  <u>Whether the Kanters Received Unreported Interest Income During 1988</u> (STJ report at 136-137)

Respondent determined in the notice of deficiency issued to the Kanters for 1988 that the Kanters failed to report interest income they received during 1988.  This adjustment was resolved in petitioners' favor, and the decision entered by the Court at docket No. 26918-92 (taxable year 1988) on September 24, 2001, was not appealed and is otherwise final.  See secs. 7481(a)(1), 7483.[147]  Consequently, we need not consider this issue.

Issue XI.  <u>Whether the Kanters Are Entitled to Certain Deductions They Claimed on Schedules A and C for 1986 to 1989</u> (STJ report at 137-144)

In notices of deficiency issued to the Kanters for 1986 to 1989, respondent disallowed deductions the Kanters claimed on Schedules A and C of their tax returns for those years.  These adjustments were resolved in petitioners' favor, and the decisions entered by the Court at docket Nos. 24002-91 (taxable year 1987), 26918-92 (taxable year 1988), and 25981-93 (taxable year 1989) on September 24, 2001, were not appealed and are otherwise final.  See secs. 7481(a)(1), 7483.

---

[146]  Respondent does not challenge the ultimate conclusion in the STJ report on this issue.

[147]  Respondent does not challenge the ultimate conclusion in the STJ report on this issue.

Respondent does not challenge the ultimate conclusion in the STJ report regarding the Kanters' deductions for the taxable years 1987 to 1989. Respondent, however, does not state whether he objects to the STJ report holding with regard to the Kanters' Schedule A deduction for 1986. Therefore, we shall address the question whether petitioners are entitled to the Schedule A deduction in question for 1986.[148]

FINDINGS OF FACT

*On Schedule A of the Kanters' 1986 Federal income tax return, the Kanters claimed a deduction of $368,227 in "Other interest" expenses. In the notice of deficiency, respondent determined that no deduction was allowable to the Kanters for the $368,227 in interest expenses claimed for 1986. The notice of deficiency stated in pertinent part:*

> *It is determined that the claimed interest expense deduction of $368,227 in 1986 is not allowed because you have not established:*
>
> *(1) that there was a valid indebtedness;*
>
> *(2) if there was a valid indebtedness, that the indebtedness was yours; or*
>
> *(3) that you actually paid any interest.*
>
> *Therefore, your taxable income for 1986 is increased by $368,227.*

---

[148] The Court's disposition of this issue represents in large measure a wholesale adoption of the recommended findings of fact and conclusions of law set forth in the STJ report.

For 1986, almost all of Kanter's expenses claimed as deductions on the Kanters' tax return were paid through funds from TACI and PSAC accounts. The funds used to pay Kanter's expenses either belonged to Kanter or were borrowed by him from other TACI and PSAC clients.

During the course of the trial, petitioners began offering evidence with respect to the above expenses as well as certain 1982 Schedule C deductions. Counsel for the parties then requested and received a short recess in order to meet and discuss off the record the various evidentiary and legal matters pertaining to these expenses. The Court did not participate in counsels' deliberations.

Immediately following their conference, counsel for the parties advised the Court that: (1) The Kanters were entitled to deduct the 1982 Schedule C expenses, and (2) the 1987, 1988, and 1989 Schedule A and Schedule C expenses the Kanters claimed had been substantiated, except that respondent (a) disputed that the expenses paid out of funds from the TACI and PSAC accounts had been paid by Kanter and (b) questioned whether the Kanters were entitled to deduct expenses with respect to property held in trust. Counsel made no mention as to whether this agreement included the Kanters' 1986 Schedule A deduction for interest expenses. **Transcr. at 3957-3960.** However, counsel for petitioners expressed to the Court their belief that the parties

had narrowed the issues on all of the adjustments that were then being heard by the Court. Counsel for respondent expressed no disagreement with that assertion. Following the colloquy between counsel for the parties and the Court, the trial resumed with respect to the remaining issues as to which the parties were unable to agree: (1) Whether payment of the subject expenses out of the TACI Special E and PSAC Special accounts represented payment by the Kanters, and (2) whether the Kanters were entitled to a deduction for interest payments with respect to property (the Kanters' personal residence) that was titled in a grantor trust in which Kanter was the deemed owner.

During and after the trial, the parties filed several stipulations of settlement. On May 15, 1995, the parties filed a Stipulation Of Settlement As To Certain Issues Between Petitioners Burton W. Kanter, Naomi R. Kanter, * * * [IRA], And Subsidiaries, And Respondent. The May 15, 1995 Stipulation Of Settled Issues listed a number of adjustments contained in the notices of deficiency that the parties had settled, including an "Unreported Fee Income" adjustment for 1986. The 1986 interest expense the Kanters claimed was not listed among these settled issues, nor was there any listing of the other Schedule A and Schedule C expenses identified above for the various years in question.

OPINION

## A.  The Parties' Arguments

The parties disagree whether their off-the-record conference, during which they narrowed the issues then being heard by the Court, included petitioners' 1986 interest expense deduction of $368,227.  Petitioners contend their agreement included the 1986 interest expense deduction, and reference to its inclusion was inadvertently omitted in their representation to the Court.  Respondent disagrees and contends that all of the reasons stated in the notice of deficiency for disallowance of the interest expense deduction for 1986 remain in dispute.

## B.  Analysis

After the parties' off-the-record conference described above, counsel for petitioners stated on the record that he believed the parties' agreement included all adjustments then being considered by the Court and invited counsel for respondent's position on that assertion.  Counsel for respondent did not point out any qualifications, restrictions, or exceptions to any of the adjustments as to which the issues had been narrowed.  On brief, respondent takes the position the issues were not narrowed with respect to petitioners' 1986 interest expense deduction, nor was any agreement reached with respect to that issue.

On this record, we conclude petitioners' 1986 interest expense deduction was included in (but inadvertently omitted from) the agreement of counsel narrowing the issues to be decided by the Court.  Bearing in mind that these cases were very complicated, involving numerous issues covering several tax years of several taxpayers, it is easy to understand how one adjustment could easily have been overlooked in counsel's announcement to the Court that the parties had agreed to narrow the issues in dispute.  Moreover, respondent failed to qualify or take any exception to petitioners' counsel's representations to the Court regarding the scope of their agreement.

Thus, we are left only with the question whether the funds from the TACI and PSAC accounts used to pay Kanter's expenses were Kanter's funds.  As previously discussed, the funds Kanter held in the TACI and PSAC accounts were his funds or funds he borrowed from other TACI or PSAC clients.  Accordingly, the Kanters are entitled the interest expense deduction they claimed for 1986.

Issue XII.   Whether Kanter Realized and Must Recognize Capital
             Gains as a Result of Transactions Involving Cashmere
             Investments Associates, Inc., During 1983 and Whether
             the Kanters May Use the Installment Method To Report
             Gains (STJ report at 145)[149]

FINDINGS OF FACT

During the 1970s, Kanter was involved in a series of real estate development projects with developers Sam Zell (Zell) and Robert Lurie (Lurie).  Kanter, Transcr. at 4241-4243, 4261.  The development properties were owned by partnerships (real estate partnerships) and Kanter held interests in the real estate partnerships through the BWK Revocable Trust, the Everglades Trusts (Nos. 1-5), the BWK Family Trusts, and THC.  Exh. 9156, items 3, 6.  The BWK Revocable Trust and the Everglades Trusts were grantor trusts whose income was attributable to Kanter personally.  Exhs. 130 and 130A; Kanter, Transcr. at 4235, 4261-4262.

The designated beneficiaries of the BWK Revocable Trust, the BWK Family Trusts, and the Everglades Trusts were members of Kanter's family.  Exhs. 453, 583, 9213, 130, 130A; Kanter, Transcr. at 4235, 4261-4262.  During 1983, THC's shareholders

---

[149] The STJ report recommended holding that respondent is barred from making any determination concerning the taxable year 1983 on account of the expiration of the period of limitations governing assessment and collection for that year.  As previously discussed, we determined that Kanter's income tax returns for the years at issue were fraudulent, and, therefore, the period of limitations remains open pursuant to sec. 6501(c)(1).

included Kanter, his immediate family members, and a large number of Kanter family trusts. Exh. 152, at 1, 2, 6, 7; Exh. 454. Weisgal was THC's president. Exh. 9156, item 3.

Kanter's interests in the real estate partnerships are identified below by the entity which held each interest, the partnership, and the entity's percentage interest in the partnership at the beginning of 1983:

| Entity | Partnership | Percentage Interest |
|--------|-------------|---------------------|
| BWK Revocable Trust | Diversified River Bend | 18.60 |
| BWK Revocable Trust | Diversified Stephenson's | 8.44 |
| BWK Revocable Trust | Bajomonte Associates | 27.33 |
| Everglades Trusts 1-5 | Wayside Partners | 5.01 |
| Everglades Trusts 1-5 | Manderville Partners | 3.86 |
| Everglades Trusts 1-5 | Shady Crest Investors | 8.43 |
| Everglades Trusts 1-5 | Palo Alto Partners | 8.90 |
| Everglades Trusts 1-5 | Diversified Raintree | 8.269 |
| Everglades Trusts 1-5 | Cedar Cove Partners | 8.71 |
| Everglades Trusts 1-5 | Diversified Boot Lake | 8.706 |
| Everglades Trusts 1-5 | Edgewater Partners | 3.53 |
| Everglades Trusts 1-5 | Kentucky Holdings | 9.296 |
| Everglades Trusts 1-5 | Walnut Creek Group | 4.03 |
| Everglades Trusts 1-5 | Candlelite Apartments | 8.825 |
| Everglades Trusts 1-5 | Village Square-Lexington | 12.51 |
| Everglades Trusts 1-5 | Worthman Office Mall | 23.75 |
| Everglades Trusts 1-5 | Kon Tiki Apartments | 16.667 |
| Everglades Trusts 1-5 | J.S. Investors | 7.50 |
| Everglades Trusts 1-5 | Cove Realty Company | 8.00 |
| Everglades Trusts 1-5 | Diversified Hillsborough | 8.27 |
| Everglades Trusts 1-5 | Midwest Properties Group | 8.44 |
| Everglades Trusts 1-5 | Washtenaw Management Co. | 8.17 |
| Everglades Trusts 1-5 | Tradewinds Shopping Ctr. | 5.88 |
| BWK Family Trusts | Centennial Investors | 17.02 |
| THC | River Bend Investors | 3.40 |
| THC | C & W Investors | 30.00 |
| THC | First Commitment & Dev. | 42.50 |
| THC | 332 Equity Partnership | 18.75 |
| THC | Katy Land Company | 16.67 |

Exh. 9156, Index and item 6. The River Bend Investors partnership interest held by THC was previously held by the Bea Ritch Trusts and was transferred to THC on or about January 1, 1983. Exh. 146, AJE's 26 and 27.

During 1982, Zell informed Kanter that Equity Financial Management Co. (Equity), an entity Zell controlled, was

interested in purchasing all of the real estate partnership interests listed above. Kanter, Transcr. at 4242-4244, 4253-4254, 4265, 4302-4303. Although Kanter was interested in selling the partnership interests, he was concerned the transaction would trigger significant capital gains because his grantor trusts had negative capital accounts in the real estate partnership interests; i.e., their liabilities exceeded their bases. Kanter, Transcr. at 4244. Kanter's grantor trusts' negative capital accounts for the partnership interests in question, as of May 15, 1983, totaled $476,888.60, as follows:

| Entity | Partnership/Interest | Cap. Acct. |
|--------|---------------------|-----------|
| BWK Rev. Trust | Bajomonte Associates | (180,270.00) |
| BWK Rev. Trust | Diversified River Bend | (37,622.05) |
| BWK Rev. Trust | Diversified Stephenson's | (30,364.70) |
| Everglades Trusts | Wayside Partners | (4,806.00) |
| Everglades Trusts | Shady Crest Investors | (36,425.79) |
| Everglades Trusts | Diversified Raintree | (27,005.92) |
| Everglades Trusts | Cedar Cove Partners | (40,725.89) |
| Everglades Trusts | Diversified Boot Lake | (15,942.00) |
| Everglades Trusts | Edgewater Partners | (24,798.38) |
| Everglades Trusts | Kentucky Holdings | (4,703.19) |
| Everglades Trusts | Walnut Creek Group | (2,095.05) |
| Everglades Trusts | Candlelite Apartments | (77,401.56) |
| Everglades Trusts | Village Square-Lexington | (15,032.32) |
| Everglades Trusts | Worthman Office Mall | (12,751.50) |
| Everglades Trusts | Kon-Tiki Apartments | (25,606.66) |
| Everglades Trusts | Diversified Hillsborough | 3,979.00 |
| Everglades Trusts | Manderville Partners | 10,353.65 |
| Everglades Trusts | Palo Alto Partners | 1,219.11 |
| Everglades Trusts | J.S. Investors | 9,305.00 |
| Everglades Trusts | Cove Realty | 14,098.00 |
| Everglades Trusts | Midwest Properties Group | 13,834.56 |
| Everglades Trusts | Washtenaw Management Co. | 2,766.09 |
| Everglades Trusts | Tradewinds Shopping Ctr. | 3,107.00 |
| Net capital accounts | | (476,888.60) |

Exh. 142 (Sch. 7); Exh. 9166; Kanter, Transcr. at 4267, 4300-4302.

As of mid-1983, the fair market value of the real estate partnership interests Zell was interested in purchasing totaled $1,219,321.64, as follows:

| Entity | Partnership/Interest | Price (FMV) |
|---|---|---|
| BWK Rev Trust | Bajomonte Associates | |
| BWK Rev Trust | Diversified River Bend | |
| BWK Rev Trust | Diversified Stephenson's | |
| **Total FMV--BWK Revocable Trust** | | **$12,321.64** |

| Entity | Partnership/Interest | Price (FMV) |
|---|---|---|
| Everglades Trusts | Wayside Partners | |
| Everglades Trusts | Shady Crest Investors | |
| Everglades Trusts | Diversified Raintree Partners | |
| Everglades Trusts | Cedar Cove Partners | |
| Everglades Trusts | Diversified Boot Lake Partners | |
| Everglades Trusts | Edgewater Partners | |
| Everglades Trusts | Kentucky Holdings | |
| Everglades Trusts | Walnut Creek Group | |
| Everglades Trusts | Candlelite Apartments | |
| Everglades Trusts | Village Square Lexington | |
| Everglades Trusts | Worthman Office Mall | |
| Everglades Trusts | Kon-Tiki Apartments | |
| Everglades Trusts | Diversified Hillsborough Partners | |
| Everglades Trusts | Manderville Partners | |
| Everglades Trusts | Palo Alto Partners | |
| Everglades Trusts | J.S. Investors | |
| Everglades Trusts | Cove Realty | |
| Everglades Trusts | Midwest Properties | |
| Everglades Trusts | Washtenaw Management Co. | |
| Everglades Trusts | Tradewinds Shopping Ctr. | |
| **Total FMV--Everglades Trust** | | **$657,000.00** |

| Entity | Partnership/Interest | Price (FMV) |
|---|---|---|
| BWK Family Trusts | Centennial Investors | $30,000.00 |

| Entity | Partnership/Interest | Price (FMV) |
|---|---|---|
| The Holding Co. | River Bend Investors | |

| | |
|---|---|
| The Holding Co. | C & W Investors |
| The Holding Co. | First Commitment & Dev. |
| The Holding Co. | 332 Equity Partnership |
| The Holding Co. | Katy Land Company |

    Total FMV--The Holding Co.                    <u>$520,000.00</u>

Exh. 9166.

Because an unqualified transfer of the partnership interests of the grantor trusts to Zell would involve the assumption of liabilities in excess of the trusts' bases in the partnership interests, Kanter (the owner of those interests by virtue of the grantor trust provisions (sections 671-677) would be required to recognize capital gains on the sale to Zell. In an effort to avoid this result, Kanter directed a series of transactions in 1983 which ultimately resulted in the transfer of both cash and the real estate partnership interests from his grantor trusts to Zell. The transfers took place in three stages described below.

A. <u>Transfer of Real Estate Partnership Interests to Cashmere</u>

Cashmere Investments Associates, Inc. (Cashmere), was an inactive "shelf" corporation incorporated in Delaware in 1982 and controlled by Kanter. Exh. 9156; Kanter, Transcr. at 4231-4246, 4249, 4260-4261, 4266. Cashmere's board of directors consisted of Sharon Meyers and Weisgal. Exh. 9156, items 4, 10(g); Kanter, Transcr. at 4264-4265. Weisgal was Cashmere's president, Sharon

Bayers was secretary, and Meyers was treasurer.  Exh. 9156, item 4, at 2; Kanter, Transcr. at 4265.

On or about May 15, 1983, Kanter directed the transfer of the grantor trusts' real estate partnership interests to Cashmere in what was intended to be a nontaxable exchange under section 351 in return for Cashmere common and preferred stock.  Exh. 9156; Kanter, Transcr. at 4234-4245.  THC, the BWK Family Trusts, and the grantor trusts received Cashmere stock in exchange for the real estate partnership interests as follows:

| | Shares of Stock | |
| Shareholder | Common | Class A Preferred |
|---|---|---|
| BWK Revocable Trust | 50 | 241.274 |
| Everglades Trusts | 400 | 257.226 |
| BWK Family Trusts | 30 | -- |
| THC | 520 | -- |

Exh. 9156, items 3, 5, 6.

Concurrently with the transfers described above, Kanter's grantor trusts also transferred to Cashmere eight promissory notes with an aggregate face value of $498,500.  Exh. 9156, item 7; Kanter, Transcr. at 4235-4238, 4244, 4249, 4267-4268. Kanter's grantor trusts transferred the following notes receivable to Cashmere:

| Maker | Payee | Amount |
|---|---|---|
| THC | Everglades Trusts | $90,000 |
| Burton W. Kanter | Everglades Trusts | 34,230 |
| Beach Trust | Burton W. Kanter | 128,725 |
| HELO | Everglades Trusts | 94,800 |
| GL's Associates | Everglades Trusts | 38,000 |
| ARO Trusts | Burton W. Kanter | 25,045 |
| Baroque Trusts | Burton W. Kanter | 66,000 |
| BWK Children's Trust | Burton W. Kanter | 21,700 |
| Total | | 498,500 |

Exh. 9156, index and item 7; Kanter, Transcr. at 4269-4270. Each promissory note listed above was dated May 1, 1983, and was due and payable on August 31, 1983. Respondent's Opening Brief at 1024, par. 1538; Petitioners' Reply Brief at 1348.

The trustee of Beach Trust was Albert Morrison, the grantor was Kanter, and the beneficiaries were members of Kanter's family. Exh. 9216. The trustee of the Baroque Trusts was Patricia Grogan, the grantor was Kanter, and the beneficiaries were members of Kanter's family. Exh. 9219. For Federal tax purposes, Kanter was the "deemed owner" of the Baroque Trusts, and income therefrom generally was reportable on Kanter's individual Federal income tax returns. Exh. 9111, Bates Nos. 000125-000127.

Kanter intended that, if the promissory notes were accorded bases equal to face values, the promissory notes would increase the aggregate basis of the property the grantor trusts transferred to Cashmere; i.e, the promissory notes' bases would

offset the grantor trusts' negative capital accounts in the real estate partnership interests, thereby eliminating the gain that otherwise would have been realized under section 357(c) if Cashmere had received the real estate partnership interests alone.[150]  Kanter did not, however, present any evidence to establish the genuineness of the promissory notes.

B.  Sale of Cashmere Stock to Waco

Waco Capital Co. (Waco) was a corporation organized under the laws of the State of Delaware, Meyers was its president, and the Bea Ritch Trusts were its sole shareholders.  Exh. 9156, items 8, 10(b), (c), (f); Kanter, Transcr. at 4270.  The Bea Ritch Trusts' beneficiaries were members of Kanter's family and who were also the beneficiaries of Kanter's grantor trusts.  Waco

---

[150]  Sec. 357(c) provides in pertinent part:

SEC. 357 (c). Liabilities in Excess of Basis.--

(1) In general.--In the case of an exchange--

(A) to which section 351 applies * * *

if the sum of the amount of the liabilities assumed * * * exceeds the total of the adjusted basis of the property transferred pursuant to such exchange, then such excess shall be considered as a gain from the sale or exchange of a capital asset or of property which is not a capital asset, as the case may be.

later changed its name to Windy City, Inc.  Kanter, Transcr. at 4536.[151]

On July 12, 1983, the BWK Revocable Trust, the Everglades Trusts, THC, and the BWK Family Trusts sold all of their Cashmere stock (common and preferred shares) to Waco for promissory installment notes totaling approximately $1.5 million.  Exh. 9156, items 8, 9.  The Waco promissory notes provided for payments in 1983 and 1984 and balloon payments in 1993.  Id.  The Waco promissory notes were secured by the Cashmere stock, subject to Waco's option to substitute as collateral the guaranties of its shareholders, the Bea Ritch Trusts, which would pledge various partnership interests (known in the aggregate as "Cablevision").  Exh. 9156, item 7, at 3.  Sharon Meyers, on behalf of Waco and the Bea Ritch Trusts, subsequently exercised this option to substitute collateral.  Exh. 9156, item 46.

Kanter reported installment sale income on Forms 6252 attached to his Federal income tax returns for 1984 and 1985.  Exhs. 130, 130A.  Kanter did not present any evidence to

---

[151] As previously mentioned supra p. 176, Zeus purchased Waco/Windy City, Inc. stock in 1986.  In addition, Kanter sold to Windy City certain promissory notes, bonds, and shares of stock in a failed attempt to generate capital losses for 1987.  See Issue XXIII, infra.

establish that WACO actually made any payments in connection with the installment promissory notes described above.

On August 25, 1983, Kanter wrote a letter to Lurie which stated that Cashmere's stockholders (at this point Waco and/or the Bea Ritch Trusts) decided they would approve a sale of 100 percent of Cashmere's stock to Equity only in exchange for cash. Exh. 9157. The letter also stated Cashmere held only real estate partnership interests and promissory notes "all of which will be paid down by August 31, 1983." Id.

On August 31, 1983, the promissory notes held by Cashmere were paid off by checks drawn on the TACI Special E account, as follows:

| Ck. No. | Date | Payee | Amount |
|---------|------|-------|--------|
| 1315 | 8/31/83 | Holding Company "For BRT" | $90,000 |
| 1316 | 8/31/83 | BWK Revocable Trust "For BRT" | 34,230 |
| 1317 | 8/31/83 | Beach Trust "For Trust (BRT)" | 128,725 |
| 1318 | 8/31/83 | Cashmere "For HELO" | 94,800 |
| 1319 | 8/31/83 | Cashmere "For GLS Assoc" | 38,000 |
| 1320 | 8/31/83 | Cashmere "For ARO" | 25,045 |
| 1321 | 8/31/83 | Cashmere "For Baroque Tr." | 66,000 |
| 1322 | 8/31/83 | Cashmere "For BWK Childrens Tr." | 21,700 |
| Total | | | 498,500 |

Exhs. 9159, 9160, 9161, and 9162; Kanter, Transcr. at 4276-4278, 4284-4285, 4288-4289, 4292. Check Nos. 1315 to 1317, listed above, were not made out to Cashmere because the debtors on those notes (Beach Trust, BWK Revocable Trust, and THC) were instructed to transmit their own checks to Cashmere. Exh. 9158 (Beach Trust); Exh. 148, at 8, 13 (THC); Kanter, Transcr. at 4274-4275, 4284-4286. Kanter testified that TACI transferred to Beach Trust, BWK Revocable Trust, and THC the amounts reflected in check Nos. 1315 to 1317 above), the amounts so transferred were considered loans from the Bea Ritch Trusts, and those loans were paid back. Kanter, Transcr. at 4292-4294. However, no documentary evidence (promissory notes, payment schedules, canceled checks representing interest or principal payments, or other records) was presented at trial to substantiate Kanter's testimony.

As of September 1, 1983, Waco held all of Cashmere's outstanding stock, and Cashmere's assets included the real estate partnership interests and $498,500 in cash. Exh. 9156, Item 10(a), at 5.

## C. Sale of Cashmere Stock From Waco to Zell

On September 2, 1983, Kanter negotiated the sale of Waco's Cashmere stock to Equity in exchange for a check in the amount of $1,647,500. Exh. 9156, items 10A, 52; Kanter, Transcr. at 4250-

**4251, 4259, 4263.  Because Cashmere held cash in the amount of $498,500, $1,149,000 of the purchase price was allocable to the partnership interests that Zell was interested in acquiring. Exh. 9156, items 10(A); Exhs. 9157, 9164.**

**Zell was not interested in the Cashmere stock and would have preferred to buy the partnership interests outright, but this was the only way that Kanter would permit the sale.  Exh. 9157; Kanter, Transcr. at 4250, 4252-4253.**

OPINION

A.  The Parties' Arguments

Respondent determined that Kanter received a net long-term capital gain of $190,756 as a result of the transfers from his grantor trusts to Cashmere.  The notice of deficiency stated in pertinent part:  "It is determined that your grantor trusts had a zero basis and negative capital account of $476,889 in the partnership interests transferred.  The transfer of other assets to the corporation by the trusts has no bona fide business purpose, was made only to avoid income tax, and, thus is ignored for Federal income tax purposes."  Respondent further determined that Kanter received a net long-term capital gain of $378,800 as a result of his grantor trusts' sale of Cashmere stock to Waco. The notice of deficiency stated in pertinent part:

> The installment sale by the trusts was a sale of
> property to a related party (the first disposition).
> The related-party purchaser disposed of the property

(the second disposition) before the grantor trusts received any payments under the first disposition. It is determined, therefore, that the total contract price for the first disposition is treated as received by the grantor trusts at the time of the second disposition.

On brief, respondent asserts the transfers from Kanter's grantor trusts to Cashmere do not qualify for nonrecognition treatment under section 351 on the alternative grounds that (1) there was no valid business purpose for the transfers from the grantor trusts to Cashmere and/or the grantor trusts did not control Cashmere immediately after the transfer (under the step-transaction doctrine), (2) the principal purpose for the transfers from the grantor trusts to Cashmere was the avoidance of Federal income tax under section 357(b), and (3) the promissory notes that the grantor trusts transferred to Cashmere did not represent genuine indebtedness, and therefore Cashmere assumed liabilities in excess of the bases in the partnership interests it received within the meaning of section 357(c). Respondent also avers that Waco's purchase of Cashmere's stock did not qualify for installment sale treatment because the transaction amounted to a disposition "of property to a related person" within the meaning of section 453(e)(1)(A).

Kanter argues the question whether the Cashmere transaction qualifies for nonrecognition treatment under section 351 is not properly before the Court, and, in any event, the grantor trusts transferred their partnership interests to Cashmere for

legitimate business purposes; i.e., to enjoy tax advantages in the event the partnership interests were sold and/or to "have an aggregation of value" within the corporate entity to allow for more efficient investments. Kanter, Transcr. at 4243. Kanter further asserts the section 357(b) issue was not raised in the pleadings and is not properly before the Court and, in any event, the Cashmere transaction is not the type of arrangement that section 357(b) is designed to address. Finally, Kanter contends the promissory notes the grantor trusts transferred to Cashmere constituted genuine indebtedness, rendering section 357(c) inapplicable in these cases.

B. Analysis

Respondent determined in the notice of deficiency that the transfers from Kanter's grantor trusts to Cashmere for stock did not qualify as a tax-free exchange because the transfers were not intended to serve a bona fide business purpose but instead were carried out only to avoid Federal income tax. Although the notice of deficiency did not explicitly refer to section 351 or 357, we conclude Kanter understood respondent's position regarding the Cashmere transaction and the bases for respondent's adjustments. We further conclude, as discussed in detail below, the Cashmere transaction does not qualify for nonrecognition treatment under either section 357(b) or (c), and therefore we

sustain respondent's determination that Kanter realized a long-term capital gain as a result of the Cashmere transaction.

A taxpayer generally recognizes gain or loss on a sale or exchange of property. Sec. 1001(c). Section 351(a) provides an exception to the general rule of section 1001(c), however, when a taxpayer transfers an appreciated asset (such as a partnership interest) to a controlled corporation solely in exchange for the corporation's stock. The favorable tax benefits associated with section 351 are subject to several qualifying provisions outlined below.

As a general rule, if a taxpayer receives property pursuant to a section 351 exchange and, as part of the transaction, another party to the transaction assumes a liability of the taxpayer, the assumption of liability shall not be treated as the receipt of money or property and shall not disqualify the transaction for nonrecognition treatment under section 351. Sec. 357(a). The general rule of section 357(a) is subject to the two exceptions set forth in section 357(b) and (c).

To paraphrase, section 357(b) provides that an assumption of a taxpayer's liability under section 357(a) shall be considered money received by the taxpayer for purposes of section 351 if, taking into consideration the nature of the liability and the circumstances surrounding the arrangement, it appears the

taxpayer's principal purpose was to avoid Federal income tax on the exchange or was not a bona fide business purpose.

Section 357(c)(1)(A) provides, in the case of an exchange to which section 351 applies, that if the amount of the liabilities assumed exceeds the total of the adjusted basis of the property transferred pursuant to the exchange, the excess is treated as gain from the sale of a capital or noncapital asset, as the case may be.[152]

### 1. Applicability of Section 357(b)(1)

Considering all the facts and circumstances, we conclude Kanter arranged the Cashmere transaction principally for the purpose of avoiding Federal income tax. The convoluted series of Cashmere transactions began when Zell informed Kanter of Equity's desire to acquire the partnership interests held by Kanter's grantor trusts. In the end, Equity acquired those partnership interests in exchange for cash. In between, over a period of a few months, Kanter arranged: (1) Transfers of notes receivable to his grantor trusts in an aggregate amount approximately equal to the grantor trusts' negative capital accounts in their partnership interests, (2) transfers of the grantor trusts' partnership interests and the notes receivable to Cashmere in exchange for Cashmere stock, (3) sales by the grantor trusts of their Cashmere stock to Waco for promissory notes, (4) the

---

[152] Sec. 357(c)(2)(A) provides sec. 357(c)(1) shall not apply to any exchange to which sec. 357(b)(1) applies.

purported satisfaction of the notes receivable held by Cashmere, and, finally, (5) Waco's sale of Cashmere stock to Equity.

Considering Zell simply wanted to acquire the real estate partnership interests held by Kanter's grantor trusts, and taking into account Kanter's desire to avoid recognizing gain on the sale to Zell to the extent his grantor trusts had negative capital accounts in the partnership interests, it is clear the rapid series of transactions described above, particularly the transfer of notes receivable to Cashmere, was carried out for no reason other than to avoid Federal income tax. Moreover, Waco's promissory notes to Kanter's grantor trusts ostensibly provided additional tax benefits in that Kanter reported the gains realized on the sale of Cashmere stock to Waco under the installment method, even though Equity paid Waco in full in 1983. In the absence of any showing that Cashmere served any legitimate business purpose before or after the transactions described above, we sustain respondent's determination that the transfers of the partnership interests with negative capital accounts to Cashmere constitute money received by Kanter (through his grantor trusts) and Kanter is taxed on the gain resulting from the transfers up to the full amount of the assumed liabilities.

2. Applicability of Section 357(c)

Section 357(c)(1)(A) provides that, in the case of an exchange to which section 351 applies, if the amount of the

liabilities assumed exceeds the total of the adjusted basis of the property transferred pursuant to the exchange, then the excess is treated as gain from the sale of a capital or noncapital asset, as the case may be. Considering all the circumstances, we conclude, as an alternative to our analysis under section 357(b), that the grantor trusts' transfer of the eight notes receivable to Cashmere is not entitled to be respected for purposes of applying section 357(c).

Cashmere was, at best, a passive investment vehicle as opposed to an operating business, and in this light the transfer of the notes receivable to Cashmere served no business purpose independent of the tax benefits Kanter hoped to reap. The eight notes receivable in question (1) were either payable by Kanter individually or by entities he controlled, (2) reflected a total principal amount approximately equal to the aggregate negative capital accounts of the partnership interests in question, (3) were all dated May 1, 1983, and payable on August 31, 1983, and (4) were all repaid with funds from a TACI account. There is no discernible paper trail evidencing the source of the TACI funds. In the end, the cash paid to Cashmere/Waco on the notes receivable was returned to Kanter (indirectly) in the form of a portion of the cash payment Equity made to Waco for Cashmere's stock.

Considering all the circumstances, we conclude the notes receivable were used as a device to circumvent section 357(c) and resulted in nothing more than a circular transfer of funds between and among Kanter-controlled entities. There is no evidence in the record that the notes receivable represented valid indebtedness.

In the absence of any discernible bases in the notes receivable, we conclude the notes did not increase the aggregate basis in the property Kanter's grantor trusts transferred to Cashmere. Under section 357(c), Kanter was required to recognize as capital gain the excess of the liabilities Cashmere assumed over basis in the property his grantor trusts transferred to Cashmere.

### 3. Kanter's Use of the Installment Method

Section 453(a) provides the general rule that income from an installment sale shall be reported under the installment method. An installment sale generally is defined as a disposition of property where at least one payment is to be received after the close of the taxable year in which the disposition occurs. Sec. 453(b)(1).

Section 453(e) prescribes special rules applicable to installment sales by related persons. In particular, section 453(e)(1) provides that if a person sells property to a related party (the first disposition) under the installment method, and

the related party purchaser then resells the property (the second disposition) within 2 years after the first disposition and before the original seller has received all payments due with respect to the first disposition, the amount realized by the related party on the second disposition is treated as a payment received at that time by the original seller. Section 453(e)(7) provides that subsection (e) shall not apply to a second disposition if neither the first disposition nor the second disposition had as one of its principal purposes the avoidance of Federal income tax.

Section 453(f)(1)(A) and (B) defines the term "related person" for purposes of section 453(e) as a person whose stock would be attributed under section 318(a) (other than paragraph (4) thereof) to the person first disposing of the property or a person who bears a relationship described in section 267(b) to the person first disposing of the property.

Waco's stock was owned entirely by the Bea Ritch Trusts, and the beneficiaries of the Bea Ritch Trusts were members of Kanter's family. In addition, Kanter's family members were the beneficiaries of Kanter's grantor trusts. Because the Waco stock owned by the Bea Ritch Trusts is considered owned by the beneficiaries of the Bea Ritch Trusts under section 318(a)(2)(B)(i), and those same beneficiaries are also the beneficiaries of Kanter's grantor trusts, ownership of the Waco

stock is imputed to the grantor trusts under section
318(a)(3)(B)(i).[153]  It follows that the grantor trusts' sale of
Cashmere stock to Waco constituted a sale to a related person for
purposes of section 453(f)(1)(A).  When Waco subsequently, within
2 years, transferred the Cashmere stock to Equity before paying
the grantor trusts for the Cashmere stock, the installment method
of reporting was no longer available to the grantor trusts (and
Kanter) by virtue of section 453(e)(1).  In sum, the entire
amount Waco realized upon its sale of Cashmere stock to Equity
(the second disposition) is treated as received by the grantor
trusts at the time of the second disposition.  Thus, we sustain
respondent's determination that Kanter was not eligible for
installment sale reporting.

Issue XIII.    Whether Kanter Is Entitled to Research and
               Development and Business Expense Deductions Related
               to Immunological Research Corp. for 1979 (STJ
               report at 147-163)[154]

    In an amendment to answer, filed November 6, 1989,
respondent asserted the Kanters were liable for an increased

---

[153]  Alternatively, under Issue V supra, we concluded Kanter
was the grantor of the Bea Ritch Trusts under the grantor trust
provisions.  Attributing the Waco stock held by the Bea Ritch
Trusts to Kanter, see sec. 318(a)(2)(B)(ii), it follows that
Kanter's ownership of the Waco stock also is attributed to
Kanter's grantor trusts under sec. 318(a)(3)(B)(ii).  Thus, Waco
and the grantor trusts are considered related persons under sec.
453(f)(1)(A).

[154]  The Court's disposition of this issue represents in
large measure a wholesale adoption of the recommended findings of
fact and conclusions of law set forth in the STJ report.

deficiency for 1979 attributable to the disallowance of a loss
of $311,478 the Kanters claimed from Immunological Research Corp.
(IRC), an S corporation in which the Kanters held an interest
through grantor trusts (i.e., the Pillpoppers Trusts).
Respondent determined that IRC was not entitled to a research and
development expense of $980,000 or various other business
expenses it reported for 1979.

FINDINGS OF FACT

*The facts underlying this issue were also considered by this
Court in Estate of Cook v. Commissioner, T.C. Memo. 1993-581,[155]
which involved another shareholder in IRC. In Estate of Cook,
the Court sustained the Commissioner's disallowance of research
and experimentation expenses under section 174(a), as well as
similar expenses claimed by two other subchapter S corporations,
Antiviral Research Corp. (ARC) and Biological Research Corp.
(BRC), that were engaged in the same activity. Kanter was not a
stockholder in ARC or BRC. In the instant case, the parties
stipulated to the record of Estate of Cook except as to those
portions of the record relating to the other two subchapter S
corporations.*

---

[155] The decision the Court entered at docket No. 9533-87,
in accordance with its Memorandum Opinion in Estate of Cook v.
Commissioner, T.C. Memo. 1993-581, was not appealed and is final.
See secs. 7481(a)(1), 7483.

Kanter was counsel of record for the taxpayers in Estate of Cook and was the trial attorney before this Court. Since Kanter was an investor in IRC, he had offered himself as a witness for the taxpayers at the trial of the Estate of Cook case. The Court did not allow Kanter to testify, however, because he was the trial attorney for the taxpayers. In the instant cases, Kanter was not the trial attorney and was before this Court as a party litigant and, therefore, he was allowed to testify as a witness.

For present purposes, the Court recites the pertinent facts from Estate of Cook. Kanter contends the Court's holding in Estate of Cook is in error. A more detailed and comprehensive findings of fact can be found in the reported opinion of Estate of Cook.

During 1979, Kanter and three other individuals (including George Cook, whose estate was the taxpayer in Estate of Cook, invested in IRC. None of the stockholders in IRC, including Kanter, had any formal educational background or experience in the field of pharmaceutical compounds, which was the business IRC was set to engage in.

Shortly after IRC was organized, IRC entered into a research/licensing agreement with Newport Pharmaceutical International, Inc. (Newport). Newport was then engaged in the manufacture, marketing, research, and development of pharmaceutical compounds. Newport owned an undivided one-half

interest in a compound identified as the NPT-15000 series that it had acquired in 1978 from the Sloan-Kettering Memorial Institute for Cancer Research (Sloan-Kettering), the discoverer of the compound. At that time, this particular compound was still in the experimental stage of development.

In the 1978 transaction, Newport also acquired one-half of the "Patent Rights [of the compound], and the inventions and improvements covered thereby, throughout the world." The term "Patent Rights" was comprehensively defined elsewhere in the 1978 sales agreement. In this 1978 sales agreement, Newport was given the exclusive right to exploit the patent rights to the subject compound on a world-wide basis, as to which Newport agreed to use its best efforts to exploit the patent rights for the mutual benefit of itself and Sloan-Kettering. The agreement further allowed Newport to license third parties in connection with the exploitation of the subject compound; however, such licensing agreements, among other things, had to be agreed to by Sloan-Kettering.

IRC ostensibly was organized to engage in a licensing agreement with Newport for exploitation of the NPT-15000 series compound in which Newport held a one-half interest. IRC and Newport entered into such an agreement in 1979 for the compound identified as NPT-15392, which was within the NPT-15000 series. However, the licensing agreement IRC entered into was only with

*Newport. Sloan-Kettering was not a party to the agreement, did not sign the agreement, and there is no evidence that Sloan-Kettering ever acquiesced in the agreement. Newport and IRC were cognizant of Sloan-Kettering's patent reservation rights, and, accordingly, the licensing agreement between IRC and Newport was structured or attempted to be structured in such fashion that the exploitation of the subject compound by IRC or its licensees would not violate Sloan-Kettering's rights. With that end in mind, the research agreement between IRC and Newport contained the following provision:*

> *2. Ownership of Project Results.*
> *Any and all products, processes, compounds, inventions, ideas, patents, patent rights, technical information, data and other proprietary know-how resulting or deriving from the Project, including all improvements thereto, and any other rights to commercially exploit the Project and the products and results thereof, including but not limited to, licensing and distribution rights, shall be the sole and exclusive property of the corporation [i.e., IRC]; provided, however, the Corporation shall have no ownership rights or rights which may be deemed to be a sub-license to the extent that any of the foregoing constitutes a "Patent Right" or an invention or improvement covered thereby as defined in the agreement dated March 28, 1978 between Newport and Sloan-Kettering Institute * * *. [Emphasis added.]*

*Pursuant to this licensing agreement, IRC paid Newport, during 1979, $980,000 for Newport's services for the research, experimentation, and further development of the compound NPT-15392. On their 1979 Federal income tax return, as noted earlier, the Kanters claimed a deduction for their portion of this $980,000 research and experimentation expense, which*

*respondent disallowed, consistent with the Commissioner's*

*position in Estate of Cook v. Commissioner, T.C. Memo. 1993-581.*

*In Estate of Cook, this Court sustained the Commissioner's*

*determination disallowing the portion of the $980,000 expense*

*claimed by George Cook as a deduction under section 174(a). The*

*parties agreed in the Estate of Cook case that IRC was not*

*engaged in a trade or business within the meaning of section*

*162(a). The Kanters here do not contend otherwise. The Kanters*

*contend, however, as Kanter argued for the taxpayers in the*

*Estate of Cook case, that the expense nevertheless qualified as a*

*deduction under section 174(a) as a research or experimentation*

*expense.*

*This Court, in the Estate of Cook case, held the expense was*

*not a research or experimentation expense within the meaning of*

*section 174(a) based on the premise that, to qualify under*

*section 174(a), two requirements must be satisfied: (1) The*

*taxpayer must have an objective intent to enter into the trade or*

*business envisioned by the licensing agreement, and (2) the*

*taxpayer must demonstrate the capability to engage in such trade*

*or business. The Court went on to conclude that IRC failed to*

*meet both of these tests. Of significance to the Court was the*

*fact that the taxpayers had not established that IRC had obtained*

*any ownership rights in any technology to be developed by Newport*

*because Sloan-Kettering was not a party to and had not consented*

*to the licensing agreement (as required in the 1978 sale by*

*Sloan-Kettering to Newport), and, moreover, the license agreement*

*between Newport and IRC expressly provided that no ownership*

*rights in the technology to be developed by Newport would inure*

*to IRC to the extent that such technology or rights envisioned by*

*the agreement came within the definition of "Patent Rights" as*

*reserved by Sloan-Kettering in the 1978 sale to Newport. The*

*reservation by Sloan-Kettering in the 1978 sale to Newport*

*provided:*

> *[the third-party license] shall have no ownership right or*
> *rights which may be deemed to be a sub-license to the extent*
> *that any of the foregoing constitutes a "Patent Right" or an*
> *invention or improvement covered thereby as defined in the*
> *agreement dated March 28, 1978 between Newport and Sloan-*
> *Kettering Institute or is covered by the Assignment*
> *Agreement between Newport and Paul Gordon dated April 26,*
> *1971 (collectively the "Prior Agreements").*

*In light of the reservation in the 1978 sale by Sloan-Kettering*

*to Newport and the broad definition of "Patent Rights" in the*

*same instrument, this Court concluded little, if anything, was*

*left to be acquired by IRC in the 1979 licensing agreement*

*between Newport and IRC.[156] The Court stated: "In light of this*

---

[156] *The Mar. 28, 1978, agreement wherein Sloan-Kettering conveyed a one-half interest to Newport defined "patent right" as follows:*

> *a. Any U.S. patent application hereafter filed covering any invention or improvement resulting from the Collaborative Efforts, and division, continuation, and continuation-in-part of any such application, and any patent which shall issue based on such application,*

(continued...)

*definition, it is hard to visualize that [IRC] obtained ownership*

---

[156](...continued)
*division, continuation, and continuation-in-part.*
  *b.  Any patent which is a reissue or an extension of, a patent of addition to, any patent defined in (a) above;*
  *c.  Any patent application or patent corresponding to any patent application or patent identified in (a) or (b) above which is hereafter filed or issued in any country.*

*In the licensing agreement between Newport and IRC, entered into in 1979, the research to be undertaken by Newport was described as follows:*

> *The research which is the subject of this Agreement will include, but is not limited to the areas of: chemical synthesis and analysis of compounds to be agreed upon; research and development of pharmaceutical dosage forms and methods of quality control testing for identity, purity and stability; preclinical toxicological, pharmacological and biochemical studies in tissue culture and animal models to determine safety efficacy and method of action and to provide guidelines for the investigation of potential applicability to human subjects; toxicological, pharmacological and biochemical studies in human subjects to determine safety and degree of tolerance in man; and clinical trials to determine range of clinical potential and conditions for obtaining maximum therapeutic benefit at minimum risk in clinical usage.*

> *This shall be a fixed price contract and Newport will provide to * * * [IRC] data on NPT-15392 and such other substances as may be agreed to, establishing the acute toxicity (single dose administration to two species); subacute toxicity (multiple dose administration in two species for 90 days); single dose administration to humans designed to establish the level at which the drug may be safely administered (including laboratory and physical measurements of potential side effects) and the results of efficacy testing in at least 12 patients in which laboratory parameters of the immune response are measured.*

*of anything that could be commercially exploited in a trade or business." The Court surmised that virtually anything Newport developed would constitute a "Patent Right", and, if so, the ownership of such improvement or technology would not be owned by IRC.*

*There were other facts the Court discussed to support the conclusion IRC was not engaged in a trade or business and did not have the capability to engage in a trade or business. These other findings are not seriously challenged by Kanter in the instant cases, and the Court does not consider it necessary to discuss those factors here.*

*Kanter was the only witness for petitioners with respect to this issue. No documentary evidence was presented to corroborate Kanter's testimony. Kanter's testimony was directed toward establishing that there were certain rights or the ownership of technology that IRC could acquire from the licensing agreement with Newport that would not fall within the umbrella of the "Patent Rights" exception existing in favor of Sloan-Kettering.*

OPINION

A.  Trade or Business Requirement of Section 174

Section 174(a)(1) provides:

A taxpayer may treat research or experimental
expenditures which are paid or incurred by him during
the taxable year in connection with his trade or
business as expenses which are not chargeable to

capital account.  The expenditures so treated shall be allowed as a deduction.

Section 174(a)(1) applies to expenditures paid or incurred by a taxpayer for research or experimentation undertaken directly by a taxpayer or to expenditures paid or incurred by a taxpayer for research or experimentation carried on by another person or entity on the taxpayer's behalf.  Sec. 1.174-2(a)(8), Income Tax Regs.

To be entitled to deductions for research and experimental expenditures, a taxpayer is not required to currently produce or sell any product.  Moreover, a taxpayer need not be currently engaged in a trade or business in order to qualify for such deductions.  Snow v. Commissioner, 416 U.S. 500, 503-504 (1974). Nevertheless, in Green v. Commissioner, 83 T.C. 667, 686-687 (1984), the Court stated:

> For section 174 to apply, the taxpayer must still be engaged in a trade or business at some time, and * * * [the Court] must still determine, through an examination of the facts of each case, whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of such section. [Fn. ref. and citations omitted.]

A taxpayer must be more than a mere investor to be entitled to deductions for research and experimental expenditures under section 174.  Id. at 688-689; see also Levin v. Commissioner, 87 T.C. 698, 725-726 (1986), affd. 832 F.2d 403 (7th Cir. 1987).  In the case of an entity claiming deductions under section 174, the

relevant inquiry is whether the entity has any realistic prospect of entering into a trade or business involving the technology under development.  Spellman v. Commissioner, 845 F.2d 148, 151 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Diamond v. Commissioner, 92 T.C. 423, 439 (1989), affd. 930 F.2d 372 (4th Cir. 1991).[157]

As the foregoing cases demonstrate, when an entity contracts out the performance of the research and development in which it intends to engage, all of the surrounding facts and circumstances are relevant to the inquiry whether the entity has any realistic prospect of entering into a trade or business with respect to the technology under development.  Consideration is given to (1) the intentions of the parties to the contract for the performance of the research and development, (2) the amount of capitalization retained by the entity during the research and development contract period, (3) the exercise of control by the entity over the person or organization doing the research, (4) the existence of an option to acquire the technology developed by the organization conducting the research and the likelihood of its exercise, (5) the business activities of the entity during the period in question, and (6) the experience of the investors in the entity.  Absent a realistic prospect that the entity will

---

[157]   See also Double Bar Chain Co., Ltd. v. Commissioner, T.C. Memo. 1991-572; Coleman v. Commissioner, T.C. Memo. 1990-357.

enter a trade or business with respect to the technology, the entity will be treated as a passive investor, not eligible for deductions under section 174.

As indicated previously, in Estate of Cook v. Commissioner, T.C. Memo. 1993-581, the Court addressed another IRC shareholder's entitlement to a deduction for IRC's claimed 1979 research and development expense. In Estate of Cook, the Court rejected the taxpayers' contention that a realistic prospect existed of IRC's entering into a trade or business to exploit the results of the research and experimentation it acquired from Newport.

B. The Parties' Arguments

Because respondent raised this issue in an amendment to answer in which he asserted an increased deficiency, respondent has the burden of proof on this issue under Rule 142(a)(1). Respondent asserts the identical research and development expense and business expense issues were presented to and decided by the Court in Estate of Cook, and respondent maintains the Court's reasoning and conclusions in Estate of Cook are equally applicable here.

Petitioners contend the issues are purely factual and the present cases can be distinguished from the Estate of Cook case on the grounds that (1) Respondent, not petitioners, bears the burden of proof; and (2) Kanter was permitted to testify in these

cases. Petitioners argue that the Court's conclusions here with respect to IRC should not be based upon certain "irrelevant" facts concerning Antiviral Research Corp. (ARC) and Biological Research Corp. (BRC), as petitioners imply happened in Estate of Cook. Petitioners maintain that almost all of the facts concerning ARC and BRC that were discussed in the Estate of Cook opinion are irrelevant here because (1) Kanter was not a shareholder of either ARC or BRC, and (2) all events relating to ARC and BRC occurred after 1979. In particular, petitioners assert that much of the documentation cited and relied upon by respondent in respondent's proposed findings of fact is not actually in evidence in the instant cases, in the light of petitioners' specific exclusion in the parties' written stipulation of those portions of the Estate of Cook record regarding ARC and BRC.

C. Analysis

Preliminarily, the Court notes that the parties, for purposes of the instant cases, generally stipulated the Estate of Cook record, except for evidence that related only to ARC or BRC. Thus, as the Court interprets the parties' stipulation, the evidence presented in Estate of Cook on ARC and BRC that would be relevant to IRC (not including perhaps the testimony of Dr. Charles Altschuler, which the Court, in any event, hereinafter does not rely upon) would be considered as evidence in the

instant cases and could be considered in resolving the IRC issues for 1979.  The Court does not construe the parties' stipulation to limit the evidence here to only those portions of the Estate of Cook evidentiary record that petitioners, in their sole opinion, considered "relevant" to IRC and Kanter.

On this record, respondent has established that Kanter is not entitled to deduct research and development expenses for 1979 under section 174(a).  The evidence establishes that there was no realistic prospect of IRC's entering into a trade or business to exploit the technology relating to the NPT-15392 compound being developed under the IRC-Newport research/licensing agreement. Simply put, there was little, if anything, IRC could acquire from the deal since virtually anything that Newport developed would almost certainly be a patentable property right that could not be owned by IRC.

As this Court previously noted in Estate of Cook v. Commissioner, T.C. Memo. 1993-581:  (1) The broad definition of the term "patent rights", as defined in the March 28, 1978, agreement between Newport and Sloan-Kettering, made it virtually impossible for IRC to acquire ownership of anything that could be commercially exploited in a trade or business; (2) the existence of the IRC Shareholders-Newport put/call agreement made it extremely unlikely IRC would ever be able to use, in a trade or business, the research Newport conducted because (a) if the

research were sufficiently successful to require the payment of royalties, then Newport likely would exercise its call option allowing it to buy the IRC stock and, (b) if the research were not sufficiently successful to require the payment of royalties, then IRC's shareholders would be motivated to put their IRC shares to Newport in return for Newport common stock; (3) after its initial capital was expended, IRC had no further capital to conduct or finance further research, and the existence of the put and call agreements gave IRC's shareholders no incentive to contribute additional capital to IRC; and (4) some of IRC's shareholders apparently had always wanted to acquire Newport stock, and structuring such an investment as a research and development activity would allow the investors a deduction for their investment.

Although the record in these cases includes Kanter's testimony, testimony which was not allowed in the Estate of Cook case, the Court finds Kanter's testimony unconvincing. Kanter's testimony was in the nature of advocacy as opposed to a presentation of substantive evidence that would show that the conclusions of the Court in Estate of Cook were in error, or that essential and relevant facts had not been presented to the Court in Estate of Cook. Essentially, Kanter misunderstood this Court's reasoning in Estate of Cook. Kanter argued that the Court in Estate of Cook incorrectly assumed that IRC held no

technical legal ownership rights in the know-how produced under
the research project.  Kanter contended that IRC did hold "other
valuable rights" in the research know-how outside of any existing
and derivative future "patent rights" in the NPT-15000 series of
compounds retained by Newport and Sloan-Kettering.[158]  However,

---

[158]  Kanter testified as follows:

[Kanter]:  Well, I can't speak to it, Your Honor,
in terms of being a patent attorney, and I don't
profess to necessarily understand what a patent
attorney would testify to as an expert, but it was my
understanding that the documents here [i.e., the
IRC-Newport R&D and License Agreement and the March 28,
1978, agreement between Newport and Sloan-Kettering],
which are part and parcel of the manner in which the *
* * [Court] developed its opinion in Cook, involved
patent rights as a form of rights that belonged to * *
* (Newport] and Sloan-Kettering under the documents.

The other rights [belonging to IRC] would be
those, of course, that exist if no patent rights were
obtained, and any other rights that were not
encompassed by any patent rights that were defined, so
that there was a body of rights that could be available
to IRC.

Absent Newport * * * and Sloan-Kettering
undertaking something that would preclude a given
right, if they were granted such a right, IRC had the
basic rights it could proceed with, should a product be
developed from this particular research.

The Court:  So I guess what you are saying is, * *
* that the researcher really has * * * [retained the
rights to develop the technology]

        *         *         *         *         *

[Kanter]:  Right.  And I think that is one of the
things they do go on, and the Court, in * * * [Estate
of Cook], pointed to the fact that Newport,.and
Sloan-Kettering appeared, under the definition of
(continued...)

Kanter was unable to explain or describe what those rights might be, nor was any other evidence presented that would establish or support his contention.  Kanter testified:

> [Kanter]: * * * But it was my understanding and my belief that there is a body of rights that, unless encompassed by a specific patent that would be issued to Sloan-Kettering and Newport, under which they could theoretically preclude the exploitation of that limited right, all other rights that might result from this particular research project did belong to IRC and that they were broad enough in--as we understood it to allow for exploitation of a profitable product or to move to the next stage of possible licensing, if in fact there was something developed.
>
> The Court:  So this body of rights that you are referring to--would these be rights that would be considered research and development.
>
> [Kanter]:  Well, actually my recollection is--and the [Estate of Cook] record will disclose it more accurately--Dr. Glasky tried to point out to the Court at that time that there is in this pharmaceutical field not the necessity at any given time for a research and development project that you develop a marketable product that can go on the shelf in a drugstore, but that in this field it is common to bring research to a point where you can license what you have developed to a large pharmaceutical manufacturer, who will take it to another stage to bring it to a commercial product that will be put on the shelf.

---

[158](...continued)
patent rights, to own the rights, and that IRC owned no rights.

> *          *          *          *          *
>
> [Petitioners' counsel]:  Well, in fact, isn't it true, Mr. Kanter, that unless a patent was obtained or reissued, that all rights would have remained in IRC?
>
> [Kanter]: That is my understanding.

Kanter, Transcr. at 4851-4854.

> *And I can't tell you now what might have conceivably been developed were this product research and development to have been successful or gone far enough, but it was our impression and understanding at this time that it either would--or could produce something significant and allow for future research and licensing or something significant enough to be an actual product that could be commercially manufactured.* * * * [Emphasis added.]

The Court: But there have been no development of these other rights that you are talking about?

[Kanter]: Well, those rights existed. There was no preclusion of the rights as far as I know, that nobody took them away in the form of defined patent rights. [Kanter, Transcr. at 4853-4854.]

The mystery to the Court is just what those "rights" might be. The Court is quite skeptical that, in the everyday world, an investor would pay $980,000 for a bundle of ambiguous property rights when there is no indication that the rights could be exploited or developed. Moreover, this Court's holding in Estate of Cook was not premised totally or exclusively upon IRC's holding no technical legal ownership rights whatsoever in the research, as Kanter implies. Rather, in Estate of Cook, this Court concluded, after considering the totality of the attendant facts and circumstances, including certain highly relevant factors, that there was no realistic prospect of IRC's entering into a trade or business to exploit the technology being developed under the IRC-Newport R&D and license agreement.[159]

---

[159] Other factors considered by the Court included a put/call agreement that allowed the IRC shareholders to "put" their stock in IRC to Newport, which the stockholders of IRC

(continued...)

Indeed, in his testimony, Kanter could not elaborate or describe what realistic prospects IRC would have of exploiting commercially the technology being developed. In view of the broad scope of the existing and potential patent rights Newport and Sloan-Kettering held, it is difficult to believe that a third party, such as a major pharmaceutical company, would want to license from IRC the know-how on NPT-15392 to further develop that technology.

On the basis of the foregoing, the Court holds the Kanters are not entitled to a deduction under section 174 for 1979 with respect to IRC's claimed research and development expense. See Spellman v. Commissioner, 845 F.2d 148 (7th Cir. 1988), affg. T.C. Memo. 1986-403; Diamond v. Commissioner, 92 T.C. 423 (1989),

---

[159](...continued)
would likely exercise if the research turned sour, or the "call" agreement that allowed Newport to buy the IRC stock, which likely would occur if the development of the technology proved to be successful. The Court also noted that all of the Schedules 10-K filed by Newport with the Securities and Exchange Commission, pursuant to sec. 13 or 15(d) of the Securities Exchange Act of 1934, as amended, described the research agreement, as entered into with IRC, as being more in the nature of an investment than a licensing of the technology. The Court further noted that, even if IRC acquired the technology from Newport, there was no showing that IRC had the resources to devote to the exploitation of the technology, nor was there any obligation on the part of IRC to compel or require capital contributions from its stockholders. The Court concluded the investments in IRC were nothing more than an investment in Newport that was structured to allow the investors in IRC a deduction for their $980,000 investment through purported research and experimental deductions that would not have been available had the investment been made directly in Newport.

affd. 930 F.2d 372 (4th Cir. 1991); Estate of Cook v. Commissioner, T.C. Memo. 1993-581.

The Court further holds the Kanters are not entitled to deductions under section 162 for 1979 with respect to IRC's claimed business expense deductions.  IRC was not engaged in an active trade or business during 1979, as IRC's activities fail to satisfy even the "in connection" with a trade or business standard of section 174.  See Estate of Cook v. Commissioner, supra.

Issue XIV.   Whether Kanter Received Unreported Partnership Income During 1978 (STJ report at 145-146)

FINDINGS OF FACT

**The notice of deficiency respondent issued to the Kanters for 1978 included as an attachment a Form 4549-B, Income Tax Examination Changes, and an accompanying schedule describing the changes determined in the notice.  Item 1h, titled "Partnership Income" states:**

    It is determined that during the tax year 1978 you
    failed to report your distributive share of partnership
    income from the sources shown.  Consequently, your
    taxable income is increased in the amount of $4,953.00.

    As Shown Below:

        T.C. Family Trust              ($512.00)
        Everglades Trust No. 1          1,093.00
        Everglades Trust No. 2          1,093.00
        Everglades Trust No. 3          1,093.00
        Everglades Trust No. 4          1,093.00
        Everglades Trust No. 5          1,093.00
                                        4,953.00

The notice of deficiency did not identify the partnership(s)

generating the income determined in item 1h.  In addition,

although Kanter disputed this adjustment in his petition, he did

not identify the underlying partnership.

On June 13, 1994, respondent filed an amendment to answer

which identified the $4,953 adjustment as "Partnership

Income/Loss (Fuel Boss - Energy Management Systems)".

No evidence regarding this adjustment was offered by either

party during the trial of these cases.

After trial, on May 15, 1995, the parties submitted to the

Court a stipulation of settlement addressing a number of the

adjustments determined in the notice of deficiency for 1978.

Paragraph 5 of the stipulation of settlement concerns item 1f

from the notice of deficiency and states:  "Notice of deficiency

adjustment 1(f), 'Schedule C--Income/Loss.'  The Court need not

**address this adjustment at this time, inasmuch as the parties have agreed that this issue is part of the 'Energy Management' project which is under the jurisdiction of Judge Halpern." The parties' stipulation of settlement, however, does not address item 1h from the notice of deficiency.**

OPINION

Respondent's amendment to answer, filed June 13, 1994, identified the $4,953 adjustment as "Partnership Income/Loss (Fuel Boss - Energy Management Systems)". Under the circumstances, it appears this issue pertains to the Energy Management Project and the adjustment was overlooked when the parties submitted to the Court their stipulation of settlement for 1978. Consequently, the parties shall make adjustments for this issue in their computations for entry of decision under Rule 155.

Issue XV. <u>Whether the Kanters Are Entitled to a Loss From GLS Associates for 1981</u> (STJ report at 163-165)[160]

On their 1981 income tax return, the Kanters claimed a $4,283 loss from GLS Associates, a partnership, which respondent disallowed in the notice of deficiency.

---

[160] The Court's disposition of this issue represents in large measure a wholesale adoption of the recommended findings of fact and conclusions of law set forth in the STJ report. Petitioners have not registered any specific objections to the STJ report regarding this issue.

OPINION

On brief, petitioners acknowledge there is no specific evidence in the record establishing the existence of a computer leasing transaction by GLS Associates Partnership out of which the claimed loss arose.  However, petitioners contend there is evidence in this record with respect to other computer leasing transactions entered into by other entities, arguing on brief:

> The record is replete with evidence regarding [certain] computer sale/leaseback transactions [of other entities]; otherwise neither party submitted any evidence with respect to * * * [GLS' computer sale/leaseback] transaction except that the parties have both introduced argument and information pertaining to the case of HGA Cinema Trust v. Commissioner, T.C. Memo. 1989-370, affd. 950 F.2d 1357 (7th Cir. 1991) * * *.

Petitioners maintain the GLS Associates computer sale/leaseback transaction was "essentially the same in substance and form" as the SLG Partners computer sale/leaseback transaction considered by this Court in HGA Cinema Trust v. Commissioner, T.C. Memo. 1989-370, affd. 950 F.2d 1357 (7th Cir. 1991).  Petitioners appear to refer to evidence presented in connection with an IRA computer equipment leasing transaction as proof they are entitled the loss they claimed with regard to GLS Associates.

Respondent, on the other hand, contends petitioners failed to carry their burden of proof under Rule 142(a).

Petitioners failed to propose any findings of fact on this issue in their posttrial opening brief.  Petitioners are

misguided in their attempt to bootstrap this issue with that of the HGA Cinema Trust case regarding the SLG Partners computer sale/leaseback transaction. SLG Partners was a separate and distinct entity from GLS Associates, and the SLG Partners computer sale/leaseback transaction was a separate and different transaction from the GLS Associates transaction. It was incumbent on petitioners to introduce pertinent evidence on the GLS Associates transaction, as opposed to merely arguing that the GLS Associates transaction was essentially the same as the SLG Partners transaction. Petitioners failed to produce any evidence on this issue, and their self-serving legal arguments on brief do not constitute evidence. Consequently, the Court sustains respondent's determination on this issue. See Rule 142(a).[161]

----

[161] The Court also finds petitioners' seeming reliance upon HGA Cinema Trust v. Commissioner, T.C. Memo. 1989-370, affd. 950 F.2d 1357 (7th Cir. 1991), curious, as petitioners are not arguing that this Court should reach a conclusion similar to its conclusion therein. In HGA Cinema Trust, this Court, among other things, determined that certain long-term promissory notes SLG Partners issued in connection with the purchase of computer equipment were not valid indebtedness. The taxpayer in HGA Cinema Trust was a trust that was a limited partner in SLG Partners. Kanter was the trust's trustee and also its counsel in the litigation before this Court and the U.S. Court of Appeals for the Seventh Circuit. Moreover, in the instant cases, although there originally had been certain adjustments at issue between the parties relating to SLG Partners and K&D Associates (which latter entity, according to petitioners, simply held an interest in SLG Partners), those adjustments were settled by the parties. On May 15, 1995, the parties filed with the Court their stipulation of settlement as to certain issues between the Kanters and respondent. Pursuant to the May 15, 1995, stipulation of settlement, petitioners generally conceded the underlying SLG Partners and K&D Associates adjustments, except

(continued...)

Issue XVI.  <u>Whether the Kanters Are Entitled to Losses From Equitec for 1983 and 1984</u> (STJ report at 165-167)[162]

On their 1983 and 1984 income tax returns, the Kanters claimed losses of $83,333 and $161,727, respectively, from an entity named Equitec.  Respondent disallowed the Equitec losses.

OPINION

A.  <u>The Parties' Arguments</u>

Although petitioners offered little, if any, evidence concerning the computer leasing transactions they contend Equitec entered into, petitioners argue that "respondent has failed to recognize the evidence of record regarding the experience of Kanter vis-a-vis equipment leasing transactions [of other entities] and the issues of Equitec before this Court."  Petitioners maintain that Equitec's transactions should be reviewed "<u>de novo</u> * * * based upon the testimony and evidence offered regarding the extensive activity of petitioners in the

---

[161](...continued)
petitioners did not agree any additions to tax should be imposed with respect to these conceded adjustments.

[162]  The STJ report recommended holding that respondent is barred from making any determination concerning the taxable year 1983 on account of the expiration of the period of limitations governing assessment and collection for that year.  As previously discussed, we determined that Kanter's income tax returns for the years at issue were fraudulent, and, therefore, the period of limitations remains open pursuant to sec. 6501(c)(1).

The foregoing aside, the Court's disposition of this issue represents in large measure a wholesale adoption of the recommended findings of fact and conclusions of law set forth in the STJ report with regard to the taxable year 1984.

computer leasing field and the pertinence of such experience to determine the potential [of the] transactions for profit."

Respondent, on the other hand, contends that petitioners failed to carry their burden of proof under Rule 142(a).

B. Analysis

Petitioners failed to meet their burden of proof on this issue. Petitioners offered no substantive evidence regarding Equitec's computer leasing transactions. Petitioners' legal arguments on brief are no substitute for evidence relating to Equitec's transactions. For instance, even assuming for the sake of argument that Kanter's prior experience in similar investments may be a relevant factor to be considered in determining whether Equitec had an actual and honest profit objective, that factor alone is far from dispositive. See sec. 1.183-2(b), Income Tax Regs. Consequently, the Court sustains respondent's determination on this issue. See Rule 142(a).

Issue XVII.  Whether the Kanters Are Entitled to an Investment Interest Expense Deduction for 1981 (STJ report at 167-168)[163]

On their 1981 income tax return, the Kanters deducted $45,095 identified as investment interest expense related to GLS Associates. Respondent disallowed this deduction in the notice of deficiency, which stated in pertinent part:

_____

[163] The Court's disposition of this issue represents in large measure a wholesale adoption of the recommended findings of fact and conclusions of law set forth in the STJ report.

The above * * * claimed investment interest expense [from GLS Associates] is disallowed because you have not substantiated that the entity was engaged in an activity entered into for profit or that the investment interest expense was paid or incurred by the entity during the taxable year, or if paid or incurred, was deductible.

OPINION

A. The Parties' Arguments

Petitioners essentially advance the same arguments they raised above relating to (1) the partnership loss they claimed with respect to GLS Associates for 1981; and (2) the loss they claimed from Equitable Leasing for 1984, which the Court has rejected. Petitioners contend the GLS Associates leasing transaction in issue is substantially the same as the SLG Partners' leasing transactions and the Court should consider Kanter's experience with other entities in the equipment leasing field.

Respondent contends petitioners failed to carry their burden of proof on this issue under Rule 142(a).

B. Analysis

Petitioners failed to offer sufficient substantive evidence concerning GLS Associates' purported leasing transaction and GLS Associates' claimed investment interest expense for 1981 to sustain their burden of proof. Self-serving legal arguments on brief are not evidence and do not suffice to sustain the burden of proof. For instance, even assuming for the sake of argument

that Kanter's prior experience with similar investments is a relevant factor in determining whether GLS Associates had an actual and honest profit objective, that factor alone is far from dispositive. See sec. 1.183-2(b), Income Tax Regs. Petitioners failed to establish that: (1) GLS Associates was engaged in an activity for profit; (2) GLS Associates incurred and paid the claimed investment interest expense; and (3) even assuming the investment interest expense was incurred, that such interest expense is deductible. Consequently, the Court sustains respondent's determination on this issue. See Rule 142(a).

Issue XVIII. <u>Whether the Kanters Are Entitled to an Investment Tax Credit Carryover for 1978</u> (STJ report at 169-170)[164]

On their 1978 income tax return, the Kanters claimed a $120,566 investment tax credit carryover. Respondent disallowed the tax credit in the notice of deficiency.

OPINION

A. <u>The Parties' Arguments</u>

Petitioners contend that their entitlement to the 1978 investment tax credit carryover is purely "computational" under Rule 155. Petitioners assert, in pertinent part:

> The issue of whether Kanter is entitled to a carryover of investment tax credit from his 1977 year to his 1978 year is purely computational. The resolution of this

---

[164] The Court's disposition of this issue represents in large measure a wholesale adoption of the recommended findings of fact and conclusions of law set forth in the STJ report.

issue is entirely dependent upon the resolution of Kanter's Tax Court case involving his 1977 year (docket. No. 12282-82), which was previously docketed and decided by this Court. Although respondent * * * [in his proposed finding] states that petitioners failed to address this issue, that is not the case. Respondent's counsel stipulated on the record that petitioners had addressed all of the issues raised in respondent's notice of deficiency. (Tr. 4825). Since this issue is purely computational, and respondent is well aware of the terms of the resolution of Kanter's 1977 tax liability, the amount of the carryover from 1977 to 1978 will be addressed in the eventual Rule 155 proceeding in this matter, and need not be addressed by the Court at this time.

The "stipulation" referred to is the discussion that took place among the Court, petitioners' counsel, and respondent's counsel concerning the parties' settlement of a number of other adjustments for the years at issue.

Respondent contends petitioners failed to carry their burden of proof under Rule 142(a).

B. <u>Analysis</u>

During the trial of these cases, Kanter's counsel suggested that he would read into the record the issues the parties had settled. Transcr. at 4823. The Court rejected this proposal and instead directed the parties to submit to the Court a comprehensive written stipulation of settlement. Transcr. at 4823-4825. The Court's objective was to avoid the confusion that an oral presentation of the settled issues was likely to create. <u>Id.</u>

Petitioners' entitlement to an investment tax credit carryover for 1978 is not addressed in the stipulation of settlement the parties filed with the Court on May 15, 1995. Petitioners now nevertheless contend that the disposition of the credit carryover issue is tied to the resolution of the underlying investment tax credit issue for 1977--a year that was not before the Court in these consolidated cases

The Court rejects petitioners' argument as contrary to the burden placed upon them under Rule 142(a). Petitioners presented no evidence to establish the existence of, nor their entitlement to, the claimed carryover. See Leavell v. Commissioner, T.C. Memo. 1996-117.[165] Moreover, petitioners must bear responsibility for submitting to the Court a stipulation of settlement that does not make any reference to this issue. Since there are several factual matters that must be established to prove the amount of the carryover that were not established at trial, the Rule 155 computational process is not a forum within which this matter can be considered. See Price v. Commissioner, T.C. Memo. 1995-290. The Court, therefore, rejects petitioners' argument that this issue is computational under Rule 155. Respondent is sustained on this issue.

---

[165] For example, the burden of proof includes not only establishing the amount of the investment credit for the year the credit was earned but also establishing what portion of the credit was absorbed or applied in the carryback of the credit to prior years, after which the remaining amount of the credit can be applied to the first carryforward year.

Issue XIX.  Whether the Kanters Are Entitled to an Interest
            Deduction for 1986 (STJ report at 171-173)[166]

On Schedule E of their 1986 income tax return, the Kanters

claimed a $50,380 deduction for "interest computers".  Respondent

disallowed this deduction in the notice of deficiency.

OPINION

A.  The Parties' Arguments

Petitioners contend either (1) they should be allowed their

claimed interest deduction, or (2) the net income they reported

for 1986 from the related computer leasing activity should be

disregarded or eliminated.  Petitioners argue on brief, in

pertinent part:

> [In his proposed finding of fact], respondent
> asserts that the * * * computer equipment leasing
> deduction disallowed for 1986 is from the same Equitec
> investment which was disallowed in the subsequently
> issued notice of deficiency issued relative to * * *
> [the Kanters'] 1984 year * * *.  Both [the notice of
> deficiency for 1984 and the notice of deficiency for
> 1986] * * * contain boilerplate language disallowing
> Kanter's computer leasing related interest deduction,
> on a variety of grounds typically used to attack
> perceived equipment leasing tax shelters.  Most
> significantly, * * * [respondent's] notice of
> deficiency claimed that Kanter failed to establish that
> "the activity was entered into for profit or was
> economically viable." However, respondent's notice of
> deficiency for 1986, in contrast to the notice issued
> to Kanter concerning this same investment for 1984,
> fails to take into account (i.e., reverse) the rental
> income reported from this computer equipment
> transaction.

---

[166]  The Court's disposition of this issue represents in
large measure a wholesale adoption of the recommended findings of
fact and conclusions of law set forth in the STJ report.

It is submitted that Kanter's $50,380 1986 Schedule E interest deduction must be viewed in conjunction with the Schedule E <u>rents reported</u> and depreciation claimed from the equipment leasing activity. Kanter introduced his Schedule E with respect to the computer leasing activity involved * * * revealing that he reported rents in 1986 from the leasing activity involved of $118,835, and claimed depreciation of $61,730, for a net taxable <u>gain</u> of $6,725.

Respondent contends petitioners failed to meet their burden of proof under Rule 142(a).

B. <u>Analysis</u>

The Equitec computer leasing transaction referred to above relative to the Kanters' 1984 tax year was resolved in respondent's favor. With regard to the 1984 loss issue, we held that the Kanters failed to sustain their burden of proof because they failed to offer substantive evidence on the merits of the activity. For the 1986 tax year, which involves the same Equitec activity, petitioners claim that either the interest claimed for 1986 should be allowed as a deduction, or the net income reported from the activity for 1986 should be disregarded or eliminated.

Here again, the record does not include any substantive evidence regarding the merits of the Equitec computer leasing activity. There likewise is no evidence regarding the merits of the indebtedness upon which the interest payments were purportedly made by the Kanters. As noted in petitioners' brief, respondent disallowed the various expenses claimed in connection with Equitec "on a variety of grounds typically used to attack

perceived equipment leasing tax shelters." The fact that the leasing activity generated a profit (for 1986) does not impress the Court as proof that petitioners are entitled to an interest expense deduction for 1986. By the same token, the disallowance of expenses claimed with respect to an activity does not mean that the income or gross receipts of the activity can be disregarded. Section 1.183-1(e), Income Tax Regs., provides, in pertinent part, that "gross income derived from an activity not engaged in for profit includes the total of all gains from the sale, exchange, or other disposition of property, and all other gross receipts derived from such activity." Such gross income shall include, for instance, capital gains and rents received for the use of property that is held in connection with the activity. The gross receipts of an activity, even if the activity is not engaged in for profit, constitute gross income, and there is no provision for the exclusion or the disregarding of such income simply because the expenses related thereto are not deductible.

Petitioners, therefore, failed to sustain their burden of proving their entitlement to an interest deduction of $50,380 for 1986, and the Court rejects petitioners' contention the net income of the activity for 1986 should be disregarded. Respondent's determination on this issue is sustained.

Issue XX.  <u>Whether the Kanters Are Entitled to a Business
Deduction of $104,231 for 1980</u> (STJ report at 173-177)

Respondent disallowed a deduction of $104,231 that
petitioners claimed on Schedule C of their 1980 tax return.  The
deduction related to a joint venture between two of Kanter's
clients, Feigan and Rappaport, to purchase a painting of George
Washington.  Kanter was instrumental in bringing the two
businessmen together at the start of the venture.  The
transaction subsequently soured, the painting was returned to its
original owner, and, although the seller returned the full
purchase price, Rappaport, who provided the funds for the
purchase, lost money on account of an intervening decline in the
value of the British pound against the U.S. dollar.  A dispute
between Rappaport and Feigan ensued, Kanter convinced Feigan to
make Rappaport whole, and Kanter contributed $104,231 to
reimburse Rappaport.

OPINION

A.  <u>The STJ Report</u>

The STJ report recommended findings of fact and conclusions
of law that Kanter was not engaged in a trade or business of
dealing in art, and, therefore, respondent's determination
disallowing the deduction should be sustained.

B.  <u>The Parties' Arguments</u>

Kanter argued the deduction should be permitted because he
made the $104,231 payment to protect his professional reputation

and he felt an obligation to shoulder a share of the loss because he had acted as a "broker". Petitioners' Reply Brief at 1407. Although respondent argued on brief that his determination disallowing the deduction should be sustained, respondent conceded in his objection to the STJ report that this transaction, like several of the transactions Kanter engaged in with The Five, served to demonstrate that Kanter routinely used his business and professional contacts to assist clients in obtaining business or in raising capital for business ventures. Citing the Court of Appeals for the Seventh Circuit's treatment of this issue in <u>Estate of Kanter v. Commissioner</u>, 337 F.3d at 855-856, respondent concedes Kanter is entitled to the disputed deduction. We accept respondent's concession of this issue.

Issue XXI. <u>Whether the Kanters Are Entitled to a Deduction for a Charitable Contribution to the Jewish United Fund for 1982</u> (STJ report at 177-180)

### FINDINGS OF FACT

*Sometime during 1982, Jewish United Fund (JUF) solicited Kanter for a donation. On or about December 17, 1982, THC executed a $15,000 promissory note, payable to Kanter, due on March 1, 1983, and bearing interest at 12 percent per annum. On December 27, 1982, THC enclosed in a letter to JUF (1) the $15,000 promissory note payable to Kanter, and (2) Kanter's completed pledge card for a $15,000 donation to JUF. The*

*December 27, 1982, letter stated:  "THC will pay its note to Kanter, who will, in turn, see to providing these funds to JUF."*

*In a letter to Kanter dated December 30, 1982, JUF acknowledged its receipt of the THC promissory note.  The December 30, 1982, letter further stated that "This note has been assigned by you to \* \* \* JUF as a charitable contribution, and we are pleased to accept it as such."*

*On February 28, 1983, THC paid to Kanter the full $15,000 in principal due on the promissory note, plus interest of $370.  On that same date, Kanter then paid $15,000 to JUF by issuing to JUF his own $15,000 check.  Kanter did not pay over to JUF the $370 in interest he received on the THC promissory note.*

*On their 1982 income tax return, the Kanters claimed a $15,000 charitable deduction for Kanter's contribution to JUF. On their 1983 income tax return, the Kanters reported the $370 in interest THC paid on the THC note as interest income.  Respondent disallowed the $15,000 JUF charitable contribution deduction claimed by the Kanters.*

OPINION

A.  The Parties' Arguments

Petitioners contend they are entitled to a charitable contribution deduction for 1982 of at least $14,700, which they maintain was the THC promissory note's fair market value on the date of its contribution to JUF in December 1982.  Petitioners

assert: "While a small discount for the fact that the note was not to be paid until several months after the date of contribution is perhaps required, there is no basis for disallowing the entire contribution." Petitioners submit that, given the interest rates at the time (as reflected in the IRS's applicable Federal rates, as well as the 12-percent interest rate set in the note itself), the 1982 deduction should be discounted not more than $300.

Respondent contends the Kanters are not entitled to a charitable contribution deduction for 1982 because: (1) There was no endorsement of the THC promissory note by Kanter to JUF, and (2) the Kanters failed to establish the note's fair market value as of the date of its purported contribution to JUF in late 1982.

B. The STJ Report

The STJ report recommended holding that the Kanters are entitled to a charitable contribution deduction of $14,630 for 1982 related to the JUF transaction. We reject the recommendation in the STJ report because it is erroneous as a matter of law.

C. Analysis

Section 170(a) generally provides that a deduction is allowed for a charitable contribution, payment of which is made within the taxable year. Payment to a charity generally occurs

when the donee relinquishes control over the property to the donee.  See, e.g., <u>Goldstein v. Commissioner</u>, 89 T.C. 535, 542 (1988).

The record shows that Kanter did not make a payment to JUF during 1982.  In short, THC forwarded to JUF a $15,000 promissory note payable to Kanter along with a letter which stated:  "THC will pay its note to Kanter, who will, in turn, see to providing these funds to JUF."  In accordance with this letter, THC paid $15,370 to Kanter in February 1983, and Kanter forwarded $15,000 to JUF at that time.

On these facts, it is evident Kanter did not endorse the promissory note over to JUF during 1982 or otherwise relinquish control of the promissory note to JUF at any time.  In the absence of a payment to JUF during 1982 within the meaning of section 170(a), it follows that the Kanters are not entitled to a charitable contribution deduction for 1982.  Nevertheless, Kanter did make a $15,000 charitable contribution to JUF during 1983, and, thus, the Kanters are entitled to a deduction for that year, subject to the adjusted gross income limitations of section 170(b).

Issue XXII.   Whether Kanter Is Liable for Self-Employment
              Tax for 1982 (STJ report at 180-181)[167]

OPINION

Respondent determined in the notice of deficiency for 1982 that Kanter is liable for additional self-employment tax of $848. Inasmuch as respondent's determination turns on the disposition of other adjustments respondent determined for 1982, the amount of Kanter's self-employment tax will be determined in the parties' computations for entry of decision pursuant to Rule 155.

Issue XXIII.   Whether the Kanters Realized Capital Gains and
               Losses as Reported on Their 1987 Tax Return
               (STJ report at 182-198)

Respondent determined in the notice of deficiency issued to the Kanters for 1987 that they were not entitled to capital losses arising from various sales of stocks, bonds, promissory notes, and partnership interests to Mallin, MAF, Inc., Windy City, Inc., and others.  These adjustments were resolved against petitioners and the decision entered by the Court at docket No. 24002-91 for the taxable year 1987 on September 24, 2001, was not

---

[167]   The STJ report recommended alternative holdings that turned on whether the self-employment tax issue was inadvertently omitted from the parties' stipulated settlement.  If so, the STJ report proposed to hold for petitioners.  On the other hand, if the matter was purely computational, the matter would be addressed in the parties' Rule 155 computations.  The Court concludes, on the basis of the manner in which the issue is set forth in the notice of deficiency, that this issue is purely computational.

appealed and is otherwise final.  See secs. 7481(a)(1), 7483.
Consequently, we need not consider this issue.

Issue XXIV.  <u>Additions to Tax and Related Matters</u>

### OPINION

In some of the notices of deficiency issued to the Kanters and/or in amended pleadings filed in the Kanters' cases, respondent determined (as an alternative to respondent's determination the Kanters were liable for additions to tax for fraud) that the Kanters were liable for additions to tax under section 6653 (negligence), section 6659 (substantial valuation overstatement), section 6661 (substantial understatement of tax), and increased interest under section 6621(c).

The STJ report, at 265-293, recommended holding (1) the Kanters were liable for additions to tax under sections 6653, 6659, and 6661 for the years in question, and (2) the Kanters were liable for increased interest for 1980, 1984, 1986, and 1987.

Inasmuch as respondent asserted these additions to tax against Kanter strictly as alternatives to respondent's assertion of the fraud additions (which we sustained above with regard to income Kanter earned from The Five), we need not consider the alternative additions to tax.

To reflect the foregoing,

Appropriate orders will be issued (1) striking from respondent's amendment to answer filed at docket No. 31301-87 increased deficiencies for 1978, and (2) granting respondent's oral motion to conform the pleadings to the proof at docket No. 26251-90, and decisions will be entered pursuant to Rule 155.

APPENDIX 1

Frey's payments to IRA's subsidiary Zeus during 1980-85:

| Date | Payments | Exhibits |
|------|----------|----------|
| 1980 | $127,372 | 12, Stmts. 7, 25, at 7, "Zeus" column; Kuck, Transcr. at 3371-3373. |
| 1981 | 105,764 | 14, at 7, "Zeus" column, ll. 2, 6, and 7; 5814 and 5817; Kuck, Transcr. at 3378-3384 |
| 1982 | 538,781 | 17, at 16, Zeus column, l. 4; Kuck, Transcr. at 3409 |
| 1-17-83 | 6,875 | 224 |
| 2-16-83 | 9,375 | 224 |
| 3-14-83 | 11,875 | 456 |
| 4-19-83 | 7,500 | 456 |
| 5-24-83 | 7,500 | 456 |
| 6-30-83 | 7,500 | 5815, 5818 |
| 7-25-83 | 7,500 | 456 |
| 8-5-83 | 7,500 | 456 |
| 9-7-83 | 7,500 | 456 |
| 10-7-83 | 7,500 | 456 |
| 11-21-83 | 7,250 | 456 |
| 12-16-83 | 7,250 | 224, at 11 |
| 11-3-83 | 15,000 | 456 |
| | 110,125 | 18, at 20 "Zeus" column |
| 1-13-84 | $7,250 | 456 |
| 2-14-84 | 7,250 | 456 |
| 3-15-84 | 7,250 | 456 |
| 4-15-84 | 7,250 | 456 |
| 6-7-84 | 7,250 | 456 |
| | 7,250 | 456 |
| 7-24-84 | 7,250 | 225 |
| | 7,250 | 225 |
| 10-5-84 | 23,392 | 225 |
| | 4,108 | 225 |
| 12-4-84 | 18,000 | 457; 5819 |
| | 103,500 | 19, at 12, "Zeus" column |
| 1-31-85 | 1,625 | 457 (Bates 000022, 000023) |
| 3-29-85 | 3,250 | 457 (Bates 000025, 000024) |
| 4-10-85 | 123,888 | 457 (Bates 000026) |
| | 128,763 | 20, 16, "Zeus" column |
| Total | 1,114,305 | |

APPENDIX 2

Carlco's officers and directors during 1982 through 1989:

| Title | 1982 | 1983 | 1984 |
|---|---|---|---|
| Directors | Kanter | Freeman | -- |
| | Carl Kanter | Meyers | -- |
| President | Carl Kanter | Meyers | Henry Lisle |
| Vice president | Kanter | -- | Donna Lisle |
| Secretary | Meyers | Gallenberger | D. Dubanevich |
| Treasurer | Meyers | Meyers | -- |
| Assistants | Meyers | -- | -- |

| Title | 1985 | 1986 | 1987 |
|---|---|---|---|
| Directors | -- | -- | -- |
| President | Henry Lisle | Henry Lisle | Henry Lisle |
| Vice president | Donna Lisle | Donna Lisle | Donna Lisle |
| Secretary | Dubanevich | Dubanevich | Dubanevich |
| Treasurer | -- | Gallenberger | Gallenberger |
| Assistants | Meyers | Lisle | Lisle |

| Title | 1988 | 1989 |
|---|---|---|
| Directors | -- | -- |
| President | Henry Lisle | Robert Lisle |
| Vice president | Donna Lisle | Thomas Lisle |
| Secretary | Dubanevich | Donna Lisle |
| Treasurer | Gallenberger | Gallenberger |
| Assistants | -- | -- |

Exhs. 67, 2086, 424, 477.

APPENDIX 3

TMT's officers and directors during 1982 through 1989:

| Title | 1982 | 1983 | 1984 |
|-------|------|------|------|
| Directors | Kanter | Freeman | Freeman |
|  | Joshua Kanter | Meyers | Meyers |
|  | Meyers | -- | -- |
| President | Kanter | Meyers | Meyers |
| Vice president | Meyers | -- | -- |
| Secretary | Meyers | Gallenberger | Gallenberger |
| Treasurer | Joshua Kanter | Meyers | Meyers |
| Assistants | Joshua Kanter | | |

| Title | 1985 | 1986 | 1987 |
|-------|------|------|------|
| Directors | Meyers | Gallenberger | Gallenberger |
| President | Meyers | Gallenberger | Gallenberger |
| Vice president | -- | -- | -- |
| Secretary | Gallenberger | Gallenberger | Gallenberger |
| Treasurer | Meyers | Gallenberger | Gallenberger |
| Assistants | | | |

| Title | 1988 | 1989 |
|-------|------|------|
| Directors | Gallenberger | Gallenberger |
| President | Gallenberger | Gallenberger |
| Vice president | -- | -- |
| Secretary | Gallenberger | Gallenberger |
| Treasurer | -- | -- |
| Assistants | -- | -- |

Exh. 91.

APPENDIX 4

BWK's officers and directors during 1982 through 1990:

| Title | 1982 | 1983 | 1984 |
|---|---|---|---|
| Directors | Kanter | Weisgal | Weisgal |
| | Joshua Kanter | -- | -- |
| | Meyers | -- | -- |
| President | Kanter | Weisgal | Weisgal |
| Vice president | Meyers | -- | -- |
| Secretary | Meyers | Meyers | Meyers |
| Treasurer | Meyers | Meyers | Meyers |
| Assistants | -- | -- | -- |

| Title | 1985 | 1986 | 1987 |
|---|---|---|---|
| Directors | Weisgal | Weisgal | Weisgal |
| President | Weisgal | Weisgal | Weisgal |
| Secretary | Gallenberger | Gallenberger | Gallenberger |
| | Kanter | Kanter | -- |
| Secretary | Gallenberger | Gallenberger | Gallenberger |
| Treasurer | -- | -- | -- |
| Assist. sec. | Snedden | Snedden | Snedden |

| Title | 1988 | 1989 | 1990 |
|---|---|---|---|
| Directors | Weisgal | Weisgal | Kanter |
| President | Weisgal | Weisgal | Kanter |
| Vice president | Gallenberger | Gallenberger | -- |
| | Kanter | Kanter | -- |
| Secretary | Gallenberger | Gallenberger | Gallenberger |
| Treasurer | -- | Kanter | -- |
| Assist. sec. | Snedden | Snedden | Snedden |

Exhs. 112, 2009.

APPENDIX 5

During 1984 to 1989, IRA made loans to KWJ Partnership as follows:

| Date | Amount | Exhibit |
|---|---|---|
| 3-22-84 | $3,000 | 29, at 15 |
| 4-24-84 | 3,000 | |
| 5-29-84 | 3,000 | |
| 6-29-84 | 3,000 | |
| 7-30-84 | 3,000 | |
| 9-12-84 | 3,000 | |
| 9-26-84 | 3,000 | |
| 11-7-84 | 4,000 | |
| 11-29-84 | 4,000 | |
| 12-26-84 | 4,000 | |
| 12-31-84 | adj.(3,000) | |
| | 30,000 | |
| | | |
| 1-21-85 | 4,000 | 32, at 13 |
| 2-21-85 | 4,000 | |
| 3-5-85 | 1,500 | |
| 3-22-85 | 4,000 | |
| 4-25-85 | 4,000 | |
| 5-28-85 | 4,000 | |
| 6-24-85 | 4,000 | |
| 7-8-85 | 4,000 | |
| 8-27-85 | 4,000 | |
| 9-23-85 | 4,000 | |
| 10-18-85 | 4,000 | |
| 12-2-85 | 4,000 | |
| | 45,500 | |
| | | |
| 1-3-86 | 4,000 | 33, at 8-9 |
| 1-31-86 | 4,000 | |
| 3-3-86 | 4,000 | |
| 7-8-86 | 2,000 | |
| 7-29-86 | 4,000 | |
| 8-15-86 | 20,000 | |
| | 38,000 | |
| | | |
| 1-8-87 | 20,000 | 9000, at 9 |
| 7-16-87 | 8,000 | |
| 10-20-87 | 12,000 | 34, at 3 |
| 11-30-87 | 8,000 | |
| | 48,000 | |

APPENDIX 5
*(Continued)*

| 3-31-88 | 20,000 | 35, at 3 |
| 11-27-89 | 68,370 | 36, at 5 |
| Total | 249,870 | 9077, Kuck Summary #3 |

APPENDIX 6

During 1985 to 1989, IRA transferred the payments that it received from PMS to Carlco, TMT, and BWK in a 45/45/10 percent split as follows:

| Date | Payments From PMS | IRA Cash Distributions | | | | |
| | | Carlco | TMT | BWK | Total | Exhibit |
|---|---|---|---|---|---|---|
| 1-9-85 | 90,423 | -- | -- | -- | -- | 320 |
| 4-3-85 | 90,423 | -- | -- | -- | -- | 323 |
| 7-1-85 | 90,423 | -- | -- | -- | -- | 325 |
| 10-2-85 | 90,423 | -- | -- | -- | -- | 327 |
| Total | 361,692 | $162,000 | $162,000 | $36,000 | $360,000 | 32, at 15-16 |
| | | | | | | |
| 1-7-86 | 90,423 | -- | -- | -- | -- | 329 |
| 5-15-86 | 90,423 | -- | -- | -- | -- | 330 |
| 7-2-86 | 90,423 | -- | -- | -- | -- | 332 |
| 9-30-86 | 90,423 | -- | -- | -- | -- | 334 |
| Total | 361,692 | $162,370 | $162,370 | $36,082 | $360,822 | 33, at 12 |
| | | | | | | |
| 1-12-87 | 90,423 | -- | -- | -- | -- | 335 |
| 5-1-87 | 90,423 | -- | -- | -- | -- | 336 |
| 7-2-87 | 90,423 | -- | -- | -- | -- | 337 |
| 10-14-87 | 90,423 | -- | -- | -- | -- | 338 |
| Total | 361,692 | $192,313 | $192,313 | $36,169 | $420,795 | 9000, at 11 |
| | | | | | | 34, at 7-8 |
| 1-22-88 | 90,423 | -- | -- | -- | -- | 339 |
| 4-27-88 | 90,423 | -- | -- | -- | -- | 340 |
| 7-18-88 | 90,423 | -- | -- | -- | -- | 341 |
| 10-24-88 | 90,423 | -- | -- | -- | -- | 342 |
| | 361,692 | $162,760 | $162,760 | $36,169 | $316,691 | 35, at 7 |
| | | | | | | |
| 1-9-89 | 90,423 | – | -- | -- | -- | 343 |
| | [1]750,000 | – | -- | -- | -- | |
| | 840,423 | $378,190 | $378,190 | $84,042 | $840,422 | 36, at 8 |
| Total | 2,287,191 | | | | 2,298,730 | |

[1]  This $750,000 payment was remitted by PMS to PSAC per Kanter's instructions.  Nevertheless, PSAC transferred this money to IRA for distribution to Carlco, TMT, and BWK in a 45/45/10 split.

APPENDIX 7

During 1983, THC transferred $2,335,298 to TACI's accounts
as follows:

| Date | Amount | Exhibit |
|------|--------|---------|
| 1-6-83 | $36,000 | 148, at 3 |
| 1-24-83 | 100,000 | 148, at 3 |
| 1-25-83 | 79,164 | 148, at 3 |
| 2-16-83 | 50,000 | 148, at 4 |
| 2-18-83 | 70,000 | 148, at 4 |
| 3-2-83 | 20,000 | 148, at 4 |
| 3-21-83 | 50,000 | 148, at 4 |
| 3-28-83 | 100,000 | 148, at 4 |
| 3-31-83 | 15,000 | 148, at 4 |
| 4-7-83 | 60,000 | 148, at 4 |
| 4-11-83 | 40,000 | 148, at 5 |
| 5-11-83 | 110,000 | 148, at 5 |
| 5-17-83 | 180,000 | 148, at 5 |
| 5-23-83 | 35,000 | 148, at 6 |
| 5-31-83 | 130,000 | 148, at 6 |
| 6-9-83 | 15,000 | 148, at 6 |
| 6-15-83 | 44,000 | 148, at 6 |
| 6-21-83 | 30,000 | 148, at 6 |
| 7-7-83 | 8,600 | 148, at 7 |
| 7-11-83 | 100,000 | 148, at 7 |
| 7-17-83 | 50,000 | 148, at 7 |
| 8-5-83 | 80,000 | 148, at 7 |
| 8-18-83 | 30,000 | 148, at 8 |
| 12-23-83 | 1,000 | 148, at 8 |
| 12-28-83 | 21,000 | 148, at 8 |
| 12-29-83 | 60,000 | 148, at 8 |
| 9-1-83 | 80,000 | 149, at 1 |
| 9-2-83 | 6,100 | 149, at 1 |
| 9-6-83 | 30,000 | 149, at 1 |
| 9-14-83 | 160,000 | 149, at 1 |
| 9-15-83 | 33,334 | 149, at 1 |
| 9-20-83 | 200,000 | 149, at 1 |
| 9-20-83 | 11,100 | 149, at 1 |
| 10-14-83 | 20,000 | 149, at 2 |
| 10-19-83 | 30,000 | 149, at 2 |
| 12-19-83 | 250,000 | 174, at 112 |
| Total | 2,335,298 | |

APPENDIX 8

TACI transferred $1,339,843 to THC during 1983 as follows:

| Bates Stamped | Dated | Check No. | Payable | Amount |
|---|---|---|---|---|
| 0-0002732 | 1-4-83 | 1186 | THC | 95,000 |
| 0-0002756 | 1-11-83 | 1198 | THC | 35,000 |
| 0-0002762 | 1-12-83 | 1201 | THC | 8,000 |
| 0-0002810 | 2-4-83 | 1227 | THC | 60,000 |
| 0-0002868 | 2-25-83 | 1258 | THC | 20,000 |
| 0-0002894 | 3-4-83 | 1271 | THC | 15,000 |
| 0-0002946 | 3-24-83 | 1297 | THC | 18,000 |
| 0-0002958 | 3-30-83 | 1303 | THC | 125,000 |
| 0-0002982 | 4-4-83 | 1315 | THC | 68,000 |
| 0-0003112 | 4-19-83 | 1405 | THC | 25,000 |
| 0-0003162 | 5-9-83 | 1432 | THC | 106,000 |
| 0-0003166 | 5-10-83 | 1434 | THC | 50,000 |
| 0-0003184 | 5-17-83 | 1444 | THC | 15,000 |
| 0-0003192 | 5-26-83 | 1448 | THC | 59,843 |
| 0-0003214 | 6-2-83 | 1461 | THC | 25,000 |
| 0-0003218 | 6-3-83 | 1463 | THC | 30,000 |
| 0-0003270 | 6-29-83 | 1491 | THC | 28,000 |
| 0-0003356 | 8-11-83 | 1538 | THC | 10,000 |
| 0-0003374 | 8-15-83 | 1547 | THC | 5,000 |
| 0-0003378 | 8-15-83 | 1549 | THC | 41,000 |
| 0-0003380 | 8-16-83 | 1551 | THC | 16,000 |
| 0-0003466 | 9-21-83 | 1602 | THC | 50,000 |
| 0-0003468 | 9-23-83 | 1603 | THC | 76,000 |
| 0-0003496 | 10-3-83 | 1618 | THC | 43,000 |
| 0-0003512 | 10-6-83 | 1627 | THC | 15,000 |
| 0-0003514 | 10-6-83 | 1628 | THC | 20,000 |
| 0-0003532 | 10-18-83 | 1639 | THC | 10,000 |
| 0-0003582 | 10-25-83 | 1664 | THC | 30,000 |
| 0-0003586 | 10-25-83 | 1666 | THC | 8,000 |
| 0-0003588 | 10-25-83 | 1667 | THC | 8,000 |
| 0-0003590 | 10-25-83 | 1668 | THC | 53,000 |
| 0-0003594 | 10-26-83 | 1670 | THC | 15,000 |
| 0-0003622 | 11-4-83 | 1685 | THC | 1,500 |
| 0-0003658 | 11-23-83 | 1705 | THC | 15,000 |
| 0-0003662 | 11-28-83 | 1707 | THC | 60,000 |
| 0-0003686 | 12-7-83 | 1720 | THC | 10,000 |
| 0-0003752 | 12-28-83 | 1756 | THC | 50,000 |
| 0-0003762 | 12-30-83 | 1761 | THC | 20,500 |
| Total | | | | 1,339,843 |

Exh. 5406.

APPENDIX 9

THC transferred $1,194,000 to TACI during 1984 as follows:

| Date | Amount | Exhibit |
|------|--------|---------|
| 2-10-84 | $25,000 | 149, at 3 |
| 2-16-84 | 1,000 | 149, at 3 |
| 2-16-84 | 1,000 | 149, at 3 |
| 3-15-84 | 20,000 | 149, at 4 |
| 4-13-84 | 60,000 | 149, at 4 |
| 4-18-84 | 10,000 | 149, at 4 |
| 4-25-84 | 50,000 | 149, at 4 |
| 5-23-84 | 13,000 | 149, at 5 |
| 7-20-84 | 50,000 | 149, at 5 |
| 8-10-84 | 30,000 | 149, at 6 |
| 8-24-84 | 37,000 | 149, at 6 |
| 9-10-84 | 125,000 | 150, at 1 |
| 9-21-84 | 20,000 | 150, at 1 |
| 10-2-84 | 110,000 | 150, at 1 |
| 10-10-84 | 30,000 | 150, at 1 |
| 11-14-84 | 345,000 | 150, at 1 |
| 11-15-84 | 140,000 | 150, at 1 |
| 11-21-84 | 37,000 | 150, at 1 |
| 12-31-84 | 90,000 | 150, at 2 |
| Total | 1,194,000 | |

APPENDIX 10

TACI transferred $756,300 to THC during 1984 as follows:

| Bates Stamped | Dated | Check No. | Payable | Amount |
|---|---|---|---|---|
| 0-0003766 | 1-4-84 | 1763 | THC | $2,650 |
| 0-0003768 | 1-4-84 | 1764 | THC | 2,650 |
| 0-0003804 | 1-13-84 | 1785 | THC | 25,000 |
| 0-0003826 | 1-24-84 | 1797 | THC | 1,000 |
| 0-0003828 | 1-24-84 | 1798 | THC | 1,000 |
| 0-0003854 | 1-31-84 | 1811 | THC | 1,000 |
| 0-0003890 | 2-13-84 | 1829 | THC | 500 |
| 0-0003892 | 2-13-84 | 1830 | THC | 500 |
| 0-0003894 | 2-13-84 | 1831 | THC | 5,000 |
| 0-0003898 | 2-14-84 | 1833 | THC | 39,000 |
| 0-0003938 | 2-17-84 | 1853 | THC | 9,000 |
| 0-0003974 | 3-7-84 | 1872 | THC | 106,000 |
| 0-0004002 | 3-22-84 | 1887 | THC | 90,000 |
| 0-0004016 | 3-26-84 | 1894 | THC | 12,000 |
| 0-0004076 | 4-19-84 | 1927 | THC | 5,000 |
| 0-0004106 | 5-1-84 | 1942 | THC | 55,000 |
| 0-0004160 | 5-3-84 | 1970 | THC | 27,000 |
| 0-0004298 | 6-21-84 | 2039 | THC | 117,000 |
| 0-0004318 | 6-28-84 | 2049 | THC | 40,000 |
| 0-0004324 | 6-29-84 | 2052 | THC | 15,000 |
| 0-0004330 | 7-2-84 | 2057 | THC | 5,000 |
| 0-0004348 | 7-3-84 | 2067 | THC | 20,000 |
| 0-0004378 | 7-11-84 | 2084 | THC | 25,000 |
| 0-0004414 | 7-25-84 | 2106 | THC | 50,000 |
| 0-0004500 | 8-23-84 | 2153 | THC | 29,000 |
| 0-0004670 | 10-24-84 | 2247 | THC | 4,000 |
| 0-0004692 | 10-30-84 | 2260 | THC | 2,000 |
| 0-0004698 | 11-1-84 | 2263 | THC | 5,000 |
| 0-0004754 | 12-4-84 | 2294 | THC | 5,000 |
| 0-0004784 | 12-13-84 | 2311 | THC | 7,000 |
| 0-0004794 | 12-18-84 | 2316 | THC | 15,000 |
| 0-0004800 | 12-20-84 | 2321 | THC | 20,000 |
| 0-0004804 | 12-21-84 | 2323 | THC | 7,000 |
| 0-0004786 | 12-14-84 | 2312 | THC | 8,000 |
| Total | | | | 756,300 |

Exh. 5406.

APPENDIX 11

During 1983, $407,458 was transferred from the TACI account
to Kanter's personal bank account purportedly as loans, as
follows:

| Bates Stamped Deposited | Dated | Check No. | Payable | Amount | Memo |
|---|---|---|---|---|---|
| 0-0002988 | 4-5-83 | 1318 | Burton Kanter | $15,000 | -- |
| 0-0003160 | 5-9-83 | 1431 | Burton Kanter | 55,000 | -- |
| 0-0003282 | 7-5-83 | 1497 | Burton Kanter | 50,000 | -- |
| 0-0003284 | 7-6-83 | 1498 | Burton Kanter | 2,000 | -- |
| 0-0003288 | 7-7-83 | 1500 | Burton Kanter | 1,000 | Loan |
| 0-0003296 | 7-12-83 | 1504 | Burton Kanter | 35,000 | Loan |
| 0-0003314 | 7-19-83 | 1514 | Burton Kanter | 15,000 | -- |
| 0-0003332 | 7-25-83 | 1525 | Burton Kanter | 25,000 | Loan |
| 0-0003396 | 8-25-83 | 1560 | Burton Kanter | 5,000 | -- |
| 0-0003402 | 8-26-83 | 1563 | Burton Kanter | 5,000 | -- |
| 0-0003404 | 8-30-83 | 1565 | Burton Kanter | 55,000 | Loan |
| 0-0003410 | 8-31-83 | 1568 | Burton Kanter | 25,000 | Loan |
| 0-0003452 | 9-16-83 | 1595 | Burton Kanter | 22,000 | Loan |
| 0-0003464 | 9-20-83 | 1601 | Burton Kanter | 5,000 | Loan |
| 0-0003478 | 9-27-83 | 1608 | Burton Kanter | 5,000 | Loan |
| 0-0003526 | 10-17-83 | 1635 | Burton Kanter | 5,000 | Loan |
| 0-0003530 | 10-18-83 | 1638 | Burton Kanter | 2,500 | Loan |
| 0-0003534 | 10-18-83 | 1640 | Burton Kanter | 5,000 | Loan |
| 0-0003538 | 10-19-83 | 1642 | Burton Kanter | 1,500 | -- |
| 0-0003548 | 10-21-83 | 1647 | Burton Kanter | 1,000 | Loan |
| 0-0003554 | 10-21-83 | 1650 | Burton Kanter | 2,000 | Loan |
| 0-0003578 | 10-24-83 | 1662 | Burton Kanter | 1,500 | Loan |
| 0-0003596 | 10-28-83 | 1671 | Burton Kanter | 42,958 | Loan |
| 0-0003678 | 12-6-83 | 1716 | Burton Kanter | 6,000 | Loan |
| 0-0003708 | 12-15-83 | 1732 | Burton Kanter | 10,000 | Loan |
| 0-0003756 | 12-29-83 | 1758 | Burton Kanter | 10,000 | Loan |
| Total | | | | 407,458 | |

Exh. 5407.

APPENDIX 12

During 1984, $909,000 was transferred from the TACI Special account to Kanter's personal bank account purportedly as loans, as follows:

| Bates No. | Dated | Check No. | Payable | Amount | Memo |
|---|---|---|---|---|---|
| 0-0003812 | 1-19-84 | 1789 | Burton Kanter | $25,000 | Loan |
| 0-0003824 | 1-24-84 | 1796 | Burton Kanter | 5,000 | -- |
| 0-0003844 | 1-27-84 | 1806 | Burton Kanter | 2,000 | Loan |
| 0-0003852 | 1-31-84 | 1810 | Burton Kanter | 2,000 | Loan |
| 0-0003880 | 2-7-84 | 1824 | Burton Kanter | 25,000 | Loan |
| 0-0003902 | 2-14-84 | 1835 | Burton Kanter | 5,000 | Loan |
| 0-0003922 | 2-16-84 | 1845 | Burton Kanter | 5,000 | Loan |
| 0-0003942 | 2-23-84 | 1855 | Burton Kanter | 20,000 | Loan |
| 0-0003952 | 3-1-84 | 1861 | Burton Kanter | 15,000 | Loan |
| 0-0003956 | 3-2-84 | 1863 | Burton Kanter | 6,000 | Loan |
| 0-0004004 | 3-22-84 | 1888 | Burton Kanter | 10,000 | Loan |
| 0-0004028 | 3-29-84 | 1900 | Burton Kanter | 26,000 | Loan |
| 0-0004082 | 4-23-84 | 1930 | Burton Kanter | 2,500 | Loan |
| 0-0004092 | 4-27-84 | 1935 | Burton Kanter | 30,000 | Loan |
| 0-0004174 | 5-15-84 | 1977 | Burton Kanter | 30,000 | Loan |
| 0-0004194 | 5-17-84 | 1987 | Burton Kanter | 5,000 | Loan |
| 0-0004198 | 5-21-84 | 1989 | Burton Kanter | 70,000 | Loan |
| 0-0004208 | 5-23-84 | 1994 | Burton Kanter | 5,000 | Loan |
| 0-0004210 | 5-24-84 | 1995 | Burton Kanter | 5,000 | Loan |
| 0-0004222 | 5-30-84 | 2001 | Burton Kanter | 10,000 | Loan |
| 0-0004230 | 5-31-84 | 2005 | Burton Kanter | 4,000 | Loan |
| 0-0004234 | 6-1-84 | 2007 | Burton Kanter | 1,000 | -- |
| 0-0004272 | 6-13-84 | 2026 | Burton Kanter | 1,500 | Loan |
| 0-0004274 | 6-14-84 | 2027 | Burton Kanter | 55,000 | Loan |
| 0-0004784 | 6-20-84 | 2032 | Burton Kanter | 20,000 | Loan |
| 0-0004296 | 6-21-84 | 2038 | Burton Kanter | 5,000 | -- |
| 0-0004312 | 6-26-84 | 2046 | Burton Kanter | 10,000 | Loan |
| 0-0004342 | 7-3-84 | 2064 | Burton Kanter | 15,000 | Loan |
| 0-0004366 | 7-9-84 | 2077 | Burton Kanter | 15,000 | -- |
| 0-0004376 | 7-11-84 | 2082 | Burton Kanter | 5,000 | Loan |
| 0-0004382 | 7-17-84 | 2086 | Burton Kanter | 17,000 | Loan |
| 0-0004406 | 7-24-84 | 2101 | Burton Kanter | 15,000 | Loan |
| 0-0004432 | 8-1-84 | 2118 | Burton Kanter | 10,000 | Loan |
| 0-0004460 | 8-8-84 | 2132 | Burton Kanter | 10,000 | Loan |
| 0-0004482 | 8-17-84 | 2143 | Burton Kanter | 20,000 | Loan |
| 0-0004488 | 8-21-84 | 2146 | Burton Kanter | 56,000 | Loan |
| 0-0004492 | 8-22-84 | 2149 | Burton Kanter | 70,000 | Loan |
| 0-0004564 | 9-14-84 | 2187 | Burton Kanter | 6,000 | Loan |

APPENDIX 12
*(Continued)*

| 0-0004572 | 9-17-84 | 2191 | Burton Kanter | 55,000 | Loan |
|-----------|---------|------|---------------|--------|------|
| 0-0004576 | 9-18-84 | 2196 | Burton Kanter | 7,000 | Loan |
| 0-0004586 | 9-24-84 | 2202 | Burton Kanter | 5,000 | Loan |
| 0-0004608 | 10-3-84 | 2216 | Burton Kanter | 175,000 | Loan |
| 0-0004618 | 10-5-84 | 2221 | Burton Kanter | 8,000 | Loan |
| 0-0004728 | 11-20-84 | 2280 | Burton Kanter | 15,000 | Loan |
| 0-0004732 | 11-21-84 | 2283 | Burton Kanter | 5,000 | Loan |
| Total | | | | 909,000 | |

Exh. 5407.

APPENDIX 13

During 1983, $24,000 was transferred from the TACI account to Kanter's personal bank account purportedly as retainer fees, as follows:

| Date | Amount | Exhibit |
|------|--------|---------|
| 1-3-83 | $2,000 | 148, at 3 |
| 2-2-83 | 2,000 | 148, at 3 |
| 3-14-83 | 2,000 | 148, at 4 |
| 3-31-83 | 2,000 | 148, at 4 |
| 5-2-83 | 2,000 | 148, at 5 |
| 6-1-83 | 2,000 | 148, at 6 |
| 6-27-83 | 2,000 | 148, at 7 |
| 8-1-83 | 2,000 | 148, at 7 |
| 9-2-83 | 2,000 | 149, at 1 |
| 9-20-83 | 2,000 | 149, at 1 |
| 11-1-83 | 2,000 | 149, at 2 |
| 12-1-83 | 2,000 | 149, at 2 |
| Total | 24,000 | |

APPENDIX 14

During 1984, $24,000 was transferred from the TACI account to Kanter's personal bank account purportedly as retainer fees, as follows:

| Date | Amount | Exhibit |
|------|--------|---------|
| 1-3-84 | $2,000 | 149, at 3 |
| 2-2-84 | 2,000 | 149, at 3 |
| 3-1-84 | 2,000 | 149, at 4 |
| 4-3-84 | 2,000 | 149, at 4 |
| 5-1-84 | 2,000 | 149, at 4 |
| 7-3-84 | 2,000 | 149, at 5 |
| 8-1-84 | 2,000 | 149, at 6 |
| 8-30-84 | 2,000 | 149, at 6 |
| 10-1-84 | 2,000 | 150, at 1 |
| 11-1-84 | 2,000 | 150, at 1 |
| 12-4-84 | 2,000 | 150, at 1 |
| 12-6-84 | 2,000 | 150, at 1 |
| Total | 24,000 | |

APPENDIX 15

During 1984, $161,000 was transferred from the TACI account
to Kanter's personal bank account purportedly as loans, as
follows:

| Date | Check No. | Payable to | Amount | Check Memo |
|---|---|---|---|---|
| 3-16-84 | 1878 | Burton Kanter | $106,000 | Loan |
| 3-23-84 | 1890 | Burton Kanter | 25,000 | Loan |
| 8-9-84 | 1975 | Burton Kanter | 5,000 | Loan |
| 8-13-84 | 2136 | Burton Kanter | 5,000 | Loan |
| 9-27-84 | 2207 | Burton Kanter | 10,000 | Loan |
| 11-27-84 | 2287 | Burton Kanter | 10,000 | Loan |
| Total | | | 161,000 | |

Exh. 9078; Kuck, Transcr. at 3482-3490.

APPENDIX 16

The IRS issued the following summonses:

| Summons Issued to | Tax Year | Date of Summons | Exhibit |
|---|---|---|---|
| Claude Ballard | 1984 | July 25, 1991 | 484 |
| Linda Gallenberger (In the matter of Claude & Mary Ballard) | 1984 | Jan. 10, 1991 | 485 |
| Linda Gallenberger (In the matter of Robert Lisle & Donna Lisle) | 1984 | Jan. 10, 1991 | 486 |
| Linda Gallenberger (In the matter of Claude & Mary Ballard) | 1984 | Jan. 10, 1991 | 487 |
| Donna Lisle | 1984 | July 30, 1991 | 488 |
| Linda Gallenberger | 1984 | Jan. 10, 1991 | 489 |
| Robert Lisle | 1988 | July 30, 1991 | 490 |
| Linda Gallenberger Officer, PSAC (In the matter of Robert Lisle & Donna Lisle) | 1984 | Jan. 10, 1991 | 491 |
| PSAC (In the matter of Burton & Naomi Kanter) | 1983, 1985-88 | Oct. 1, 1990 | 9046 |
| Mildred Schott (In the matter of Burton & Naomi Kanter) | 1983, 1985-88 | Apr. 30, 1990 | 492 |

Lunk, Transcr. at 1045-1052.

APPENDIX 17

Original and additional beneficiaries of the Bea Ritch

Trusts:

| Trust Name | Original Beneficiaries | Additional Beneficiaries |
|---|---|---|
| BWK Trust | Burton Kanter | JSK 1st Trust #5<br>JSK 2d Trust #5<br>JSK 3d Trust #5 |
| Naomi Trust | Naomi Kanter | JSK 3d Trust #19<br>JSK 1st Trust #20 |
| BN Trust | Burton & Naomi | JSK 1st Trust #4<br>JSK 2d Trust #4<br>JSK 3d Trust #4 |
| Joel Trust | Burton & Joel Kanter | JSK 1st Trust #17<br>JSK 2d Trust #17 |
| Janis Trust | Burton & Janis Kanter | JSK 3d Trust #15<br>JSK 1st Trust #16 |
| Joshua Trust | Burton & Joshua Kanter | JSK 2d Trust #18<br>JSK 3d Trust #18 |
| Joel Childrens Trust | Burton & Naomi Joel & Joel's children living | JSK 3d Trust #17<br>JSK 1st Trust #18 |
| Janis Childrens Trust | Burton & Naomi Janis & Janis's children living from time to time | JSK 2d Trust #16<br>JSK 3d Trust #16 |
| Joshua Childrens Trust | Burton & Naomi Joshua & Joshua's children living from time to time | JSK 1st Trust #19<br>JSK 2d Trust #19 |
| JL-1 Trust | Burton & Joel Harriet Blum & Joel's 1st child | JSK 3d Trust #11<br>JSK 1st Trust #12 |

APPENDIX 17
*(Continued)*

| JL-2 Trust | Burton & Joel Debbie Blum & Joel's 2d child | JSK 2d Trust #12 JSK 3d Trust #12 |
|---|---|---|
| JL-3 Trust | Burton & Joel Jeff Blum & Joel's 3d child | JSK 1st Trust #13 JSK 2d Trust #13 |
| JA-1 Trust | Burton & Janis Henry Krakow Janis's 1st child | JSK 1st Trust #9 JSK 2d Trust #9 JSK 3d Trust #9 |
| JA-2 Trust | Burton & Janis Helen Krakow & Janis's 3d child | JSK 1st Trust #10 JSK 2d Trust #10 JSK 3d Trust #10 |
| JA-3 Trust | Burton & Janis Evelyn Krakow & Janis's 3d child | JSK 1st Trust #11 JSK 2d Trust #11 |
| JS-1 Trust | Burton & Joshua Gerald L. Kanter & Joshua's 1st child | JSK 3d Trust #13 JSK 1st Trust #14 |
| JS-2 Trust | Burton & Joshua Ruth Kanter & Joshua's 2d child | JSK 2d Trust #14 JSK 3d Trust #14 |
| JS-3 Trust | Burton & Joshua Joshua's 3d child & all of the children of Gerald L. Kanter living from time to time | JSK 1st Trust #15 JSK 2d Trust #15 |
| BK Childrens Trust | Burton, Naomi, & all of the children of the grantor's son living from time to time | JSK 1st Trust #1 JSK 2d Trust #1 JSK 3d Trust #1 |

APPENDIX 17
*(Continued)*

| | | |
|---|---|---|
| BK Descendants' Trust | Burton, Naomi, & all of the descendants of the grantor's son living from time to time | JSK 1st Trust #2<br>JSK 2d Trust #2<br>JSK 3d Trust #2 |
| BK Grandchildren's Trust | Burton, Naomi, & Burton's grandchildren living from time to time | JSK 1st Trust #3<br>JSK 2d Trust #3<br>JSK 3d Trust #3 |
| Lillian Trust | Burton, Naomi, & Lillian Wilsker | JSK 2d Trust #20<br>JSK 3d Trust #20 |
| J-1 Wifes Trust | Burton, Joel's wife & the children of Carl I. Kanter living from time to time | JSK 1st Trust #6<br>JSK 2d Trust #6<br>JSK 3d Trust #6 |
| J-2 Husbands Trust | Burton & Janis's husband & the children of Aloysius B. and Helene M. Osowski | JSK 1st Trust #7<br>JSK 2d Trust #7<br>JSK 3d Trust #7 |
| J-3 Wifes Trust | Burton, Joshua's wife & Ruth & Philip Loshin | JSK 1st Trust #8<br>JSK 2d Trust #8<br>JSK 3d Trust #8 |

Exhs. 135, 9187, 9269, 9270, 9271.